## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HE DEPU, *et al.*

                Plaintiffs,

      v.

YAHOO! INC., *et al.*

                Defendants.

No. 1:17-635-JDB

Judge John D. Bates

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**

NATURE OF THE ACTION ........................................................................... 1

JURISDICTION AND VENUE ...................................................................... 3

PARTIES ........................................................................................................ 3

    A.    Plaintiffs ........................................................................................ 3

    B.    Defendants .................................................................................... 8

        1.    The Yahoo Defendants ..................................................... 8

        2.    Estate of Harry Wu ........................................................... 9

        3.    Laogai Research Foundation and Laogai Research Foundation-CA .......... 9

        4.    Laogai Human Rights Organization ................................. 9

        5.    Yahoo Human Rights Fund Trust ................................... 10

        6.    Doe Defendants ............................................................... 10

STATEMENT OF FACTS ............................................................................ 10

    A.    Yahoo Was Sued in 2007 for Providing Information about Dissidents to Chinese Government, Leading to Their Imprisonment ....................................... 10

    B.    The Trust Is Established as a Condition of the Settlement of the 2007 Lawsuit .. 12

    C.    The Yahoo Defendants Exercised Considerable Control over Trust Assets and Were Trustees with Important Fiduciary Responsibilities.................................... 16

    D.    Trust Assets Are Systematically and Unlawfully Depleted by Wu and the LRF in Contravention of the Trust's Purpose, while the Yahoo Defendants Willfully Ignore Red Flags ....................................................................... 19

    E.    Yahoo Repeatedly Denies Responsibility for the Trust........................................ 25

    F.    The Yahoo Defendants Were Well Aware of the Misconduct and Were Repeatedly and Directly Warned .................................................. 28

    G.    Yahoo Touts the Trust and Uses It to Defeat Shareholder Proposals.................. 31

    H.    Defendants' Failure to Administer the Trust for the Benefit of Imprisoned Chinese Dissidents ...................................................................... 33

ALTER EGO ALLEGATIONS.................................................................... 35

STANDING ALLEGATIONS ...................................................................... 36

STATUTE OF LIMITATIONS ALLEGATIONS ........................................ 37

FIRST CLAIM FOR RELIEF ...................................................................... 38

SECOND CLAIM FOR RELIEF ................................................................. 40

THIRD CLAIM FOR RELIEF ........................................................................................................ 40

FOURTH CLAIM FOR RELIEF .................................................................................................... 41

FIFTH CLAIM FOR RELIEF ........................................................................................................ 41

SIXTH CLAIM FOR RELIEF........................................................................................................ 42

SEVENTH CLAIM FOR RELIEF ................................................................................................. 42

PRAYER FOR RELIEF ................................................................................................................. 43

Plaintiffs He Depu ("Mr. He"), Yang Zili ("Yang"), Li Dawei ("Li"), Wang Jinbo ("Wang"), Ouyang Yi ("Ouyang"), Xu Yonghai ("Xu"), Xu Wanping ("Xu W."), and Yu Ling ("Yu") bring this action based upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, against Yahoo! Inc. ("Yahoo"), Michael Callahan ("Callahan"), Ronald Bell ("Bell"), the Estate of Harry Wu ("Wu"), the Laogai Human Rights Organization ("LHRO"), the Laogai Research Foundation, Laogai Research Foundation-CA (together with the Laogai Research Foundation, "LRF"), other Doe defendants currently unknown to Plaintiffs (Yahoo, Callahan, Bell, Wu, LHRO, LRF, and Doe defendants are collectively referred to as "Defendants"), and the Yahoo Human Rights Fund Trust ("Trust") as a nominal defendant, as follows:

## NATURE OF THE ACTION

1.      This action arises from a secretive and years-long course of conduct, including breaches of trust and fiduciary duty, surrounding: (1) the operation of a fund originally entrusted for the charitable purpose of providing humanitarian and legal assistance to Chinese dissidents imprisoned for exercising their freedom of expression online; (2) the depletion of Trust assets to such an extent that it constituted a the breach of that purpose (and of the Settlement [defined below] that gave rise to the Trust in the first place); and (3) the termination of that purpose completely. That course of conduct, and Defendants' efforts to keep facts about it hidden, would likely have succeeded, were it not for Plaintiffs' investigation, and this lawsuit.

2.      Still, the true facts—including even the basic question of what, if anything, is left of the Trust corpus—remain obscure. Only a reasonable opportunity for discovery can provide the needed clarity, and answer the central question of this lawsuit: how did things go so wrong, when they started out with such promise?

1

3.      Indeed, the only reason light is now finally being shed on these facts is that Plaintiffs—residents of China who speak little or no English and who placed their trust and confidence in Defendants, their fiduciaries—conducted an investigation beyond what could have been expected of a reasonable person in their circumstances, which, in some cases, included being in Chinese prison while these events unfolded. Indeed, from their homes in China, and with little understanding of the American legal system, Plaintiffs and their allies managed to uncover key pieces of information that Defendants had attempted to keep secret over the years, including internal emails and documents, yielding the factual bases for this lawsuit. They and their allies tracked down former employees, who provided them with key documents and information relating to the Trust. They and their allies also gained the attention of prominent journalists, who obtained and reported additional facts and documents previously kept hidden by Defendants.

4.      For example, in 2016, Plaintiffs' investigation unearthed previously confidential information showing that, contrary to Yahoo's repeated representations that it had no authority over the Trust, Yahoo actually exercised considerable control over Trust assets and was a trustee of the Trust from the very outset. As another example, in 2016, Plaintiffs' investigation showed that Yahoo well understood this fact, as evidenced by various half-hearted and previously undisclosed attempts to ensure that the Trust's humanitarian purpose was carried out, again contradicting Yahoo's representations that it had no authority over the Trust.

5.      And yet, the truth about the nature and scope of the misconduct remains elusive, and will only be revealed with a reasonable opportunity for discovery.

6.      Indeed, even *without* discovery, this lawsuit is beginning to shed light on new facts. For example, a document filed in this lawsuit has revealed that in 2009, there was an

attempt to "amend" the Settlement that gave rise to the Trust, an "amendment" that the plaintiffs in the underlying lawsuit were never informed of and that has never been public until now. Another document filed in this lawsuit revealed that in 2009, the Trust's trustees carved out $3.55 million from the Trust, to be placed in a separate trust, to resolve claims against Yahoo.[1] Plaintiffs believe that discovery will yield further evidence of wrongdoing with respect to the administration of the Trust.

## JURISDICTION AND VENUE

7.      This action arises under the laws of the District of Columbia, including the common law of the District of Columbia, and the District of Columbia Uniform Trust Code.

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because it is an action between citizens of a State and citizens of a foreign state, and the amount in controversy exceeds $75,000.

9.      Venue is proper in the District Court for the District of Columbia, pursuant to 28 U.S.C. § 1391(b)-(d), because a substantial part of the unlawful conduct occurred in the District of Columbia, and because a substantial part of the property that is the subject of this action is located in the District of Columbia.

## PARTIES

### A.      Plaintiffs

10.      Plaintiff He Depu (defined above as "Mr. He") is a citizen and resident of China, domiciled in Beijing. He was detained on November 4, 2002 and was eventually charged and

---

[1] This separate trust was entitled the Yahoo! Irrevocable Human Rights Trust 2009, but its precise nature and purpose, including the Declaration of Trust document itself, were not made public, and were not known to Plaintiffs, until this lawsuit.

convicted of "inciting subversion of state power."[2] The evidence at trial consisted largely of his email communications and "provocative" articles published online or with his signature, including evidence transmitted through Mr. He's Yahoo email account. The verdict repeatedly quoted from evidence obtained by the Beijing Municipal Public Security Bureau's "Public Information Cyberspace Security Division." On November 6, 2003, Mr. He was sentenced to eight years' imprisonment by the Beijing Municipal First Intermediate People's Court. Mr. He was released in 2011. Mr. He is a beneficiary of the Trust's humanitarian purpose. Mr. He was injured by: (1) the depletion of Trust assets to such an extent that it constituted a breach of that purpose; and (2) the termination of that purpose completely. Mr. He, who continues to voice dissenting opinions in China, cannot receive funding if he is imprisoned because of the depletion of Trust assets and the termination of the Trust's humanitarian purpose.

11.   Plaintiff Yang Zili (defined above as "Yang") is a citizen and resident of China, domiciled in Beijing. On March 13, 2001, Yang was detained by Chinese authorities on suspicion of "subversion of state power," and was eventually convicted. The verdict against Yang accused him of "using the Internet to publicize essays, and preparing to organize a website and online publication," as well as "using the Internet to publicize" political commentary, and cited evidence and information transmitted through Yang's Yahoo email account. On May 28, 2003, Yang was sentenced to 8 years' imprisonment by the Beijing Municipal Intermediate People's Court. The Beijing Supreme People's Court upheld the sentence after appeal on November 6, 2003. Yang was released in March 2009. Yang is a beneficiary of the Trust's humanitarian purpose. He was injured by: (1) the depletion of Trust assets to such an extent that

---

[2] Quotations from Chinese proceedings have been translated from the original Chinese.

it constituted a breach of that purpose; and (2) the termination of that purpose completely. Yang, who continues to voice dissenting opinions in China, cannot receive funding if he is imprisoned because of the depletion of Trust assets and the termination of the Trust's humanitarian purpose.

12.     Plaintiff Li Dawei (defined above as "Li") is a citizen and resident of China, domiciled in Tianshui city, Gansu province. Li was detained on April 15, 2001, on charges of "subversion of state power," and was eventually convicted. The verdict against him said that his "criminal" activities included using the Internet to publicize an open letter, and "using the Internet" to send letters to activists outside of China, as well as using the Internet to collect information. This included activity conducted using Li's Yahoo email account. The Tianshui Municipal Intermediate People's Court in Gansu Province sentenced Li to 11 years' imprisonment on July 17, 2003. Li was released in 2012. Li is a beneficiary of the Trust's humanitarian purpose. He was injured by: (1) the depletion of Trust assets to such an extent that it constituted a breach of that purpose; and (2) the termination of that purpose completely. Li, who continues to voice dissenting opinions in China, cannot receive funding if he is imprisoned because of the depletion of Trust assets and the termination of the Trust's humanitarian purpose.

