**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HE DEPU, *et al*., | Case No. 1:17-cv-00635-JDB |
| Plaintiffs, | Judge John D. Bates |
| v. | **ORAL HEARING REQUESTED** |
| YAHOO! INC., *et al.*, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
YAHOO! INC., RONALD BELL, AND MICHAEL CALLAHAN'S
<u>MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II. RELEVANT BACKGROUND ........................................................................... 2

    A.  The Governing Legal Standard On This Motion To Dismiss............................... 2

    B.  The *Wang v. Yahoo!* Lawsuit, The *Wang* Settlement, And All That
          Followed ......................................................................................................... 3

III. ALL OF PLAINTIFFS' CLAIMS AGAINST THE YAHOO DEFENDANTS
     SHOULD BE DISMISSED WITH PREJUDICE............................................. 10

    A.  Plaintiffs Lack Standing To Bring Their Claims. ................................................ 10

    B.  Plaintiffs Other Claims Against The Yahoo Defendants (Their Sixth And
          Seventh Claims) Fail As Well............................................................................ 16

    C.  Plaintiffs' Claims Against The Yahoo Defendants (Their First And Their
          Fourth Through Seventh Claims) Are Also Time-Barred. ................................... 19

IV. THE COURT SHOULD NOT GRANT PLAINTIFFS LEAVE TO AMEND............... 27

V.  CONCLUSION................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant:small-caps">Cases</span>

*Alexander v. Wash. Gas Light Co.*,
  2006 WL 3798858 (D.C. Cir. Aug. 24, 2006) ........................................................ 28

*Alpert v. Riley*,
  274 S.W.3d 277 (Tex. App. 2008) ........................................................................ 16

*Am. Dental Ass'n v. Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010) ............................................................................ 3

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................... 2, 3, 28

*Averill v. Lewis*,
  106 Conn. 582 (1927) ......................................................................................... 14

*Beard v. Edmondson & Gallagher*,
  790 A.2d 541 (D.C. 2002) ................................................................................... 24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................. 3

*Biggins v. Wells Fargo & Co.*,
  266 F.R.D. 399 (N.D. Cal. 2009) ........................................................................ 16

*Bussineau v. President & Directors of Georgetown Coll.*,
  518 A.2d 423 (D.C. 1986) ................................................................................... 24

*Carter v. Washington Metro. Area Transit Auth.*,
  764 F.2d 854 (D.C. Cir. 1985) ............................................................................ 19

*Cheng v. AIM Sports, Inc.*,
  2011 WL 1317134 (C.D. Cal. May 4, 2011) ....................................................... 28

*Childress v. Northrop Corp.*,
  618 F. Supp. 44 (D.D.C. 1985) ........................................................................... 24

*Coverdell v. Mid-South Farm Equipment Ass'n*,
  335 F.2d 9 (6th Cir. 1964) .................................................................................... 9

*De May v. Moore & Bruce, LLP*,
  584 F.Supp.2d 170 (D.D.C. 2008) ........................................................................ 9

*DePippo v. Chertoff*,
  453 F. Supp. 2d 30 (D.D.C. 2006) ............................................................... 20, 23

# TABLE OF AUTHORITIES
(continued)

<u>Page(s)</u>

*Drake v. McNair*,
993 A.2d 607 (2010) ......................................................................................... 24

*Edmond v. Am. Educ. Servs.*,
2010 WL 4269129 (D.D.C. Oct. 28, 2010) ........................................................ 19

*Felder v. WMATA*,
105 F. Supp. 3d 52 (D.D.C. 2015) ..................................................................... 28

*Felter v. Kempthorne*,
473 F.3d 1255 (D.C. Cir. 2007) .......................................................................... 25

*Fischer v. Eldon Stevenson, Jr. Scholarship Fund Trust*,
2005 Tenn. App. LEXIS 518 (Mar. 3, 2005) ...................................................... 14

*Foman v. Davis*,
371 U.S. 178 (1962) ........................................................................................... 28

*Freedom Republicans v. Federal Elec. Comm'n*,
13 F.3d 412  (D.C. Cir. 1994) ............................................................................ 11

*Freidman v. Massage Envy Franchising, LCC*,
2013 WL 3026641 (S.D. Cal. June 13, 2013) ..................................................... 17

*Gordon v. Nat'l Youth Work Alliance*,
675 F.2d 356 (D.C. Cir. 1982) ........................................................................... 20

*Guaranty Trust Co. v. York*,
326 U.S. 99 (1945) ............................................................................................. 20

*Habib v. Raytheon Co.*,
616 F.2d 1204 (D.C. Cir. 1980) .......................................................................... 20

*Halberstam v. Welch*,
705 F.2d 472 (1983) ........................................................................................... 19

*Hall v. Clinton*,
285 F.3d 74 (D.C. Cir. 2002) ............................................................................. 19

*Hendel v. World Plan Exec. Council*,
705 A.2d 656 (D.C. 1997) ............................................................................ 24, 25

*Himmelfarb v. Horwitz*,
536 A.2d 86 (1987) ....................................................................................... 10, 12

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Hooker v. Edes Home*,
    579 A.2d 608 (D.C. 1990) ......................................................................................... 13

*Ibrahim v. Mid-Atl. Air of DC, LLC*,
    802 F. Supp. 2d 73 (D.D.C. 2011) ............................................................................. 3

*Jefferson v. Collins*,
    905 F. Supp. 2d 269 (D.D.C. 2012) ......................................................................... 16

*Jing v. Yahoo Inc.*,
    Case No. 7203 (Del. Chanc. Ct. 2012) ...................................................................... 9

*Jung v. Mundy, Holt & Mance, P.C.*,
    372 F.3d 429 (D.C. Cir. 2004) ................................................................................. 20

*Kaar v. Wells Fargo Bank, N.A.*,
    2016 WL 3068396 (N.D. Cal. June 1, 2016) ........................................................... 18

*Kania v. Chatham*,
    297 N.C. 290 (1979) ........................................................................................... 13, 14

*Kavanagh v. Noble*,
    332 U.S. 535 (1947) ................................................................................................. 20

*Khan v. Parsons Global Servs.*,
    521 F.3d 421 (D.C. Cir. 2008) ................................................................................... 2

*Ling Yuan Hu v. George Wash. Univ.*,
    766 F. Supp. 2d 236 (D.D.C. 2011) ......................................................................... 20

*Long v. United States*,
    604 F. Supp. 2d 119 (D.D.C. 2009) ......................................................................... 25

*Macklin v. Spector Freight Systems, Inc.*,
    478 F.2d 979 (D.C. Cir. 1973) ................................................................................. 19

*Madera v. Metro. Life Ins. Co.*,
    2002 WL 1453827 (S.D.N.Y. July 3, 2002) ............................................................ 24

*Massey v. D.C.*,
    2015 WL 9310126 (D.C. Cir. Dec. 9, 2015) ............................................... 2, 16, 18

*Matijkiw v. Strauss*,
    2011 D.C. Super. LEXIS 13 (D.C. Super. Ct. June 17, 2011)................................... 9

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Moldea v. N.Y. Times Co.*,
   22 F.3d 310 (D.C. Cir. 1994) ................................................................................................ 27

*Mullin v. Wash. Free Weekly*,
   785 A.2d 296 (2001) ........................................................................................................... 25

*Nader v. Democratic Nat'l Comm.*,
   567 F.3d 692 (D.C. 2009) ................................................................................................... 25

*Nat'l Realty Trust v. Neelon Mgmt. Co., Inc.*,
   1973 WL 398 (D.D.C. July 6, 1973) .................................................................................. 20

*Nordberg v. Trilegiant Corp.*,
   445 F. Supp. 2d 1082 (N.D. Cal. 2006) ............................................................................. 17

*Paleteria La Michoacana v. Productos Lacteos*,
   905 F. Supp. 2d 189 (D.D.C. 2012) ................................................................................... 28

*Patrick v. District of Columbia*,
   179 F. Supp. 3d 82 (D.D.C. 2016) ..................................................................................... 28

*Randolph v. ING Life Ins. & Annuity Co.*,
   973 A.2d 702 (D.C. 2009) .................................................................................................. 12

*Rearden v. Riggs Nat'l Bank*,
   677 A.2d 1032 (D.C. 1996) ................................................................................................ 16

*Resolution Trust Corp., v. Gardner*,
   788 F. Supp. 26 (D.D.C. 1992) .......................................................................................... 20

*Sandza v. Barclays Bank PLC*,
   151 F. Supp. 3d 94 (D.D.C. 2015) ..................................................................................... 25

*Schalkenbach Found. v. Lincoln Found.*,
   208 Ariz. 176 (2004) .......................................................................................................... 14

*Si v. Laogai Research Found.*,
   71 F. Supp. 3d 73 (D.D.C. 2014) .............................................................................. 2, 9, 23

*Sperling v. Donovan*,
   104 F.R.D. 4 (D.D.C. 1984) ............................................................................................... 24

*Spinelli v. Nat'l Football League*,
   96 F. Supp. 3d 81 (S.D.N.Y. 2015) ................................................................................... 18

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*St. Croix Chippewa Indians of Wisconsin v. Kempthorne,*
   2008 WL 4449620 (D.D.C. Sept. 30, 2008) ........................................................................ 11

