**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HE DEPU, *et al*.

                     Plaintiffs,

          v.

YAHOO! INC., *et al*.

                    Defendants.

No. 1:17-635-JDB

Judge John D. Bates

**SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................. 1

JURISDICTION AND VENUE ............................................................................................ 3

PARTIES ................................................................................................................................ 4

    A.    Plaintiffs ................................................................................................................ 4

    B.    Defendants .............................................................................................................. 9

        1.    The Yahoo Defendants ............................................................................ 9

        2.    Estate of Harry Wu ............................................................................... 10

        3.    Laogai Research Foundation and Laogai Research Foundation-CA ........ 10

        4.    Laogai Human Rights Organization ...................................................... 11

        5.    Yahoo Human Rights Fund .................................................................. 11

        6.    Doe Defendants ..................................................................................... 11

STATEMENT OF FACTS ................................................................................................... 12

    A.    Yahoo was sued in 2007 for providing information about dissidents to Chinese government, leading to their imprisonment. ......................................................... 12

    B.    The Yahoo Human Rights Fund is established as a condition of the settlement of the 2007 Lawsuit. ............................................................................................... 14

    C.    The establishment of the Yahoo Human Rights Fund created an enforceable charitable trust. ................................................................................................... 15

    D.    The Yahoo Defendants exercised considerable control over Trust assets and were trustees with important fiduciary responsibilities. ................................................ 20

    E.    Trust assets are systematically and unlawfully depleted by Wu and the LRF in contravention of the Trust's humanitarian purpose, while the Yahoo Defendants willfully ignore red flags. ..................................................................................... 23

    F.    The Trust's humanitarian purpose is terminated. ................................................. 28

    G.    Yahoo repeatedly denies responsibility for the Trust or its humanitarian purpose. ............................................................................................................................ 29

    H.    The Yahoo Defendants were well aware of the misconduct and were repeatedly and directly warned. ............................................................................................. 34

    I.    Yahoo touts the Trust's humanitarian purpose and relies on it to defeat shareholder proposals. ......................................................................................... 37

    J.    Defendants' failure to administer the Trust and its humanitarian purpose for the benefit of imprisoned Chinese dissidents. ........................................................... 38

    K.    Developments between the filing of the action and April 27, 2018, the date the proposed second amended complaint, ECF No. 42-1, was filed. ......................... 41

L.    Developments since April 27, 2018. ..................................................... 43

    1.    Following the filing of Plaintiffs' proposed second amended complaint, Mr. Yu and Chang apparently abandoned their attempts to personally benefit from the Trust. ................................................................. 43

    2.    Defendants display a guilty conscience by creating a "Humanitarian Program Grant." ................................................................. 43

    3.    Defendants concede there was no obligation under the Settlement for the LRF to receive any monies from the Yahoo Human Rights Fund. .......... 44

    4.    Despite that concession, Defendants fail to prevent further dissipation of the Trust on benefiting the LRF. ................................................. 45

*ALTER EGO* ALLEGATIONS ................................................................. 47

CHARITABLE BENEFICIARY STANDING ALLEGATIONS ................................. 48

STATUTE OF LIMITATIONS ALLEGATIONS ................................................. 51

FIRST CLAIM FOR RELIEF ................................................................. 53

SECOND CLAIM FOR RELIEF ................................................................. 55

THIRD CLAIM FOR RELIEF ................................................................. 56

FOURTH CLAIM FOR RELIEF ................................................................. 56

FIFTH CLAIM FOR RELIEF ................................................................. 57

SIXTH CLAIM FOR RELIEF ................................................................. 58

PRAYER FOR RELIEF ................................................................. 59

Plaintiffs He Depu ("Mr. He"), Li Dawei ("Li"), Wang Jinbo ("Wang"), Ouyang Yi ("Ouyang"), Xu Yonghai ("Xu"), and Xu Wanping ("Xu W.") bring this action based upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, against Oath Holdings, Inc. ("Verizon" or "Yahoo" or "Oath"), Michael Callahan ("Callahan"), Ronald Bell ("Bell"), the Estate of Harry Wu ("Wu"), the Laogai Human Rights Organization ("LHRO"), the Laogai Research Foundation, Laogai Research Foundation-CA (together with the Laogai Research Foundation, "LRF"), other Doe defendants currently unknown to Plaintiffs (Yahoo, Callahan, Bell, Wu, LHRO, LRF, and Doe defendants are collectively referred to as "Defendants"), and the Yahoo Human Rights Fund ("YHRF" or "Trust" or "Fund") as a nominal defendant, as follows:

## NATURE OF THE ACTION

1.      This case arises from breaches of trust relating to a $17.3 million Trust called the Yahoo Human Rights Fund that is, at least in part, a charitable trust. In particular, a significant portion of the Trust was intended by the settlors to be spent on the charitable purpose of providing humanitarian and legal assistance to Chinese dissidents imprisoned for exercising their freedom of expression online.

2.      The breaches consist of: (1) the failure to spend sufficient Trust assets on the Trust's humanitarian purpose combined with the overspending of Trust assets on unrelated matters, and particularly for the benefit of Wu and the LRF, resulting in the material violation of the Trust and its humanitarian purpose; (2) the outright termination of the Trust's humanitarian purpose in March 2016; and (3) the ongoing failure to take steps to protect the Trust and its humanitarian purpose, combined with the ongoing spending of Trust assets on unrelated matters, including for the benefit of the LRF and the LHRO. Moreover, because Defendants have conceded there was and is no obligation to spend any portion of the Fund for the benefit of Wu

or the LRF, Defendants' past, present, and future allowance of massive amounts of such spending, to the detriment of the Trust and its humanitarian purpose, were and are breaches of trust that were and are willful and/or intentional, and/or committed in bad faith and/or with reckless indifference to the Trust and its humanitarian purpose.

3.      Plaintiffs are residents of China who speak little or no English and who placed their trust and confidence in Defendants, their fiduciaries, and who conducted an investigation beyond what could have been expected of a reasonable person in their circumstances, which, in some cases, included being in Chinese prison while these events unfolded. Indeed, from their homes in China, and with little understanding of the American legal system, Plaintiffs and their allies managed to uncover key pieces of information that Defendants had attempted to keep secret over the years, including internal emails and documents, yielding the factual bases for this lawsuit. They and their allies tracked down former employees, who provided them with key documents and information relating to the Trust and its humanitarian purpose. They and their allies also gained the attention of prominent journalists, who obtained and reported additional facts and documents previously kept hidden by Defendants.

4.      For example, in 2016, Plaintiffs' investigation unearthed previously confidential information showing that, contrary to Yahoo's repeated representations that it had no authority over the Trust, Yahoo actually exercised considerable control over Trust assets and was a trustee of the Trust and its humanitarian purpose from the very outset. As another example, in 2016, Plaintiffs' investigation showed that Yahoo well understood this fact, as evidenced by various half-hearted and previously undisclosed attempts to ensure that the Trust and its humanitarian purpose were carried out, again contradicting Yahoo's representations that it had no authority over the Trust and its humanitarian purpose.

5.      And yet, the truth about the nature and scope of the misconduct remains elusive, and will only be revealed with a reasonable opportunity for discovery.

6.      Indeed, even *without* discovery, this lawsuit has shed light on new facts. For example, a document filed by Defendants in this lawsuit has revealed that in 2009, there was an attempt to "amend" the Settlement that gave rise to the Trust and its humanitarian purpose, an "amendment" that the plaintiffs in the underlying lawsuit were never informed of and that has never been public until now. Another document not previously publicly available until it was filed by Defendants in this lawsuit revealed that in 2009, the trustees carved out $3.55 million from the Trust, to be placed in a separate trust, to resolve claims against Yahoo. This separate trust was entitled the Yahoo! Irrevocable Human Rights Trust 2009 ("YIHRT"), but its precise nature and purpose, including the Declaration of Trust document itself, were not made public, and were not known to Plaintiffs, until this lawsuit. Plaintiffs believe that discovery will yield further evidence of wrongdoing with respect to the administration of the Trust and its humanitarian purpose.

## JURISDICTION AND VENUE

7.      This action arises under the laws of the District of Columbia, including the common law of the District of Columbia, and the District of Columbia Uniform Trust Code.

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because it is an action between citizens of a State and citizens of a foreign state, and the amount in controversy exceeds $75,000.

9.      Venue is proper in the District Court for the District of Columbia, pursuant to 28 U.S.C. § 1391(b)-(d), because a substantial part of the unlawful conduct occurred in the District of Columbia, and because a substantial part of the property that is the subject of this action is located in the District of Columbia.

## PARTIES

### A.   Plaintiffs

10.    Plaintiff He Depu (defined above as "Mr. He") is a citizen and resident of China, domiciled in Beijing. He was detained on November 4, 2002 and was eventually charged and convicted of "inciting subversion of state power."[1] The evidence at trial consisted largely of his email communications and "provocative" articles published online or with his signature, including evidence transmitted through Mr. He's Yahoo email account. The verdict repeatedly quoted from evidence obtained by the Beijing Municipal Public Security Bureau's "Public Information Cyberspace Security Division." On November 6, 2003, Mr. He was sentenced to eight years' imprisonment by the Beijing Municipal First Intermediate People's Court. Mr. He was released in 2011. Mr. He is a past beneficiary of the Trust, and was a potential future beneficiary until the unlawful termination of its humanitarian purpose. Mr. He previously applied to and received funding from the Trust, but not as much as he would have had Defendants administered the Trust lawfully. Mr. He continues to voice dissenting opinions in China. Mr. He suffered the following injuries: (1) receiving less than he would have but for the unlawful diversion of Trust assets away from its humanitarian purpose; (2) losing the opportunity to obtain meaningful funding as a result of the unlawful diversion of Trust assets away from its humanitarian purpose to such an extent that that purpose was fundamentally violated; (3) losing the opportunity to ever receive funding from the Trust's humanitarian purpose as a result of its termination; and (4) a significant and ever-worsening decrease in the likelihood of a meaningful restoration of that opportunity as a result of Defendants' ongoing failures to protect and restore that purpose.

---

[1] Quotations from Chinese proceedings have been translated from the original Chinese.

11.     Plaintiff Li Dawei (defined above as "Li") is a citizen and resident of China, domiciled in Tianshui city, Gansu province. Li was detained on April 15, 2001, on charges of "subversion of state power," and was eventually convicted. The verdict against him said that his "criminal" activities included using the Internet to publicize an open letter, and "using the Internet" to send letters to activists outside of China, as well as using the Internet to collect information. This included activity conducted using Li's Yahoo email account. The Tianshui Municipal Intermediate People's Court in Gansu Province sentenced Li to 11 years' imprisonment on July 17, 2003. Li was released in 2012. Li is a past beneficiary of the Trust, and was a potential future beneficiary until the unlawful termination of its humanitarian purpose. Li previously applied to and received funding from the Trust, but not as much as he would have had Defendants administered the Trust lawfully. Li continues to voice dissenting opinions in China. Li suffered the following injuries: (1) receiving less than he would have but for the unlawful diversion of Trust assets away from its humanitarian purpose; (2) losing the opportunity to obtain meaningful funding as a result of the unlawful diversion of Trust assets away from its humanitarian purpose to such an extent that that purpose was fundamentally violated; (3) losing the opportunity to ever receive funding from the Trust's humanitarian purpose as a result of its termination; and (4) a significant and ever-worsening decrease in the likelihood of a meaningful restoration of that opportunity as a result of Defendants' ongoing failures to protect and restore that purpose.

12.     Plaintiff Wang Jinbo (defined above as "Wang") is a citizen and resident of China, domiciled in Linyi city, Shandong province. Wang was detained on May 24, 2001, for "inciting subversion of state power," was eventually convicted on December 4, 2001, and sentenced to four years' imprisonment by the Linyi Municipal Intermediate People's Court in Shandong

Province. The verdict was based in part on Wang's exercise of his freedom of expression, and on activity conducted using Wang's Yahoo email account. Wang was released in 2005. Wang is a past beneficiary of the Trust, and was a potential future beneficiary until the unlawful termination of its humanitarian purpose. Wang previously applied to and received funding from the Trust, but not as much as he would have had Defendants administered the Trust lawfully. Wang continues to voice dissenting opinions in China. Wang suffered the following injuries: (1) receiving less than he would have but for the unlawful diversion of Trust assets away from its humanitarian purpose; (2) losing the opportunity to obtain meaningful funding as a result of the unlawful diversion of Trust assets away from its humanitarian purpose to such an extent that that purpose was fundamentally violated; (3) losing the opportunity to ever receive funding from the Trust's humanitarian purpose as a result of its termination; and (4) a significant and ever-worsening decrease in the likelihood of a meaningful restoration of that opportunity as a result of Defendants' ongoing failures to protect and restore that purpose.

13.    Plaintiff Ouyang Yi (defined above as "Ouyang") is a citizen and resident of China, domiciled in Suining city, Sichuan province. Ouyang was detained by the Chengdu Municipal Public Security Bureau on December 5, 2002 and was eventually convicted on charges of "incitement of subversion of state power." The verdict against him cited email evidence, including an open letter to the Chinese Communist Party distributed via email, and "sent using email to overseas websites and propagated online," and other evidence and information transmitted through, and activities conducted using Ouyang's Yahoo email account. On March 1, 2004, the Chengdu Municipal Intermediate People's Court in Sichuan Province sentenced Ouyang to two years' imprisonment. Ouyang was released in 2006. Ouyang is a past beneficiary of the Trust, and was a potential future beneficiary until the unlawful termination of

its humanitarian purpose. Ouyang previously applied to and received funding from the Trust, but not as much as he would have had Defendants administered the Trust lawfully. Ouyang continues to voice dissenting opinions in China. Ouyang suffered the following injuries: (1) receiving less than he would have but for the unlawful diversion of Trust assets away from its humanitarian purpose; (2) losing the opportunity to obtain meaningful funding as a result of the unlawful diversion of Trust assets away from its humanitarian purpose to such an extent that that purpose was fundamentally violated; (3) losing the opportunity to ever receive funding from the Trust's humanitarian purpose as a result of its termination; and (4) a significant and ever-worsening decrease in the likelihood of a meaningful restoration of that opportunity as a result of Defendants' ongoing failures to protect and restore that purpose.