13.     Plaintiff Wang Jinbo (defined above as "Wang") is a citizen and resident of China, domiciled in Linyi city, Shandong province. Wang was detained on May 24, 2001, for "inciting subversion of state power," was eventually convicted on December 4, 2001, and sentenced to four years' imprisonment by the Linyi Municipal Intermediate People's Court in Shandong Province. The verdict was based in part on Wang's exercise of his freedom of expression, and on activity conducted using Wang's Yahoo email account. Wang was released in 2005. Wang is a beneficiary of the Trust's humanitarian purpose. He was injured by: (1) the depletion of Trust assets to such an extent that it constituted a breach of that purpose; and (2) the termination of that

purpose completely. Wang, who continues to voice dissenting opinions in China, cannot receive funding if he is imprisoned because of the depletion of Trust assets and the termination of the Trust's humanitarian purpose.

14.    Plaintiff Ouyang Yi (defined above as "Ouyang") is a citizen and resident of China, domiciled in Suining city, Sichuan province. Ouyang was detained by the Chengdu Municipal Public Security Bureau on December 5, 2002 and was eventually convicted on charges of "incitement of subversion of state power." The verdict against him cited email evidence, including an open letter to the Chinese Communist Party distributed via email, and "sent using email to overseas websites and propagated online," and other evidence and information transmitted through, and activities conducted using Ouyang's Yahoo email account. On March 1, 2004, the Chengdu Municipal Intermediate People's Court in Sichuan Province sentenced Ouyang to two years' imprisonment. Ouyang was released in 2006. Ouyang is a beneficiary of the Trust's humanitarian purpose. He was injured by: (1) the depletion of Trust assets to such an extent that it constituted a breach of that purpose; and (2) the termination of that purpose completely. Ouyang, who continues to voice dissenting opinions in China, cannot receive funding if he is imprisoned because of the depletion of Trust assets and the termination of the Trust's humanitarian purpose.

15.    Plaintiff Xu Yonghai (defined above as "Xu") is a citizen and resident of China, domiciled in Beijing. On October 13, 2003, Xu was arrested in Hangzhou and charged with "suspicion of illegally providing state secrets and information" outside of China. The charges related to an investigative report Xu and others had compiled on the persecution of Christian "house churches" in China. The verdict against Xu cited evidence that this report had "been provided to foreign personnel through email." Xu used his Yahoo email account to transmit

6

some of the evidence cited against him. On August 6, 2004, Xu was sentenced to two years' imprisonment. Xu was released in 2006. Xu is a beneficiary of the Trust's humanitarian purpose. He was injured by: (1) the depletion of Trust assets to such an extent that it constituted a breach of that purpose; and (2) the termination of that purpose completely. Xu, who continues to voice dissenting opinions in China, cannot receive funding if he is imprisoned because of the depletion of Trust assets and the termination of the Trust's humanitarian purpose.

16.     Plaintiff Xu Wanping (defined above as "Xu W.") is a citizen and resident of China, domiciled in Chongqing. Xu W. has served a total of 20 years in prison for political dissent, most recently from 2005 to 2014. Xu W. was released from prison on April 29, 2014. The verdict against Xu W. relied on Xu W.'s online activity as evidence, including emails and articles Xu. W. sent, received, and published using his Yahoo email account. Xu W. is still an active political dissident and activist. In early 2016, Xu W. applied for funding from the Trust. Defendant Harry Wu responded in March 2016, informing Xu W. that the Trust was no longer providing humanitarian assistance to imprisoned Chinese dissidents, terminating the humanitarian purpose of the Trust. Xu W. is a beneficiary of the Trust's humanitarian purpose. As such, he was injured by: (1) the depletion of Trust assets to such an extent that it constituted a breach of that purpose; (2) the termination of that purpose completely; and (3) being denied funding as a result of that termination. Xu W., who continues to voice dissenting opinions in China, cannot receive funding if he is imprisoned because of the depletion of Trust assets and the termination of the Trust's humanitarian purpose.

17.     Plaintiffs He, Yang, Li, Wang, Ouyang, Xu, and Xu W. are sometimes referred to as the "Beneficiary Plaintiffs."

18.     Plaintiff Yu Ling (defined above as "Yu") is a citizen and resident of China, domiciled in Beijing. Yu is a party to the Settlement (defined below) between Yahoo and plaintiffs in the 2007 Lawsuit (defined below). The Settlement was breached by: (1) the depletion of Trust assets to such an extent that it culminated in the breach of the Settlement, which required that Trust assets be used "to provide humanitarian and legal assistance primarily to persons in or from the People's Republic of China who have been imprisoned for expressing their views through Yahoo! or another medium," and that Wu and the LRF "use their best efforts to maximize the benefits achieved" by this provision; and (2) the unlawful termination of that humanitarian purpose, in violation of the Settlement's requirement that Trust assets be used for that purpose.

**B.     Defendants**

**1.     The Yahoo Defendants**

19.     Defendant Yahoo! Inc. (defined above as "Yahoo") is headquartered Sunnyvale, California. Yahoo was a defendant in the 2007 Lawsuit (defined below), the settlement of which resulted in the creation of the Trust. Yahoo was a trustee of the Trust at all relevant times and owed and continue to owe fiduciary duties to the Beneficiary Plaintiffs.

20.     Defendant Michael Callahan (defined above as "Callahan") was Executive Vice President, General Counsel, and Corporate Secretary at Yahoo from December 1999 to July 2012. Callahan was a trustee of the Trust, and a member of the board of directors of LHRO (defined below), until his departure from Yahoo. As trustee and director, Callahan owed fiduciary duties to the Beneficiary Plaintiffs at all relevant times. Callahan is a resident of California. At all relevant times, Callahan was compensated for his services as trustee and director, including by Yahoo and the LHRO.

21.    Defendant Ronald Bell (defined above as "Bell") was General Counsel and Corporate Secretary at Yahoo. Callahan was a trustee of the Trust and was a member of the board of directors of LHRO until 2016. As trustee and director, Bell owed fiduciary duties to the Beneficiary Plaintiffs at all relevant times. Bell is a resident of California. At all relevant times, Bell was compensated for his services as trustee and director, including by Yahoo and the LRHO.

22.    Defendants Yahoo, Callahan, and Bell are collectively referred to as the "Yahoo Defendants."

### 2.    Estate of Harry Wu

23.    Defendant Estate of Harry Wu is the estate of Harry Wu (defined above as "Wu"), who was a trustee of the Trust, and Executive Director of LHRO and LRF. As trustee and director, Wu owed fiduciary duties to the Beneficiary Plaintiffs at all relevant times. Wu was a resident of Virginia. Wu passed away on April 26, 2016. At all relevant times, Wu was compensated for his services as trustee and director, including by Yahoo, the LRF, and the LHRO.

### 3.    Laogai Research Foundation and Laogai Research Foundation-CA

24.    Defendant Laogai Research Foundation is a 501(c)(3) non-profit corporation, organized under the laws of the Commonwealth of Virginia. Defendant Laogai Research Foundation-CA is a 501(c)(3) non-profit corporation, organized under the laws of the State of California. (The Laogai Research Foundation and the Laogai Research Foundation-CA were previously together defined as "LRF.") LRF's principal place of business is 1901 18th St. NW, Washington, DC, 20009. At all relevant times, LRF was Wu's *alter ego*, as Wu dominated and controlled all aspects of LRF operations. LRF was a trustee of the Trust, and owed fiduciary duties to the Beneficiary Plaintiffs at all relevant times.

### 4.    Laogai Human Rights Organization

25.     Defendant Laogai Human Rights Organization (defined above as "LHRO") is a 501(c)(3) non-profit corporation organized under the laws of the District of Columbia. LHRO's principal place of business is 1901 18th St. NW, Washington, DC, 20009. LHRO was established to administer a portion of Trust assets. The LHRO was a trustee of the Trust, and it owed fiduciary duties to the Beneficiary Plaintiffs at all relevant times.

### 5.     Yahoo Human Rights Fund Trust

26.     Defendant Yahoo Human Rights Fund Trust (defined above as the "Trust") is a trust created in 2007 to provide humanitarian and legal assistance to persons in China who have been imprisoned for exercising their freedom of expression online. Given the possibility that the Trust currently holds title to assets necessary to grant Plaintiffs complete relief, it is named as a nominal defendant.

### 6.     Doe Defendants

27.     Defendants Does 1-20 are current and former employees, officers, and directors of Defendants Yahoo, LRF, and LHRO, who were either trustees of the Trust who breached their duties as trustees, or who knowingly assisted and participated in the breaches of trust alleged herein. They will be identified and named after discovery.

### STATEMENT OF FACTS

**A.     Yahoo Was Sued in 2007 for Providing Information about Dissidents to Chinese Government, Leading to Their Imprisonment**

28.     Yahoo was one of the first international internet companies to operate in China, and in the early 2000s, many Chinese dissidents used Yahoo's email services to communicate and disseminate information, including information that the Chinese Communist Party ("CCP") considered subversive. These users believed that, as an American company ostensibly respectful of First Amendment ideals such as freedom of expression, Yahoo would resist inevitable CCP

efforts to obtain their private information, which the CCP would use to punish them and to eliminate dissent. Unfortunately, Yahoo failed to live up to these ideals, and instead readily turned over user information to the CCP, fully aware of the likely consequences. As a result, many Yahoo users were imprisoned based on evidence provided by Yahoo.