*State v. Hutcherson,*
   96 S.W.3d 81 (Mo. 2003) ................................................................................................ 14

*Stevens v. Sodexo, Inc.,*
   846 F. Supp. 2d 119 (D.D.C. 2012) ........................................................................ 1, 18, 19

*Thompson, Cobb, Bazilio & Assocs., P.C. v. Grant Thornton LLP,*
   2002 WL 458997 (D.D.C. Mar. 25, 2002) ...................................................................... 20

*Tidler v. Eli Lilly & Co.,*
   851 F.2d 418 (D.C. Cir. 1988) ........................................................................................ 15

*U.S. Ecology, Inc. v. U.S. Dept. of Interior,*
   231 F.3d 20 (D.C. Cir. 2000) ................................................................................... 10, 11

*Waldon v. Covington,*
   415 A.2d 1070 (D.C. 1980) ............................................................................................ 19

*Williams v. Bd. of Trustees of Mt. Jezreel Baptist Church,*
   589 A.2d 901 (D.C. 1991) ................................................................................ 1, 12, 13, 15

*Zheng v. Yahoo! Inc.,*
   2009 WL 4430297 (N.D. Cal. Dec. 2, 2009) .................................................................... 6

**STATUTES**

D.C. Code § 12-301(8) ...................................................................................................... 20

D.C. Code § 12-302 .......................................................................................................... 27

D.C. Code § 19-1310.01 .................................................................................................... 20

D.C. Code § 19-1310.05 .............................................................................................. 23, 28

**OTHER AUTHORITIES**

G. Bogert, THE LAW OF TRUSTS AND TRUSTEES (Rev. 2d Ed. Supp. 2003) ........................... 14, 16

RESTATEMENT (SECOND) OF TRUSTS (1959) ................................................................... 12, 16

## I.    INTRODUCTION

China's treatment of political dissidents poses important human-rights concerns that profoundly affects the lives of hundreds of thousands of people.  But this time-barred lawsuit—brought by plaintiffs without standing to sue—is not a proper vehicle to address those concerns.  This lawsuit against Yahoo! Inc. and its former general counsels Michael Callahan and Ron Bell (the "Yahoo Defendants") should be dismissed with prejudice for four primary reasons.

*First*, plaintiffs lack standing to sue, as all but one of them (Yu Ling) is not in privity with the Yahoo Defendants.  Plaintiffs seek to establish such a connection by arguing that they—along with every other Chinese citizen who has been imprisoned for expressing themselves online—are the beneficiaries of a now-terminated trust that Yahoo created.  But unnamed members of such a broad, "uncertain" class lack standing to sue.  *Williams v. Bd. of Trustees of Mt. Jezreel Baptist Church*, 589 A.2d 901, 909 (D.C. 1991).  Plaintiffs ask the Court to ignore this well-established rule and to extend standing to all "potential beneficiaries" of the former trust—a class that (on plaintiffs' theory of the case) is comprised of hundreds of thousands of unknown past and future dissidents.  Courts consistently reject such radical attempts to confer standing on potential beneficiaries, as doing so would invite "recurring vexatious litigation."  *Id.*

*Second*, plaintiff Yu Ling's breach-of-contract claim fails on its own terms.  She can identify no obligation of her 2007 settlement with Yahoo that Yahoo breached, which is fatal to her claim.  *See Stevens v. Sodexo, Inc.*, 846 F. Supp. 2d 119, 125 (D.D.C. 2012).  Moreover, while she devotes most of the new allegations in her amended complaint to contesting a 2009 amendment to the 2007 settlement agreement, she concedes that she filed and settled a lawsuit in 2011, in which she expressly waived any right to challenge conduct that occurred in 2009.

*Third*, plaintiffs' claims are time-barred.  A three-year limitations period governs each claim, and the complained-of conduct here—alleged financial waste and abdication of fiduciary

1

duties—occurred more than three years before the filing of this suit.  These (erroneous) allegations, moreover, were widely reported in public sources, including three prior lawsuits and in various major media outlets, putting plaintiffs on notice of their alleged injuries.

*Fourth*, plaintiffs have now amended their complaint after being confronted with the various underlying operative documents that they erroneously described in their original complaint—all of which the Yahoo Defendants asked this Court to judicially notice on their first motion to dismiss.  Rather than grounding their amended claims in these documents, plaintiffs' amended complaint again misstates them, selectively and misleadingly quoting or rewriting parts of the documents from whole cloth.  Further amendment would be futile, as plaintiffs cannot create standing where none exists, or go back in time, or rewrite the words of agreements.  The Yahoo Defendants' motion should be granted, and this case should be dismissed, with prejudice.[1]

## II.    RELEVANT BACKGROUND

Plaintiffs' amended complaint is replete with misleading and inaccurate allegations that have been asserted publicly for years.  Even accepting these erroneous allegations as true (when pleaded properly), plaintiffs fail to state a claim, and the amended complaint must be dismissed.

### A.    The Governing Legal Standard On This Motion To Dismiss

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Conclusory allegations and formulaic recitations of the elements of a claim do not suffice.  *See id.*; *Massey v. D.C.*, 2015 WL 9310126, at *1 (D.C. Cir. Dec. 9, 2015) ("sparse, conclusory, and unsupported allegations [a]re inadequate to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"); *accord Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 84 (D.D.C. 2014).

---

[1] Plaintiffs' claims are also subject to arbitration.  *See* KD Ex. 1 at 118.  In filing this Motion, the Yahoo Defendants seek the dismissal of plaintiffs' claims, but do not waive their right to arbitrate.  *See Khan v. Parsons Global Servs.,* 521 F.3d 421, 427 (D.C. Cir. 2008).

Legal conclusions masquerading as facts do not meet plaintiff's burden, *see Iqbal*, 556 U.S. at 678, and nor do "speculative" allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Allegations need not be assumed true, moreover, if there are "obvious alternative explanation[s] [for defendants' actions], which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010). Thus, even where allegations taken as true "are consistent with" unlawful conduct, the complaint still must be dismissed if the allegations are "more likely explained by, lawful … behavior." *Iqbal*, 556 U.S. at 680. These pleading requirements apply to each element of a plaintiff's claim, *id*. at 680-84, and plaintiffs cannot take discovery—as they seek to do here, Am. Compl. ¶¶ 2, 5, 6—to fix a deficient complaint, *id*. at 678-79.

In deciding this motion, the Court may consider documents referenced in a complaint and judicially noticeable materials. Here, that includes the agreements and other materials cited in the amended complaint, filings in related lawsuits, government documents, and news accounts. *See Ibrahim v. Mid-Atl. Air of DC, LLC*, 802 F. Supp. 2d 73, 75 (D.D.C. 2011) (the "court may consider facts alleged in the complaint, documents attached to or incorporated in the complaint, matters of which courts may take judicial notice, and documents appended to a motion to dismiss whose authenticity is not disputed, if they are referred to in the complaint and integral to a claim"); *see also* Request for Judicial Notice *passim* ("RJN") (filed herewith).

### B.      The *Wang v. Yahoo!* Lawsuit, The *Wang* Settlement, And All That Followed

As noted in plaintiffs' amended complaint, Am. Compl. ¶ 29 *et seq*., this lawsuit arises from another case filed against Yahoo more than 10 years ago, which settled in October 2007. *See Wang v. Yahoo! Inc.*, Case No. 4:07-cv-02151-CW (N.D. Cal.). That lawsuit, like this present one, was brought by Chinese political activists. *Wang*, *supra*, Dkt. 51.

*1. Yahoo China's operations.*  Yahoo Hong Kong Limited ("YHK") entered the Chinese

market in 1999, and through a Chinese subsidiary (Yahoo China) began offering Yahoo Mail, a

free web-based e-mail service, in China.  *Id.* ¶¶ 14-16; Am. Compl. ¶ 28.  Years later, members

of Congress raised concern that the Chinese government (the "PRC") had prosecuted political

activists using information obtained in the PRC from technology companies, including Yahoo

China.  KD Ex. 7 (Feb. 15, 2006 Hr'g Tr.).

*2. The 2007* **Wang v. Yahoo** *litigation.*  On April 18, 2007, two imprisoned Chinese

political activists, Wang Xiaoning and Shi Tao, and Mr. Wang's wife Yu Ling (a plaintiff in this

case) filed suit against Yahoo and YHK in California, alleging that they violated federal and state

law by turning over Mr. Wang's and Mr. Shi's e-mails to the PRC.  *See Wang*, *supra*.

Yahoo vigorously defended against the claims, and moved to dismiss the case in August

2007.  *Wang*, Dkt. 65.  The motion made clear that any disclosure of e-mails by Yahoo China

was made *involuntarily*, in response to subpoenas from the PRC.  *Id.* at 3 & n.3 (Hong Kong

Privacy Commissioner: "the disclosure of [i]nformation … was not a voluntary act, … but was

compelled under the force of PRC law"); *see* Am. Compl. ¶ 31 (conceding that Yahoo provided

information to PRC authorities in response to "subpoena-like documents issued by Chinese

authorities").  Yahoo showed that compliance with PRC law—including its subpoenas—was

mandated by both U.S. and PRC law.  *Wang*, Dkt. 51 at 5.  Yahoo disputed plaintiffs' contention

that Wang's and Shi's criminal convictions were caused by Yahoo China's alleged disclosure.