14.     Plaintiff Xu Yonghai (defined above as "Xu") is a citizen and resident of China, domiciled in Beijing. On October 13, 2003, Xu was arrested in Hangzhou and charged with "suspicion of illegally providing state secrets and information" outside of China. The charges related to an investigative report Xu and others had compiled on the persecution of Christian "house churches" in China. The verdict against Xu cited evidence that this report had "been provided to foreign personnel through email." Xu used his Yahoo email account to transmit some of the evidence cited against him. On August 6, 2004, Xu was sentenced to two years' imprisonment. Xu was released in 2006. Xu is a past beneficiary of the Trust, and was a potential future beneficiary until the unlawful termination of its humanitarian purpose. Xu previously applied to and received funding from the Trust, but not as much as he would have had Defendants administered the Trust lawfully. Xu continues to voice dissenting opinions in China. Xu suffered the following injuries: (1) receiving less than he would have but for the unlawful diversion of Trust assets away from its humanitarian purpose; (2) losing the opportunity to obtain

meaningful funding as a result of the unlawful diversion of Trust assets away from its humanitarian purpose to such an extent that that purpose was fundamentally violated; (3) losing the opportunity to ever receive funding from the Trust's humanitarian purpose as a result of its termination; and (4) a significant and ever-worsening decrease in the likelihood of a meaningful restoration of that opportunity as a result of Defendants' ongoing failures to protect and restore that purpose.

15.     Plaintiff Xu Wanping (defined above as "Xu W.") is a citizen and resident of China, domiciled in Chongqing. Xu W. has served a total of 20 years in prison for political dissent, most recently from 2005 to 2014. Xu W. was released from prison on April 29, 2014. The verdict against Xu W. relied on Xu W.'s online activity as evidence, including emails and articles Xu. W. sent, received, and published using his Yahoo email account. Xu W. is still an active political dissident and activist. In early 2016, Xu W. applied for funding from the Trust. Defendant Harry Wu responded in March 2016, informing Xu W. that the LRF had deliberated the matter, concluded that the Trust's humanitarian purpose should be terminated, and that that purpose was, in fact, terminated. Xu W. was a potential beneficiary of the Trust until the termination of its humanitarian purpose. As such, he suffered the following injuries: (1) losing the opportunity to obtain meaningful funding as a result of the unlawful diversion of Trust assets away from its humanitarian purpose to such an extent that that purpose was fundamentally violated; (2) being denied funding as a result of the termination of the Trust's humanitarian purpose; (3) losing the opportunity to ever receive funding from the Trust and its humanitarian purpose as a result of the termination of that purpose; and (4) a significant and ever-worsening decrease in the likelihood of a meaningful restoration of that opportunity as a result of Defendants' ongoing failures to protect and restore that purpose.

B.    **Defendants**

1.    **The Yahoo Defendants**

16.    Defendant Oath Holdings, Inc. (defined above as "Verizon" or "Yahoo" or "Oath Holdings"), is a wholly-owned subsidiary of Verizon Communications Inc. According to counsel for Yahoo! Inc. and Verizon, and to a sworn declaration provided to Plaintiffs by in-house counsel for Verizon before the filing of this complaint, Yahoo! Inc. (now known as Altaba Inc.) transferred certain assets and liabilities making up that Yahoo! Inc.'s operating business to Verizon, effective June 2017. This action was assertedly one of those liabilities, and, in reliance on the representations of counsel for Yahoo! Inc. and Verizon, Oath Holdings, Inc. is named as a defendant here, and Yahoo! Inc. is not. For readability, it will be referred to either as Yahoo, Verizon, or Oath Holdings, or some combination thereof, depending on context.

17.    Oath Holdings, Inc. is located in Sunnyvale, California.

18.    According to Yahoo! Inc. (now known as Altaba Inc.), as a result of the June 2017 transfer of assets and liabilities, the Trust "is now being administered by Verizon." *See* Appendix A.

19.    Yahoo was a defendant in the 2007 Lawsuit (defined below), the settlement of which resulted in the creation of the Trust. Yahoo was and remains a trustee of the Trust and its humanitarian purpose. Yahoo owed and continues to owe fiduciary duties to Plaintiffs and to the Trust and its humanitarian purpose.

20.    Defendant Michael Callahan (defined above as "Callahan") was Executive Vice President, General Counsel, and Corporate Secretary at Yahoo from December 1999 to July 2012. Callahan was a trustee of the Trust and its humanitarian purpose, and a member of the board of directors of LHRO (defined below), until his departure from Yahoo. As trustee and director, Callahan owed fiduciary duties to Plaintiffs and to the Trust and its humanitarian

purpose. Callahan is a resident of California. Callahan was compensated for his services as trustee and director, including by Yahoo and the LHRO.

21.     Defendant Ronald Bell (defined above as "Bell") was General Counsel and Corporate Secretary at Yahoo. Bell was a trustee of the Trust and its humanitarian purpose, and was a member of the board of directors of LHRO until 2016. As trustee and director, Bell owed fiduciary duties to Plaintiffs and to the Trust and its humanitarian purpose. Bell is a resident of California. Bell was compensated for his services as trustee and director, including by Yahoo and the LRHO.

22.     Bell notified the LHRO board on January 7, 2016, that because of the termination of the YIHRT (defined below), Yahoo's role on the LHRO board was no longer needed, and that he was resigning from the board effective January 8, 2016.

23.     Defendants Yahoo, Callahan, and Bell are collectively referred to as the "Yahoo Defendants."

## 2.     Estate of Harry Wu

24.     Defendant Estate of Harry Wu is the estate of Harry Wu (defined above as "Wu"), who was a trustee of the Trust and its humanitarian purpose, and Executive Director of LHRO and LRF. As trustee and director, Wu owed fiduciary duties to Plaintiffs and to the Trust and its humanitarian purpose. Wu was a resident of Virginia. Wu passed away on April 26, 2016. Wu was compensated for his services as trustee and director, including by Yahoo, the LRF, and the LHRO.

## 3.     Laogai Research Foundation and Laogai Research Foundation-CA

25.     Defendant Laogai Research Foundation is a 501(c)(3) non-profit corporation, organized under the laws of the Commonwealth of Virginia. Defendant Laogai Research Foundation-CA is a 501(c)(3) non-profit corporation, organized under the laws of the State of

California. (The Laogai Research Foundation and the Laogai Research Foundation-CA were previously together defined as "LRF.") The LRF's principal place of business is 1901 18th St. NW, Washington, DC, 20009. LRF was Wu's *alter ego* when Wu was alive, as Wu dominated and controlled all aspects of the LRF's operations. The LRF was and remains a trustee of the Trust and its humanitarian purpose, and owed and continues to owe fiduciary duties to Plaintiffs and to the Trust and its humanitarian purpose.

### 4.      Laogai Human Rights Organization

26.      Defendant Laogai Human Rights Organization (defined above as "LHRO") is a 501(c)(3) non-profit corporation organized under the laws of the District of Columbia. The LHRO's principal place of business is 1901 18th St. NW, Washington, DC, 20009. LHRO was established to administer a portion of the Trust's assets. The LHRO was and remains a trustee of the Trust and its humanitarian purpose. The LHRO owed and continues to owe fiduciary duties to Plaintiffs and the Trust and its humanitarian purpose.

### 5.      Yahoo Human Rights Fund

27.      Defendant Yahoo Human Rights Fund (defined above as the "YHRF" or "Trust or "Fund") is a trust fund established in 2007 and fully funded in 2008 in substantial part to provide humanitarian and legal assistance to persons in China who have been imprisoned for exercising their freedom of expression online. Given the possibility that the Trust currently holds title to assets necessary to grant Plaintiffs complete relief, it is named as a nominal defendant.

### 6.      Doe Defendants

28.      Does 1-20 are those who were or are trustees of the Trust and its humanitarian purpose and who breached or are breaching their duties as trustees ("Doe Trustees").

29.      They are also those who knowingly assisted or participated, or who are knowingly assisting or participating, in the trustees' breaches of trust ("Doe Abettors").

30.     They are also those who: (1) took or are taking Trust property transferred to them in breach of the trustees' fiduciary duties to Plaintiffs and/or to the Trust and its humanitarian purpose; (2) knew or should have known, or know or should know, that such property was or is from the Yahoo Human Rights Fund; and (3) were aware or should have been aware, or are aware or should be aware, of the allegations in this action ("Doe Recipients," and together with Doe Trustees and Doe Abettors, "Doe Defendants"). They do not include anyone who purchased such property for value and without notice of the breach.

31.     Doe Defendants will be identified and named after discovery.

## STATEMENT OF FACTS

**A.    Yahoo was sued in 2007 for providing information about dissidents to Chinese government, leading to their imprisonment.**

32.     Yahoo was one of the first international internet companies to operate in China, and in the early 2000s, many Chinese dissidents used Yahoo's email services to communicate and disseminate information, including information that the Chinese Communist Party ("CCP") considered subversive. These users believed that, as an American company ostensibly respectful of First Amendment ideals such as freedom of expression, Yahoo would resist inevitable CCP efforts to obtain their private information, which the CCP would use to punish them and to eliminate dissent. Unfortunately, Yahoo failed to live up to these ideals, and instead readily turned over user information to the CCP, fully aware of the likely consequences. As a result, many Yahoo users were imprisoned based on evidence provided by Yahoo.

33.     In 2007, two such imprisoned Yahoo users, Wang Xiaoning ("Wang X.") and Shi Tao ("Shi"), along with Wang X.'s wife, Yu Ling, brought a lawsuit against Yahoo ("2007 Lawsuit") in the U.S. District Court for the Northern District of California. *See Wang Xiaoning, Shi Tao, Yu Ling et al. v. Yahoo!, Inc. et al.*, No. 07-02151-CW, ECF No. 51 (N.D. Cal., July 30,

2007) (amended complaint). The lawsuit alleged, among other things, that Yahoo was liable under the Alien Tort Statute, 28 U.S.C. § 1350, the Torture Victim Protection Act, 28 U.S.C. § 1350, the Electronic Communications Privacy Act, 18 U.S.C. § 2701, and the common law of California. *See id*.

34.     The Shi Tao case in particular had by then attracted significant public attention. Shi was a journalist and editor at a business newspaper who was imprisoned for attempting to shed light on CCP efforts to control and suppress dissent in advance of the 15th anniversary of the 1989 Tiananmen Square massacre. Specifically, he sent his notes from a staff meeting about those efforts to a New York-based website, using his Yahoo email account. His eventual conviction and ten-year prison sentence relied on detailed evidence about that account provided by Yahoo.

35.     In a 2006 Congressional hearing that touched on Shi's case, Yahoo's then general counsel, Callahan, defended Yahoo by claiming that when Yahoo complied with the Chinese government's request, it had "no information about the nature of the investigation." In 2007, however, evidence came to light showing that was not true, as the subpoena-like documents issued by Chinese authorities to Yahoo specifically stated that the investigation related to "provision of state secrets," a well-known euphemism employed by the CCP to suppress dissent.

36.     Yahoo's dishonesty amplified already intense criticism, and led to an additional Congressional hearing on November 7, 2007. That hearing was attended by Yu Ling, a plaintiff in the 2007 Lawsuit, and wife of the imprisoned plaintiff Wang X. Accompanying Yu Ling was Wu, who served as Yu Ling's translator. Present for Yahoo were Callahan and Yahoo's then CEO, Jerry Yang ("Yang").

**B.    The Yahoo Human Rights Fund is established as a condition of the settlement of the 2007 Lawsuit.**

37.    Immediately after the hearing, in an anteroom at the Capitol, Yang met with Yu Ling, Wu, and others, and Yu Ling agreed to settle the 2007 Lawsuit. In exchange: (1) Yahoo would pay compensation to the plaintiffs; (2) Yahoo would finance a trust fund to provide financial assistance to imprisoned Chinese dissidents; and (3) Yang would directly advocate to the Chinese government for Wang X.'s release.

38.    Attorneys for plaintiffs in the 2007 Lawsuit were not present at this meeting. Indeed, Wu insisted that the attorneys be terminated, and that he would lead the negotiations on the plaintiffs' behalf. Following the November 7, 2007 meeting, Wu continued to discuss a settlement with Yahoo on the plaintiffs' behalf.

39.    On November 9, 2007, a formal settlement agreement ("Settlement") was signed. Wu did not consult with plaintiffs on the specific terms and conditions of the Settlement, which the Settlement provided were to remain confidential. Indeed, Wu instructed Liao Tienchi ("Liao"), then an employee and board member of the LRF, not to disclose the amounts contained in the Settlement to the plaintiffs. No Chinese translation of the Settlement was provided to the plaintiffs (none of whom could read English).

40.    Nevertheless, Wu signed the Settlement on behalf of the plaintiffs, and Yang signed on behalf of Yahoo. The terms included the dismissal of plaintiffs' claims in the 2007 Lawsuit, in exchange for a payment by Yahoo of $3.2 million to each of the two imprisoned users' families, as well as the establishment of a $17.3 million trust fund for the benefit of other imprisoned Chinese dissidents, such as Plaintiffs here, which was to be called the Yahoo Human Rights Fund.