29.     In 2007, two such imprisoned Yahoo users, Wang Xiaoning ("Wang X.") and Shi Tao ("Shi"), along with Wang X.'s wife, Plaintiff Yu here, brought a lawsuit against Yahoo ("2007 Lawsuit") in the U.S. District Court for the Northern District of California. *See Wang Xiaoning, Shi Tao, Yu Ling et al. v. Yahoo!, Inc. et al.*, ECF No. 51, No. 07-02151-CW (N.D. Cal., filed July 30, 2007) (amended complaint). The lawsuit alleged, among other things, that Yahoo was liable under the Alien Tort Statute, 28 U.S.C. § 1350, the Torture Victim Protection Act, 28 U.S.C. § 1350, the Electronic Communications Privacy Act, 18 U.S.C. § 2701, and the common law of California. *See id.*

30.     The Shi Tao case in particular had by then attracted significant public attention. Shi was a journalist and editor at a business newspaper who was imprisoned for attempting to shed light on CCP efforts to control and suppress dissent in advance of the 15th anniversary of the 1989 Tiananmen Square massacre. Specifically, he sent his notes from a staff meeting about those efforts to a New York-based website, using his Yahoo email account. His eventual conviction and ten-year prison sentence relied on detailed evidence about that account provided by Yahoo.

31.     In a 2006 Congressional hearing that touched on Shi's case, Yahoo's then general counsel, Callahan, defended Yahoo by claiming that when Yahoo complied with the Chinese government's request, it had "no information about the nature of the investigation." In 2007, however, evidence came to light showing that was not true, as the subpoena-like documents

issued by Chinese authorities to Yahoo specifically stated that the investigation related to "provision of state secrets," a well-known euphemism employed by the CCP to suppress dissent.

32.     Yahoo's dishonesty amplified already intense criticism, and led to an additional Congressional hearing on November 7, 2007. That hearing was attended by Plaintiff Yu, a plaintiff in the 2007 Lawsuit, and wife of the imprisoned plaintiff Wang X. Accompanying Plaintiff Yu was Wu, who served as Plaintiff Yu's translator. Present for Yahoo were Callahan and Yahoo's then CEO, Jerry Yang ("Yang").

**B.      The Trust Is Established as a Condition of the Settlement of the 2007 Lawsuit**

33.     Immediately after the hearing, in an anteroom at the Capitol, Yang met with Plaintiff Yu, Wu, and others, and Plaintiff Yu agreed to settle the 2007 Lawsuit. In exchange: (1) Yahoo would pay compensation to the plaintiffs; (2) Yahoo would finance a trust fund to provide financial assistance to imprisoned Chinese dissidents; and (3) Yang would directly advocate to the Chinese government for Wang X.'s release.

34.     Attorneys for plaintiffs in the 2007 Lawsuit were not present at this meeting. Indeed, Wu insisted that the attorneys be terminated, and that he would lead the negotiations on the plaintiffs' behalf. Following the November 7, 2007 meeting, Wu continued to discuss a settlement with Yahoo on the plaintiffs' behalf.

35.     On November 9, 2007, a formal settlement agreement ("Settlement") was signed. Wu did not consult with plaintiffs on the specific terms and conditions of the Settlement, which the Settlement provided were to remain confidential. Indeed, Wu instructed Liao Tienchi ("Liao"), then an employee and board member of LRF, not to disclose the amounts contained in the Settlement to the plaintiffs. No Chinese translation of the Settlement was provided to the plaintiffs (none of whom could read English).

12

36.     Nevertheless, Wu signed the Settlement on behalf of the plaintiffs, and Yang signed on behalf of Yahoo. The terms included the dismissal of plaintiffs' claims in the 2007 Lawsuit, in exchange for a payment by Yahoo of $3.2 million to each of the two imprisoned users' families, as well as the establishment of a $17.3 million trust fund for the benefit of other imprisoned Chinese dissidents, such as the Beneficiary Plaintiffs here, which was to be called the Yahoo Human Rights Fund (defined above as the "Trust").[3]

37.     With respect to the payments to the plaintiffs, not only did Wu deliberately conceal the terms and amounts from the plaintiffs, he attempted to extort the plaintiffs into handing over to Wu and the LRF parts of the Settlement belonging to them. For instance, when Shi's mother arrived in Washington, D.C. to collect her son's portion, Wu demanded that she "donate" $1 million of her son's $3.2 million share to Wu and the LRF. Having no legal representation, and under intense pressure from Wu, she asked whether $500,000 would be sufficient. Wu responded in a fury, berating her, and causing her great distress. At this point, Liao intervened, telling Wu his behavior was inappropriate. Liao then reached out to a contact at the U.S. Department of State, Eric N. Richardson ("Richardson"), for help. Richardson agreed to help, told Wu to stop demanding money from Shi's mother, and escorted both Wu and Shi's mother to the bank, making sure that all funds belonging to Shi were transferred to a separate account.

---

[3] Payments establishing the Trust were made in trust to the LRF in four installments, with the final installment paid in July 2008. The Settlement also required that Trust assets be maintained separately from LRF's funds. It also required that a board of directors be established for the Trust, and that Yahoo be consulted for board appointments. Information and documents relating to the establishment of that board have never been made public or provided to Plaintiffs, and are among the facts that will be uncovered after a reasonable opportunity for discovery.

38.     Similarly, Wang X. and Plaintiff Yu were forced to file a lawsuit ("2011 Lawsuit") to recover $1 million belonging to them, and misappropriated by Wu. *See Yu et al. v. Wu et al.*, ECF No. 1, No. 1:11-cv-92-JCC (E.D. Va., filed Jan. 28, 2011). The 2011 Lawsuit included an exhibit showing that Wu purchased a $1 million annuity for his own benefit, falsely claiming that Yu was his cousin on the annuity application. *See id.*, Exhibit 1. The focus of the 2011 Lawsuit was not to enforce the Trust's humanitarian purpose.

39.     On October 21, 2011, Plaintiff Yu settled the 2011 Lawsuit, and entered into a settlement agreement that released claims "which have existed or may have existed . . . from the beginning of the world to the date of this Agreement." Plaintiff Yu does not sue here for any breaches of the Settlement that occurred before October 21, 2011. Rather, she sues only for breaches of the Settlement that occurred after that date. As a result, the release does not bar her claims here.

40.     As for the Trust, the Settlement contemplated that Wu and the LRF would be responsible for its day-to-day administration, but that Yahoo would maintain oversight to ensure Trust assets were being spent in accordance with its purpose: providing humanitarian and legal aid to Chinese dissidents imprisoned for exercising their freedom of expression online.[4] (As discussed further below, Yahoo kept its oversight role hidden, and repeatedly pointed the finger at Wu and the LRF when asked to investigate how the Trust assets were being spent.)

41.     In a November 13, 2007 press release announcing the Settlement, Yahoo emphasized this purpose:

---

[4] A related purpose was to provide such assistance to applicants who were Yahoo users specifically, in exchange for the settlement of potential legal claims against Yahoo.

Yahoo! is working to provide financial, humanitarian and legal support to the families of Shi Tao and Wang Xiaoning. After working with the families to reach a private agreement, the parties are withdrawing their lawsuit against Yahoo!. **Yahoo! is also working to create a separate human rights fund to provide humanitarian and legal support to political dissidents who have been imprisoned for expressing their views online, as well as their families.**

. . .

"We are committed to making sure our actions match our values around the world. **That's why we are also working to establish a Human Rights Fund to provide humanitarian and legal aid to dissidents who have been imprisoned for expressing their views online.**"

42.     Thus, from the outset, Yahoo touted the establishment of the Trust as an example of Yahoo's commitment to human rights, and sought to benefit reputationally from it.

43.     The purpose of the Trust was reiterated in July 2008 by Yahoo, through Vice President and Deputy General Counsel Michael Samway ("Samway"). Before wiring the final portion of Trust assets to the LRF, Samway emphasized to Liao that "[a]s a general principle, we need to use the Fund for its intended principles regarding online dissent," and that although "limited exceptions" had been made, "[w]e should be sure to keep focused on the Fund's purpose though."

44.     The "limited exception" to which Samway referred was a provision that stated that the Trust funds could also be used for the operating expenses and educational efforts of Wu's foundation, the LRF. The LRF would then be required to provide information to Yahoo about how it planned to use Trust funds. There was no obligation that a minimum amount be provided to the LRF per year, but a maximum amount of $1 million per year was imposed.

45.     As Yahoo and Samway made clear, however, this provision was a "limited exception" to the Trust's primary humanitarian purpose, and was subordinate to that purpose. The limited and subordinate nature of this provision was confirmed by the fact that Wu and the LRF were required by the Settlement to "maximize the benefits achieved" by the Trust's primary

humanitarian purpose. It is also confirmed by the fact that Wu and the LRF were not entitled to any minimum distribution from the Trust, such that the trustees would have been well within their rights—and indeed, had a duty—to provide *less* than $1 million per year to Wu and the LRF, if doing so was necessary to ensure the Trust's intended purpose was not swallowed up and violated by this "limited exception." It is further confirmed by provisions that prohibited Wu and the LRF from using Trust assets on "political purposes of any kind." It is also further confirmed by the requirement that Wu and the LRF report how Trust assets were being spent on this "limited exception."

46.     Furthermore, the expenditures outlined below suggest that the LRF spent *more* than $1 million per year of Trust assets on non-humanitarian purposes.

**C.     The Yahoo Defendants Exercised Considerable Control over Trust Assets and Were Trustees with Important Fiduciary Responsibilities**

47.     After the Trust was established, the Yahoo Defendants publicly distanced themselves from the Trust's actual administration, and, indeed, repeatedly denied having any responsibility for that administration, as discussed further below.

48.     Privately, however, Yahoo exercised considerable control over Trust assets, although the precise way Yahoo exercised that control remains largely unclear, owing to Defendants' obfuscation of those facts.