*Id.* at 4 n.4.  It further argued that the claims at issue were not judiciable under the political-

question doctrine and showed that the conduct challenged—responding to lawful subpoenas—

was fully privileged under federal, California, and international law.  *Id.* at 4-35.

*3. The* **Wang** *settlement*.  On November 6, 2007, while these motions were pending,

Yahoo's then-CEO Jerry Yang testified before Congress.  Representative Tom Lantos and others

criticized Yahoo.  KD Ex. 8.  Shortly after the hearing, Yahoo agreed to settle the *Wang* case. *Wang*, Dkt. 114; KD Ex. 9 (*Washington Post*:  "The pressures by Congress on Jerry Yang were of tremendous importance to making this settlement happen,' said Morton H. Sklar, [who] represents the Chinese families.").

In exchange for the *Wang* plaintiffs agreeing to dismiss their lawsuit with prejudice, Yahoo agreed to pay $3.2 million to the families of plaintiffs Wang and Shi, and $17.3 million to the Laogai Research Foundation ("LRF") to establish the Yahoo Human Rights Fund ("YHRF"). *See* KD Ex. 2 (*Wang* settlement agreement).[2]  The LRF is an organization founded by Harry Wu, himself a former Chinese political prisoner—who at the time of the *Wang* settlement had become a leading activist for Chinese political prisoners.  *See* Am. Compl. ¶ 24; KD Ex. 10.

The LRF was to use the $17.3 million for three purposes:  (1) provide humanitarian and legal assistance to those in China imprisoned or threatened with imprisonment for expressing themselves through Yahoo or another medium; (2) resolve claims against Yahoo; and (3) fund its "operating expenses" and "educational work conducted in the United States in support of human rights."  KD Ex. 2 at 113.  A $1 million annual limit was placed on the funding of LRF operating expenses, but no limit was placed on the funding of the LRF's educational work.  *Id.*  Despite plaintiffs' repeated allegations to the contrary, none of these three purposes was the "primary purpose," Am. Compl. ¶¶ 65, 67, 110, and none was "subordinate" to the others, *id.* ¶ 45.

The *Wang* plaintiffs were represented by counsel in this resolution.  *See* KD Ex. 9; *Wang*, Dkt. 114 at 2 (stipulation of dismissal by Morton Sklar, Roger Myers, and Karen Parker on behalf of plaintiffs).  Harry Wu executed the settlement on behalf of plaintiffs, after obtaining a power of attorney for each plaintiff.  *See* KD Ex. 2 at 121-27 (power of attorney executed by Yu

---

[2] This payment reflected Yahoo's commitment to human rights—which extends broadly.  *See* https://yahoobhrp.tumblr.com/ (Yahoo Business & Human Rights Program).

Ling on behalf of herself and her husband Wang Xiaoning; power of attorney executed by Gao

Qingsheng on behalf of herself and her son Shi Tao).  As required by the *Wang* settlement,

Yahoo paid plaintiffs $3.2 million and provided $17.3 million to the LRF.  *See* Am. Compl. ¶ 36.

**4.  *The operations of the LRF and the YHRF.***  Soon after the *Wang* settlement, national

media, including the *Wall Street Journal*, *New York Times*, and *Washington Post* reported on the

LRF's work and how it used the *Wang* settlement funds.  KD Exs. 9-11.  The stories reported

that the LRF used the funds to purchase the LRF's new Laogai Museum in Washington D.C.,

which documented China's treatment of political prisoners.  *Id.*  The LRF also used the funds to

settle claims by other Chinese activists, including Li Zhi and Jiang Lijun.  Am. Compl. ¶ 59 n.6.[3]

**5.  *2009 amendment to the* Wang *settlement.***  In June 2009, the *Wang* settlement was

amended.  *See* KD Exs. 2, 3.  Harry Wu, who held power of attorney for the *Wang* plaintiffs,

signed the amendment, along with Michael Samway of Yahoo.  *Id.* Ex. 3 at 129.  Under the

amendment, the LRF transferred $3.55 million to a new Yahoo Irrevocable Human Rights Trust

("Trust"); the remaining funds were transferred to a new organization called the Laogai Human

Rights Organization, Inc. ("LHRO").  *See id* at 128.[4]

Under the amendment, the three purposes of the original settlement funds, *supra* at 5,

were divided between the Trust and LHRO.  The Trust had one purpose: "to resolve claims

against Yahoo Inc. entities, subsidiaries, or affiliates by (a) persons primarily in or from the

---

[3] Yahoo also defended—and defeated—other claims brought by other activists.  *See Zheng v. Yahoo! Inc.*, 2009 WL 4430297, at *4-5 (N.D. Cal. Dec. 2, 2009) (dismissing claims against Yahoo with prejudice).  Yahoo made clear that while it "disagrees with the PRC's restrictions on freedom of expression and privacy, [such] litigation [wa]s not the place to change American foreign policy promoting investment in China and requiring companies operating abroad to comply with local law."  *Zheng*, Case No. 3:08-cv-01068-MMC, Dkt. 62 at 1.

[4] Although plaintiffs make unsupported allegations about the 2009 amendment, Am. Compl. ¶ 6, they never challenge its validity.  Plaintiff Yu Ling, moreover, knew of the amendment as of 2011, because she named the Trust—which was created pursuant to the 2009 amendment—in litigation filed in 2011.  *See Yu*, Case No. 1:11-cv-00092-JCC-JFA, Dkt. 1 at 1; *see infra* at 8.

[PRC] … who have been imprisoned for expressing their views through Yahoo, or (b) any persons threatened with prosecution or imprisonment for expressing their views through Yahoo." *Id*. Ex. 1 at 67 (Trust Overview); *id.* at 70-71 ("The trustees shall pay such part (or all) of the net income and/or principal of the trust property, *in their discretion*, *in order to resolve claims against Yahoo Inc. entities … or affiliates* by (a) persons primarily in or from the [PRC]… who have been imprisoned for expressing their views through Yahoo, or … threatened with prosecution or imprisonment for expressing their views through Yahoo.") (emphases added).

The LHRO—which is not a trust—was to provide the LRF with up to $1 million a year for operational expenses and funds for "humanitarian and legal assistance" to qualifying Chinese activists.  *Id.* at 8 (LHRO Overview); *id.* at 15 (LHRO Articles of Incorporation:  LHRO's purpose is to "fund the projects and programs and administrative expenses of the [LRF]").  The LHRO's bylaws granted it almost no discretion in approving the LRF's requests for funds for operational expenses.  *Id*. at 26 (LHRO Bylaws:  "The Board *will* approve on a semi-annual basis the disbursement of funds to the [LRF]" for operational expenses); *id*. at 9 (requests for funds "*shall be approved*, and *not otherwise subject to the discretion* of the [LHRO] Board," after a "presentation by [the] LRF of a budget and programs overview for the pending disbursement, and a report on the use of funds previously disbursed") (emphases added).[5]

Yahoo was neither a director or trustee of the Trust or LHRO.  It was merely the Trust's "Donor," and its role was limited to the power to appoint and remove a single trustee  and director of the Trust and LHRO, respectively.  KD Ex. 1 at 67.  Michael Samway was the original director and trustee named by Yahoo.  *Id*.  He was replaced as director and trustee by

---

[5] Plaintiffs claim that "trustees" would have "been well within their rights" to provide less than $1 million per year to the LRF is belied by the plain language of the LHRO's incorporation documents.  *Compare* Am. Compl. ¶ 45, *with supra*; KD Ex. 1 at 26.

Mr. Callahan, who served as a director and trustee "until his departure from Yahoo" in July

2012, at which point he was replaced as director and trustee by Mr. Bell.  Am. Compl. ¶¶ 20-21.

Under the Trust incorporation documents, the LHRO was the "known beneficiary" of the

Trust, and "applicants for assistance funding" were deemed "potential beneficiaries."  KD Ex. 1

at 69; *see also* Ex. 4 at 136 (Termination of Trust: LHRO is the "*sole beneficiary* of the Trust")

(emphasis added).  The Trust terminated by its own terms on June 12, 2014.  Ex. 1 at 68; *see also*

Ex. 4 at 130 ("[T]he Trust terminated by its express terms on June 12, 2014").

*6. Criticisms of Harry Wu and the LRF.*  At the time of the *Wang* settlement, Mr. Wu

was a celebrated human-rights activists with close ties to Congressional leaders.  *E.g.*, KD Ex. 7.

In the years following the *Wang* settlement, however, Mr. Wu became the subject of significant

controversy and was involved in several lawsuits, including a case brought by plaintiff Yu Ling.

*See* KD Ex. 13 (*New York Times* article); Am. Compl. ¶¶ 39, 58.