41.     With respect to the payments to the plaintiffs, not only did Wu deliberately conceal the terms and amounts from the plaintiffs, he attempted to extort the plaintiffs into handing over to Wu and the LRF parts of the Settlement belonging to them. For instance, when Shi's mother arrived in Washington, D.C. to collect her son's portion, Wu demanded that she "donate" $1 million of her son's $3.2 million share to Wu and the LRF. Having no legal representation, and under intense pressure from Wu, she asked whether $500,000 would be sufficient. Wu responded in a fury, berating her, and causing her great distress. At this point, Liao intervened, telling Wu his behavior was inappropriate. Liao then reached out to a contact at the U.S. Department of State, Eric N. Richardson, for help. Richardson agreed to help, told Wu to stop demanding money from Shi's mother, and escorted both Wu and Shi's mother to the bank, making sure that all funds belonging to Shi were transferred to a separate account.

42.     Similarly, Wang X. and Yu Ling were forced to file a lawsuit ("2011 Lawsuit") to recover $1 million belonging to them, and misappropriated by Wu. *See Yu et al. v. Wu et al.*, No. 1:11-cv-00092-JCC-JFA, ECF No. 1 (E.D. Va., Jan. 28, 2011). The 2011 Lawsuit included an exhibit showing that Wu purchased a $1 million annuity for his own benefit, falsely claiming that Yu Ling was his cousin on the annuity application. *See id.*, Exhibit 1. The focus of the 2011 Lawsuit was not to enforce the Trust's humanitarian purpose.

### C.    The establishment of the Yahoo Human Rights Fund created an enforceable charitable trust.

43.     As for the Yahoo Human Rights Fund, the Settlement explained that "[t]he Yahoo Human Rights Fund may be used for three purposes only." The first was "to provide humanitarian and legal assistance primarily to persons in or from the People's Republic of China who have been imprisoned for expressing their views through Yahoo! or another medium." The second was "to resolve claims primarily by such persons, or persons threatened with prosecution

or imprisonment," against Yahoo and related entities. The third was "payment of [LRF] operating expenses and the [LRF's] educational work conducted in the United States in support of human rights." There was no obligation that any minimum amount be provided to the LRF per year, as Defendants have conceded. Instead, the Settlement stated that the LRF "may use for its operating expenses *up to* $1 million USD of the Yahoo Human Rights Fund in each calendar year," subject to reports to be made to Yahoo "concerning the amount of the Yahoo Human Rights Fund that is used each year for the operating and educational expenses of the [LRF]," and the only reasonable construction of the Settlement is that that cap included both "operating expenses" and "educational work." Further, the expenditures outlined below suggest that the LRF spent *more* than $1 million per year of Trust assets on its operating and educational expenses.

44.     Depending on whether the second and third purposes are properly considered charitable, the Trust can be characterized as a charitable trust or a mixed trust with enforceable charitable and non-charitable purposes, but in any event the purpose of providing humanitarian assistance is an enforceable charitable purpose of the Trust, and that enforceability does not depend on whether the second or third purposes are deemed charitable.

45.     That the Yahoo Human Rights Fund and its humanitarian purpose were intended to be an enforceable trust, as opposed to a gift in support of the LRF generally, or property to be held by the LRF as Yahoo's agent, or property to be disposed of in accordance with a contract, or property that created a debtor-credit relationship between the LRF and Yahoo, or a mere promise to create a trust or otherwise dispose of property pursuant to such promise in the future, or any relationship with respect to the Yahoo Human Rights Fund and its humanitarian purpose *other* than that of a trust, is evidenced by the following objective indicators:

- the Settlement prohibited commingling of the payments constituting the Yahoo Human Rights Fund with LRF's funds, stating that "[t]hese payments *shall be maintained separately from other Foundation funds*";

- the Settlement provided that four payments of $4.3 million would be "made in trust" to the LRF, with the final installment paid in July 2008;

- the Settlement specified the payments "shall be known as the 'Yahoo! Human Rights Fund' or 'YHR Fund,'" thus specifically designating the payments as distinct from other monies paid in connection with the Settlement or controlled by LRF;

- the Settlement prohibited the payments from being "used for political purposes of any kind";

- the Settlement prohibited the payments from being "given to, or used to support or assist, directly or indirectly, any governments, political parties, or armed organizations";

- the Settlement required that Wu and the LRF "establish a Board of Directors for the YHR Fund";

- the Settlement specified that such "Board of Directors shall have the power and authority to direct the activities and expenditures of the YHR Fund, subject to the restrictions set forth in this agreement";

- the Settlement specified that Wu and the LRF "shall consult with Yahoo! regarding the composition and membership of the Board of Directors before making any appointments to the Board";

- the LRF in fact did not commingle Trust assets with the LRF's own funds;

- the LRF knew it was acting as trustee, and there is no indication Yahoo duped Wu or the LRF into executing a document purporting to create a trust, unbeknownst to Wu or the LRF;

- the LRF does not currently report certain Trust assets on its balance sheet or as its assets in its tax filings;

- a significant portion of the Trust was transferred to the LHRO, a non-profit corporation created for the express purpose of ensuring the Settlement and the Trust, including the Trust's humanitarian purpose, was carried out;

- several parties, including Yahoo itself, have at times objected to LRF's use of Trust assets in a manner inconsistent with the Trust and its humanitarian purpose;

17

- prior to the Trust, the LRF did not operate a program or carry out a purpose equivalent to the Trust's humanitarian purpose;

- in tax years 2006 and 2007, the LRF did not provide humanitarian aid to anyone;

- the LRF's stated mission, according to its tax filings, is "to research the 'Laogai' prison system," "for continued research and investigation and to provide information on China's prison system 'Laogai,'" to "gather information and raise public awareness of the Laogai – China's extensive system of forced-labor prison camps," *etc.*;

- payments were transferred to the LRF for the specific purpose of establishing the Trust and its humanitarian purpose, which purpose previously did not exist, and which was not the LRF's mission or purpose; and

- Defendants' admitted that title to the Trust's assets was intended to be divided, and was in fact divided, with the LRF holding legal title, but not full equitable title, to those assets.

46.    In a November 13, 2007 press release announcing the Settlement, Yahoo

emphasized the Trust's humanitarian purpose:

Yahoo! is working to provide financial, humanitarian and legal support to the families of Shi Tao and Wang Xiaoning. After working with the families to reach a private agreement, the parties are withdrawing their lawsuit against Yahoo!. **Yahoo! is also working to create a separate human rights fund to provide humanitarian and legal support to political dissidents who have been imprisoned for expressing their views online, as well as their families.**

. . .

Yahoo! CEO Jerry Yang said, "After meeting with the families, it was clear to me what we had to do to make this right for them, for Yahoo and for the future. Yahoo was founded on the idea that the free exchange of information can fundamentally change how people lead their lives, conduct their business and interact with their governments.

"We are committed to making sure our actions match our values around the world. **That's why we are also working to establish a Human Rights Fund to provide humanitarian and legal aid to dissidents who have been imprisoned for expressing their views online.**"

18

47.    Moreover, a *Wall Street Journal* article dated November 14, 2007 quoted "a person close to Yahoo" as stating that the creation of the Yahoo Human Rights Fund "was not a legal calculation, but a humanitarian decision."

48.    Thus, from the outset, Yahoo touted the establishment of the Yahoo Human Rights Fund as an example of Yahoo's commitment to human rights, and sought to benefit reputationally from it.

49.    That the Trust was primarily intended to protect online dissent, as opposed to any other purpose, such as benefiting Wu or the LRF, was reiterated in July 2008 by Yahoo, through Vice President and Deputy General Counsel Michael Samway ("Samway"). Before wiring the final portion of Trust assets to the LRF, Samway emphasized to Liao that "[a]s a general principle, we need to use the Fund for its intended purposes regarding online dissent," and that although "limited exceptions" had been made, "[w]e should be sure to keep focused on the Fund's purpose though." The "limited exception" to which Samway referred "include[ed] supporting some of the preparatory work for the LRF Museum." *See* Appendix B.

50.    With respect to the parties' motives for entering the Settlement as a whole, the Settlement stated in Section I.B. that those motives included that "[t]he Parties, without any admission of liability, desire to resolve their disputes, and all claims, causes of action and controversies existing or arising among or between them that are or could have been alleged … without further expenditure of time and expense on litigation."

51.    With respect to the parties' motives for establishing the Trust and its humanitarian purpose specifically, however, and as set out in more detail above, Yahoo publicly explained that the reason "why we are also working to establish a Human Rights Fund to provide humanitarian and legal aid to dissidents who have been imprisoned for expressing their views online" was to

"mak[e] sure our actions match our values around the world" and to "make [things right] for the future," an act that was publicly described by a person close to Yahoo as "not a legal calculation, but a humanitarian decision."

        **D.**    **The Yahoo Defendants exercised considerable control over Trust assets and were trustees with important fiduciary responsibilities.**

52.     After the Trust and its humanitarian purpose were established, the Yahoo Defendants publicly distanced themselves from the Trust's actual administration, and, indeed, repeatedly denied having any responsibility for that administration, as discussed further below.

53.     Privately, however, Yahoo exercised considerable control over Trust assets, although the precise way Yahoo exercised that control remains largely unclear, owing to Defendants' obfuscation of those facts.

54.     For example, after the Settlement, Yahoo and the LRF drafted guidelines for the Trust. (These guidelines were not publicly available.) One of the requirements Yahoo insisted on including in those guidelines was that at least one Yahoo employee be a member of the Trust's board of directors. Another requirement was that a quorum of the Trust's board of directors could not be achieved without Yahoo's designated board member present. Another requirement was that all disbursements of Trust assets required board consensus (and thus Yahoo's approval, given the requirement that a quorum required Yahoo's participation, through its designee). Another requirement was that Yahoo itself be notified at least twice a year about the Trust's activities, including being provided with details about how Trust assets were being spent on the "limited exception" of supporting the LRF's operations.

55.     As for applications for funding from the Trust's humanitarian purpose, the guidelines set forth the following criteria: (1) whether the case involved persons from China; (2) whether the person suffered violations of fundamental human rights; (3) whether those violations

were the direct result of the exercise of the person's freedom of expression; and (4) whether Yahoo's services or other electronic media were involved. The guidelines further required that persons meeting those criteria would be "given the highest priority" for funding and assistance. The amount of the assistance was to be based on: (1) whether the person was imprisoned; (2) the length of the sentence; (3) the person's family situation; and (4) legal defense needs. Board consensus—and thus Yahoo's approval—was required for all disbursements.

56.     As another example of Yahoo's control of Trust assets, in July 2008, Yahoo and Samway wrote to the LRF to press various issues Yahoo and its representatives had raised at the Trust's board meetings, including: (1) the need to obtain "professional guidance to evaluate the tax implications the Fund will have on LRF and Yahoo"; (2) the need for "transparency mechanisms for the Board to have better visibility into applications for assistance and payments from the Fund and also with respect to the overall expenses of the Fund"; (3) the fact that "we need to use the Fund for its intended purposes regarding online dissent"; (4) the fact that "supporting some of the preparatory work for the LRF Museum" was a "limited exception" to those purposes; (5) the fact that, notwithstanding those exceptions, "we should be sure to keep focus on the Fund's purpose though"; (6) a proposal "to seek Board approval for distribution of funds of more than a certain amount, say $10,000"; and (7) the need to "establish criteria for what types of projects the YHRF Board should consider and also decide if they're within the scope of the Fund."

57.     As yet another example of Yahoo's control of Trust assets, after transferring the entire corpus to accounts that, while separate from the LRF's own funds, were controlled by Wu and the LRF, Yahoo orchestrated the transfer of some or all those assets back into accounts that Yahoo controlled, at least in part. Most notably, in 2009, Yahoo, Wu, and the LRF orchestrated a

purported "amendment" to the Settlement, which "amendment" contemplated transferring Trust assets into at least two buckets.

58.     The first bucket, into which $3.55 million in Trust assets was transferred, became a newly created trust for the second purpose set forth in the Settlement, namely settling claims made against Yahoo by imprisoned Yahoo users. Yahoo installed Callahan, Bell, and other Yahoo employees to serve as trustees over this portion of Trust assets. In 2015, the Yahoo Defendants purported to terminate this separate sub-trust, and the assets were transferred back to the Trust, and specifically to the LHRO, as described below.

59.     The second bucket, from which the Trust's humanitarian purpose would ostensibly be carried out, was to be deposited with a newly created non-profit corporation, the Laogai Human Rights Organization (defined above as "LHRO"), that would "support" the LRF. Yahoo required that its employees serve on the LHRO's board of directors. Indeed, the LHRO's tax filings state that Callahan, and then Bell, devoted an average of *25 hours per week* to the LHRO.

60.     Yahoo, Wu, and the LRF made this 2009 "amendment," and the related transfers of Trust assets, in secret—even other LRF personnel did not know about it until it surfaced in connection with the instant lawsuit. Notably, they never notified, or obtained consent from, the parties to the Settlement. And, unlike the Settlement, no powers of attorney were attached to the "amendment." This "amendment," and the related transfers of Trust assets, were uncovered only in June 2017, after Defendants moved to dismiss the initial complaint in the above-captioned case, and its validity is unclear without discovery.

61.     The 2009 "amendment" and the related transfers of Trust assets reveal that, contrary to numerous public representations, the Yahoo Defendants exercised considerable

Case 1:17-cv-00635-RDM   Document 64   Filed 06/04/20   Page 26 of 66


control over Trust assets, and that far from having no responsibility for those assets, they were in fact trustees of those assets, including the portions devoted to the Trust's humanitarian purpose. As such, from the outset, the Yahoo Defendants had important fiduciary responsibilities to ensure the Trust's humanitarian purpose was carried out and was not materially violated.