49.     For example, after the Settlement, Yahoo and the LRF drafted guidelines for the Trust. (These guidelines were not publicly available.) One of the requirements Yahoo insisted on including in those guidelines was that at least one Yahoo employee be a member of the Trust's board of directors. Another requirement was that a quorum of the Trust's board of directors could not be achieved without Yahoo's designated board member present. Another requirement was that all disbursements of Trust assets required board consensus (and thus Yahoo's approval,

given the requirement that a quorum required Yahoo's participation, through its designee). Another requirement was that Yahoo itself be notified at least twice a year about Trust activities, including being provided with details about how Trust assets were being spent on the "limited exception" of LRF operations.

50.     As for applications for humanitarian funding, the guidelines set forth the following criteria: (1) whether the case involved persons from China; (2) whether the person suffered violations of fundamental human rights; (3) whether those violations were the direct result of the exercise of the person's freedom of expression; and (4) whether Yahoo's services or other electronic media were involved. The guidelines further required that persons meeting those criteria would be "given the highest priority" for funding and assistance. The amount of the assistance was to be based on: (1) whether the person was imprisoned; (2) the length of the sentence; (3) the person's family situation; and (4) legal defense needs. Board consensus—and thus Yahoo's approval—was required for all disbursements.

51.     As another example of Yahoo's control of Trust assets, in July 2008, Yahoo and Samway wrote to the LRF to press various issues Yahoo and its representatives had raised at Trust board meetings, including: (1) the need to obtain "professional guidance to evaluate the tax implications the Fund [*i.e.*, the Trust] will have on LRF and Yahoo"; (2) the need for "transparency mechanisms for the Board to have better visibility into applications for assistance and payments from the Fund [*i.e.*, the Trust] and also with respect to the overall expenses of the Fund [*i.e.*, the Trust]"; (3) the fact that "we need to use the Fund [*i.e.*, the Trust] for its intended purposes regarding online dissent"; (4) the fact that "supporting some of the preparatory work for the LRF Museum" was a "limited exception" to those purposes; (5) the fact that, notwithstanding those exceptions, "we should be sure to keep focus on the Fund's [*i.e.*, the Trust's]

[humanitarian] purposes though"; (6) a proposal "to seek Board approval for distribution of funds of more than a certain amount, say $10,000"; and (7) the need to "establish criteria for what types of projects the YHRF [*i.e.*, the Trust] Board should consider and also decide if they're within the scope of the Fund [*i.e.*, the Trust]."

52.     As yet another example of Yahoo's control of Trust assets, after transferring the entire Trust corpus to accounts controlled by Wu and the LRF, Yahoo orchestrated the transfer of some or all those assets back into accounts that Yahoo controlled, at least in part. Most notably, in 2009, Yahoo, Wu, and the LRF orchestrated a purported "amendment" to the Settlement, which "amendment" contemplated transferring Trust assets into at least two buckets.

53.     The first bucket, into which $3.55 million in Trust assets was transferred, became a newly created trust for the purpose of settling claims made against Yahoo by imprisoned Yahoo users. Yahoo installed Callahan, Bell, and other Yahoo employees to serve as trustees over this portion of Trust assets. In 2015, the Yahoo Defendants purported to terminate this separate sub-trust.

54.     The second bucket, from which the Trust's humanitarian purpose would ostensibly be carried out, was to be deposited with a newly created non-profit corporation, the Laogai Human Rights Organization (defined above as "LHRO"), that would "support" LRF. Yahoo required that its employees serve on LHRO's board of directors.[5]

55.     Yahoo, Wu, and the LRF made this 2009 "amendment," and the related transfers of Trust assets, in secret. Notably, they never notified, or obtained consent from, the parties to the Settlement. And, unlike the Settlement, no powers of attorney were attached to the

---

[5] LHRO's tax filings claim that Callahan, and then Bell, devoted an average of 25 hours per week to the LHRO.

"amendment." This "amendment," and the related transfers of Trust assets, were uncovered only in June 2017, after Defendants moved to dismiss the initial complaint in the above-captioned case.

56.     The 2009 "amendment" and the related transfers of Trust assets reveal that, contrary to numerous public representations, the Yahoo Defendants exercised considerable control over Trust assets, and that far from having no responsibility for those assets, they were in fact trustees of those assets. As such, from the outset, the Yahoo Defendants had important fiduciary responsibilities to ensure the Trust's charitable purpose of providing humanitarian and legal assistance to Chinese dissidents imprisoned for expressing their views online was carried out and was not materially violated.

57.     As discussed further below, the Yahoo Defendants failed to live up to those responsibilities. Instead, they abdicated their fiduciary responsibilities, and placed Trust assets almost entirely in the hands of Wu and the LRF. The Yahoo Defendants did this despite numerous red flags that should have been, and likely were, apparent to the Yahoo Defendants from the very outset, including many red flags that *only* the Yahoo Defendants would have been timely aware of, given the confidential and non-transparent nature of Trust operations. Indeed, the Yahoo Defendants' failure is particularly lamentable because for years, they were essentially the *only* parties with the ability to prevent the Trust from deviating so far from its intended humanitarian purpose that this lawsuit to enforce that purpose was finally necessitated.

### D.     Trust Assets Are Systematically and Unlawfully Depleted by Wu and the LRF in Contravention of the Trust's Purpose, while the Yahoo Defendants Willfully Ignore Red Flags

58.     The folly of entrusting Trust assets to Wu and the LRF should have been, and likely was, apparent to the Yahoo Defendants from the beginning. Indeed, in negotiating the Settlement of the 2007 Lawsuit with Wu, Yahoo was well aware that Wu was not an attorney,

much less the attorney for plaintiffs in that action, which attorneys had been inexplicably excluded from the negotiations. Despite these irregularities, Yahoo chose to negotiate directly with Wu. Then, during those negotiations, Wu demanded a provision that had the potential of benefiting Wu personally by up to *$1 million per year*—another red flag that Yahoo failed to question or scrutinize. To make matters even worse, Yahoo not only executed the Settlement with Wu as the only signatory for plaintiffs, but *also gave Wu and the LRF virtually unfettered control over the settlement money—including the entirety of the Trust's assets*.

59.     This decision was disastrous for the Trust, and for its charitable mission of providing humanitarian aid to imprisoned Chinese dissidents. Indeed, in the years since the Trust was established, only approximately $700,000—or a mere *4%* of the $17.3 million corpus—has been spent on that mission.[6] Instead, the vast bulk of the Trust's assets—likely *more than $13 million*—has been unlawfully spent on personally enriching Wu and the LRF.[7]

60.     For example, between 2008 and 2015, the LRF reported expenditures of more than *$11 million*. Further, in 2015, the LRF purchased a *$2.55 million* townhouse in Washington, D.C. The source of the vast bulk of these expenditures was Trust assets. Indeed, during this time, LRF's only other revenue sources were three National Endowment for Democracy grants from 2008-2010, totaling approximately $600,000, and a donation of Google stock valued at approximately $316,000.

---

[6] An additional $550,000 appears to have been used to resolve legal claims against Yahoo by two individuals, Li Zhi and Jiang Lijun, about whom Yahoo had provided information to the Chinese government.

[7] Even if the Trust entitled LRF to $1 million per year—and it did not—spending $13 million in approximately 8 years *still* violated the Trust by $5 million.

61.     The systematic and unlawful depletion began immediately and should have alerted the Yahoo Defendants, as trustees, of the need to protect the Trust's primary charitable purpose, particularly because they knew of such expenditures, and whether they conformed with that purpose, before anyone else could meaningfully scrutinize that question.

62.     For example, in 2007, Wu's salary as "Executive Director" was $48,000, while his wife's salary as "Secretary/Treasurer" was $24,000. In 2008, following an enormous cash infusion of more than $18 million in connection with the Settlement—*i.e.*, the Trust assets, which was supposed to be held in trust by Wu and the LRF—Wu gave himself a ***$60,000 raise***, ***more than doubling*** his compensation to over $108,000 per year. He also gave his wife a large raise, increasing her compensation to $42,000 (despite the fact that as of 2010, she had not worked in the LRF office even once in the preceding ten years, and did little discernable work for the LRF, such that hers was apparently a "no-show" job). In 2009, Wu increased his compensation to $110,000, and his wife's to $50,000. In 2010, Wu paid himself $108,000, and his wife $48,000. Thereafter, Wu's wife "retired" and was not replaced. Over the next five years, Wu paid himself $108,600, $113,700, $120,400, $131,200, and $122,907 per year respectively. All told, after the establishment of the Trust, Wu paid himself and his wife more than ***$1 million***.

63.     Most, if not all, of this amount was paid using Trust assets. Yet, whether and to what extent these expenditures were in violation of the Trust's primary charitable purpose was not and could not reasonably have been known to Plaintiffs at the time they were made and reported. The Yahoo Defendants, by contrast, knew or should have known of their impact on the Trust's purpose. Yet, the Yahoo Defendants did nothing to scrutinize, much less curtail, these expenditures—which even concerned LRF directors and employees were largely powerless to

stop, much less Plaintiffs here—or to prevent them from materially undermining the Trust's primary charitable purpose, which the Yahoo Defendants had a duty to protect as trustees.

64.     As another example, the LRF incurred enormous legal fees, most if not all of which were funded with Trust assets, and spent for the benefit of Wu personally. For instance, in 2011, the LRF recorded $322,596 in legal fee expenditures. A substantial portion, if not all, of this amount was spent in connection with the 2011 Lawsuit filed by Yu to recover the portion of the Settlement wrongfully withheld from her by Wu. From 2013 to 2015, the LRF reported an additional $515,000 in legal fees. During this time, Wu faced a number of additional lawsuits, including a lawsuit accusing Wu of sexual harassment, *see Jing v. Wu*, Docket No. 2015-011903 (Va. Cir. Ct. Sept. 8, 2015), and a *qui tam* and employment retaliation lawsuit accusing Wu and the LRF of defrauding the federal government by misusing federal grants, and of firing the plaintiff in retaliation for raising concerns about that alleged fraud. *See Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73 (D.D.C. 2014) (holding that retaliation claims were adequately alleged).