In her lawsuit filed in 2011—*i.e.*, over *six years* ago—Ms. Yu accused Mr. Wu and the

LRF of mismanaging the LRF and of misusing the settlement proceeds, including by purchasing

a $1.45 million property in Washington, DC, and by "otherwise breach[ing]" duties owed to her

and her husband.  *Yu v. Wu*, Case No. 1:11-cv-00092-JCC-JFA (E.D. Va.), Dkt. 1 ¶ 48.  The

lawsuit received media attention when filed.  *See* KD Ex. 14 ("The Chinese couple who sued

Yahoo for its role in the husband's being sentenced to 10 years of forced labor in a Chinese

prison says the man who brokered the settlement with Yahoo extorted millions of dollars from

them.").  Ms. Yu settled her lawsuit in late 2011, and in doing so, she granted the Trust, the LRF,

and their directors and affiliates complete and broad releases.  *See* KD Ex. 5 at 138.

In 2009, a former employee of the LRF (Si Pengcheng) filed another lawsuit against the

LRF and Wu, alleging that Wu violated the False Claims Act by mismanaging LRF funds and

defrauding the government.  *See Si v. Laogai Research Found.*, Case No. 1:09-cv-023888-KBJ

(D.D.C.).  As plaintiffs in this case contend in their amended complaint, Am. Compl. ¶ 101, the *Si* case was a "public lawsuit making serious allegations against Wu and the LRF," and Si's allegations "came to light" in public when, in 2012, the court unsealed the *Si* complaint.

  **7.  *Criticism of the Trust by shareholders.***  In 2011, Chinese dissident Jing Zhao, also a Yahoo shareholder, introduced a public "proposal urging that Yahoo take various measures to protect human rights" and "calling for Yahoo to 'supervise the abused [Trust]' in light of information that it was being mismanaged."  Am. Compl. ¶ 105.  After his proposal was soundly defeated, Mr. Jing sued to assert the same claims.  *See Jing v. Yahoo Inc.*, Case No. 7203 (Del. Chanc. Ct. 2012).  The complaint cited alleged "evidence" that Yahoo's "directors and officers were aware that Harry Wu was misappropriating and misusing Fund assets and [Yahoo's] directors and officers did not use proper judgment or due care when establishing the Fund and when it failed to prohibit or end these wrongdoings."  KD Ex. 25 ¶ 9.  Mr. Jing was represented by Morton Sklar, the same lawyer who represented plaintiff Yu Ling in the *Wang* lawsuit.  *Id*.

  **8.  *This litigation.***  On April 11, 2017, plaintiffs He Depu, Yang Zili, Li Dawei, Wang Jinbo, Ouyang Yi, Xu Yonghai, Xu Wangping, and Ms. Yu filed this lawsuit against the Yahoo Defendants, the LRF, the LHRO, the Estate of Harry Wu,[6] and the Trust.[7]  Each plaintiff, except Yu Ling, claims to be a political activist who was imprisoned in China.  Am. Compl. ¶¶ 10-17.

  On June 12, 2017, the Yahoo Defendants moved to dismiss plaintiffs' complaint.  Dkt. 18.  Rather than oppose that motion, plaintiffs amended their complaint on July 3, 2017.  That

---

  [6] Harry Wu died April 26, 2016.  *See* Am. Compl. ¶ 23.

  [7] The Trust is not a proper party.  *See Matijkiw v. Strauss,* 2011 D.C. Super. LEXIS 13, at *14-15 (D.C. Super. Ct. June 17, 2011) ("while the plaintiffs ask the court to impose judgment against the trusts, they are really seeking judgment against the trustee, because a trust is merely the description of a relationship between the legal and equitable owners of property"); *accord De May v. Moore & Bruce, LLP*, 584 F.Supp.2d 170, 185-86 (D.D.C. 2008); *Coverdell v. Mid-South Farm Equipment Ass'n*, 335 F.2d 9, 11-13 (6th Cir. 1964) ("overwhelming weight of authority" holds that a "[t]rust cannot be sued").  In any event, the Trust no longer exists.  *Supra* at 8.

amended complaint is materially the same as plaintiffs' first defective pleading.  Plaintiffs asserts

claims against the Yahoo Defendants for breach and modification of trust, *id.* ¶¶ 125-131, 135-

36, and civil conspiracy, *id.* ¶¶ 112-13.  They also allege third-party and principal-agent liability

claims for breach of trust against Yahoo, *id.* ¶¶ 137-141.  Ms. Yu—the only plaintiff who claims

to be a party to the 2007 settlement agreement in *Wang*, *Id.* ¶ 18—brings a claim against Yahoo

for breach of settlement.  *Id.* ¶¶ 142-45.

## III.   ALL OF PLAINTIFFS' CLAIMS AGAINST THE YAHOO DEFENDANTS SHOULD BE DISMISSED WITH PREJUDICE.

### A.   Plaintiffs Lack Standing To Bring Their Claims.

The amended complaint should be dismissed because plaintiffs lack standing to sue.  All

plaintiffs (save for Ms. Yu) fail the Article III standing test because the Court cannot redress

their asserted injuries.  *See U.S. Ecology, Inc. v. U.S. Dept. of Interior*, 231 F.3d 20, 24 (D.C.

Cir. 2000) (no Article III standing where no "showing of redressability").  All Plaintiffs

(including Ms. Yu) also lack standing to sue under trust law (the basis for plaintiffs' First, Third,

Fourth, and Fifth Claims) because they are not "beneficiaries with an interest" in the Trust.

*Himmelfarb v. Horwitz*, 536 A.2d 86, 92 (1987).

*1. Plaintiffs lack Article III standing.*  Plaintiffs claim they have been injured by a

"breach" and "termination" of the Trust's "purpose."  Am. Compl. ¶¶ 11-17.  They allege they

"continue to voice dissenting opinions in China" and will be unable to "receive funding [from

the Trust] if … imprisoned [in the PRC] because of the depletion of Trust assets and termination

of the Trust's humanitarian purpose."  *Id.*  Such speculative theories of injury and redress fail to

confer Article III standing.  *See U.S. Ecology*, 231 F.3d at 24; *Freedom Republicans v. Federal

Elec. Comm'n*, 13 F.3d 412, 415  (D.C. Cir. 1994) ("Compliance with the mandates of Article III

is an essential prerequisite to the exercise of federal jurisdiction.").

In *St. Croix Chippewa Indians of Wisconsin v. Kempthorne*, 2008 WL 4449620, at *1-2 (D.D.C. Sept. 30, 2008), for example, the court rejected a similar claim.  There, a tribe applied to the Interior Department to have off-reservation land taken into federal trust so the tribe could build a casino.  Prior to any agency decision, the tribe filed suit, alleging the Department's procedure for reviewing its application violated federal law.  *Id.* at *3.  The Department moved to dismiss, arguing that the tribe lacked standing to sue because its application had not yet been denied.  The court agreed.  *Id.* at *4, 7.  The tribe's "only claimed injury is the increased 'possibility' that the … application will be denied.  While plaintiff contends its application may 'in all probability' be denied, such predictions are not enough to withstand the injury in fact requirement[.]"  *Id.* at *7.  On appeal, the D.C. Circuit affirmed, holding that the tribe lacked Article III standing because it could not allege a "substantial probability" that the challenged action "will harm its concrete and particularized interests."  *St. Croix*, 384 F. App'x 7, at *3.

Here, not only do plaintiffs similarly fail to allege "a substantial probability" of harm or redress, they do not allege *any* redressable injury.  They claim that they will be unable to receive funding from the Trust, but they ignore that the Trust *no longer exists*, and has not existed since 2014.  KD Ex. 1 at 69; Ex. 4 at 136.  And while they contend their applications for funds will be denied, that has not occurred yet.  Plaintiffs have not and cannot establish the "concrete and particularized" harm required for standing under Article III.  *St. Croix*, 384 F. App'x 7, at *3.

**2.  *Plaintiffs lack standing under trust law (the basis for their First, Third, Fourth, and Fifth Claims against the Yahoo Defendants).***  The "only parties with standing to challenge the administration of a private trust … are the beneficiaries with an interest in the aspect challenged."  *Himmelfarb*, 536 A.2d at 92; *see* RESTATEMENT (SECOND) OF TRUSTS § 200 (1959) ("No one except a beneficiary or one suing on his behalf can maintain a suit against the trustee to enforce the trust or to enjoin or obtain redress for a breach of trust."); *Randolph v. ING Life Ins.*

*& Annuity Co.*, 973 A.2d 702, 709 (D.C. 2009) ("Breach of fiduciary duty is not actionable unless injury accrues to the beneficiary.").

Under these plain rules, plaintiffs are not beneficiaries of the Trust with standing to sue. In the operative agreements, "applicants for assistance funding"—*e.g.*, the plaintiffs here—are mere "potential beneficiaries," KD Ex. 1 at 69, and the only named, "known beneficiary [of the Trust] is the [LHRO]," *id.*; Ex. 4 at 136 (LHRO is "sole beneficiary").  While the LHRO has standing to sue, *see Himmelfarb*, 536 A.2d at 92, applicants for assistance funding—like plaintiffs, and hundreds of thousands of others who have criticized the PRC online, *e.g.*, KD Exs. 15-22—lack standing to sue.  "Where property is bequeathed to a person upon an intended trust for such members of an indefinite class of persons as he may select, *no member of the class can maintain a proceeding to enforce the trust, nor can any other person maintain such a proceeding*."  RESTATEMENT, *supra*, § 122, cmt. d (italics added).  Indeed, courts around the country—including the D.C. Court of Appeals—repeatedly reject unworkable attempts, like plaintiffs', to extend standing to members of large potential beneficiary classes.