62.     As discussed further below, the Yahoo Defendants failed to live up to those responsibilities. Instead, they abdicated their fiduciary responsibilities, and placed Trust assets almost entirely in the hands of Wu and the LRF. The Yahoo Defendants did this despite numerous red flags that should have been, and likely were, apparent to the Yahoo Defendants from the very outset, including many red flags that *only* the Yahoo Defendants would have been timely aware of, given the confidential and non-transparent nature of Trust operations. Indeed, the Yahoo Defendants' failure is particularly lamentable because for years they were essentially the *only* parties with the ability to prevent the Trust from deviating so far from its humanitarian purpose that this lawsuit to enforce that charitable purpose was finally necessitated.

   **E.     Trust assets are systematically and unlawfully depleted by Wu and the LRF in contravention of the Trust's humanitarian purpose, while the Yahoo Defendants willfully ignore red flags.**

63.     The folly of entrusting Trust assets to Wu and the LRF should have been, and likely was, apparent to the Yahoo Defendants from the beginning. Indeed, in negotiating the Settlement of the 2007 Lawsuit with Wu, Yahoo was well aware that Wu was not an attorney, much less the attorney for plaintiffs in that action, which attorneys had been inexplicably excluded from the negotiations. Despite these irregularities, Yahoo chose to negotiate directly with Wu. Then, during those negotiations, Wu demanded a provision that had the potential of benefiting Wu personally by up to *$1 million per year*—another red flag that Yahoo failed to question or scrutinize. To make matters even worse, Yahoo not only executed the Settlement with Wu as the only signatory for plaintiffs, but *also gave Wu and the LRF almost unfettered*

***control over the settlement money—including the entirety of the Trust's assets—***with the only thing standing between Wu and the LRF on the one hand, and improper spending on the other hand, being Yahoo and the Yahoo Defendants themselves.

64.     Given the disinterest of the Yahoo Defendants in protecting against such improper spending, this decision was disastrous for the Trust and its humanitarian purpose. Indeed, in the years since the Trust was established, only approximately $700,000—or a mere ***4%*** of the $17.3 million corpus—has been spent on the Trust's humanitarian purpose.[2] Instead, the vast bulk of the Trust's assets—potentially ***more than $14 million***—has been unlawfully spent on enriching Wu and the LRF.[3]

65.     For example, between 2008 and 2016, the LRF reported expenditures of more than ***$12.4 million***. Further, in 2015, the LRF purchased a ***$2.55 million*** townhouse in Washington, D.C. The source of the vast bulk of these expenditures was Trust assets. Indeed, during this time, LRF's only other apparent revenue sources were three National Endowment for Democracy grants from 2008-2010, totaling approximately $600,000, and a donation of Google stock valued at approximately $316,000.

66.     The systematic and unlawful depletion began immediately and should have alerted the Yahoo Defendants, as trustees, of the need to protect the Trust's humanitarian purpose, particularly because they knew of such expenditures, and whether they conformed with that purpose, before anyone else could meaningfully scrutinize that question.

---

[2] An additional $550,000 appears to have been used to resolve legal claims against Yahoo by two individuals, Li Zhi and Jiang Lijun, about whom Yahoo had provided information to the Chinese government.

[3] Even if the Trust entitled LRF to $1 million per year—and it did not, as Defendants themselves have conceded—spending over $14 million for the benefit of Wu and the LRF in approximately 12 years *still* violated the Trust by more than $2 million.

67.    For example, in 2007, Wu's salary as "Executive Director" was $48,000, while his wife's salary as "Secretary/Treasurer" was $24,000. In 2008, following an enormous cash infusion of more than $18 million in connection with the Settlement—*i.e.*, the Trust assets, which was supposed to be held in trust by Wu and the LRF—Wu gave himself a ***$60,000 raise***, ***more than doubling*** his compensation to over $108,000 per year. He also gave his wife a large raise, increasing her compensation to $42,000 (despite the fact that as of 2010, she had not worked in the LRF office even once in the preceding ten years, and did little discernable work for the LRF, such that hers was apparently a "no-show" job). In 2009, Wu increased his compensation to $110,000, and his wife's to $50,000. In 2010, Wu paid himself $108,000, and his wife $48,000. Thereafter, Wu's wife "retired" and was not replaced. Over the next five years, Wu paid himself $108,600, $113,700, $120,400, $131,200, and $122,907 per year respectively. All told, after the establishment of the Trust, Wu paid himself and his wife more than ***$1 million***.

68.    Most, if not all, of this amount was paid using Trust assets. Yet, whether and to what extent these expenditures were in violation of the Trust's humanitarian purpose was not and could not reasonably have been known to Plaintiffs at the time they were made and reported. The Yahoo Defendants, by contrast, knew or should have known of their impact on the Trust and its humanitarian purpose. Yet, the Yahoo Defendants did nothing to scrutinize, much less curtail, these expenditures—which even concerned LRF directors and employees were largely powerless to stop, much less Plaintiffs here—or to prevent them from materially undermining the Trust and its humanitarian purpose, which the Yahoo Defendants had a duty to protect as trustees.

69.    As another example, the LRF incurred enormous legal fees, most if not all of which were funded with Trust assets, and spent for the benefit of Wu personally. For instance, in 2011, the LRF recorded $322,596 in legal fee expenditures. A substantial portion, if not all, of

this amount was spent in connection with the 2011 Lawsuit filed by Yu to recover the portion of the Settlement wrongfully withheld from her by Wu. From 2013 to 2015, the LRF reported an additional $515,000 in legal fees. During this time, Wu faced a number of additional lawsuits, including a lawsuit accusing Wu of sexual harassment, *see Jing v. Wu*, Docket No. 2015-011903 (Va. Cir. Ct. Sept. 8, 2015), and a *qui tam* and employment retaliation lawsuit accusing Wu and the LRF of defrauding the federal government by misusing federal grants, and of firing the plaintiff in retaliation for raising concerns about that alleged fraud. *See Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73 (D.D.C. 2014) (holding that retaliation claims were adequately alleged).

70.    Again, whether and to what extent these legal fees were in violation of the Trust and its humanitarian purpose was not and could not reasonably have been known to Plaintiffs at the time these expenditures were made and reported.

71.    Not so for the Yahoo Defendants, who, as trustees, knew or should have known whether and to what extent the Trust and its humanitarian purpose were being materially undermined, and who had a duty to prevent that from happening, but failed to do so.

72.    Wu and the LRF also used Trust assets to purchase expensive real estate for Wu and the LRF's benefit. In January 2008—just two months after the Settlement—Wu and LRF purchased a ***$1.45 million*** property, located at 1109 M Street NW, in Washington, D.C. Again, at the time, whether this purchase constituted or contributed to a breach of the Trust and its humanitarian purpose was largely unknowable to anyone but Defendants, as the terms of the Settlement were hidden, even from the plaintiffs in the 2007 Lawsuit.

73.    Then, in July 2015, Wu and LRF purchased a ***$2.55 million*** townhouse at 1901 18th Street NW, Washington, D.C. Yet again, the Yahoo Defendants willfully ignored these

expenditures and their impact on the Trust and its humanitarian purpose, and took no steps to prevent the Trust and its humanitarian purpose from being undermined by this expenditure.

74.    Wu and the LRF also transferred Trust assets to recipients whose identities are currently unknown. For instance, in 2009 and 2010, Wu and the LRF reported transfers of $65,000 and $100,000, respectively, to another non-profit organization headed by Wu, the China Information Center ("CIC"). However, these transfers were *not* reported on CIC's tax filings, and the actual recipients of these transfers are unknown.

75.    More generally, each year the LRF used hundreds of thousands, if not millions, of dollars in Trust assets, with little to no accountability, transparency, or oversight. Indeed, Wu made all spending decisions unilaterally, viewing the assets as "his alone," as former LRF director Jeff Fiedler told the New York Times.[4]

76.    In May 2009, Fiedler wrote an email stating that he was resigning from the LRF board in part because Wu was managing the LRF as his "personal fiefdom." Liao tried to persuade him to reconsider, urging that his resignation would have "no shocking effect" on Wu, that Wu "will not and can not [*sic*] change his character," and that Fiedler would "very likely be replaced by a yesman or woman, which can only deteriorate the situation." The Yahoo Defendants were aware or should have been aware of this email.

77.    None of these expenditures furthered the Trust and its humanitarian purpose. Whether any individual expenditure was lawful or unlawful under the terms of the Trust, and thus whether it was injurious to Plaintiffs, could not reasonably have been known to anyone but

---

[4] *See* Andrew Jacobs, *Champion of Human Rights in China Leaves a Tarnished Legacy*, NEW YORK TIMES (Aug. 13, 2016). The article also reported that in 2015, the Internal Revenue Service ("IRS") fined Wu and the LRF "$40,000 for financial irregularities." The IRS also found that Wu paid personal income taxes using LRF assets.

Defendants. However, when the cumulative impact of these expenditures resulted in the fundamental violation of the Trust's humanitarian purpose, Plaintiffs were injured.

### F.   The Trust's humanitarian purpose is terminated.

78.   The complete termination of the Trust's humanitarian purpose occurred in 2016. In early 2016, Plaintiff Xu W., a Chinese dissident who was imprisoned for approximately nine years, from 2005 to 2014 (and who had served two previous sentences, from 1989 to 1997, and from 1998 to 2001, for a total of 20 years), emailed Wu and the LRF seeking assistance from the Trust and its humanitarian purpose. Wu responded in March 2016, informing Plaintiff Xu W. that Wu and the LRF had decided to ***terminate the Trust's humanitarian purpose altogether***.

79.   Specifically, Wu and the LRF wrote to Plaintiff Xu W.:

> We have received all your emails[.] … One of the main reasons that we did not reply to you for a long time was related to the humanitarian aid project of our Laogai Research Foundation. … Over the past one year or so, our Laogai Research Foundation has been considering and discussing whether this project should be continued. After repeated discussion, the conclusion reached was: ***We have decided to discontinue this project***.[5]

80.   However, Wu and the LRF told Plaintiff Xu W. that "[w]e will continue our website (both in English and Chinese), the Laogai Museum, and public speeches, including those to the U.S. political circle, the U.S. Congress, parliaments of various nations in Europe, and European and U.S. media outlets, *etc*.," all presumably funded in large part, if not in whole, by Trust assets, including assets intended for humanitarian assistance.

81.   This was in violation of D.C.'s Nonprofit Corporation Act, which states that "[p]roperty held in trust by [a nonprofit] entity or otherwise dedicated to a charitable purpose shall not be diverted from its purpose by any transaction … unless the entity obtains an

---

[5] Translated from Chinese.

appropriate order of the [D.C.] Superior Court specifying the disposition of the property to the extent required by and pursuant to the law of the District on cy pres or otherwise dealing with the nondiversion of charitable assets." D.C. Code § 29-401.05(b). Neither Wu nor the LRF, nor the LHRO, nor anyone, has ever petitioned the D.C. Superior Court for an order permitting the termination of the Trust's humanitarian purpose.

82.     An equally egregious case is that of Gou Zhongshan ("Gou"). Wu recruited Gou in February 2005 to collect information about and take photographs of prison labor camps and execution grounds. On April 9, 2006, Gou was arrested for "illegally providing information for an overseas entity." On December 1, 2006, Gou was sentenced to 13 years in prison.

83.     Wu and the LRF took no action whatsoever to publicize Gou's arrest and sentence, or to advocate for Gou's release. Gou was eventually released in April 2016, and immediately contacted the LRF for assistance. However, he was told that Wu had passed away, and that the LRF had no record of Gou working for them.

84.     According to LRF's publicly available tax filing as of April 27, 2018, **nothing** was disbursed to imprisoned Chinese dissidents in accordance with the Trust's humanitarian purpose, but **$1,057,436** was spent on other matters.

**G.     Yahoo repeatedly denies responsibility for the Trust or its humanitarian purpose.**

85.     Throughout this entire time, when Plaintiffs were largely powerless to act, the Yahoo Defendants concealed the fact that they were trustees of the Trust and that they had control over the Trust. Indeed, the Yahoo Defendants went so far as to outright deny any responsibility for the administration of the Trust or its humanitarian purpose at all.

86.     For example, after Yu Ling's 2011 Lawsuit, concerns arose that Wu and the LRF not only wrongfully withheld a portion of Yu Ling's personal share of the Settlement, but that

Wu and the LRF were spending other monies obtained from the Settlement inappropriately. At the time, such concerns remained largely nebulous, because basic facts about how much money was in the Trust, how Trust assets were being spent and in what amounts, and whether that spending conformed to the Trust's purposes, remained unclear. Also unclear was Yahoo's role in the Trust's administration. This lack of clarity was by design, as Wu, the LRF, and Yahoo kept such details confidential and hidden from public view.

87.     Still, efforts were made to compel Yahoo to investigate. Yahoo resisted those efforts, however, asserting that the administration of the Trust and its humanitarian purpose was not its responsibility.

88.     For example, after Yu Ling's 2011 Lawsuit was filed, Yahoo shareholder Zhao Jing ("Zhao") made a books and records demand on Yahoo under 8 Del. C. § 220. In so doing, Zhao argued that an "inference of mismanagement" by Yahoo with respect to the Trust could be drawn from that lawsuit.

89.     In opposing the demand, Yahoo vehemently denied any responsibility for the Trust. Indeed, Yahoo refused to allow Zhao to inspect Yahoo's records on the ground that Zhao's demand "does not articulate *any* basis, let alone a credible basis, that there has been any wrongdoing by *anyone* at Yahoo!." (Emphasis added.) Instead, Yahoo pointed the finger at Wu, noting that Zhao's "allegations of wrongdoing [were made] against Harry Wu," and that, as such, they "fail[ed] to provide a credible basis to find probable wrongdoing by *anyone* at Yahoo!." (Emphasis added.)