65.     Again, whether and to what extent these legal fees were in violation of the Trust's primary purpose was not and could not reasonably have been known to Plaintiffs at the time these expenditures were made and reported.

66.     Not so for the Yahoo Defendants, who, as trustees, knew or should have known whether and to what extent the Trust's humanitarian purpose was being materially undermined, and who had a duty to prevent that from happening, but failed to do so.

67.     Wu and the LRF also used Trust assets to purchase expensive real estate for Wu and the LRF's benefit. In January 2008—just two months after the Settlement—Wu and LRF purchased a ***$1.45 million*** property, located at 1109 M Street NW, in Washington, D.C. Again, at

the time, whether this purchase constituted or contributed to a breach of the Trust's primary purpose was largely unknowable to anyone but Defendants, as the terms of the Settlement were hidden, even from the plaintiffs in the 2007 Lawsuit.

68.     Then, in July 2015, Wu and LRF purchased a *$2.55 million* townhouse at 1901 18th Street NW, Washington, D.C. Yet again, the Yahoo Defendants willfully ignored these expenditures and their impact on the Trust's humanitarian purpose, and took no steps to prevent that purpose from being undermined by this expenditure.

69.     Wu and the LRF also transferred Trust assets to recipients whose identities are currently unknown. For instance, in 2009 and 2010, Wu and the LRF reported transfers of $65,000 and $100,000, respectively, to another non-profit organization headed by Wu, the China Information Center ("CIC"). However, these transfers were *not* reported on CIC's tax filings, and the actual recipients of these transfers are unknown.

70.     More generally, each year the LRF used hundreds of thousands, if not millions, of dollars in Trust assets, with little to no accountability, transparency, or oversight. Indeed, Wu made all spending decisions unilaterally, viewing the assets as "his alone," as former LRF director Jeff Fiedler told the New York Times.[8,9]

---

[8] In May 2009, Fiedler wrote an email stating that he was resigning from the LRF board in part because Wu was managing the LRF as his "personal fiefdom." Liao tried to persuade him to reconsider, urging that his resignation would have "no shocking effect" on Wu, that Wu "will not and can not [*sic*] change his character," and that Fiedler would "very likely be replaced by a yesman or woman, which can only deteriorate the situation." The Yahoo Defendants were aware or should have been aware of this email.

[9] *See* Andrew Jacobs, *Champion of Human Rights in China Leaves a Tarnished Legacy*, NEW YORK TIMES (Aug. 13, 2016). The article also reported that in 2015, the Internal Revenue Service ("IRS") fined Wu and the LRF "$40,000 for financial irregularities." The IRS also found that Wu paid personal income taxes using LRF assets.

71.     None of these expenditures furthered the Trust's mission of providing humanitarian and legal assistance to Chinese dissidents imprisoned for exercising their freedom of expression online. Whether any individual expenditure was lawful or unlawful, and thus whether it was injurious to Plaintiffs, could not reasonably have been known to anyone but Defendants. However, when the cumulative impact of these expenditures resulted in the fundamental violation of the Trust's primary charitable purpose, the Beneficiary Plaintiffs were clearly injured, and the Settlement was clearly breached.

72.     The complete termination of the Trust's charitable purpose was effected in 2016. In early 2016, Plaintiff Xu W., a Chinese dissident who was imprisoned for approximately nine years, from 2005 to 2014 (and who had served two previous sentences, from 1989 to 1997, and from 1998 to 2001, for a total of 20 years), emailed Wu and the LRF seeking assistance from the Trust. Wu responded in March 2016, informing Plaintiff Xu W. that Wu and the LRF had decided to **stop providing humanitarian assistance to imprisoned Chinese dissidents altogether**, terminating the Trust's primary charitable purpose completely.

73.     An equally egregious case is that of Gou Zhongshan ("Gou"). Wu recruited Gou in February 2005 to collect information about and take photographs of prison labor camps and execution grounds. On April 9, 2006, Gou was arrested for "illegally providing information for an overseas entity." On December 1, 2006, Gou was sentenced to 13 years in prison.

74.     Wu and the LRF took no action whatsoever to publicize Gou's arrest and sentence, or to advocate for Gou's release. Gou was eventually released in April 2016, and immediately contacted the LRF for assistance. However, he was told that Wu had passed away, and that the LRF had no record of Gou working for them.

### E.     Yahoo Repeatedly Denies Responsibility for the Trust

75.     Throughout this entire time, when Plaintiffs were largely powerless to act, the Yahoo Defendants concealed the fact that they were trustees of the Trust and that they had control over the Trust. Indeed, the Yahoo Defendants went so far as to outright deny any responsibility for the administration of the Trust at all.

76.     For example, after Plaintiff Yu's 2011 Lawsuit, concerns arose that Wu and the LRF not only wrongfully withheld a portion of Plaintiff Yu's personal share of the Settlement, but that Wu and the LRF were spending other monies obtained from the Settlement inappropriately. At the time, such concerns remained largely nebulous, because basic facts about how much money belonged to the Trust, how Trust assets were being spent and in what amounts, and whether that spending conformed to the Trust's purposes, remained unclear. Also unclear was Yahoo's role in the Trust's administration. This lack of clarity was by design, as Wu, the LRF, and Yahoo kept such details confidential and hidden from public view.

77.     Still, efforts were made to compel Yahoo to investigate. Yahoo resisted those efforts, however, asserting that the administration of the Trust was not its responsibility.

78.     For example, after Plaintiff Yu's 2011 Lawsuit was filed, Yahoo shareholder Zhao Jing ("Zhao") made a books and records demand on Yahoo under 8 Del. C. § 220. In so doing, Zhao argued that an "inference of mismanagement" by Yahoo with respect to the Trust could be drawn from that lawsuit.

79.     In opposing the demand, Yahoo vehemently denied any responsibility for the Trust. Indeed, Yahoo refused to allow Zhao to inspect Yahoo's records on the ground that Zhao's demand "does not articulate **any** basis, let alone a credible basis, that there has been any wrongdoing by **anyone** at Yahoo!." (Emphasis added.) Instead, Yahoo pointed the finger at Wu, noting that Zhao's "allegations of wrongdoing [were made] against Harry Wu," and that, as such,

they "fail[ed] to provide a credible basis to find probable wrongdoing by *anyone* at Yahoo!."
(Emphasis added.)

80.     Zhao responded by pointing out that Yahoo and Wu had "partnered to establish"
the Trust, arguing that Wu was therefore Yahoo's agent for the purposes of operating the Trust.
Still, Zhao agreed to narrow his request to seek only documents relating to Yahoo's partnership
with Wu or the LRF and the appointment of Wu and the LRF to administer and operate the Trust.

81.     Yahoo continued to resist. Indeed, Yahoo doubled down on its position that it had
no responsibility for the administration of the Trust, and that nothing in Zhao's demand provided
a credible basis for so inferring. Yahoo first noted that Zhao merely alleged that Yahoo
"partnered" with Wu to "establish" the Trust, but that "all of your allegations of wrongdoing
involve the administration of the [Trust], which necessarily post-dated the establishment of the
[Trust]." Thus, Yahoo asserted that "the fact that Mr. Wu and LRF partnered with Yahoo! to
establish the [Trust] is irrelevant to your Demand."

82.     Yahoo then argued that, although Zhao asserted that Wu was Yahoo's agent and
that Yahoo relied on Wu to operate the Trust, Zhao had "no basis . . . to claim that Yahoo!
manages or controls the [Trust]."

83.     Yahoo then went even further, using Plaintiff Yu's 2011 Lawsuit as a *shield*
against responsibility, repeatedly arguing that, rather than providing a credible basis to infer
wrongdoing on Yahoo's part, it supported an inference of *Yahoo's innocence*.

84.     For example, Yahoo pointed out that, rather than supporting an inference that
Yahoo was involved in the administration of the Trust, "[i]n fact, in Yu Ling's 2011 lawsuit
against Harry Wu, Yu Ling alleges that the [Trust] is administered by Mr. Wu and the Laogai
Human Rights Organization."

85.     As another example, Yahoo noted that the lawsuit "further alleges that Mr. Wu and LRF had exclusive control over her money," not Yahoo.

86.     Perhaps most audaciously, Yahoo touted the fact that "Yu Ling did not even name Yahoo! as a defendant in her suit" as a basis for inferring its innocence.

87.     Yahoo then stated that if Zhao was willing to agree to certain conditions— including tailoring his requests and entering into a confidentiality agreement—it was prepared to allow "an appropriate inspection of its books and records."[10]

88.     Yahoo similarly disclaimed responsibility in proceedings before the U.S. Securities Exchange Commission ("SEC"). For example, in 2012, Zhao proposed a shareholder resolution asking Yahoo to investigate "potentially unlawful activities of the Yahoo! Human Rights Fund."

89.     In successfully opposing Zhao's proposal, Yahoo argued to the SEC that Zhao's proposal was irredeemably unclear, to the point that it was "materially false and misleading." With respect to Trust expenditures, Yahoo argued that Zhao's proposal was deficient because it "identifies no specific allegations about . . . any transactions or operations of the Yahoo! Human Rights Fund [*i.e.*, the Trust]."