In *Williams*, 589 A.2d at 904, for example, former members of a Washington D.C. church sued to block the sale of church property.  The court rejected plaintiffs' standing claim that "regular attendance and financial contributions" to the church was sufficient, holding that granting standing to such an "uncertain and limitless" class would run afoul of "traditional notions of standing" and "subject[] the … trustees to recurring vexatious litigation."  *Id.* at 909.

Plaintiffs' lack of standing here follows *a fortiori* from *Williams*:  If a potential beneficiary class consisting of individuals who regularly attended and made contributions to a single church in a single city was too "uncertain and limitless," the same is necessarily true for the potentially hundreds of thousands of potential beneficiaries here.  *See id.*; *cf. Hooker v. Edes Home*, 579 A.2d 608, 614 (D.C. 1990) (potential beneficiaries have standing to enforce trust only

"if the class is sharply defined and its members are limited"; holding plaintiffs had standing because the "sharply defined" class was female, indigent, aged, widows who were in good health and lived in Georgetown for at least five years).

Perhaps most on point are cases like *Kania v. Chatham*, 297 N.C. 290, 292 (1979), in which plaintiff sued the trustees of a foundation that did not award him a scholarship. Plaintiff was nominated for the scholarship and "classified himself as a 'potential beneficiary'" of the trust. *Id.* He argued, as do plaintiffs here, "that the status thus acquired g[a]ve[] him a special interest in the performance of the trust and standing to maintain the action." *Id.* The North Carolina Supreme Court rejected his claim: "We do not agree that plaintiff's classification as a *potential beneficiary* confers upon him standing to maintain his suit. *To the contrary, such classification is fatal to his claim.* Plaintiff is a member of a group comprised of *hundreds* of candidates from which the trustee, in their sole discretion, selected [scholarship] recipients…. *The mere fact that a person may, in the discretion of the Trustees, become a recipient of the benefit under the trust does not entitle him to maintain a suit for the enforcement of the trust.*" *Id.* (italics added). The Court added that plaintiff was one of "more than 930 unsuccessful" applicants, and to "grant plaintiff standing to maintain this action would only open the door to similar actions by other unsuccessful nominees now and in the future"—which would "not only impose upon our courts the burden of multiple litigation but would also require trustees to expend valuable time and resources in defending unwarranted lawsuits." *Id.* at 292-93.[8]

---

[8] Others authorities agree—*see, e.g.*: *Schalkenbach Found. v. Lincoln Found.*, 208 Ariz. 176, 182-83 (2004) ("a party must show that they have a special interest in the trust, such as being a current beneficiary, and not merely being a potential or prior beneficiary of a large class of potential beneficiaries"); *State v. Hutcherson*, 96 S.W.3d 81, 85 (Mo. 2003) (no standing to enforce trust where the "estimated … number of [potential beneficiaries]" was at least 6,000 people); *Averill v. Lewis*, 106 Conn. 582 (1927) (class consisting of "white, protestant, female teachers … residing in the county of Fairfield, Connecticut" too large a class to confer standing to enforce trust); G. Bogert, THE LAW OF TRUSTS AND TRUSTEES § 414 (Rev. 2d Ed. Supp. 2003)

In their amended complaint, plaintiffs attempt to plead around their clear standing deficiencies with the conclusory, unsupported assertions that the class they have identified is "small, sharply defined, … numerically limited," and sufficiently ascertainable.  Am. Compl. ¶ 119-21.  Yet their amended proposed class is even broader than their proposed class in the original complaint.  *See* Doc. 1 ¶¶ 3, 84 (Trust designed to assist "Chinese political dissidents" imprisoned "for exercising their views online").  Under plaintiffs' latest capacious theory, every Chinese citizen who has been imprisoned or threatened with imprisonment for "expressing their freedom of expression … online," *id.* ¶ 119—and *not* just through Yahoo—would have standing to enforce the former Trust.  For example, Chinese citizens targeted for expressing themselves through Google, Hotmail, Instagram, Facebook, or the comments section of an online news outlet would have standing to proceed in this case and others like them under plaintiffs' theory. So, too, would users of leading Chinese internet platforms, including Baidu, QQ, Sina.com, Weibo, and Youku.  And Chinese citizens who expressed themselves online *20 years ago* would also have standing, too, as plaintiffs propose no temporal limitation, either.

While plaintiffs make the conclusory claim this class is "small and numerically limited," that assertion is simply implausible.  *Supra* at 3.  Tens, if not hundreds of thousands or millions of people in China have expressed themselves in all sorts of media online over the past few decades.  And the number of individuals with standing, on plaintiffs' theory, continues to grow, as the PRC—once called "the planet's leading censor," KD Ex. 15—limits online expression. *See* KD Ex. 16  (*Reuters*: police in China claim to have arrested "15,000 people for crimes that jeopardized Internet security" as part of an investigation of 66,000 websites); Ex. 17

---

("[A]s a general rule, no private citizen can sue to enforce a charitable trust merely on the ground that he believes he is within the class to be benefitted by the trust[.]"); *see also Fischer v. Eldon Stevenson, Jr. Scholarship Fund Trust*, 2005 Tenn. App. LEXIS 518, at *14 (Mar. 3, 2005) (even a "prior beneficiary of a large class of potential beneficiaries" lacks standing to enforce a trust).

(*Washington Post*:  China's internet "crackdown has intensified"); Ex. 18 (*Wall Street Journal*:
PRC "has been tightening [its] grip on power by stifling dissent [and by] sending a number of
critics to prison"); Ex. 19 (*New York Times*:  PRC crackdown on political dissent has intensified,
and nearly 300 human rights lawyers were detained as part of a single operation in 2015); Ex. 20
(Congressional-Executive Commission on China:  8,481 reported cases of political or religious
imprisonment as of 2016, but there are likely "considerably more" unreported cases); Ex. 21
(*South China Morning Post*:  "China's internet users grew in 2016 … to 731 million"); Ex. 22
(*New York Times*:  single Chinese online platform "has … 768 million daily active users").

The law of trusts generally—and D.C. law in particular, *see Williams*, 589 A.2d at 904—
refuses to allow members of large potential-beneficiary classes (even numbering in the hundreds)
to file suit.  The asserted class here is orders of magnitude larger, and D.C. trust law bars all of
the claims asserted in this lawsuit (leaving only Yu Ling's breach-of settlement-claim).  *See infra*
Section III.B.  In this diversity case especially, the Court should not rewrite D.C. law to cognize
plaintiffs' unprecedented claims.  *See Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 424 (D.C. Cir.
1988) (federal court sitting in diversity may not "apply[] any rule other than the traditional one").

*3.  **Yahoo, as a mere donor, is not a proper party.***  Plaintiffs' claims against Yahoo fail
for the additional reason that Yahoo never acted as a trustee; Yahoo was a donor only.  *See KD*
Ex. 1 at 69.  As such, Yahoo owed no fiduciary duties.  *See Alpert v. Riley*, 274 S.W.3d 277, 292
(Tex. App. 2008) ("Absent some assignment of duty to the [donor] in the trust instrument, a
trustee has no cause of action to sue the [donor] for a breach of fiduciary duty to the trust
beneficiaries."); Bogert, *supra*, § 42 (with almost no exceptions, "after a [donor] has completed
the creation of a trust, the [donor] is not … in any legal relationship with the beneficiaries or the
trustee, and has no rights, liabilities[,] or powers with regard to the trust administration").

Plaintiffs identify no language in the *Wang* settlement or Trust documents that imposes fiduciary duties upon Yahoo or otherwise overcomes the well-settled rule that donors are not liable for breaches.  Plaintiffs' try to plead around the plain language of the Trust by claiming that Yahoo (and all defendants) are trustees *de son tort*, a constructive trustee, an implied trustee, or a *de facto* trustee, but they fail to allege anything beyond these meaningless legal conclusions, which "[a]re inadequate" under *Iqbal* and trust law.  *Massey*, 2015 WL 9310126, at *1.