90.     Zhao responded by pointing out that Yahoo and Wu had "partnered to establish" the Trust, arguing that Wu was therefore Yahoo's agent for the purposes of operating the Trust.

30

Still, Zhao agreed to narrow his request to seek only documents relating to Yahoo's partnership with Wu or the LRF and the appointment of Wu and the LRF to administer and operate the Trust.

91.    Yahoo continued to resist. Indeed, Yahoo doubled down on its position that it had no responsibility for the administration of the Trust, and that nothing in Zhao's demand provided a credible basis for so inferring. Yahoo first noted that Zhao merely alleged that Yahoo "partnered" with Wu to "establish" the Trust, but that "all of your allegations of wrongdoing involve the administration of the Fund, which necessarily post-dated the establishment of the Fund." Thus, Yahoo asserted that "the fact that Mr. Wu and LRF partnered with Yahoo! to establish the Fund is irrelevant to your Demand."

92.    Yahoo then argued that, although Zhao asserted that Wu was Yahoo's agent and that Yahoo relied on Wu to operate the Trust, Zhao had "no basis . . . to claim that Yahoo! manages or controls the Fund."

93.    Yahoo then went even further, using Yu Ling's 2011 Lawsuit as a *shield* against responsibility, repeatedly arguing that, rather than providing a credible basis to infer wrongdoing on Yahoo's part, it supported an inference of *Yahoo's innocence*.

94.    For example, Yahoo pointed out that, rather than supporting an inference that Yahoo was involved in the administration of the Trust, "[i]n fact, in Yu Ling's 2011 lawsuit against Harry Wu, Yu Ling alleges that the Fund is administered by Mr. Wu and the Laogai Human Rights Organization."

95.    As another example, Yahoo noted that the lawsuit "further alleges that Mr. Wu and LRF had exclusive control over her money," not Yahoo.

96.    Perhaps most audaciously, Yahoo touted the fact that "Yu Ling did not even name Yahoo! as a defendant in her suit" as a basis for inferring its innocence.

97.     Yahoo then stated that if Zhao was willing to agree to certain conditions—including tailoring his requests and entering into a confidentiality agreement—it was prepared to allow "an appropriate inspection of its books and records."[6]

98.     Yahoo similarly disclaimed responsibility in proceedings before the U.S. Securities Exchange Commission ("SEC"). For example, in 2012, Zhao proposed a shareholder resolution asking Yahoo to investigate "potentially unlawful activities of the Yahoo! Human Rights Fund."

99.     In successfully opposing Zhao's proposal, Yahoo argued to the SEC that Zhao's proposal was irredeemably unclear, to the point that it was "materially false and misleading." With respect to Trust expenditures, Yahoo argued that Zhao's proposal was deficient because it "identifies no specific allegations about . . . any transactions or operations of the Yahoo! Human Rights Fund."

100.    Yahoo also continued to obfuscate the nature of its responsibility with respect to the Trust, asserting that it "has no ownership interest in the Yahoo! Human Rights Fund." Yahoo also stated that it was "misleading" to suggest that either it or its board of directors was "able to require disclosure of information regarding" the Trust. However, given that Bell, acting as Yahoo's agent, was at the time "Vice Chairman" of the LHRO, allegedly devoting 25 hours per

---

[6] Zhao apparently did not agree, as he subsequently filed a complaint in the Delaware Court of Chancery to compel inspection. That complaint, dated February 1, 2012, repeated the same assertions that Yahoo argued did not provide "any basis, let alone a credible basis," to infer wrongdoing on Yahoo's part. According to the docket, in April 2013, a broad protective order providing for the confidential treatment of materials produced in discovery was entered, and in July 2013, the matter appears to have settled, presumably also on a confidential basis. *See generally Zhao v. Yahoo! Inc.*, C.A. No. 7203 (Del. Ch. 2012) ("Zhao Lawsuit").

week to the LHRO, it was actually Yahoo's statement that was at a minimum incomplete if not outright false and misleading.

101.    Finally, Yahoo yet again deflected responsibility to Wu, noting that "[t]he Human Rights Fund is administered by Harry Wu . . . with the help of a board of directors." Of course, Yahoo failed to state that its employee Bell, acting as its agent, served on this board of directors as part of his employment with Yahoo.

102.    In July and September 2015, certain Plaintiffs wrote letters to Yahoo and Yang, which, among other things, expressed their hope that the Trust could be run in a more transparent manner, and more for the benefit of imprisoned Chinese dissidents, particularly those who were Yahoo users. Yahoo never responded to these letters.

103.    In February 2016, Yahoo and Bell were again implored to step in to address problems with the management of the Trust. Yahoo and Bell did not respond until April 2016, and even then, only did so because they had been pressured by contact from a prominent journalist about a story relating to the Trust. In their response, Yahoo and Bell again denied responsibility for the Trust and its humanitarian purpose, and continued to point the finger at Wu and the LRF. Yahoo and Bell also used the confidentiality of the Settlement as a shield, stating that the Settlement's confidentiality "necessarily limits our ability to respond," and that they would not respond "point-by-point" to suggestions that Yahoo or Bell bore responsibility for the depletion of Trust assets.

104.    In July 2017, after this action was filed, the falsity of the Yahoo Defendants' denials was laid bare when Yahoo! Inc. (now known as Altaba Inc. stated that, as a result of the sale of Yahoo Inc.'s operating business to Verizon, "the Yahoo Human Rights Fund is now being administered by Verizon."

**H.      The Yahoo Defendants were well aware of the misconduct and were repeatedly and directly warned.**

105.    Meanwhile, as Yahoo was touting the Trust and relying on it to defeat multiple shareholder proposals, the Yahoo Defendants were well aware that Trust assets were being unlawfully depleted by Wu and the LRF, to the detriment of the Trust and its humanitarian purpose. As trustees, and as members of the LHRO board, they received regular reports from the LRF on how Trust assets were being spent. They also knew that Wang X. and Yu Ling, two of the plaintiffs in the 2007 Lawsuit, were forced to sue Wu in 2011 just to get their rightful personal share of the Settlement. They also knew of the 2011 Lawsuit's allegations with respect to the alarming circumstances surrounding the Settlement—namely, that Wu had orchestrated the termination of the plaintiffs' attorneys, usurped the role of negotiating a settlement for himself, deliberately concealed the Settlement's terms from the plaintiffs, misrepresented how attorneys' fees had been paid, stolen $1 million belonging to Wang X. and Yu Ling for himself, and mispresented on an annuity application that Yu Ling was his cousin.

106.    The Yahoo Defendants were also ***repeatedly and directly*** warned of Wu's wrongful conduct, including by LRF employee Liao, who wrote emails and letters to the Yahoo Defendants sounding the alarm. Liao also repeatedly voiced concerns about Wu's wrongful conduct during LRF board meetings.

107.    For example, in December 2010, Liao wrote a detailed letter (which was not publicly available) to the boards of the Trust and YIHRT, which included at least Callahan, and the board of the LRF, detailing numerous red flags raised by Wu and the LRF's handling of the Trust. For instance, Liao warned that Wu "decides and raises his own salary," yet failed to regularly hold board meetings. When meetings happened to be held, Wu "provides no agenda, minutes, financial reports and related documents (fund application). If he does provide some

documents it is not in a timely manner and it is not well prepared," and includes "wrong financial information." He also "makes important financial decisions (e.g. new lease in Dupont Circle) alone without first get[ting] the opinion and approval from the board. Not to mention that the move to a new space is not justified."

108.    Liao also warned that Wu was "[o]ffend[ing] the basic agreement with Yahoo, provide not sufficient humanitarian support to the victims in or from China (only 8% from the budget, according to the financial report I have), no qualified office staff is working on this issue."

109.    Liao also warned that "[t]he financial situation of the organization is not transparent. With the Yahoo Fund, Harry [Wu] bought the building at the [*sic*] M Street, 1,45 mi[llion dollars,] and signed with his own name. Now, does this property belong to Harry Wu or the organization?"

110.    Liao also warned that there is "[n]o effective and ethical management," that the organization was "overload[ed] with staff, but the output is poor. There exists not even a website about the Yahoo HR Fund. People do not know how to apply."

111.    Liao specifically requested that there should be "an investigation about all the wrong-doings of Harry Wu," and that the investigation should "make clear that the property belongs to the Trust." Unless the Yahoo Defendants ensured that such an investigation took place, Liao warned that "[t]here will be a miserable or even catastrophic failure for LRF and [the] Yahoo HR Trust," that "Wu will harm the organization and damage the image of Yahoo," and that "scandals will be exposed and it would be a heavy blow to the human rights issue in China."

112.    In 2014, Defendant Bell travelled to Washington, D.C. to discuss with Wu the issue of inadequate spending of Trust assets on the Trust's humanitarian purpose. However, no

meaningful change resulted from that discussion, and there do not appear to have been any follow-up attempts.

113.    Yet another lawsuit against Wu and the LRF alleging unlawful spending for Wu's personal benefit came to light in 2012, when a *qui tam* action under the False Claims Act (*Qui Tam* Lawsuit") was unsealed. *See Pencheng Si v. Laogai Research Found.*, No. 1:09-cv-02388-KBJ, ECF No. 15 (D.D.C. Mar. 22, 2012) (order unsealing complaint). The *Qui Tam* Lawsuit made a series of allegations that Wu and the LRF defrauded the federal government, including by unlawfully spending federal grants, and that Wu and the LRF's "core mission was to lobby [the federal government] and, thereby, ensure their continued funding and Defendant Wu's comfortable lifestyle." Defendants, including the Yahoo Defendants, knew or should have known about the *Qui Tam* Lawsuit, as it was a public lawsuit making serious allegations against Wu and the LRF. (This lawsuit did not accuse the Yahoo Defendants of any wrongdoing or provide any indication that the Yahoo Defendants were trustees of the Trust or its humanitarian purpose.)

114.    Yet another lawsuit was filed against Wu and the LRF in 2015 ("2015 Lawsuit"), this time in Virginia state court, by plaintiff Wang Jing, the wife of a Chinese dissident who had previously been imprisoned, and who was not permitted to leave China. *See Jing v. Wu*, No. 2015-011903 (Va. Cir. Ct. Sept. 8, 2015). The 2015 Lawsuit alleged that Wu sexually assaulted Wang Jing after luring her from California to the Washington, D.C. area on the promise of financial assistance drawn from the Trust. Defendants, including the Yahoo Defendants, knew or should have known about the 2015 Lawsuit, as it was a public lawsuit making serious allegations against Wu, and named the Trust as a defendant.

I.   **Yahoo touts the Trust's humanitarian purpose and relies on it to defeat shareholder proposals.**

115.   All the while, as the Yahoo Defendants stood idly by, willfully ignoring the mountain of evidence that these expenditures were improper, doing nothing to prevent the systematic unlawful depletion of Trust assets in violation of the Trust's humanitarian purpose, they simultaneously advertised the Trust's humanitarian purpose as evidence of Yahoo's commitment to human rights, and used its existence to defeat shareholder proposals calling on Yahoo to do more to advance human rights.

116.   For example, in 2008, the City of New York Office of the Comptroller, on behalf of several New York City public pension funds who were Yahoo shareholders, made a shareholder proposal relating to internet censorship, urging Yahoo to "institute policies to help protect freedom of access to the Internet." Yahoo opposed the proposal, arguing, among other things, that it was "unnecessary" in light of "initiatives already in place at the Company," including the "establish[ment] of a Human Rights Fund, in partnership with a noted Chinese human rights activist, to provide humanitarian relief and legal support for dissidents imprisoned for expressing their views online." The proposal was defeated.

117.   In 2011, Yahoo shareholder Zhao made a shareholder proposal urging that Yahoo take various measures to protect human rights, including adopting principles protective of human rights, and specifically calling for Yahoo to "supervis[e] the abused Yahoo! Human Rights Fund" in light of information that it was being mismanaged.

118.   In opposing Zhao's proposal, Yahoo noted that it was already committed to human rights issues, citing as evidence "a number of core initiatives, including . . . [c]reating the Yahoo! Human Rights Fund," which Yahoo again described as having been "established to

provide humanitarian and legal support to political dissidents who have been imprisoned for expressing their views online, as well as assistance for their families." The proposal was defeated.

119.    In 2014, Yahoo shareholder John Harrington ("Harrington") made a shareholder proposal that Yahoo create a committee "to oversee the Company's responses to domestic and international developments in human rights that affect our company." Again, Yahoo opposed this proposal on the ground that "Yahoo already has extensive policies and practices in place" with respect to human rights, including "a number of core initiatives, including . . . [c]reating the Yahoo Human Rights Fund, which Yahoo established to provide humanitarian and legal support to political dissidents who have been imprisoned for expressing their views online, as well as assistance to their families." This proposal was defeated as well.

120.    In 2015, Harrington made a similar proposal, which Yahoo again opposed, based in part on the Trust's humanitarian purpose. This proposal was also defeated.

121.    Notably, at no point did Yahoo ever disclose that Trust assets were being substantially depleted on purposes having nothing to do with providing humanitarian aid to imprisoned dissidents, which aid it was touting in opposing these shareholder proposals, or that the amounts being spent on such aid were as small as they were, as detailed below.