90.     Yahoo also continued to obfuscate the nature of its responsibility with respect to the Trust, asserting that it "has no ownership interest in the Yahoo! Human Rights Fund [*i.e.*, the

---

[10] Zhao apparently did not agree, as he subsequently filed a complaint in the Delaware Court of Chancery to compel inspection. That complaint, dated February 1, 2012, repeated the same assertions that Yahoo argued did not provide "any basis, let alone a credible basis," to infer wrongdoing on Yahoo's part. According to the docket, in April 2013, a broad protective order providing for the confidential treatment of materials produced in discovery was entered, and in July 2013, the matter appears to have settled, presumably also on a confidential basis. *See generally Zhao v. Yahoo! Inc.*, C.A. No. 7203 (Del. Ch.) ("Zhao Lawsuit").

Trust].” Yahoo also suggested that neither it nor its board of directors was “able to require disclosure of information regarding” the Trust.

91.     Finally, Yahoo yet again deflected responsibility to Wu, noting that “[t]he Human Rights Fund [*i.e.*, the Trust] is administered by Harry Wu . . . with the help of a board of directors.”

92.     In July and September 2015, certain Beneficiary Plaintiffs wrote letters to Yahoo and Yang, which, among other things, expressed their hope that the Yahoo Human Rights Fund, *i.e.*, the Trust, could be run in a more transparent manner, and more for the benefit of imprisoned Chinese dissidents, particularly those who were Yahoo users. Yahoo never responded to these letters.

93.     In February 2016, Yahoo and Bell were again implored to step in to address problems with the management of the Trust. Yahoo and Bell did not respond until April 2016, and even then, only did so because they had been pressured by contact from a prominent journalist about a story relating to the Trust. In their response, Yahoo and Bell again denied responsibility for the Trust, and continued to point the finger at Wu and the LRF.  Yahoo and Bell also used the confidentiality of the Settlement as a shield, stating that the Settlement’s confidentiality “necessarily limits our ability to respond,” and that they would not respond “point-by-point” to suggestions that Yahoo or Bell bore responsibility for the depletion of Trust assets.

### F.     The Yahoo Defendants Were Well Aware of the Misconduct and Were Repeatedly and Directly Warned

94.     Meanwhile, as Yahoo was touting the Trust and relying on it to defeat multiple shareholder proposals, the Yahoo Defendants were well aware that Trust assets were being unlawfully depleted by Wu and the LRF, to the detriment of the Trust’s charitable purpose. As

trustees, and as members of the LHRO board, they received regular reports from the LRF on how Trust assets were being spent. They also knew that Wang X. and Yu, two of the plaintiffs in the 2007 Lawsuit, were forced to sue Wu in 2011 just to get their rightful personal share of the Settlement. They also knew of the 2011 Lawsuit's allegations with respect to the alarming circumstances surrounding the Settlement—namely, that Wu had orchestrated the termination of the plaintiffs' attorneys, usurped the role of negotiating a settlement for himself, deliberately concealed the Settlement's terms from the plaintiffs, mispresented how attorneys' fees had been paid, stolen $1 million belonging to Wang and Yu for himself, and mispresented on an annuity application that Yu was his cousin.

95.     The Yahoo Defendants were also ***repeatedly and directly*** warned of Wu's wrongful conduct, including by LRF employee Liao, who wrote emails and letters to the Yahoo Defendants sounding the alarm. Liao also repeatedly voiced concerns about Wu's wrongful conduct during LRF board meetings.

96.     For example, in December 2010, Liao wrote a detailed letter (which was not publicly available) to the boards of the Trust, which included at least Callahan, and the LRF, detailing numerous red flags raised by Wu and the LRF's handling of the Trust. For instance, Liao warned that Wu "decides and raises his own salary," yet failed to regularly hold board meetings. When meetings happened to be held, Wu "provides no agenda, minutes, financial reports and related documents (fund application). If he does provide some documents it is not in a timely manner and it is not well prepared," and includes "wrong financial information." He also "makes important financial decisions (e.g. new lease in Dupont Circle) alone without first get[ting] the opinion and approval from the board. Not to mention that the move to a new space is not justified."

97.     Liao also warned that Wu was "[o]ffend[ing] the basic agreement with Yahoo, provide not sufficient humanitarian support to the victims in or from China (only 8% from the budget, according to the financial report I have), no qualified office staff is working on this issue."

98.     Liao also warned that "[t]he financial situation of the organization is not transparent. With the Yahoo Fund, Harry [Wu] bought the building at the [*sic*] M Street, 1,45 mi[llion dollars,] and signed with his own name. Now, does this property belong to Harry Wu or the organization?"

99.     Liao also warned that there is "[n]o effective and ethical management," that the organization was "overload[ed] with staff, but the output is poor. There exists not even a website about the Yahoo HR Fund [*i.e.*, the Trust]. People do not know how to apply."

100.    Liao specifically requested that there should be "an investigation about all the wrong-doings of Harry Wu," and that the investigation should "make clear that the property belongs to the [Yahoo] Trust." Unless the Yahoo Defendants ensured that such an investigation took place, Liao warned that "[t]here will be a miserable or even catastrophic failure for LRF and [the] Yahoo HR Trust," that "Wu will harm the organization and damage the image of Yahoo," and that "scandals will be exposed and it would be a heavy blow to the human rights issue in China." [11]

101.    Yet another lawsuit against Wu and the LRF alleging unlawful spending for Wu's personal benefit came to light in 2012, when a *qui tam* action under the False Claims Act (*Qui Tam* Lawsuit") was unsealed. *See Pencheng Si v. Laogai Research Found.*, 1:09-cv-02388-KBJ-

---

[11] In 2014, Defendant Bell travelled to Washington, D.C. to discuss with Wu the issue of inadequate spending on the Trust's humanitarian purpose. However, no meaningful change resulted from that lone attempt.

SI, ECF No. 15 (D.D.C. Mar. 15, 2012) (unsealing complaint). The *Qui Tam* Lawsuit made a series of allegations that Wu and the LRF defrauded the federal government, including by unlawfully spending federal grants, and that Wu and the LRF's "core mission was to lobby [the federal government] and, thereby, ensure their continued funding and Defendant Wu's comfortable lifestyle." Defendants, including the Yahoo Defendants, knew or should have known about the *Qui Tam* Lawsuit, as it was a public lawsuit making serious allegations against Wu and the LRF. (This lawsuit did not accuse the Yahoo Defendants of any wrongdoing or provide any indication that the Yahoo Defendants were trustees of the Trust.)

102.    Yet another lawsuit was filed against Wu and the LRF in 2015 ("2015 Lawsuit"), this time in Virginia state court, by plaintiff Wang Jing, the wife of a Chinese dissident who had previously been imprisoned, and who was not permitted to leave China. *See Jing v. Wu*, Docket No. 2015-011903 (Va. Cir. Ct. Sept. 8, 2015). The 2015 Lawsuit alleged that Wu sexually assaulted Wang Jing after luring her from California to the Washington, D.C. area on the promise of financial assistance drawn from the Trust. Defendants, including the Yahoo Defendants, knew or should have known about the 2015 Lawsuit, as it was a public lawsuit making serious allegations against Wu, and named the Trust as a defendant.

### G.    Yahoo Touts the Trust and Uses It to Defeat Shareholder Proposals

103.    All the while, as the Yahoo Defendants stood idly by, willfully ignoring the mountain of evidence that these expenditures were improper, doing nothing to prevent the systematic unlawful depletion of Trust assets in violation of the Trust's humanitarian purpose, they simultaneously advertised the Trust as evidence of its commitment to human rights, and used its existence to defeat shareholder proposals calling on Yahoo to do more to advance human rights.

104.    For example, in 2008, the City of New York Office of the Comptroller, on behalf of several New York City public pension funds who were Yahoo shareholders, made a shareholder proposal relating to internet censorship, urging Yahoo to "institute policies to help protect freedom of access to the Internet." Yahoo opposed the proposal, arguing, among other things, that it was "unnecessary" in light of "initiatives already in place at the Company," including the "establish[ment] of a Human Rights Fund [*i.e.*, the Trust], in partnership with a noted Chinese human rights activist, to provide humanitarian relief and legal support for dissidents imprisoned for expressing their views online." The proposal was defeated.

105.    In 2011, Yahoo shareholder Zhao made a shareholder proposal urging that Yahoo take various measures to protect human rights, including adopting principles protective of human rights, and specifically calling for Yahoo to "supervis[e] the abused Yahoo! Human Rights Fund [*i.e.*, the Trust]" in light of information that it was being mismanaged.

106.    In opposing Zhao's proposal, Yahoo noted that it was already committed to human rights issues, citing as evidence "a number of core initiatives, including . . . [c]reating the Yahoo! Human Rights Fund [*i.e.*, the Trust]," which Yahoo again described as having been "established to provide humanitarian and legal support to political dissidents who have been imprisoned for expressing their views online, as well as assistance for their families." The proposal was defeated.

107.    In 2014, Yahoo shareholder John Harrington ("Harrington") made a shareholder proposal that Yahoo create a committee "to oversee the Company's responses to domestic and international developments in human rights that affect our company." Again, Yahoo opposed this proposal on the ground that "Yahoo already has extensive policies and practices in place" with respect to human rights, including "a number of core initiatives, including . . . [c]reating the

Yahoo Human Rights Fund [*i.e.*, the Trust], which Yahoo established to provide humanitarian and legal support to political dissidents who have been imprisoned for expressing their views online, as well as assistance to their families." This proposal was defeated as well.

108.    In 2015, Harrington made a similar proposal, which Yahoo again opposed, based in part on the Trust. This proposal was also defeated.

109.    Notably, at no point did Yahoo ever disclose that Trust assets were being substantially depleted on purposes having nothing to do with the humanitarian purpose it was touting in opposing these shareholder proposals.

**H.    Defendants' Failure to Administer the Trust for the Benefit of Imprisoned Chinese Dissidents**

110.    In contrast to the $13 million spent on Wu and the LRF, a relative pittance—less than $700,000—has been spent on the Trust's primary purpose of providing humanitarian aid to Chinese dissidents imprisoned for expressing their views online, a purpose that the Yahoo Defendants repeatedly and publicly reiterated.