Plaintiffs' claims against Yahoo for "[t]hird-[p]arty" and "principal-agent liability" are similarly misplaced.   Am. Compl. ¶¶ 137-41 (Fifth Claim).  The third-party liability claim fails because "a beneficiary cannot bring an action directly against a third-party wrongdoer," as plaintiffs seek to do here.  *Rearden v. Riggs Nat'l Bank*, 677 A.2d 1032, 1037 (D.C. 1996) (citing RESTATEMENT, *supra*, § 281).  The principal-agent liability claim fails because plaintiffs fail to allege, with any of the required specifics, how Callahan or Bell sacrificed their independence to Yahoo when acting in their capacities as directors or trustees.  After *Iqbal*, such conclusory agency allegations do not state a claim.  *See, e.g., Jefferson v. Collins*, 905 F. Supp. 2d 269, 285 (D.D.C. 2012) (dismissing cause of action predicated on agency relationship because plaintiffs "advance only a conclusory [agency] allegation").[9]

**B.      Plaintiffs Other Claims Against The Yahoo Defendants (Their Sixth And Seventh Claims) Fail As Well.**

*1. Yu Ling alleges no specific breach by Yahoo of the* **Wang** *settlement.*   In their original complaint, all eight plaintiffs claimed to be beneficiaries of the *Wang* settlement

---

[9] *Accord, e.g.*, *Biggins v. Wells Fargo & Co.*, 266 F.R.D. 399, 414 (N.D. Cal. 2009) (rejecting agency claim because allegations "are nothing more than bare legal conclusions"); *Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1103 (N.D. Cal. 2006) (rejecting conclusory agency allegations because they lacked any "specific factual allegations" against the defendant); *Freidman v. Massage Envy Franchising, LCC*, 2013 WL 3026641, at *3 (S.D. Cal. June 13, 2013) ("recitation of conclusory language intended to establish [agency] relationship" insufficient to "raise the allegations beyond the speculative").

agreement, and asserted a breach of settlement claim against Yahoo, even though Yu Ling was

the only plaintiff who was a party to that agreement.   Seven of the eight plaintiffs have now

correctly dropped their breach of settlement claim against Yahoo, but Yu Ling's remaining claim

also fails and must be dismissed.   Although the Yahoo Defendants provided plaintiffs with a

copy of the *Wang* settlement and amendment, Dkt No. 18-5, 18-6, the amended complaint

nevertheless still fails to identify *any* provision that the Yahoo Defendants breached.   Instead, it

once again makes conclusory allegations, divorced from the operative agreements' plain

language, and misleads the Court about the legal obligations arising from it.

- Yu Ling claims that the Yahoo Defendants breached the *Wang* settlement because the

    $17.3 million set aside for the YHRF was not spent exclusively on "provid[ing]

    humanitarian and legal assistance primarily to persons in or from [China] who have

    been imprisoned for expressing their views through Yahoo[] or another medium."

    Am. Compl. ¶ 144.   Yet the amended complaint misleadingly omits language—*from*

    *the very same sentence* of the *Wang* settlement—confirming that the $17.3 million

    fund could also be spent "to resolve claims primarily by such persons; and … for

    payment of [LRF] operating expenses and the Foundation's educational work

    conducted in the United States in support of human rights…."   KD Ex. 2 at 113.   It

    also fails to mention that Yu Ling has known about the "significant" payments to the

    LRF for operating expenses for at least six years, as she conceded in her 2011

    lawsuit.   *See Yu*, Case No. 1:11-cv-00092-JCC-JFA, Dkt. 1 ¶ 41 (noting the

    "significant monies paid to" the LRF for "its operations and budget for operating

    expenses"); *id.* ¶ 61 (alleging that Yu Ling found out prior to filing her 2011 lawsuit

    that the LRF "was permitted to use significant monies for operating expenses").

- She claims that the Yahoo Defendants breached the settlement by failing to "review all of [Harry] Wu and the LRF's activities," Am. Compl. ¶ 144, but, of course, can point to no provision requiring the Yahoo Defendants to undertake this duty. Indeed, as noted earlier, the LHRO bylaws limit independent discretion by specifically requiring approval of funding requests upon a presentation by the LRF of a budget and programs overview for pending disbursements. KD Ex. 1 at 9; *supra* at 7 & n.5.

- And she alleges that the *Wang* settlement was breached by the Yahoo Defendants through the "unlawful termination of [its] humanitarian purpose," but she again fails to tie that allegation to any provision or legal obligation in the agreement. *Id.*

These generalized allegations—untethered to a specific legal obligation or instance—cannot survive a motion to dismiss. *See Massey*, 2015 WL 9310126, at *1; *supra* at 2-3. To plead breach of contract after *Iqbal*, a plaintiff must allege which particular provision of the contract was breached and how. *See Stevens*, 846 F. Supp. 2d at 125 (plaintiff must identify "the specific terms of th[e] alleged contract" such that "[defendant's] actions could constitute a breach of its contractual obligations").[10] Yu Ling does not, and cannot, identify any such provision. The reason for that is clear: Under the *Wang* settlement, Yahoo was obligated to make payments to the *Wang* plaintiffs and their families (which it did), and to pay $17.3 million to the LRF to establish the YHRF (which it also did). *Id.* No breach occurred.

---

[10] *Accord, e.g., Kaar v. Wells Fargo Bank, N.A.*, 2016 WL 3068396, at *1 (N.D. Cal. June 1, 2016) ("To claim a breach of contract in federal court[,] the complaint must identify the specific provision of the contract allegedly breached by the defendant."); *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 131 (S.D.N.Y. 2015) ("*Twombly-Iqbal* standards of federal pleading require a complaint to identify, in non-conclusory fashion, the specific terms of the contract that a defendant has breached."); *Edmond v. Am. Educ. Servs.*, 2010 WL 4269129, at *2 (D.D.C. Oct. 28, 2010) ("Without a contractual duty, there can be no breach of contract.").

*2. Plaintiffs' civil conspiracy claim fails as a matter of law.*  Civil conspiracy is not an independent cause of action under District of Columbia law.  Rather, it "depends on performance of some underlying tortious act."  *Halberstam v. Welch*, 705 F.2d 472, 479 (1983); *see Waldon v. Covington,* 415 A.2d 1070, 1074 n.14 (D.C. 1980) ("There is no recognized independent tort action for civil conspiracy in the District of Columbia."); *Hall v. Clinton*, 285 F.3d 74, 82 (D.C. Cir. 2002) ("Civil conspiracy, of course, is not actionable in and of itself.").  Because plaintiffs' underlying causes of action fail, their civil conspiracy claim must also be dismissed.

### C.  Plaintiffs' Claims Against The Yahoo Defendants (Their First And Their Fourth Through Seventh Claims) Are Also Time-Barred.

Despite adding a slew of new allegations, plaintiffs' amended complaint confirms that all of the Yahoo Defendants' alleged misconduct occurred well before April 11, 2014—*i.e.*, more than three years before plaintiffs filed their amended complaint.  All plaintiffs' claims against the Yahoo Defendants—including those brought by plaintiff Xu Wanping, Am. Compl. ¶ 124—are therefore barred by the statute of limitations.

*1. Applicable Rules.*  Limitations periods exist to "prevent[] … stale claims" and to avoid prejudice to defendants.  *Macklin v. Spector Freight Systems, Inc.*, 478 F.2d 979, 996 n.30 (D.C. Cir. 1973); *see Carter v. Washington Metro. Area Transit Auth.*, 764 F.2d 854, 857 (D.C. Cir. 1985) ("[F]inality of outcome, regardless of the merits of the claim, is exactly the purpose of the statute of limitations that the legislature has enacted.").  Such statutes serve "to cut off rights, justifiable or not" and "they must be strictly adhered to by the judiciary."  *Kavanagh v. Noble*, 332 U.S. 535, 539 (1947).

On a motion to dismiss, a cause of action "fail[s] to state a claim" when it is barred by the statute of limitations.  *Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356, 366 (D.C. Cir. 1982).  Courts grant motions to dismiss on statute of limitations grounds where "the facts that

give rise to the defense are [conclusively] clear from the face of the complaint." *DePippo v. Chertoff*, 453 F. Supp. 2d 30, 33 (D.D.C. 2006); *Ling Yuan Hu v. George Wash. Univ.*, 766 F. Supp. 2d 236, 245 (D.D.C. 2011) (granting motion to dismiss on statute of limitations grounds).

As a federal court sitting in diversity, the Court applies the District of Columbia's statute of limitations. *See Guaranty Trust Co. v. York*, 326 U.S. 99, 110 (1945). Plaintiffs' claims for breach of settlement (a species of breach of contract), breach of trust, and civil conspiracy are all subject to a three-year statute. *See Thompson, Cobb, Bazilio & Assocs., P.C. v. Grant Thornton LLP,* 2002 WL 458997, at *2 (D.D.C. Mar. 25, 2002) (breach of contract); *Nat'l Realty Trust v. Neelon Mgmt. Co., Inc.*, 1973 WL 398, at *3 (D.D.C. July 6, 1973) (breach of trust); *Habib v. Raytheon Co*., 616 F.2d 1204, 1208 (D.C. Cir. 1980) (civil conspiracy); D.C. Code § 12-301(8).

Plaintiff's purported breach of settlement claim accrued "at the time of breach," and the breach of trust and civil conspiracy claims all accrued at "the time when the plaintiff both should have known of the defendant's actions and suffered actual injury." *Resolution Trust Corp., v. Gardner*, 788 F. Supp. 26, 29 (D.D.C. 1992); *see* D.C. Code § 19-1310.01 (breach of trust occurs where there has been "a violation by a trustee of a duty the trustee owes a beneficiary"); *Jung v. Mundy, Holt & Mance, P.C.*, 372 F.3d 429, 433 (D.C. Cir. 2004) ("The statute of limitations . . . begins to run once a plaintiff has inquiry notice of a potential cause of action.").