**J.    Defendants' failure to administer the Trust and its humanitarian purpose for the benefit of imprisoned Chinese dissidents.**

122.    In contrast to the **over $14 million** spent on Wu and the LRF since the establishment of the Trust, a relative pittance—approximately $700,000—has been spent on the Trust's humanitarian purpose, a purpose that the Yahoo Defendants repeatedly and publicly reiterated. Since the Trust's establishment, the LRF has spent a mere **4%** of the Trust's assets on the Trust's humanitarian purpose, while spending over **91%** of its total reported outlays, the vast bulk of which was financed by the Trust, ***on benefiting itself and Wu.***

38

123.    For instance, since the establishment of the Trust and its humanitarian purpose, the LRF's reported expenditures on humanitarian aid have been as follows:

| Year | Spending that benefited the Trust's humanitarian purpose | Spending that benefited Wu and the LRF |
|---|---|---|
| 2008 | $135,987 | $939,617 |
| 2009 | $177,540[7] | $1,299,332 |
| 2010 | $248,495 | $1,272,692 |
| 2011 | $54,910 | $1,493,303 |
| 2012 | $28,424 | $1,270,306 |
| 2013 | $20,852 | $1,323,080 |
| 2014 | $22,496 | $1,236,751 |
| 2015 | $19,802 | $1,301,791 |
| 2016 | $0[8] | $1,054,436 |
| 2017 | $0 | $903,508 |
| 2018 | $0 | $1,262,437 |
| 2019 | $0[9] | $722,185 |
| TOTAL | $708,506 | $14,079,438 |

124.    Moreover, even these small amounts may be inflated. For instance, including the $550,000 payment made to settle two lawsuits against Yahoo, the LRF's 2009 Form 990 claims $727,540 in humanitarian aid. However, only $677,540 is reported on the Schedule F, which lists

---

[7] The reported amount was $727,540, but $550,000 was used to settle two lawsuits against Yahoo, which does not qualify as humanitarian aid.

[8] LRF did report $3,000 in donations to the Raoul Wallenberg Committee of the United States, and described the purpose of that donation as "humanitarian aid," but it clearly was not a payment to an imprisoned dissident, and so is not counted here.

[9] LRF did report $96,250 in "contributions, gifts, [and] grants paid," but none of that money apparently went to Chinese dissidents imprisoned for online dissent. $20,000 was apparently spent to commission a sculpture. The balance was apparently spent on organizations and individuals to "document and report human rights violations in China, and support activities, projects in pursuit of democracy." However well-intentioned and worthy such activities might be, they do not conform to the Trust's humanitarian purpose. In all events, even if all $96,250 conformed to that purpose, it would still constitute a mere *11%* of the LRF's total spending that year. The remaining *89%*—or *$722,185*—was spent for the benefit of the LRF itself.

LRF payments to recipients outside of the United States. Thus, $50,000 in claimed humanitarian aid is unaccounted for.

125.    As another example, in 2010, LRF claimed $248,495 was distributed in humanitarian aid to "40 qualified individuals," and that "payments ranged from $1,000 to $20,250." However, on its Schedule F, only $108,495 in payments to 20 individuals in China are reported, leaving an unexplained shortfall of $140,000.

126.    As another example, in 2014, LRF claimed $22,496 was distributed to "6 qualified individuals," and that "payments ranged from $500 to $3,000." However, even if all six received the maximum $3,000 amount, the total would only be $18,000.

127.    Given these discrepancies, and given the extent of the misconduct described herein, no faith can be placed in even these reported figures, which are likely inflated.

128.    Additionally, numerous facts surrounding the irregular nature of how Wu and the LRF handled what little humanitarian aid they did disburse, raise further doubts about the accuracy of these figures. For example, in May 2010, Wu drafted a financial report claiming that a payment to 2010 Nobel Peace Prize recipient Liu Xiaobo ("Liu") qualified as humanitarian assistance. However, Liao objected, saying that the payment was in fact funded by a National Endowment for Democracy grant, and was not humanitarian assistance, but was in fact payment for certain of Liu's written work.[10] The Yahoo Defendants were or should have been aware of these facts.

129.    As other additional examples, Wu and the LRF: (1) failed to provide a Chinese version of the website announcing the humanitarian aid program; (2) failed to make a Chinese

---

[10] As a result of Liao's objections, Wu directed that Liao be removed from LRF's board, and Liao was voted off the board.

version of the application form available; (3) failed to respond to numerous inquiries and applications; (4) rejected applications on the basis of personal vendettas; (5) routinely asked applicants to sign blank application forms without filling them out; (6) sent recipients small amounts of cash without asking for an application or providing receipts; and (7) sent recipients payments in amounts that were less than the amounts LRF had previously indicated had been approved, with no explanation. The Yahoo Defendants were or should have been aware of these facts.

### K. Developments between the filing of the action and April 27, 2018, the date the proposed second amended complaint, ECF No. 42-1, was filed.

130.    A complaint filed on December 11, 2017 in *Liu et al. v. Laogai Research Foundation et al.*, No. 2017 CA 001629 (D.C. Superior Ct.), a litigation over unpaid wages, revealed previously undisclosed attempts to divert Trust assets away from its humanitarian purpose. Specifically, the complaint alleged that beginning around 2015, two of the LHRO's current directors, Yu Maochun ("Mr. Yu") and Gordon Chang ("Chang"), sought to initially establish a talk show, and subsequently a think tank, using Trust assets.

131.    Yu served on the boards of the LRF and the LHRO from about May 2010 to about April 7, 2016, and Chang has served on the board of the LHRO from about 2011, and currently still serves on the LHRO board.

132.    In or about 2015, Mr. Yu met with Wu and other LRF personnel to request that the LRF give Mr. Yu and Chang $2 million from the Trust to create and broadcast a talk show, which request was denied.

133.    On February 12, 2016, following Bell's resignation from the LHRO board, and given Yahoo's abandonment of oversight responsibilities over the Trust, a joint meeting of the LHRO and LRF boards was held at LRF's offices in Washington, D.C. At that meeting, Wu

proposed that LHRO be dissolved and that Chang and Mr. Yu join the board of the LRF following that dissolution.

134.    During that meeting, and at other times before and after, Chang and Mr. Yu proposed that the Trust be used instead to establish a new think tank, to which Chang and Mr. Yu would devote their time. Chang and Mr. Yu further proposed that an initial round of $1 million in funding be used to establish the think tank, with the total possibly increasing to $3 million over several years. Chang and Mr. Yu further wanted to manage the think tank. These proposals were rejected by Wu.

135.    Chang and Mr. Yu had on other occasions over the years asked LRF to disburse funds to projects or organizations with which they were affiliated.

136.    On April 7, 2016, Mr. Yu resigned from the board of LHRO in protest of Wu's rejection of Mr. Yu and Chang's think tank proposal.

137.    On April 27, 2016, the day after Wu passed away, Mr. Yu appeared at LRF's offices and announced to LRF personnel that he was re-joining LHRO's board. On or around May 2, 2016, Chang attempted to re-appoint Mr. Yu to the LHRO board, over the objection of other LRF personnel. At the time of the filing of Plaintiffs' second amended complaint on April 27, 2018, Mr. Yu's current status as a board member of either the LHRO or the LRF was not known, but Plaintiffs were informed and believed that he was a board member of at least one.

138.    The foregoing efforts to establish a think tank were rejected by Wu when he was alive. At the time of the filing of Plaintiffs' proposed second amended complaint on April 27, 2018, it was unclear whether Mr. Yu and Chang were still attempting to use the Trust's assets to establish a think tank. In that filing, Plaintiffs indicated their belief that such attempts would be in violation of the Trust and its humanitarian purpose.

139.    As for the Trust's humanitarian purpose, the latest publicly available tax filings as of April 27, 2018 for the LHRO and the LRF appeared to confirm that it has been terminated, as stated by Wu in March 2016, as *zero dollars* were distributed to imprisoned Chinese dissidents in 2016.

**L.    Developments since April 27, 2018.**

      **1.    Following the filing of Plaintiffs' proposed second amended complaint, Mr. Yu and Chang apparently abandoned their attempts to personally benefit from the Trust.**

140.    Following the filing of Plaintiffs' proposed second amended complaint on April 27, 2018, it appears that Mr. Yu and Chang abandoned their attempts to use the Trust's assets for their own benefit. According to the latest publicly available tax filings for the LRF and the LHRO, neither Mr. Yu nor Chang appear to be members of either organization's board of directors.

      **2.    Defendants display a guilty conscience by creating a "Humanitarian Program Grant."**

141.    Sometime after April 27, 2018, Defendants apparently realized that terminating the Trust's humanitarian purpose was wrong. In response, and reflecting their guilty conscience, a "Humanitarian Program Grant" was created while this case was pending. But the "Grant" fails to comply with the Trust for several reasons. First, from publicly available information, it does not appear as if it is awarded to imprisoned Chinese dissidents. Instead, it appears that it is awarded to U.S. organizations registered with the Internal Revenue Service under Section 501(c)(3) of the Internal Revenue Code. Second, it has no apparent nexus with online activity. Third, despite the fact that the monies for the "Grant" presumably come from the Trust, the "Grant" requires the recipient to characterize the funding as having been provided by the LRF, presumably in an attempt to rehabilitate the organization's image in the wake of the

controversies described here. This requirement in no way benefits imprisoned Chinese dissidents or the Trust's humanitarian purpose. Instead, it benefits the LRF.

142.     Given that the "Humanitarian Program Grant" plainly deviates from the terms of the Trust, Defendants were required to obtain judicial approval if they intended for it to satisfy the Trust. By not seeking judicial approval, despite Plaintiffs having already pointed out to Defendants that such approval is necessary for the modification of a charitable trust, Defendants worsened their pre-existing breaches of trust, and arguably committed new ones.

143.     Moreover, as described above, the amounts currently being spent on benefiting the LRF far outweigh any amounts that can be remotely characterized as humanitarian spending. For example, from its latest publicly available tax filings, *89%* of the LRF's total expenditures were for the benefit of the LRF, while only *11%* was characterized by the LRF itself as "humanitarian" spending.

144.     In all events, even if the "Humanitarian Program Grant" complies with the Trust, and it does not, it is too little, too late. It cannot absolve Defendants of the breaches of trust prior to it, much less Defendants' ongoing breaches of trust.

### 3.     Defendants concede there was no obligation under the Settlement for the LRF to receive any monies from the Yahoo Human Rights Fund.

145.     In 2019, Defendants conceded that there was no obligation under the Settlement to spend even one penny of the Trust's assets on benefiting Wu or the LRF. Indeed, they stated that "the entire $17.3 million sum could have been used to settle other dissidents' claims against Yahoo" without running afoul of the Settlement.

146.     As a result, Defendants' failure to protect the Trust's humanitarian purpose from Wu and the LRF's massive overspending of Trust assets on benefiting Wu and the LRF themselves cannot be attributed to any belief that they were constrained from preventing such

overspending (which belief would be negligent in any event). That they nevertheless failed to prevent such spending was therefore willful, intentional, in bad faith, and/or with reckless indifference to the Trust's humanitarian purpose.

> **4.      Despite that concession, Defendants fail to prevent further dissipation of the Trust on benefiting the LRF.**

147.    Having conceded that they do not believe that any obligation exists under the Settlement to spend *any* amount of the Trust's assets for the LRF's benefit, Defendants nevertheless continue to allow large amounts of such spending, while refusing to protect and restore the Trust's humanitarian purpose.

148.    On May 18, 2020, Plaintiffs asked certain Defendants, through counsel, what steps they had taken since April 27, 2018 to protect the Trust's humanitarian purpose.

149.    With respect to the Yahoo Defendants, Plaintiffs noted that a July 28, 2017 statement by Yahoo! Inc. (now known as Altaba Inc.) asserted that "the Yahoo Human Rights Fund is now being administered by Verizon." Plaintiffs then asked what, if anything, any of the Yahoo Defendants had done to protect the Trust's humanitarian purpose since April 27, 2018. Plaintiffs asked if any of the Yahoo Defendants (which includes Verizon) had taken any steps to ensure whatever assets remain in the Trust are not further depleted to the detriment of that purpose. Plaintiffs said if Plaintiffs did not a receive a response by June 1, 2020, Plaintiffs would assume the answer was that the Yahoo Defendants did not take any such steps. As of the date of this complaint, the Yahoo Defendants have not responded.

150.    With respect to the LHRO and the LRF, who apparently have the most direct control over the remaining Trust assets, Plaintiffs asked what they and their officers or directors have done to protect the Trust's humanitarian purpose since April 27, 2018. Plaintiffs asked if

any of them had taken any steps to ensure whatever Trust assets remain are not further depleted to the detriment of that purpose.

151.    By way of example, Plaintiffs asked if either the LRF, the LHRO, or any of their officers or directors, had taken steps to seek funding from sources *other* than the Trust to pay for their expenses, such as their legal bills in this matter. Plaintiffs said if Plaintiffs did not receive a response by June 1, 2020, Plaintiffs would assume the answer was that no such steps had been taken. As of the date of this complaint, Plaintiffs have not received a response to this inquiry.

152.    Given that Defendants took the position that there is no obligation to spend *any* of the Trust's assets for the benefit of the LRF, and that *all* of it could properly have been spent on benefiting Yahoo, Defendants' continued tolerance of the depletion of Trust assets for the benefit of the LRF and the LHRO is a willful and/or intentional breach of trust committed in bad faith and/or with reckless indifference to the Trust's humanitarian purpose. That breach is exacerbated by the fact that Defendants have apparently made no effort to seek funding for the LRF or the LHRO's expenses *other* than from the Trust. These breaches constitute profound injuries to the Trust's humanitarian purpose in and of themselves, and they also worsen Defendants' prior breaches.

153.    Moreover, to the extent Defendants continue to deplete Trust assets for the benefit of the LHRO and the LRF as this litigation proceeds, Defendants' breaches, and the injuries to Plaintiffs and the Trust's humanitarian purpose, will deepen, as will the recklessness, willfulness, intentionality, and/or bad-faith nature of Defendants' misconduct.