111.    For instance, since the establishment of the Trust, the LRF's reported expenditures on humanitarian aid have been as follows:

| Year | Humanitarian Aid Expenditures | Total Reported LRF Expenditures | Humanitarian Aid as Percentage of LRF Expenditures | Humanitarian Aid as Percentage of Trust Assets |
|---|---|---|---|---|
| 2008 | $135,987 | $1,075,604 | 12.64% | 0.79% |
| 2009 | $177,540[12] | $2,026,872 | 8.76% | 1.03% |
| 2010 | $248,495 | $1,521,187 | 16.34% | 1.44% |
| 2011 | $54,910 | $1,548,213 | 3.55% | 0.32% |

---

[12] The reported amount was $727,540, but $550,000 was used to settle two lawsuits against Yahoo, which does not qualify as humanitarian aid.

| Year | Humanitarian Aid Expenditures | Total Reported LRF Expenditures | Humanitarian Aid as Percentage of LRF Expenditures | Humanitarian Aid as Percentage of Trust Assets |
|------|------|------|------|------|
| 2012 | $28,424 | $1,298,730 | 2.19% | 0.16% |
| 2013 | $20,852 | $1,343,932 | 1.55% | 0.12% |
| 2014 | $22,496 | $1,259,247 | 1.79% | 0.13% |
| 2015 | $19,841 | $1,321,593 | 1.50% | 0.11% |

112.    Moreover, even these small amounts may be inflated. For instance, including the $550,000 payment made to settle two lawsuits against Yahoo, the LRF's 2009 Form 990 claims $727,540 in humanitarian aid. However, only $677,540 is reported on the Schedule F, which lists LRF payments to recipients outside of the United States. Thus, $50,000 in claimed humanitarian aid is unaccounted for.

113.    As another example, in 2010, LRF claimed $248,495 was distributed in humanitarian aid to "40 qualified individuals," and that "payments ranged from $1,000 to $20,250." However, on its Schedule F, only $108,495 in payments to 20 individuals in China are reported, leaving a shortfall of $140,000 apparently distributed to 20 other individuals.

114.    As another example, in 2014, LRF claimed $22,496 was distributed to "6 qualified individuals," and that "payments ranged from $500 to $3,000." However, even if all six received the maximum $3,000 amount, the total would only be $18,000.

115.    Given these discrepancies, and given the extent of the misconduct described herein, no faith can be placed in even these reported figures.

116.    Additionally, numerous facts surrounding the irregular nature of how Wu and the LRF handled what little humanitarian aid they did disburse, raise further doubts about the accuracy of these figures. For example, in May 2010, Wu drafted a financial report claiming that a payment to 2010 Nobel Peace Prize recipient Liu Xiaobo ("Liu") qualified as humanitarian

assistance. However, Liao objected, saying that the payment was in fact funded by a National Endowment for Democracy grant, and was not humanitarian assistance, but was in fact payment for certain of Liu's written work.[13] The Yahoo Defendants were or should have been aware of these facts.

117.    As other additional examples, Wu and the LRF: (1) failed to provide a Chinese version of the website announcing the humanitarian aid program; (2) failed to make a Chinese version of the application form available; (3) failed to respond to numerous inquiries and applications; (4) rejected applications on the basis of personal vendettas; (5) routinely asked applicants to sign blank application forms without filling them out; (6) sent recipients small amounts of cash without asking for an application or providing receipts; and (7) sent recipients payments in amounts that were less than the amounts LRF had previously indicated had been approved, with no explanation. The Yahoo Defendants were or should have been aware of these facts.

### *ALTER EGO* ALLEGATIONS

118.    At all times relevant to this complaint, Wu and the LRF were *alter egos* of each other. Wu dominated the operation of the LRF, had *de facto* control over the LRF, unilaterally made all spending decisions, failed to hold formal board meetings, and failed to keep written minutes of board meetings. Wu also ignored the input and advice of other LRF board members, and included them in public documents largely for appearance's sake. Wu also identified individuals as directors even though they had not agreed to be directors. For instance, Wu listed Professor Yu Ying-Shih ("Professor Yu"), a distinguished professor and recipient of a

---

[13] As a result of Liao's objections, Wu directed that Liao be removed from LRF's board, and Liao was voted off the board.

prestigious award from the Library of Congress, as a director on certain documents, despite the fact that Professor Yu had only agreed to be an advisor to the board. Wu was also described as "the only driving force" of the LRF by Yang Fengshi ("Yang"), an associate of Wu's, who also stated that the LRF had an "operating model of 'one-man-driving-all.'" Following Wu's death, Yang recommended that the LRF no longer be "directed by a single person," and that the "LRF should now be led by a real board of directors." As such, Wu and the LRF were at all relevant times *alter egos* of each other. *See Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 104 (D.D.C. 2014) (finding plaintiff adequately alleged Wu was *alter ego* of LRF). Moreover, because the Yahoo Defendants received regular reports from Wu and the LRF in their role as trustees and as directors of the LHRO, the Yahoo Defendants knew of Wu's dominance and control of the LRF at all relevant times.

## STANDING ALLEGATIONS

119.    Beneficiary Plaintiffs are members of a small, sharply defined, and numerically limited class of Trust beneficiaries, with interests that are distinct from that of the general public. Specifically, the Trust is intended to benefit: (1) Chinese persons (2) who are imprisoned in China (3) for exercising their freedom of expression (4) online. As these requirements make clear, being imprisoned is a necessary prerequisite to becoming a member of the class, and even then, it is not sufficient. As such, it is not easy to become a beneficiary.

120.    Nor are there are so many persons meeting these requirements that the beneficiary class is uncertain and limitless.

121.    Nor is there any difficulty in identifying who falls within the class of beneficiaries.

122.    The Beneficiary Plaintiffs are also entitled to preference in the distribution of Trust assets, compared to distributees who do *not* meet the requirements of the above-described class.

123.    The Beneficiary Plaintiffs' challenge is not to an ordinary exercise of discretion on a matter expressly committed to the trustees, but to misconduct that caused a fundamental change in the nature of the Trust's humanitarian purpose, thus constituting a violation of the Trust's humanitarian purpose, and to the outright termination of the Trust and its humanitarian purpose.

## STATUTE OF LIMITATIONS ALLEGATIONS

124.    This action, which commenced on April 11, 2017, is not time-barred because:

- Before April 11, 2014: (1) no trustee other than Callahan was removed, resigned, or died; (2) the Beneficiary Plaintiffs' interest in the Trust had not terminated; and (3) the Trust had not terminated;

- Plaintiff Xu W. was imprisoned until April 29, 2014;

- the breach of trust claim against Callahan is subject to tolling under District of Columbia law;

- this is an action to enforce the charitable purpose of a charitable trust;

- the Beneficiary Plaintiffs bring equitable claims against Defendants as trustees, to enforce their rights under the Trust, and there was no clear or continuing repudiation of those rights before April 11, 2014;

- there was a fiduciary relationship of trust and confidence between Plaintiffs and Defendants, mitigating any duty to inquire;

- the breach of the Trust's humanitarian purpose, and of the Settlement, arose from the cumulative effect of non-humanitarian spending, with the violative character of the non-humanitarian spending not becoming evident until it was repeated over many years, resulting in the clear repudiation of the Trust's humanitarian purpose and clear injury to Plaintiffs, such that the specific moment of breach is imprecise. As such, the lawful or unlawful nature of any particular expenditure, and whether such an expenditure materially breached the Trust's humanitarian purpose, cannot reasonably be ascertained without discovery;

- Defendants repeatedly refused to answer questions put to them about the administration of the Trust by Plaintiffs, Plaintiffs' representatives, and various third parties, and administered Trust assets in a deliberately non-transparent and obfuscating manner, thereby concealing and prolonging the misconduct;

37

- the Trust's humanitarian purpose was not definitively terminated until 2016; and

- before April 11, 2014, Plaintiffs did not and could not reasonably have known of a right to maintain this action, even with reasonable diligence, because: (1) the Yahoo Defendants repeatedly disclaimed responsibility over the Trust; (2) Plaintiffs did not obtain key non-public facts and documents contradicting the Yahoo Defendants, including internal emails and Trust documents, until 2016, and only obtained this information after conducting an investigation, beyond what could be expected of reasonable persons in their circumstances; (3) whether the Trust's humanitarian purpose had been, was being, or would be fundamentally violated could not reasonably have been ascertained before April 11, 2014 based on publicly available information; (4) there was no clear repudiation of the Trust's humanitarian purpose before April 11, 2014; (5) the facts necessary to suggest an illegal violation of the Trust's primary humanitarian purpose—such as the facts that spending of Trust assets on LRF's operational expenses was a "limited exception" to that purpose, and that the Yahoo Defendants exercised considerable control over Trust assets—were concealed by Defendants, and could not have been uncovered with reasonable diligence; and (6) at that time, the publicly available Forms 990 for LRF and LHRO suggested that 57% or more of the $17.3 million Trust corpus remained intact, which was insufficient to provide notice that the Trust's humanitarian purpose had been, was being, or would be fundamentally violated.

## FIRST CLAIM FOR RELIEF
### (Breach of Trust under the Common Law, and in Violation of the District of Columbia Uniform Trust Code, D.C. Code § 19-1301.01, *et seq.*)
### Against all Defendants by Beneficiary Plaintiffs

125.    Plaintiffs re-allege and incorporate all allegations with the same force and effect as if fully restated herein.

126.    Defendants were trustees of the Trust at all relevant times, including as trustees *de son tort*, constructive trustees, implied trustees, or *de facto* trustees. As such, each had a duty to use reasonable care to prevent co-trustees from committing a breach of trust, including breaching the Trust's primary humanitarian purpose, as well as a duty to obtain redress if such a breach occurred.