**2. *Ample Notice.*** Plaintiffs received ample notice of their alleged claims and injuries. Their own amended complaint identified numerous alleged, well-publicized bad acts that occurred *before 2014* that allegedly injured them.

a.  The LRF's 2008 purchase of a property on M Street NW.  Plaintiffs allege that YHRF funds were wasted on an "unlawful" 2008 purchase of a $1.45 million property on M St.  Am. Compl. ¶ 67.  This acquisition received significant media attention in 2008 and 2011, and these stories highlighted that YHRF assets were used to buy the building:

- Nov. 12, 2008 *Wall Street Journal* article:  "On Wednesday, the Laogai Museum will open on M Street in Washington, D.C.  Run by expatriate Chinese dissident Harry Wu, the museum documents forced labor camps called laogai through photographs, government papers and prisoner uniforms ....  *The museum is backed by a noteworthy benefactor: Internet giant Yahoo Inc.*  Following its public apology last year for aiding in the arrest of Chinese journalist Shi Tao, Yahoo set up a human rights fund to 'provide humanitarian and legal support to political dissidents who have been imprisoned for expressing their views online.'  *The museum is one of the fund's first public projects.*  Yahoo CEO Jerry Yang is scheduled to cut the ribbon."  KD Ex. 10.

- June 27, 2011 *Washington Post* article:  "The [Laogai] [M]useum is intended to showcase human rights abuses in China....  It was created by Harry Wu, 74, a human rights activist who spent 19 years in forced labor camps ....  The museum first opened on M Street NW in 2008.  The new space, which opened this spring on 20th Street, cost $1 million to develop, design and construct.  *Most of the money for the 2,100-square-foot museum came from the Yahoo Human Rights Fund.*"  *Id.* Ex. 11.

- June 30, 2011 *New York Times* article:  "The Laogai Museum … is the only museum in the United States to focus on China's labor camp system.  *[It] opened in April with support from the Yahoo Human Rights Fund.*"  *Id.* Ex. 12 (all italics added).

b.  The 2011 Yahoo shareholder proposal regarding the management of the YHRF.  In 2011, Jing Zhao publicly "call[ed] for Yahoo to 'supervise the abused [YHRF]' in light of information that it was being mismanaged."  Am. Compl. ¶ 105.  He claimed that "*considerable information ha[d] come to light in 2011* in court proceedings and *in extensive media coverage and vast Internet blogs* concerning of the appropriateness of Yahoo's handling of the unethical

and potentially unlawful activities of the [YHRF]." KD Ex. 6 (italics added). His unsuccessful proposal attracted media attention in 2011, including from CNN. *See* KD Ex. 23.

c.  Mr. Zhao's 2012 lawsuit against Yahoo.  After his shareholder proposal was defeated, Mr. Zhao sued Yahoo in Delaware Chancery Court making the same allegations about the YHRF. He alleged "specific instances [where] … [Yahoo]'s directors and officers were aware that Harry Wu was misappropriating and misusing Fund assets and the Company's directors and officers did not use proper judgment or due care when establishing the Fund and when it failed to prohibit or end these wrongdoings." KD Ex. 25 ¶ 9; *supra* at 9.

d.  Plaintiff Yu Ling's 2011 lawsuit against Harry Wu.  The amended complaint alleges "the LRF incurred enormous legal fees," paid for with Trust assets, defending lawsuits against Mr. Wu, the LRF, and the LHRO, including a lawsuit filed by plaintiff Yu Ling to recover $1 million of her *Wang* settlement funds. Am. Compl. ¶ 64. This public 2011 lawsuit alleged that Wu and the LRF mismanaged funds that the LRF received pursuant to the *Wang* settlement, including by purchasing the $1.45 million property on M St., and by "breach[ing] … their fiduciary obligations." *Yu*, Case No. Case No. 1:11-cv-00092-JCC-JFA, Dkt. 1 at 16-17. Ms. Yu settled her claims. Both her lawsuit and her allegations were public news. KD Ex. 14.

e.  Si Pengcheng's 2009 lawsuit against Mr. Wu and the LRF.  Mr. Si's 2009 lawsuit alleged that Mr. Wu mismanaged LRF funds and committed fraud. *See Si*, Case No. 1:09-cv-023888-KBJ. As plaintiffs concede, Si's allegations "came to light" five years ago, in 2012, when the *Si* complaint was unsealed. *See* Am. Compl. ¶ 101 (the *Si* lawsuit was a "public lawsuit making serious allegations against Wu and the LRF"); *see also* KD Ex. 24 ("A federal judge on Wednesday declined to toss a False Claims Act suit against … the Laogai Research Foundation and the China Information Center, formed by human rights activist Harry Wu.").

    <u>f.  Other asserted harms.</u>  The amended complaint alleges that Mr. Wu and his wife

increased their salaries at the LRF after receipt of the *Wang* settlement proceeds.  Am. Compl.

¶ 62.  Yet these alleged increases began in 2008—nine years ago.  *Id.*  Similarly, plaintiffs allege

that Mr. Wu and the LRF improperly transferred funds to a Wu-affiliated organization, the China

Information Center.  *Id.* ¶ 69.  Again, the first transfer occurred in 2009.  *Id.*

    ***3.  Plaintiffs' Claims Are Barred.***

    a.  Given that these alleged injuries—and any basis to challenge the management of the

Trust or to assert breach—all arose years before April 2014 (or more than three years before the

filing of this suit), plaintiffs' claims are time-barred.  *See DePippo*, 453 F. Supp. 2d at 33.

    Plaintiffs' breach of trust claim against Mr. Callahan is also barred under D.C. Code §

19-1310.05, the statute of repose for breach of trust actions, which requires that "a judicial

proceeding by a beneficiary against a trustee … be commenced within 3 years after [his] removal

[or] resignation," D.C. § 19-1310.05, regardless of when plaintiffs first learned of the alleged

breach.  *See Lewis v. Parker*, 67 F. Supp. 3d 189, 209 (D.D.C. 2014) ("[N]o tolling applies to a

statute of repose and the statute is an 'absolute bar' to liability[.]").  As the amended complaint

admits, Mr. Callahan has not been a trustee since June 2012.  Am. Compl. ¶ 20.  Plaintiffs' claim

against him fail for this further reason as well.

    b.  Plaintiffs seek to revive these past claims and excuse the untimeliness of their lawsuit

generally by arguing that the "unlawful activity" they allege "was continuing in nature, and

could not reasonably have been expected to be the subject of a lawsuit until recently," and that

"[o]nly over time did the cumulative impact of the repeated failures to administer Yahoo Trust

assets in good faith … cause harm to Plaintiffs."  Am. Compl. ¶ 93.

    These conclusory excuses are unavailing because the so-called "continuing violation"

doctrine has no application here.  *See Madera v. Metro. Life Ins. Co*., 2002 WL 1453827, at *4

(S.D.N.Y. July 3, 2002) ("Plaintiff's conclusory allegations that the acts amounted to a continuing violation are an insufficient substitute for an explanation of how these distinct acts are related."); *accord Childress v. Northrop Corp.*, 618 F. Supp. 44, 46-47 (D.D.C. 1985).

"[C]ourts have carefully limited their application" of the doctrine, *Sperling v. Donovan*, 104 F.R.D. 4, 7 (D.D.C. 1984), and it does not apply when plaintiffs (and the public) were plainly on notice of the alleged misconduct—so much so, that it was subject of numerous lawsuits and news stories from large media outlets. *E.g.*, *Hendel v. World Plan Exec. Council*, 705 A.2d 656, 667 (D.C. 1997) ("[O]nce the plaintiff has been placed on notice of an injury and the role of the defendants' wrongful conduct in causing it, the policy disfavoring stale claims makes application of the continuous tort doctrine inappropriate."); *Beard v. Edmondson & Gallagher*, 790 A.2d 541, 548 (D.C. 2002) ("When the plaintiff is or should be aware that he or she is being injured by a continuing tort, the statute of limitations begins to run.").

Nor does the so-called "discovery rule" apply. It applies only "where the relationship between the fact of injury and the alleged tortious conduct is obscure when the injury occurs." *Bussineau v. President & Directors of Georgetown Coll.*, 518 A.2d 423, 425 (D.C. 1986). The D.C. Court of Appeals has held that a "party with immediate suspicions of wrongdoing has an obligation to move promptly and with reasonable diligence to inquire further into the matter," and that the "discovery rule does not ... give the plaintiff carte blanche to defer legal action indefinitely if she knows or should know that she may have suffered injury and that the defendant may have caused her harm." *Drake v. McNair*, 993 A.2d 607, 617 (2010). Indeed, "a right of action may accrue before the plaintiff becomes aware of all of the relevant facts"; "general knowledge that [the defendant's conduct] was wrongful, rather than knowledge of the precise legal remedies for [it], is the focus of this discovery rule." *Hendel*, 705 A.2d at 661.