154.    Additionally, to the extent Defendants continue to fail to seek alternative sources of funding for the LHRO and the LRF's expenses as this litigation proceeds, Defendants'

breaches, and the injuries to Plaintiffs and the Trust's humanitarian purpose, will deepen, as will the recklessness, willfulness, intentionality, and/or bad-faith nature of Defendants' misconduct.

155.    Finally, to the extent currently unnamed third parties (defined above as "Doe Recipients") accepted and continue to accept monies they know or should have known came from the Yahoo Human Rights Fund, while also being aware of the allegations in this action, Plaintiffs intend to seek restitution of such monies under the well-settled principle that, when a trustee breaches their fiduciary duties and transfers trust property to third parties, those third parties take the property subject to the trust, unless the third parties purchased the property for value and without notice of the fiduciary's breach. Such Doe Recipients, if any exist, will be identified and named after discovery.

## *ALTER EGO* ALLEGATIONS

156.    When Wu was alive, Wu and the LRF were *alter egos* of each other. Wu dominated the operation of the LRF, had *de facto* control over the LRF, unilaterally made all spending decisions, failed to hold formal board meetings, and failed to keep written minutes of board meetings. Wu also ignored the input and advice of other LRF board members, and included them in public documents largely for appearance's sake. Wu also identified individuals as directors even though they had not agreed to be directors. For instance, Wu listed Professor Yu Ying-Shih ("Professor Yu"), a distinguished professor and recipient of a prestigious award from the Library of Congress, as a director on certain documents, despite the fact that Professor Yu had only agreed to be an advisor to the board. Wu was also described as "the only driving force" of the LRF by Yang Fengshi ("Yang"), an associate of Wu's, who also stated that the LRF had an "operating model of 'one-man-driving-all.'" Following Wu's death, Yang recommended that the LRF no longer be "directed by a single person," and that the "LRF should now be led by a real board of directors." As such, Wu and the LRF were *alter egos* of each other when Wu was

alive. *See Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 104 (D.D.C. 2014) (finding plaintiff adequately alleged Wu was *alter ego* of LRF). Moreover, because the Yahoo Defendants received regular reports from Wu and the LRF in their role as trustees and as directors of the LHRO, the Yahoo Defendants knew of Wu's dominance and control of the LRF at all relevant times.

## CHARITABLE BENEFICIARY STANDING ALLEGATIONS

157.    Plaintiffs are members of a small, sharply defined, and numerically limited class of Trust beneficiaries, namely the beneficiaries of the Trust's humanitarian purpose, with interests that are distinct from that of the general public. Specifically, the Trust's humanitarian purpose is intended to benefit: (1) Chinese persons (2) who are imprisoned in China (3) for exercising their freedom of expression (4) online. As these requirements make clear, being imprisoned is a necessary prerequisite to becoming a member of the class, and even then, it is not sufficient. As such, it is not easy to become a beneficiary.

158.    Nor are there are so many persons meeting these requirements that the beneficiary class is uncertain and limitless.

159.    The U.S. Congressional-Executive Committee on China ("CECC") maintains a Political Prisoner Database that contains more than 9,100 entries. The database has been compiled by CECC staff over several years, is regularly revised and corrected, and information about individual prisoner records is regularly added. The information in the database is compiled based on research conducted by CECC staff, including information provided by multinational, national, and nongovernment organizations specializing in human rights and political prisoners. The database includes both current prisoners and those who have been released, died, or escaped.

160.    Among the organizations that contributes information to CECC staff for inclusion in the CECC database is the Dui Hua Foundation ("Dui Hua"), a nonprofit humanitarian

organization that benefits Chinese prisoners of conscience, founded and chaired by John Kamm, a U.S. businessman who has served as representative of the National Council for U.S.-China Trade and vice president and president of the American Chamber of Commerce in Hong Kong, and who in 2004 was awarded a MacArthur Fellowship for his work with Dui Hua, and was the first businessman to be so awarded.

161.    A search conducted across the entire CECC database for entries containing terms relating to internet use yields 633 records.[11] These 633 people include *all* Plaintiffs, indicating that the search terms used are strong predictors of membership in the beneficiary class.

162.    To be sure, in a document listing 1,414 current cases as of November 5, 2017, the CECC states that there are "considerably more than 1,414 cases of current political and religious imprisonment in China," recognizing that the database is unlikely to be 100% comprehensive. However, given that the beneficiary class almost by definition consists of internet-savvy individuals likely to have contacts with individuals and organizations outside China, including organizations like Dui Hua, who would then report political imprisonment to the CECC, it is likely that the database includes a substantial majority of the beneficiary class. Indeed, it includes *all* Plaintiffs. Thus, even assuming the CECC database includes only between approximately 50%-75% of the beneficiary class—an assumption that likely *exaggerates* how many potential beneficiaries are not included in the database, and thus *inflates* the likely size of the beneficiary class, given that the database includes 100% of Plaintiffs—the beneficiary class consists of only about 800 to 1,200 individuals. Accordingly, on the exaggerated assumption that the CECC

---

[11] The terms used were: online, internet, email, emailed, emails, e-mail, e-mailed, e-mails, website, websites, web site, web sites, cyber, open letter, wechat, twitter, qq, tencent, sina, baidu, weibo, youku.

database includes approximately 50%-75% of the beneficiary class, Plaintiffs allege that the beneficiary class consists of approximately 800 to 1,200 individuals.

163.    Plaintiffs' standing is further reinforced by the fact that the number of individuals reported to have received funding from the Trust has declined over the years, as follows:

| LRF tax year | Number of reported recipients of humanitarian assistance |
|:---:|:---:|
| 2008 | 0 |
| 2009 | 40 |
| 2010 | 40 |
| 2011 | 20 |
| 2012 | 9 |
| 2013 | 11 |
| 2014 | 6 |
| 2015 | 6 |
| 2016 | 0 |

164.    Even these figures are likely inflated, as evidenced by the inconsistencies described above, further bolstering Plaintiffs' standing. As for the number of applicants for Trust's humanitarian purpose, that is known only to Defendants, but Plaintiffs are informed and believe that number has declined as well.

165.    This decline is reinforced by data compiled by the Network of Chinese Human Rights Defenders ("CHRD"), a coalition of Chinese and international human rights non-governmental organizations dedicated to the human rights, democracy, rule of law, and grassroots activism in China. Specifically, according to data compiled by CHRD, the number of "human rights defenders" in China who were "deprived of liberty for at least five (5) days, and those known to have been tortured or treated inhumanely in retaliation for their rights advocacy work, regardless of length of detention," declined from 968 cases in 2014 to 704 cases in 2015.

166.    There is no difficulty in identifying who falls within the class of beneficiaries.

167.    Plaintiffs are entitled to preference in the distribution of the Trust's assets, compared to distributees who do *not* meet the requirements of the above-described class.

168.    Plaintiffs' challenge is not to an ordinary exercise of discretion on a matter expressly committed to the trustees, but to misconduct that caused a fundamental change in the nature of the Trust—specifically, the material and irreversible depletion of assets committed to the Trust's humanitarian purpose—to the outright termination of the Trust's humanitarian purpose, and to the Defendants' continued refusal to protect and restore the Trust's humanitarian purpose, all in violation of the Trust.

## STATUTE OF LIMITATIONS ALLEGATIONS

169.    This action, which commenced on April 11, 2017, is not time-barred because:

- before April 11, 2014: (1) no trustee other than Callahan was removed, resigned, or died; (2) Plaintiffs' interest in the Trust and its humanitarian purpose had not terminated; and (3) the Trust's humanitarian purpose had not been terminated;

- Plaintiff Xu W. was imprisoned until April 29, 2014;

- the breach of trust claim against Callahan is subject to tolling under District of Columbia law;

- this is an action to enforce the charitable purpose of a charitable trust;

- Plaintiffs bring equitable claims against Defendants as trustees, to enforce their rights under the Trust and its humanitarian purpose, and there was no clear or continuing repudiation of those rights before April 11, 2014;

- there was a fiduciary relationship of trust and confidence between Plaintiffs and Defendants, mitigating any duty to inquire;

- the breach of the Trust and its humanitarian purpose arose from the cumulative effect of non-humanitarian spending, with the violative character of the non-humanitarian spending not becoming evident until it was repeated over many years, resulting in the clear repudiation of the Trust's humanitarian purpose and clear injury to Plaintiffs, such that the specific moment of breach is imprecise. To give an example, suppose a $100 trust benefits three people equally. If $10 is spent on one beneficiary, but not the other two, without any clear indication to the other two that the

remainder will not be spent on them, it cannot be that the other two beneficiaries' failure to sue upon the spending of the initial $10 means their later suit is time-barred—particularly if, as here, the terms and conditions of the trust were kept hidden from them until years after the $10 was spent. As such, the lawful or unlawful nature of any particular expenditure, and whether such an expenditure materially breached the Trust and its humanitarian purpose cannot reasonably be ascertained without discovery;

- Defendants repeatedly refused to answer questions put to them about the administration of the Trust and its humanitarian purpose by Plaintiffs, Plaintiffs' representatives, and various third parties, and administered Trust assets in a deliberately non-transparent and obfuscating manner, thereby concealing and prolonging the misconduct;

- the Trust's humanitarian purpose was not definitively terminated until 2016; and

- before April 11, 2014, Plaintiffs did not and could not reasonably have known of a right to maintain this action, even with reasonable diligence, because: (1) the Yahoo Defendants repeatedly disclaimed responsibility over the Trust and its humanitarian purpose; (2) Plaintiffs did not obtain key non-public facts and documents contradicting the Yahoo Defendants, including internal emails and Trust documents, until 2016, and only obtained this information after conducting an investigation, beyond what could be expected of reasonable persons in their circumstances; (3) whether the Trust and its humanitarian purpose had been, was being, or would be fundamentally violated could not reasonably have been ascertained before April 11, 2014 based on publicly available information; (4) there was no clear repudiation of the Trust's humanitarian purpose before April 11, 2014; (5) the facts necessary to suggest an illegal violation of the Trust's humanitarian purpose—such as the facts that spending of Trust's assets on the LRF's expenses was a "limited exception" to that purpose, and that the Yahoo Defendants exercised considerable control over Trust assets—were concealed by Defendants, and could not have been uncovered with reasonable diligence; and (6) at that time, the publicly available Forms 990 for LRF and LHRO suggested that 57% or more of the initial $17.3 million Trust corpus remained intact, which was insufficient to provide notice at the time that the Trust's humanitarian purpose had been, was being, or would be fundamentally violated.

## FIRST CLAIM FOR RELIEF
### (Breach of Trust under the Common Law, and in Violation of the District of Columbia Uniform Trust Code, D.C. Code § 19-1301.01, *et seq.*)
### Against all Defendants, except Doe Abettors and Doe Recipients

170.    Plaintiffs re-allege and incorporate all the allegations of this complaint with the same force and effect as if fully restated herein.

171.    Defendants, including currently unknown Doe Trustees, were trustees of the Trust and its humanitarian purpose, including as trustees *de son tort*, constructive trustees, implied trustees, or *de facto* trustees, and currently, at least Verizon, the LRF, and the LHRO remain trustees. As such, each had a duty to use reasonable care to prevent co-trustees from committing a breach of trust, including breaching the Trust's humanitarian purpose, as well as a duty to obtain redress if such a breach occurred. Of the Defendants, at least Verizon, the LRF, and the LHRO continue to have such duties.

172.    As alleged herein, Defendants breached these duties by failing to administer the Trust and its humanitarian purpose with reasonable care, by permitting the substantial depletion of Trust assets in violation of its humanitarian purpose, while benefiting from the Trust and its humanitarian purpose, including by enjoying the Trust's reputation-enhancing effects, by relying on the existence of the Trust and its humanitarian purpose to defeat shareholder proposals relating to human rights, by allocating and using Trust assets for their own benefit and in violation of the Trust's humanitarian purpose, by terminating the Trust's humanitarian purpose, by failing to obtain redress for these breaches, and by continuing to allow the depletion of Trust assets on benefiting the LRF, the LHRO, to the detriment of the Trust's humanitarian purpose.

173.    Yahoo and Bell further breached their duties as trustees by completely abandoning their duties with respect to the Trust and its humanitarian purpose in 2015 or 2016, leaving Trust assets substantially in the control of Wu and the LRF, who they knew or should

have known were not trustworthy, and who they knew or should have known would spend Trust assets in violation of the Trust's humanitarian purpose, and without taking adequate precautions against that violation.

174. By their conduct, Defendants breached duties of trust owed to Plaintiffs and caused the Trust's assets to be systematically and unlawfully depleted in violation of the Trust's humanitarian purpose, caused the Trust's humanitarian purpose to be unlawfully terminated, and are causing it to become increasingly difficult to protect and restore the Trust's humanitarian purpose by allowing Trust assets to be depleted as this litigation proceeds.

175. Plaintiffs are entitled to equitable relief from Defendants, including: an injunction against further breaches of trust; an injunction to compel Defendants to redress breaches of trust by paying money or restoring Trust property; an accounting; the appointment of a special fiduciary to take possession of Trust property and to administer the Trust; the suspension of Defendants as trustees; the removal of Defendants as trustees; the denial of compensation to trustees; voiding Defendants' actions as trustees; the imposition of a lien or constructive trust on Trust property; and tracing of Trust property and recovery of it or its proceeds.

176. Plaintiffs are also entitled to damages from Defendants for their breaches of trust in the amount required to restore the value of the Trust assets devoted to the Trust's humanitarian purpose to what they would have been had the breaches not occurred, or in the amount of the profit to Defendants by reason of their breaches, whichever is greater.

177. Plaintiffs are also entitled to punitive damages from Defendants, payable to the Trust's humanitarian purpose, because their breaches of trust were and are willful, intentional, in bad faith, and/or with reckless indifference to the Trust's humanitarian purpose.