127.     As alleged herein, Defendants breached these duties by failing to administer the Trust with reasonable care, by permitting the substantial depletion of Trust assets in violation of the Trust's primary humanitarian purpose, while benefiting from the Trust, including by enjoying the Trust's reputation-enhancing effects, by relying on the existence of the Trust to defeat shareholder proposals relating to human rights, by allocating and using Trust assets for their own benefit and in violation of the Trust's purpose, by terminating the Trust in violation of the Trust's purpose, and by failing to obtain redress for these breaches.

128.     Yahoo and Bell further breached their duties as trustees by completely abandoning their duties with respect to the Trust in 2015, leaving Trust assets substantially in the control of Wu and the LRF, who they knew or should have known were not trustworthy, and who they knew or should have known would spend Trust assets in violation of the Trust's humanitarian purpose, and without taking adequate precautions against that violation.

129.     By their conduct, Defendants breached duties of trust owed to the Beneficiary Plaintiffs, and caused the Trust assets to be systematically and unlawfully depleted in violation of the Trust's primary humanitarian purpose, and to be unlawfully terminated.

130.     The Beneficiary Plaintiffs are entitled to equitable relief from Defendants, including: an injunction against further breaches of trust; an injunction to compel Defendants to redress breaches of trust by paying money or restoring Trust property; an accounting; the appointment of a special fiduciary to take possession of Trust property and to administer the Trust; the suspension of Defendants as trustees; the removal of Defendants as trustees; the denial of compensation to trustees; voiding Defendants' actions as trustees; the imposition of a lien or constructive trust on Trust property; and tracing of Trust property and recovery of it or its proceeds.

131.   The Beneficiary Plaintiffs are also entitled to damages from Defendants for their breach of trust in the amount required to restore the value of the Trust assets to what they would have been had the breach not occurred.

### SECOND CLAIM FOR RELIEF
**(Unjust Enrichment Under the Common Law)**
**Against Wu and the LRF by Plaintiff Yu**

132.   Plaintiffs re-allege and incorporate all allegations with the same force and effect as if fully restated herein.

133.   Wu and LRF enjoyed enormous financial benefits as a result of their misconduct, including benefits obtained from breaches that occurred after October 21, 2011, and conferred on them by Yu, as Wu and the LRF could not have enjoyed these benefits had Plaintiff Yu Ling not relinquished her causes of action in the 2007 Lawsuit. It would be inequitable for Wu and LRF to retain these benefits obtained after October 21, 2011.

134.   Plaintiff Yu Ling is entitled to the establishment of a constructive trust imposed upon the unjust benefits Wu and the LRF obtained after October 21, 2011 as a result of Wu and the LRF's breaches of the Settlement's requirements relating to the Trust's humanitarian purpose.

### THIRD CLAIM FOR RELIEF
**(Modification of Trust under D.C. Code §§ 19–1304.10 and 19–1304.12)**
**Against the LRF by the Beneficiary Plaintiffs**

135.   Plaintiffs re-allege and incorporate all allegations with the same force and effect as if fully restated herein.

136.   The Trust should be modified under D.C. Code § 19–1304.12 to modify or terminate the LRF's status as a beneficiary of the Trust, because that would further the Trust's humanitarian purpose. Further, the Trust should be modified under D.C. Code § 19–1304.10 to modify or terminate the LRF's status as a beneficiary of the Trust, because continued provision

of Trust assets to the LRF would further the unlawful breach the Trust's humanitarian purpose, and would be unlawful, wasteful, and contrary to public policy.

## FOURTH CLAIM FOR RELIEF
### (Third-Party Liability for Breach of Trust)
### Against Yahoo by the Beneficiary Plaintiffs
### (In the Alternative to the First Claim for Relief against Yahoo)

137.    Plaintiffs re-allege and incorporate all allegations of this Complaint with the same force and effect as if fully restated herein.

138.    A third person who knowingly assists or participates in a trustee's breach of trust is liable to the beneficiary.

139.    To the extent Yahoo is deemed not to be a trustee of the Trust, Yahoo is liable to the Beneficiary Plaintiffs as a third party for knowingly assisting and participating in Callahan's and Bell's breaches of trust.

## FIFTH CLAIM FOR RELIEF
### (Principal-Agent Liability for Breach of Trust)
### Against Yahoo by the Beneficiary Plaintiffs
### (In the Alternative to the First Claim for Relief against Yahoo)

140.    Plaintiffs re-allege and incorporate all allegations of this Complaint with the same force and effect as if fully restated herein.

141.    To the extent Yahoo is deemed not to be a trustee of the Trust, Yahoo is liable for the acts of its agents Callahan and Bell. Yahoo required Callahan and Bell to serve as trustees of the Trust as a condition of Callahan and Bell's employment, and Callahan and Bell agreed. Callahan and Bell were compensated by Yahoo for serving as trustees. Yahoo had the right to remove Callahan and Bell as trustees.

## SIXTH CLAIM FOR RELIEF
### (Breach of Settlement Agreement)
### Against Yahoo, Wu, and the LRF by Plaintiff Yu Ling

142.     Plaintiffs re-allege and incorporate all allegations of this Complaint with the same force and effect as if fully restated herein.

143.     Plaintiff Yu is a party to the Settlement in the 2007 Lawsuit. Plaintiff Yu agreed to dismiss the 2007 Lawsuit in exchange for, among other things, the creation of a Trust for the benefit of Chinese dissidents imprisoned for exercising their freedom of expression online. The Settlement imposed obligations on Yahoo, Wu, and the LRF to ensure that purpose was carried out.

144.     The Settlement was breached upon: (1) the depletion of Trust assets to such an extent that it culminated in the breach of the Settlement, which required that Trust assets be used "to provide humanitarian and legal assistance primarily to persons in or from the People's Republic of China who have been imprisoned for expressing their views through Yahoo! or another medium," that Wu and the LRF "use their best efforts to maximize the benefits achieved" by this provision, and that Yahoo review all of Wu and the LRF's activities with respect to that provision; and (2) the unlawful termination of that humanitarian purpose, in violation of the Settlement's requirement that Trust assets be used for that purpose.

145.     To the extent any breach occurred before October 21, 2011, Plaintiff Yu Ling is not suing for such a breach.

## SEVENTH CLAIM FOR RELIEF
### (Civil Conspiracy)
### Against All Defendants by All Plaintiffs

146.     Plaintiffs re-allege and incorporate all allegations of this Complaint with the same force and effect as if fully restated herein.

147.    The Yahoo Defendants, Wu, the LRF, the LHRO, and Does 1-20 entered into an agreement that, notwithstanding the Trust's primary humanitarian purpose, and notwithstanding the obligations in the Settlement relating to that purpose, Trust assets would be permitted to be spent on other purposes in ways that would result in the primary humanitarian purpose being fundamentally violated, and in the Settlement being breached. The Yahoo Defendants would benefit by avoiding the cost and burden that proper administration of the Trust would have required of the Yahoo Defendants, while simultaneously enjoying the reputation-enhancing benefits of the Trust, as well as the ability to rely on the existence of the Trust to defeat shareholder proposals, while Wu and the LRF would benefit by using the Trust to enrich themselves.

148.    Overt acts in furtherance of this scheme include: (1) the Yahoo Defendants publicly denying responsibility for the Trust's administration; (2) the Yahoo Defendants identifying Wu and the LRF as being solely responsible for the Trust's administration; (3) the Yahoo Defendants touting the Trust; (4) the Yahoo Defendants permitting Wu and the LRF to spend Trust assets without scrutinizing such spending; (5) Defendants' concealment of facts and documents relating to the scheme; and (6) the Yahoo Defendants relinquishing their authority over Trust assets in 2015 and largely conferring unfettered authority over such assets to Wu and the LRF.

149.    As a result of the agreement and Defendants' acts in furtherance of the agreement, the Trust assets were depleted to such an extent that the Trust's primary humanitarian purpose was violated, with that purpose being terminated completely, and with the Settlement being breached, harming Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.      Damages against all Defendants to which Plaintiffs may be entitled pursuant to each of the counts alleged in this Complaint.

B.      Disgorgement of all monies, including interest, taken by Wu and the LRF and used to their benefit and to the detriment of Plaintiffs in such amounts, including but not limited to the disgorgement and sale of real property as necessary to satisfy the judgment awarded herein.

C.      Specific performance of the Settlement's requirement that Trust assets be spent primarily on Chinese dissidents imprisoned for exercising their freedom of expression online.

D.      Restoration of Trust assets, to be deposited in a constructive trust.

E.      Accounting of Trust assets and expenditures since the establishment of the Trust.

F.      Constructive trust over all remaining Trust assets.

G.      Creation of a constructive trust into which Defendants shall pay damages, disgorgement, and restitution.

H.      Tracing of Trust assets wrongfully disposed of and recovery of such assets or their proceeds.

I.      Modification of the Trust to make Chinese dissidents imprisoned for exercising their freedom of expression online the sole beneficiaries of Trust assets.

J.      The removal of Defendants as trustees.

K.      The appointment of a special fiduciary to take possession of Trust property and to administer the Trust.

L.      Plaintiffs' reasonable attorneys' fees and costs.

M.      Such other and further relief, including any additional equitable relief, as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

Dated: July 3, 2017 **COHEN MILSTEIN SELLERS & TOLL PLLC**

By: */s/ Times Wang*

Daniel S. Sommers (D.C. Bar 416549)
S. Douglas Bunch (D.C. Bar 974054)
Times Wang (D.C. Bar 1025389)
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com
twang@cohenmilstein.com
1100 New York Ave NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2017, I caused the foregoing to be electronically filed

using the CM/ECF system, which will send notice of this filing to all counsel of record.

*/s/ Times Wang*
Times Wang (D.C. Bar 1025389)
twang@cohenmilstein.com
1100 New York Ave NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

1