Here, plaintiffs knew or should have known about their alleged injuries since 2011, if not well before. Ms. Yu plainly knew, because she filed suit making the same claims in 2011. *See Yu, supra*, Dkt. 1 at 16-17. The remaining plaintiffs similarly should have been aware of the allegations in the amended complaint, which, as detailed above, have been publicized for years and were discoverable through reasonable inquiry. *See Sandza v. Barclays Bank PLC,* 151 F. Supp. 3d 94, 112 (D.D.C. 2015) (taking judicial notice of news articles, granting motion to dismiss, and holding that "press coverage was sufficient, as a matter of law, to put a reasonable person on notice of the need to investigate"); *Nader v. Democratic Nat'l Comm.,* 567 F.3d 692, 700-01 (D.C. 2009) (affirming motion to dismiss on timeliness grounds; plaintiff "could by reasonable diligence have known" about alleged wrongdoing because it was covered in press); *Mullin v. Wash. Free Weekly*, 785 A.2d 296, 299 (2001) (declining to apply discovery rule to claims that received coverage in newspaper; "fact of … injury c[ould] be readily determined").

**4. Recent Activity.** Confronted with these arguments, the amended complaint now references three acts that allegedly occurred in the past three years—*i.e.*, that Mr. Wu and the LRF purchased "a $2.55 million townhouse" in July 2015; that Mr. Wu received a salary of $131,200 and $122,907 in 2014 and 2015; and that "the LRF reported … $515,000 in legal expenses" between 2013 and 2015. Am. Compl. ¶¶ 56-59. These claims do not save the amended complaint from its fatal untimeliness problems. These are at most "lingering injur[ies]," *Long v. United States*, 604 F. Supp. 2d 119, 122 (D.D.C. 2009), from defendants' alleged initial "fail[ure]" to meet their fiduciary responsibilities, Am. Compl. ¶ 53. *See Felter v. Kempthorne*, 473 F.3d 1255, 1260 (D.C. Cir. 2007) (subsequent "effect of an unlawful act is not itself an unlawful act"). Indeed, complaints about Wu's salary, buying real property, and use of funds all date back to 2007, 2008, 2009, and Yu's 2011 lawsuit. *Supra* at 20-24.

In any event, all of the alleged conduct occurred *after* Mr. Callahan resigned as a trustee in 2012, Am. Compl. ¶ 20, and most (including the alleged house purchase in 2015) occurred *after* the Trust's termination in 2014. *Id.* ¶ 22; KD Ex.1 at 70.  Unsurprisingly, plaintiffs fail to allege that the Yahoo Defendants approved any of these expenses.  Moreover, while plaintiffs allege that the LRF made these "unlawful" expenditures using "Yahoo Trust assets," Am. Compl. ¶¶ 57-60, they never explain *how* these expenditures are unlawful or run afoul of the *Wang* settlement or the LHRO or Trust bylaws.  Nor can they.  While it is true that part of the $17.3 million that Yahoo paid in *Wang* was aimed at "providing humanitarian aid to imprisoned Chinese dissidents," *id.* ¶ 55, the amended complaint sidesteps the equally vital fact that $1 million each year was to be used "for payment of [the LRF's] *operating expenses* and the [LRF's] education work conducted in the United States."  KD Ex. 2 at 113 (italics added).

And while the amended complaint asserts the legal conclusion that Mr. Wu should not have been paid the salary he was, that the LRF should not have opened the educational museum that it did, or that Mr. Wu's legal expenses should not have been covered in the *Yu* case, Am. Compl. ¶¶ 57-60, the fact of the LRF using its operating expense budget to pay for such items *was long since known to plaintiffs, and indeed, was subject of Yu's and others' lawsuit*.  *Supra* at 7-8, 18-21.  Indeed, the disbursement of $1 million per year to cover such operating expenses was not only permitted by the *Wang* settlement that Ms. Yu sued to enforce, *see id.* & n.7; KD Ex. 2 at 113, such payments were *required* by the bylaws referenced in plaintiff's amended complaint.  *Compare* Am. Compl. ¶ 54-62, *with* KD Ex. 1 at 9 (the LHRO "*will* provide funds for operational expenses to the LRF, up to $[1 million] a year," which shall "*not otherwise be subject to the discretion of the Board*") (italics added).

   ***5. Xu Wanping***.  The amended complaint alleges that plaintiff Xu Wanping remained in prison until April 29, 2014, and that he therefore is not subject to the April 11, 2014 limitations

date.  Am. Compl. ¶ 124.  Even if that were true, his claims would begin to run upon his release

from prison.  D.C. Code § 12-302.  At best, therefore, Xu Wanping's limitations period is

extended by 18 days, from April 11, 2014 (the date when the other plaintiffs' claims began to

run) to April 29, 2014.  The amended complaint alleges no misconduct on the part of the Yahoo

Defendants during those 18 days, and therefore Xu Wanping's claims should be dismissed on

statute of limitations grounds for the same reason that the other plaintiffs' claims should be.

In short, all plaintiffs' claims are untimely.  While they may be dissatisfied with the terms

of the *Wang* settlement or with the LHRO and Trust's bylaws, such terms have been known to

them for years and cannot be challenged now in this time-barred case.

## IV.    THE COURT SHOULD NOT GRANT PLAINTIFFS LEAVE TO AMEND.

The defects of the amended complaint cannot be cured any more than the defects of the

original complaint, and the Court should deny plaintiffs leave to amend a second time.  The

Yahoo Defendants pointed out the manifold deficiencies in the original complaint, and provided

Plaintiffs with the key documents at issue in this dispute.  *See* Dkt. 18.  Yet plaintiffs come no

closer to stating viable claims in their amended complaint.  Plaintiffs cannot create standing for

themselves where, as a matter of law, none exists.  Moreover, they cannot change when their

asserted injuries occurred, nor the numerous ways in which these alleged injuries were openly

discussed in public, all of which started the clock running many years ago to file suit.

Because any amendment would be futile, the Yahoo Defendants should be spared

multiple rounds of briefing these defective claims.  *See, e.g.*, *Moldea v. N.Y. Times Co.*, 22 F.3d

310, 319 (D.C. Cir. 1994) (affirming denial of leave to amend complaint where "the amended

[c]omplaint could not withstand a motion to dismiss and so would be futile."); *accord Alexander*

*v. Wash. Gas Light Co.*, 2006 WL 3798858, at *1 (D.C. Cir. Aug. 24, 2006).

Leave to amend is particularly inappropriate where, as here, plaintiffs have no reasonable grounds to bring several claims, including those that misread the plain terms of the operative agreements. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). Plaintiffs concede, moreover, that Callahan has not been a trustee of the former Trust for five years, Am. Compl. ¶¶ 20, yet they pursue claims against him, in the face of well-settled D.C. law. *See* D.C. Code § 19-1310.05 (actions against trustees "must be commenced" within 3 years of trustee's resignation). The Yahoo Defendants alerted plaintiffs of these issues and asked them to dismiss, KD ¶ 2, but plaintiffs nevertheless refused to drop their claims against Mr. Callahan.

Nor should plaintiffs be permitted discovery, as they now request, to solve the problems of their deficient amended complaint. *See* Am. Compl. ¶¶ 2, 5, 6, 36 n.3. *Iqbal* makes clear that "the doors of discovery" are not unlocked "for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79; *Paleteria La Michoacana v. Productos Lacteos*, 905 F. Supp. 2d 189, 192 (D.D.C. 2012) ("baseless complaints" may not "open the gates to expensive discovery"); *Felder v. WMATA*, 105 F. Supp. 3d 52, 59 (D.D.C. 2015) ("A plaintiff may not … use discovery to obtain the facts necessary to establish [that] a claim … is plausible on its face … even when those facts 'are only within the head or hands of the defendant."). Indeed, "by arguing that [they] require discovery at the motion-to-dismiss stage," plaintiffs "essentially concede[] that [their] allegations" against the Yahoo Defendants "are based on speculation." *See Patrick v. District of Columbia*, 179 F. Supp. 3d 82 (D.D.C. 2016).[11]

---

[11] In any event, discovery in this case will be problematic if not impossible on key issues, given PRC prohibitions on discovery in China. *E.g.*, *Cheng v. AIM Sports, Inc.*, 2011 WL 1317134, at *1 (C.D. Cal. May 4, 2011) (noting U.S. State Department report finding that "China could well deem taking depositions by American attorneys or other persons in China [to be] a violation of China's judicial sovereignty," resulting "in the arrest, detention, expulsion, or deportation of the American attorneys"). This reality makes recognizing the "potential beneficiary" class that plaintiffs need to state a claim—*supra* Section III.A—doubly impractical.

V.      **CONCLUSION**

For all of the foregoing reasons, the Court should grant the Yahoo Defendants' motion

and dismiss plaintiffs' amended complaint in its entirety without leave to amend.

Dated:   August 2, 2017                          Respectfully Submitted,

By: /s/ Matt Kline
          Matthew T. Kline

Brian Boyle (D.C. Bar No. 419773)
  bboyle@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
Telephone:     (202) 387-5327
Facsimile:     (202) 383-5414

Matthew T. Kline (*pro hac vice*)
  mkline@omm.com
Patrick S. McNally (*pro hac vice*)
  pmcnally@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone:     (310) 553-6700
Facsimile:     (310) 246-6779

*Attorneys for Defendants Yahoo! Inc., Ronald
Bell, and Michael Callahan*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 2, 2017, I caused the foregoing document to be electronically filed with the clerk of the United States District Court for the District of Columbia using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the electronic Mail Notice List.

Executed on August 2, 2017, in Los Angeles, California.


_____
/s/ Matt Kline
Matthew T. Kline