## SECOND CLAIM FOR RELIEF
### (Modification of Trust)
**Against all Defendants, except Doe Abettors and Doe Recipients**

178.    Plaintiffs re-allege and incorporate all the allegations of this complaint with the same force and effect as if fully restated herein.

179.    The Trust should be modified under D.C. Code § 19–1304.12 to modify or terminate the LRF's status as a beneficiary of the Trust, and to remove all Defendants as trustees, because the continuation of such terms would be impracticable or wasteful or impair the administration of the Trust and its humanitarian purpose.

180.    The Trust should be modified under D.C. Code § 19–1304.10 to modify or terminate the LRF's status as a beneficiary of the Trust, and to remove all Defendants as trustees, because continued provision of Trust assets to the LRF, and Defendants' continued service as trustees, would further the unlawful breach of the Trust's humanitarian purpose, and would be unlawful, wasteful, and contrary to public policy.

181.    The Trust should be reformed under D.C. Code § 19–1304.15 to remove the LRF as a beneficiary and all Defendants as trustees because the settlors' intent and the terms of the trust were affected by mistakes of fact and/or law, including the mistaken belief that Wu and the LRF cared about the Trust's humanitarian purpose.

182.    The Trust should be modified to modify or terminate the LRF's status as a beneficiary of the Trust, and to remove Defendants as trustees, because Defendants' breaches of trust, including Wu and the LRF's self-dealing, were, and the Defendants' breaches continue to be, so egregious, reckless, willful, intentional, and in bad faith, that to allow the LRF to continue to be a beneficiary, and to allow Defendants to continue to serve as trustees, would subvert the interests of justice—particularly since Defendants have taken the position there is no obligation to spend any of the Trust's assets on the LRF.

183.     Finally, the Trust should be modified to make Chinese dissidents imprisoned for exercising their freedom of expression online the sole beneficiaries of the Trust because that would further the Trust's humanitarian purpose.

### THIRD CLAIM FOR RELIEF
#### (Third-Party Liability for Breach of Trust)
#### Against Yahoo/Verizon and Doe Abettors
#### (As to Verizon/Verizon, in the Alternative to the First Claim for Relief against Yahoo/Verizon)

184.     Plaintiffs re-allege and incorporate all the above allegations of this complaint with the same force and effect as if fully restated herein.

185.     A third person who knowingly assists or participates in a trustee's breach of trust is liable to the beneficiary. These include persons defined above as Doe Abettors, who, if any exist, will be identified and named after discovery.

186.     To the extent Yahoo is deemed not to be a trustee of the Trust, Yahoo is liable to Plaintiffs as a third party for knowingly assisting and participating in Callahan's and Bell's breaches of trust.

### FOURTH CLAIM FOR RELIEF
#### (Principal-Agent Liability for Breach of Trust)
#### Against Yahoo/Verizon
#### (In the Alternative to the First Claim for Relief against Yahoo/Verizon)

187.     Plaintiffs re-allege and incorporate all the allegations of this complaint with the same force and effect as if fully restated herein.

188.     To the extent Yahoo/Verizon is deemed not to be a trustee of the Trust or its humanitarian purpose, Yahoo/Verizon is liable for the acts of its agents Callahan and Bell. Yahoo required Callahan and Bell to serve as trustees of the Trust and its humanitarian purpose as a condition of Callahan and Bell's employment, and Callahan and Bell agreed. Callahan and Bell were compensated by Yahoo for serving as trustees. Yahoo had the right to remove

56

Callahan and Bell as trustees, directed Callahan and Bell in the exercise of their duties as trustees, and made clear that, in serving as trustees, Callahan and Bell were to protect the interests of Yahoo.

**FIFTH CLAIM FOR RELIEF**
**(Civil Conspiracy)**
**Against All Defendants**

189.    Plaintiffs re-allege and incorporate all the allegations of this complaint with the same force and effect as if fully restated herein.

190.    The Yahoo Defendants, Wu, the LRF, the LHRO, and Does 1-20 entered into an agreement that, notwithstanding the requirements of the Trust and its humanitarian purpose, and notwithstanding the obligations in the Settlement relating to the Trust and its humanitarian purpose, Trust assets would be permitted to be spent on other purposes in ways that would result in the Trust's humanitarian purpose being fundamentally violated. The Yahoo Defendants would benefit by avoiding the cost and burden that proper administration of the Trust and its humanitarian purpose would have required of the Yahoo Defendants, while simultaneously enjoying the reputation-enhancing benefits of the Trust and its humanitarian purpose, as well as the ability to rely on the existence of the Trust and its humanitarian purpose to defeat shareholder proposals, while Wu and the LRF would benefit by using the Trust and assets devoted to its humanitarian purpose to enrich themselves.

191.    Overt acts in furtherance of this scheme include: (1) the Yahoo Defendants publicly denying responsibility for the administration of the Trust or its humanitarian purpose; (2) the Yahoo Defendants identifying Wu and the LRF as being solely responsible for the administration of the Trust and its humanitarian purpose; (3) the Yahoo Defendants touting the Trust and its humanitarian purpose; (4) the Yahoo Defendants permitting Wu and the LRF to spend Trust assets without scrutinizing such spending; (5) Defendants' concealment of facts and

57

documents relating to the scheme; (6) the Yahoo Defendants' attempting to relinquish their authority over Trust assets in 2015 or 2016 and largely conferring unfettered authority over such assets to Wu and the LRF; (7) the Yahoo Defendants, which includes Verizon, refusing to act to protect or restore the Trust's humanitarian purpose, despite the fact that the Trust "is now being administered by Verizon," according to Yahoo! Inc. (now known as Altaba Inc.); and (8) Defendants' continued allowance of seemingly unfettered spending of Trust assets for the benefit of the LRF and the LHRO, despite taking the position that there is no obligation that Trust assets be spent for their benefit.

192.    As a result of the agreement and Defendants' acts in furtherance of the agreement, the Trust and its humanitarian purpose were depleted, and continue to be depleted, to such an extent that Trust and its humanitarian purpose were, and continue to be, violated, including by the complete termination of the Trust's humanitarian purpose, harming Plaintiffs.

**SIXTH CLAIM FOR RELIEF**
**(Restitution)**
**Against Doe Recipients**

193.    Plaintiffs re-allege and incorporate all the allegations of this complaint with the same force and effect as if fully restated herein.

194.    When a trustee breaches their fiduciary duties and transfers trust property to a third party, the third party takes the property subject to the trust, unless the third party purchased the property for value and without notice of the breach.

195.    Here, Doe Recipients (defined above) are such third parties. Specifically, they are those who: (1) took or are taking Trust property transferred to them in breach of the trustees' fiduciary duties to Plaintiffs and/or to the Trust and its humanitarian purpose; (2) knew or should have known, or know or should know, that such property was or is from the Yahoo Human Rights Fund; and (3) were aware or should have been aware, or are aware or should be aware, of

58

the allegations in this action. Doe Recipients do not include anyone who purchased such property for value and without notice of the breach.

196.    Doe Recipients, if any exist, will be identified and named after discovery.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.    Damages, with interest, against all Defendants to which Plaintiffs may be entitled pursuant to each of the counts alleged in this Complaint, including punitive damages.

B.    Disgorgement of all monies, with interest, taken by Wu and the LRF and used to their benefit and to the detriment of Plaintiffs in such amounts, including but not limited to the disgorgement and sale of real property, as necessary to satisfy the judgment awarded herein.

C.    Restoration of Trust assets, to be deposited in a constructive trust.

D.    Accounting of Trust assets and expenditures since the establishment of the Yahoo Human Rights Fund.

E.    Constructive trust over all remaining Trust assets.

F.    Creation of a constructive trust into which Defendants shall pay damages, disgorgement, and restitution.

G.    Tracing of Trust assets wrongfully disposed of and recovery of such assets or their proceeds.

H.    Modification of the Trust to make Chinese dissidents imprisoned for exercising their freedom of expression online the sole beneficiaries of Trust assets.

I.    The removal of Defendants as trustees.

J.    The appointment of a special fiduciary to take possession of Trust property and to administer the Trust.

K.      Plaintiffs' reasonable attorneys' fees and costs, including under D.C. Code § 19-1310.04 and the Uniform Trust Code § 1004, upon which D.C. Code § 19-1310.04 is based.

L.      Such other and further relief, including any additional equitable relief, as the Court may deem just and proper.


Dated: June 4, 2020                         By: *Times Wang*_____
                                            **NORTH RIVER LAW PLLC**
                                            Times Wang (D.C. Bar 1025389)
                                            1300 I St. NW, Suite 400E
                                            Washington, DC 20005
                                            (202) 838-6489
                                            *twang@northriverlaw.com*

                                            *Counsel for Plaintiffs*

**Altaba Inc.**
**(f/k/a Yahoo! Inc.)**
**140 East 45th Street, 15th Floor**
**New York, NY 10017**

July 28, 2017

Jing Zhao
262 Altadena Circle
Pittsburgh, California 94565

RE: <u>Shareholder Proposal on Yahoo Human Rights Fund's Transparency (the "Proposal")</u>

Dear Dr. Zhao:

As you may be aware, Yahoo! Inc. recently sold its operating business to Verizon Communications Inc. (the "Sale Transaction"), changed its name to Altaba Inc. ("Altaba") and registered as an independent, publicly traded, non-diversified, closed-end management investment company under the Investment Company Act of 1940.

The Board of Directors of Altaba (the "Board") has carefully considered the Proposal and has determined that Altaba is not the proper addressee of the Proposal because the Yahoo Human Rights Fund is now being administered by Verizon as a result of the Sale Transaction. Accordingly, Altaba does not have any control or influence over the administration of the Yahoo Human Rights Fund nor is it in a position to provide the requested information regarding the historic administration of the Yahoo Human Rights Fund. Further, even if Altaba were in a position to access such information, the Board believes it would be an inappropriate use of Altaba's resources to prepare the report requested by the Proposal. We therefore formally request that you withdraw the Proposal on the basis that Altaba is unable to address the demands made therein.

Sincerely,

DocuSigned by:
*Eric Brandt*
6556E438D8B7485...
Eric K. Brandt
Chairman of the Board of Altaba.

990355-CHISR01A - MSW

Appendix A

7/17/2008

Dear Tienchi,

Thank you for the payment notice and for your hard work on all these important items. I'm arranging payment by Yahoo! now, getting the appropriate internal approvals and signatures. Pardon the delay, it's been a busy time at Yahoo!. We should be able to wire the funds very shortly.

I also want to briefly re-emphasize two points, which we've all discussed at the YHRF Board meetings.

- We should agree on professional guidance to evaluate the tax implications the Fund will have on LRF and Yahoo!, and consider any sensible changes or restructurings to best protect everyone and also further the goal of the Fund. At Harry and the Board's request, I've spoken with Susan Dorn, whom I understand represents the LRF Board. We'll work with Susan and the YHRF Board to understand potential tax issues and also work to formalize the documents described in the YHRF Guidelines we all agreed in principle at our last in-person YHRF Board meeting. This should include transparency mechanisms for the Board to have better visibility into the applications for assistance and payments from the Fund and also with respect to the overall expenses of the Fund.
- As a general principle, we need to use the Fund for its intended purposes regarding online dissent. We have made certain limited exceptions, all for good purposes, including supporting some of the preparatory work for the LRF Museum. We should be sure to keep focused on the Fund's purpose though. One approach would be to seek Board approval for distribution of funds of more than a certain amount, say, $10,000. We should also establish criteria for what types of projects the YHRF Board should consider and also decide if they're within the scope of the Fund. Also, I believe LRF is reaching the limit on administrative expenses for the year, and we'd recommend LRF give an estimate of remaining expenses proposed to draw-down from the Fund. Ideally we all agree that the Fund should be around for many years to come!

I'm in California early next week and then in Asia at the end of the week and into the following week. I look forward to speaking with you and Harry at the end of July. In any case, I'll have my cell phone, and you can always reach me, even while traveling. Jerry, Callahan, and I want to thank you again for your partnership with Yahoo!, including through these challenging but important Fund issues. I'll speak to you soon.

Sincerely,

Michael

Michael Samway
VP & Deputy General Counsel
Yahoo! Inc.

Michael Samway / TC
7/17/2008

Yahoo! Business & Human Rights Program
http://ycorpblog.com/2008/05/07/business-and-human-rights/
http://yhoo.client.shareholder.com/press/human-rights-free-expression.cfm

**From:** tienchi liao [mailto:tienchimartin@gmail.com]
**Sent:** Tuesday, July 15, 2008 1:09 PM
**To:** Michael Samway
**Cc:** harry w
**Subject:** Re: request for the fourth payment of the YHRF

- Show quoted text -

↰Reply  ↰Reply to all  ↱ Forward  <u>Invite Michael to Gmail</u>
**Your message has been sent.**

| | to | show detail<u>s</u> | 10:23 am (0 minutes ago) | ↰ Reply |
| tienchi liao | Michael , harry | | | |

↰ Reply to all  → Forward ↰ Print ↰ Add tienchi to Contacts list
↰ Delete this message ↰ Report phishing ↰ Show original ↰ Message text garbled?

Hi, Michael,

Thank you so much for  arranging the fourth Yahoo payment. I do understand that Yahoo is extremly busy in the recent time.
The points you mentioned here are also our concern.  We are happy that you talked to Ms. Susan Dorn in terms of the YHRF's tax  situation and the guideline. We need to work out the documents soon so that in the next meeting the board can approve it.
As to the usage of the fund, the purpose, amount and the limitation, I think your thoughts is right and valuable. I will discuss with Harry. We may make some suggestions at the next meeting.
Wish you a good and sucessful trip.

Tienchi

- Show quoted text -