**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HE DEPU *et al.*,

              *Plaintiffs*,

      v.

OATH HOLDINGS, INC. *et al.*,

              *Defendants*.

Civil Action No. 17-635 (RDM)

**MEMORANDUM OPINION AND ORDER**

In 2007, in an earlier lawsuit brought before a different court, Chinese dissidents who had been imprisoned based on their online activity sued Yahoo.  As part of a settlement agreement in that case, Yahoo paid $17.3 million to create the Yahoo Human Rights Fund, a portion of which was to be distributed to other Chinese dissidents who were imprisoned based on their online activity.  This new Fund would be administered by Chinese human rights activist Harry Wu and his Laogai Research Foundation (and later the Laogai Human Rights Organization).

Plaintiffs are six Chinese dissidents who either received some money from the Fund or who applied for such funding but were denied.  They allege that the Fund is a charitable trust and that they are past or potential beneficiaries of that trust.  Plaintiffs further allege that they would have received more funding, except that Wu and his organizations mismanaged the fund, distributing only 4 percent of the $17.3 million to Chinese dissidents and using well over $10 million for their own purposes.  They name as Defendants Oath Holdings, Inc., which is Yahoo's successor in interest, as well as former Yahoo employees Ronald Bell and Michael Callahan, who allegedly served as trustees of the Fund (collectively, the "Yahoo Defendants"); the Laogai Research Foundation ("LRF") and Laogai Human Rights Organization ("LHRO"), which were

tasked with administering the Fund (collectively, the "Laogai Defendants"); and the Estate of Harry Wu, who allegedly treated the Fund money as if it were his own ("Wu Estate").

In an earlier decision, this Court (Bates, J.) dismissed the case on the grounds that the 2007 settlement agreement did not create a trust and, even if it had, that Plaintiffs did not have standing to bring a breach of trust claim. The D.C. Circuit reversed and remanded. The three sets of Defendants have each filed renewed motions to dismiss. For the reasons that follow, the Court will **GRANT** in part and **DENY** in part the pending motions.

## I. BACKGROUND

### A.      Factual Background

For the purpose of resolving Defendants' pending motions to dismiss, the Court assumes the truth of the allegations in the Second Amended Complaint. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015). This case relates to the settlement agreement in an earlier lawsuit, which Plaintiffs allege created a trust whose charitable purpose Defendants have violated. In 2007, imprisoned Chinese dissidents Wang Xiaoning and Shi Tao, along with Wang's wife, Ling Yu, sued Yahoo. *See Depu v. Yahoo! Inc.*, 950 F.3d 897, 899 (D.C. Cir. 2020) ("*Depu II*") (citing *Wang v. Yahoo! Inc.*, No. 7-cv-2151 (N.D. Cal. Apr. 18, 2007)). They alleged that the company had facilitated the prisoners' prosecutions by turning the contents of their email accounts over to Chinese authorities, in violation of federal and state law. *Id.* With Harry Wu acting on behalf of the plaintiffs in that case, the parties entered a confidential settlement agreement. *See* Dkt. 64 at 17 (2d Am. Compl. §§ 39–40); Dkt. 66-1 (Settlement Agreement).

The settlement provided that Yahoo would pay $3.2 million to each of the plaintiffs'
families, with the money to be held in trust by the LRF.[1]  Dkt. 66-1 at 3 (§ II.B).  In addition, the
settlement called for payment from Yahoo to the LRF of $17.3 million in four installments to
establish the Yahoo Human Rights Fund ("YHRF" or "Fund"), which is the subject of the
current dispute.  *Id.* (§ II.C).  The settlement provided that "all payments" to the LRF for the
Fund would be "[m]ade in [t]rust."  *Id.* (§ II.C.1).  The LRF was to "maintain" the YHRF money
"separately from other [LRF] funds," and the second, third, and fourth installments were
contingent on Yahoo's "satisfactory review" of the disbursements from the prior quarter to
ensure that they "conform with the purposes of the" Fund.  *Id.*

Under the settlement agreement, the YHRF money "may be used for three purposes
only."  *Id.* at 4 (§ II.C.2).  First, money from the Fund would go "to provide humanitarian and
legal assistance primarily to persons in or from the People's Republic of China who have been
imprisoned for expressing their views through Yahoo! or another medium."  *Id.*  In implementing
this charitable purpose, the LRF "and its Executive Director, Harry Wu, agree[d] to use their best
efforts to maximize the benefits achieved through their use of a portion of the [YHRF] for
humanitarian and legal assistance."  *Id.* (§ II.C.2.i).  Second, the Fund would be used "to resolve
claims primarily by [imprisoned] persons, or persons threatened with prosecution or
imprisonment, against the Yahoo! Entities or any Yahoo! subsidiary or affiliate."  *Id.* (§ II.C.2).
The settlement details a procedure through which the LRF and Yahoo would work together to
facilitate the resolution of such claims in the future.  *Id.* (§ II.C.2.ii).  Third, money from the

---

[1]  Although tangential to their claims, Plaintiffs allege that both of the imprisoned dissidents'
families had to fight Wu for access to the money they were owed, and one of the families later
filed a separate lawsuit to recover $1 million that Wu and the LRF withheld.  Dkt. 64 at 18 (2d
Am. Compl. ¶¶ 41–42) (citing Complaint, *Yu v. Wu*, No. 11-cv-92 (E.D. Va. Jan. 28, 2011)).

Fund could be used "for payment of [LRF] operating expenses and [the LRF]'s educational work conducted in the United States in support of human rights," provided that no more than $1 million per year go to operating expenses and provided that the LRF report its operating and educational expenditures to Yahoo.  *Id.* (§ II.C.2.iii).  The agreement provided that its terms "may be amended, modified, canceled, or waived only by written instrument executed by each of the parties."  *Id.* at 10 (§ 4.O).

After entering the settlement, Yahoo publicly promoted the Fund and its humanitarian purpose.  In a November 13, 2007 press release, Yahoo explained that it was "working to create a separate human rights fund to provide humanitarian and legal support to political dissidents who have been imprisoned for expressing their views online, as well as their families."  Dkt. 64 at 21 (2d Am. Compl. § 46).  The release quoted Yahoo CEO Jerry Yang as saying that the company was "committed to making sure our actions match our values around the world."  *Id.* And in a Wall Street Journal article, an unnamed "person close to Yahoo" told the paper that the creation of the fund "was not a legal calculation, but a humanitarian decision."  *Id.* at 22 (2d Am. Compl. § 47) (internal quotation marks omitted).

After the settlement, Yahoo publicly deferred to Wu and the LRF with respect to the Fund's administration.  *Id.* at 23 (2d Am. Compl. ¶ 52).  Behind the scenes, however, Yahoo appears to have wielded (though not always exerted) significant authority over the Fund, according to documents obtained by Plaintiffs.  *Id.* (2d Am. Compl. ¶ 53).  In setting up the Fund, Yahoo and the LRF drafted guidelines to govern its operations.  *Id.* (2d Am. Compl. ¶ 54). The guidelines required (1) that at least one Yahoo employee serve on the Fund's board of directors, (2) that the board would not have a quorum for meetings unless Yahoo's designated board member was present, and (3) that all disbursements of Fund assets required board

consensus.  *Id.*  Taken together, these provisions gave Yahoo veto power over any spending of Fund assets.  In addition, the guidelines required the Fund's board to notify Yahoo at least twice per year of the Fund's activities.  *Id.*

According to Plaintiffs, Defendant Michael Callahan, who was executive vice president, general counsel, and corporate secretary for Yahoo from 1999 to 2012, was a trustee of the Fund and its humanitarian purpose until his departure from Yahoo.  *Id.* at 12–13 (2d Am. Compl. ¶ 20).  Likewise, Plaintiffs allege that Defendant Ronald Bell, who also served as Yahoo's general counsel and corporate secretary, was a trustee of the Fund and its humanitarian purpose until 2016.  *Id.* at 13 (2d Am. Compl. ¶ 21).

The guidelines also provided parameters for disbursements in support of the Fund's humanitarian purpose.  *Id.* at 23–24 (2d Am. Compl. ¶ 55).  Applications for funding were to be evaluated based on specific criteria, including whether the applicant was from China, whether the applicant suffered violations of fundamental human rights, whether those violations resulted from the applicant's freedom of expression, and whether the case involved Yahoo's services or other electronic media.  *Id.*  The guidelines directed that the amount of assistance would be based on whether the applicant was imprisoned and the length of her sentence, as well as the applicant's family situation and legal defense needs.  *Id.* at 24.

Yahoo later reiterated the charitable purpose of the Fund in communications with the LRF.  Before wiring the final portion of the trust funds to the LRF in 2008, Yahoo vice president and deputy general counsel Michael Samway wrote to LRF employee and board member Liao Tienchi ("Liao"), emphasizing that "[a]s a general principle, we need to use the Fund for its intended purposes regarding online dissent," despite "limited exceptions," such as "supporting some of the preparatory work for the LRF Museum."  *Id.* at 17, 22 (2d Am. Compl. ¶¶ 39, 49);

*see also id.* at 65 (email from Samway to Liao).  Samway also argued for greater board oversight of how Wu and the LRF were spending money from the YHRF, seeking "transparency mechanisms for the [b]oard to have better visibility into applications for assistance and payments from the Fund and also with respect to the overall expenses of the Fund." *Id.* at 24 (2d Am. Compl. ¶ 56).  He also proposed that Wu and the LRF "seek Board approval for distribution of funds of more than a certain amount, say $10,000." *Id.*  In addition, he seemed to indicate that spending had not complied with the guidelines, advocating that they "establish criteria for what types of projects the YHRF Board should consider and also decide if they're within the scope of the Fund." *Id.*

In 2009, Yahoo, the LRF, and Wu purported to amend the settlement to change the administration of the YHRF in two important respects.[2] *Id.* at 24–25 (2d Am. Compl. ¶ 57).  First, they used $3.55 million in Fund assets to create a separate trust that would exclusively focus on the Fund's second purpose—to settle claims against Yahoo by imprisoned political dissidents.  *Id.* at 25 (2d Am. Compl. ¶ 58).  Over time, both Callahan and Bell of Yahoo served as trustees of this separate trust.  *Id.*  In 2015, this separate trust was terminated, and its assets transferred back into the Fund.  *Id.*

Second, to continue the Fund's humanitarian purpose, Yahoo, the LRF, and Wu transferred all or a portion (Plaintiffs seem unsure which) of the Fund's remaining assets to a new nonprofit corporation, to be called the Laogai Human Rights Organization, which would support the LRF.  *Id.* (2d Am. Compl. ¶ 59).  Yahoo employees served on the LHRO's board,

---

[2]  Plaintiffs here allege that these "amendments" to the terms of the settlement were invalid because Defendants made the changes without first obtaining the consent of the plaintiffs from the original lawsuit.  *Id.* at 25 (2d Am. Compl. ¶ 60).

and tax filings suggest that Callahan and Bell, during their respective tenures, "devoted an average of 25 hours per week to the LHRO." *Id.* (emphasis omitted).

Plaintiffs in this case are six Chinese dissidents[3] who have been imprisoned because of their online activity, including through the use of Yahoo email accounts. *Id.* at 7–11 (2d Am. Compl. ¶¶ 10–15). Five of them are past beneficiaries of the Fund's humanitarian purpose, while the sixth applied to the Fund in 2016 and was told by Wu that its humanitarian purpose had been terminated. *Id.* They allege that they would have received more money from the trust if the assets had not been "systematically and unlawfully depleted by Wu and the LRF in contravention of the [Fund's] humanitarian purpose, while [Yahoo] willfully ignore[d] red flags." *Id.* at 26.

Plaintiffs allege that, with little oversight from Yahoo, Wu and the LRF have spent only $700,000 of the Fund's $17.3 million on its humanitarian purpose while "potentially more than $14 million" went to "enriching Wu and the LRF." *Id.* at 27 (2d Am. Compl. ¶ 64) (emphasis omitted). Between 2008 and 2016, the LRF reported expenditures of more than $12.4 million, nearly all of which evidently came from the Fund, given that the LRF reported less than $1 million in total revenue from other sources during the relevant period. *Id.* (2d Am. Compl. ¶ 65). Part of these expenditures covered salary raises for Wu and his wife. In 2007, prior to the settlement, Wu received $48,000 in his role as executive director of the LRF, while his wife made $24,000 as the secretary and treasurer. *Id.* at 28 (2d Am. Compl. ¶ 67). In 2008, after receiving the settlement money, Wu increased his salary by $60,000 to $108,000 per year, while his wife's salary jumped to $42,000. *Id.* Wu increased his own salary several times over the

---

[3] This lawsuit originally involved eight plaintiffs, but two of them did not participate in the successful appeal of Judge Bates's earlier order dismissing the case with prejudice. That prior dismissal thus remains the final judgment in this case as to those plaintiffs, and they are, therefore, no longer part of the case. One of the terminated plaintiffs, Yu Ling, was a plaintiff in the original lawsuit that led to the settlement.

ensuing years.  *Id.*  Plaintiffs allege that Yahoo "did nothing to scrutinize, much less curtail, these expenditures."  *Id.* (2d Am. Compl. ¶ 68).

Wu and the LRF also spent Fund assets on real estate.  In 2008, immediately following the settlement, they purchased a $1.45 million property in the District of Columbia.  *Id.* at 29 (2d Am. Compl. ¶ 72).  In 2015, the LRF purchased a townhouse in the District of Columbia for $2.55 million.  *Id.* at 29–30 (2d Am. Compl. ¶ 73).  Additional assets from the Fund went to defend Wu in a series of lawsuits.  In 2011, the LRF incurred $322,596 in legal fees, including to defend a suit by one of the plaintiffs in the original lawsuit seeking the money owed under the settlement.  *Id.* at 28–29 (2d Am. Compl. ¶ 69); *see also Yu v. Wu*, No. 11-cv-92 (E.D. Va. Jan. 28, 2011).  From 2013 to 2015, the LRF spent another $515,000 on legal fees.  Dkt. 64 at 29 (2d Am. Compl. ¶ 69).  During this time, Wu faced lawsuits accusing him of sexual harassment, *see id.* (citing *Jing v. Wu*, No. 2015-11903 (Va. Cir. Ct. Sept. 8, 2015)), and of misusing federal grant funds and then firing an employee in retaliation for raising concerns about that alleged fraud, *see id.*; *see also Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73 (D.D.C. 2014).  Other expenditures were harder to pin down.  In 2009, Wu and the LRF transferred $65,000 to the China Information Center, another nonprofit run by Wu.  Dkt. 64 at 30 (2d Am. Compl. ¶ 74).  In 2010, they sent an additional $100,000.  *Id.*  But neither transfer was reported in the Chinese Information Center's tax filings, which leads Plaintiffs to conclude that "the actual recipients of these transfers are unknown."  *Id.*

All the while, relatively little money went to the Fund's humanitarian purpose.  As noted above, the LRF has reported approximately $700,000 in direct aid to Chinese dissidents in conformance with the Fund's humanitarian purpose.  *See id.* at 42 (2d Am. Compl. ¶ 123).  But, according to Plaintiffs, "even these small amounts may be inflated."  *Id.* (2d Am. Compl. ¶ 123).

8

Plaintiffs point to several discrepancies in the LRF's tax filings.  In 2009, the LRF's Form 990 claimed $727,540 in aid ($550,000 of which went to settle lawsuits against Yahoo), but the organization reported only $677,540 on its Schedule F, which lists payments to recipients outside the United States.  *Id.* at 42–43 (2d Am. Compl. ¶¶ 123–24).  That leaves $50,000 in claimed humanitarian aid that appears not to have gone to China.  *Id.* at 43 (2d Am. Compl. ¶ 124).  A similar discrepancy in 2010 showed a $140,000 gap between the aid that the LRF claimed and what was reported on its Schedule F.  *Id.* (2d Am. Compl. ¶ 125).  It is thus possible that the LRF put even less than $700,000 from the Fund toward its humanitarian purpose.

Despite Yahoo employees serving on the board of the LHRO, Wu reportedly viewed the assets in the Fund as "his alone" and made spending decisions unilaterally, according to an article in *The New York Times* about Wu's life.  *See* Andrew Jacobs, *Champion of Human Rights in China Leaves a Tarnished Legacy*, N.Y. Times (Aug. 13, 2016), https://www.nytimes.com/2016/08/14/us/champion-of-human-rights-in-china-leaves-a-tarnished-legacy.html (internal quotation marks omitted).  The article also reported that the Internal Revenue Service fined the LRF "$40,000 for financial irregularities" in 2015.  *Id.*

In 2016, Wu and the LRF appear to have terminated the Fund's humanitarian purpose entirely.  Plaintiff Xu Wanping, a Chinese dissident who had had been imprisoned repeatedly, serving a total of twenty years in prison, emailed Wu and the LRF seeking assistance from the Fund.  Dkt. 64 at 31 (2d Am. Compl. ¶ 78).  Wu and the LRF responded as follows:

> We have received all your emails[.] . . .  One of the main reasons that we did not reply to you for a long time was related to the humanitarian aid project of our Laogai Research Foundation. . . .  Over the past one year or so, our Laogai Research Foundation has been considering and discussing whether this project should be continued.  After repeated discussion, the conclusion reached was: We have decided to discontinue this project. . . .

> We will continue our website (both in English and Chinese), the Laogai
> Museum, and public speeches, including those to the U.S. political circle, the
> U.S. Congress, parliaments of various nations in Europe, and European and U.S.
> media outlets, etc.

*Id.* (2d Am. Compl. ¶¶ 79–80) (brackets removed).  The LRF seems to have ceased using money from the Fund for its humanitarian purpose in 2016, but its other expenditures continued unabated.  *See id.* at 42 (2d Am. Compl. ¶ 123).  In its tax filings for the years following 2016, the LRF reported that it did not disperse any money to Chinese dissidents, but the organization spent, on average, just under $1 million per year on other things.  *Id.*

Yahoo, for its part, denied responsibility for administering the Fund but, at the same time, continued to tout the Fund's humanitarian purpose.  Following Yu Ling's 2011 lawsuit to recover money owed under the settlement, Yahoo shareholder Zhao Jing made a books and records demand related to the Fund, arguing that the lawsuit raised an "inference of mismanagement."  *Id.* at 33 (2d Am. Compl. ¶ 88).  In response, Yahoo argued that mismanagement of the Fund did not implicate any Yahoo employees because, although Yahoo may have "partnered" with Wu and the LRF to "establish" the Fund, "all of [Zhao's] allegations of wrongdoing involve the administration of the Fund, which necessarily post-dated the establishment of the Fund."  *Id.* at 33–34 (2d Am. Compl. ¶¶ 89–91) (internal quotation marks omitted).  Yahoo thus maintained that Zhao Jing had "no basis . . . to claim that Yahoo! manages or controls the Fund."  *Id.* at 34 (2d Am. Compl. ¶ 92).  Indeed, Yahoo argued that the lawsuit was proof that it was not responsible for the Fund, since the suit had placed blame on Wu and the LRF and did not name Yahoo as a defendant.  *Id.* (2d Am. Compl. ¶¶ 93–96).  When Zhao Ling later proposed a shareholder resolution asking Yahoo to investigate the management of the YHRF, Yahoo again denied its involvement, arguing that Wu was responsible for administering

the Fund.  *Id.* at 35–36 (2d Am. Compl. ¶¶ 98–101).  Yahoo neglected to mention that Bell was

then serving as "Vice Chairman" of the LHRO.  *Id.* (2d Am. Compl. ¶ 100).

Plaintiffs allege that Yahoo, despite these public denials, had received "repeated[]"

warnings that Wu and the LRF were mismanaging the Fund, including the series of lawsuits

against Wu discussed above and communications from LRF employee Liao "sounding the

alarm."  *Id.* at 37 (2d Am. Compl. ¶ 106).  In December 2010, Liao wrote a letter, which was not

publicly available at the time, to the boards of the Fund and the LRF, expressing his concerns.

*Id.* (2d Am. Compl. ¶ 107).  Liao wrote that Wu rarely held board meetings, and when he did, he

"provide[d] no agenda, minutes, financial reports and related documents (fund application)."  *Id.*

(internal quotation marks omitted).  Liao asserted that Wu "decide[d] and raise[d] his own

salary" and "ma[d]e important financial decisions (e.g. new lease in Dupont Circle) alone

without first get[ting] the opinion and approval from the board."  *Id.* at 38 (internal quotation

marks omitted).  Even more relevant to the present dispute, Liao warned that Wu was

"[o]ffend[ing] the basic agreement with Yahoo, provid[ing] . . . not sufficient humanitarian

support to the victims in or from China (only 8% from the budget, according to the financial

report [Liao] ha[d]), [and] no qualified office staff is working on this issue."  *Id.* (Second Am.

Compl. ¶ 108).  The Fund lacked a website, and people did not know how to apply.  *Id.* (2d Am.

Compl. ¶ 110).  Liao complained that the financial situation of the organization was not

transparent and that Wu had purchased a building in the District of Columbia in his own name,

using money from the Fund.  *Id.* (2d Am. Compl. ¶ 109).  In conclusion, Liao requested an

investigation of "wrong-doings of Harry Wu."  *Id.* (2d Am. Compl. ¶ 111) (internal quotation

marks omitted).  Liao cautioned that, in the absence of such an investigation, "[t]here will be a

miserable or even catastrophic failure for LRF and [the] Yahoo HR Trust," that "Wu will harm

the organization and damage the image of Yahoo," and that "scandals will be exposed and it would be a heavy blow to the human rights issue in China." *Id.*

While Yahoo disclaimed oversight of the Fund's operations, the company continued to promote the Fund's humanitarian purpose when challenged on its human-rights record.  In 2008, shortly after the creation of the Fund, the City of New York Office of the Comptroller, on behalf of several public pension funds that held Yahoo stock, put forth a shareholder proposal urging Yahoo to "institute policies to help protect freedom of access to the Internet." *Id.* at 40 (2d Am. Compl. ¶ 116).  Yahoo argued successfully that such action was "unnecessary" in light of ongoing initiatives, including the "establish[ment] of a Human Rights Fund, in partnership with a noted Chinese human rights activist, to provide humanitarian relief and legal support for dissidents imprisoned for expressing their views online." *Id.*  Yahoo relied on the Fund to defeat similar shareholder proposals in 2011, 2014, and 2015 as well.  *Id.* at 40–41 (2d Am. Compl. ¶¶ 117–20).  Plaintiffs allege that "at no point did Yahoo ever disclose that [Fund] assets were being substantially depleted on purposes having nothing to do with providing humanitarian aid to imprisoned dissidents, which aid it was touting in opposing these shareholder proposals, or that the amounts being spent on such aid were as small as they were." *Id.* at 41 (2d Am. Compl. ¶ 121).

## B.    Procedural Background

Plaintiffs filed this lawsuit on April 11, 2017, invoking the Court's diversity jurisdiction.  Dkt. 1.  Several months later, they filed their First Amended Complaint, which included seven claims.  Dkt. 26.  At that time, the case included eight plaintiffs, seven of whom were past or potential beneficiaries of the Fund ("Beneficiary Plaintiffs").  *Id.* at 6–10 (1st Am. Compl. ¶ 10– 17).  The eighth plaintiff, Yu Ling, had also been a plaintiff in the original 2007 lawsuit against

Yahoo and was thus a party to the settlement that created the Fund. *Id.* at 11 (1st Am. Compl. ¶ 18). Plaintiffs named Yahoo, Callahan, Bell, the Wu Estate, the LRF, the LHRO, and the Fund as defendants, in addition to twenty unknown "Doe Defendants" who were employees or agents of the named defendants and who in one way or another participated in breaching the trust. *Id.* at 11–13 (1st Am. Compl. ¶¶ 19–27).

The Beneficiary Plaintiffs alleged that the portion of the Fund designated to provide humanitarian aid was a trust and that all Defendants, as trustees, had breached that trust by permitting the depletion of the trust's assets in violation of its humanitarian purpose. *Id.* at 41–43 (1st Am. Compl. ¶¶ 125–31). In addition to that breach of trust claim, the Beneficiary Plaintiffs brought a related claim against all Defendants for modification of trust. *Id.* at 43–44 (1st Am. Compl. ¶¶ 135–36). They also alleged, in the alternative, that Yahoo was responsible for the breach of trust under third-party and principal-agent theories of relief, *id.* at 44 (1st Am. Compl. ¶¶ 137–41). Yu Ling brought two separate contract claims, based on the settlement, alleging breach of the agreement by Yahoo, Wu, and the LRF, *id.* at 45 (1st Am. Compl. ¶¶ 142–45), and unjust enrichment by Wu and the LRF, *id.* at 43 (1st Am. Compl. ¶¶ 132–34). Finally, all Plaintiffs brought a civil conspiracy claim against all Defendants. *Id.* at 45–46 (1st Am. Compl. ¶¶ 146–49). Defendants, at that time grouped slightly differently than they are now, filed four separate motions to dismiss. *See* Dkt. 27 (LRF); Dkt. 28 (LHRO); Dkt. 29 (Yahoo, Bell, and Callahan); Dkt. 30 (Wu Estate).

On March 30, 2018, this Court (Bates, J.) granted the motions to dismiss and dismissed "the complaint in its entirety." *He Depu v. Yahoo! Inc.*, 306 F. Supp. 3d 181, 185 (D.D.C. 2018) ("*Depu I*"). With respect to the four counts that sounded in trust law, the Court concluded that the Beneficiary Plaintiffs "ha[d] not plausibly alleged that Yahoo established a charitable trust in

13

2007 and, even if they had, they lack[ed] standing to bring these claims." *Id.* The Court went on

to hold that Yu Ling's two contract claims based on the 2007 settlement were barred by the

provisions of the separate settlement agreement in her 2011 lawsuit, which also aimed to enforce

the 2007 settlement. *Id.* at 191–92; *see also Yu v. Wu*, No. 11-cv-92 (E.D. Va. Jan. 28, 2011). In

the alternative, the Court held that she had failed adequately to plead her claims. *Depu I*, 306

F. Supp. 3d at 192–94. Finally, the Court dismissed the civil conspiracy count. *Id.* at 194. The

Court explained that civil conspiracy "is not an independent cause of action under District of

Columbia law," but rather "'depends on the performance of some underlying tortious act.'" *Id.*

(quoting *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983)). Because "Plaintiffs [had]

not alleged any torts in the amended complaint," and because "all of their other claims [were]

dismissed," the Court dismissed the civil conspiracy claim as well. The Court subsequently

denied Plaintiffs' motion to amend the judgment and their motion for leave to amend their

complaint. Dkt. 48; Dkt. 49.

At that point, Yu Ling and one of the Beneficiary Plaintiffs gave up on their claims, but

the remaining six Beneficiary Plaintiffs appealed the dismissal of the four claims that sounded in

trust. Dkt. 50; *see also* Appellants' Br. 2–3, *Depu II*, No. 18-7161 (Apr. 15, 2019). On February

28, 2020, the D.C. Circuit reversed. *See Depu II*, 950 F.3d at 899. The court of appeals first

decided that Plaintiffs had plausibly alleged that Yahoo created a charitable trust through the

2007 settlement agreement. *Id.* at 901–05. As the D.C. Circuit explained, the elements of a trust

under D.C. law are "1) a trustee, who holds the trust property and is subject to equitable duties to

deal with it for the benefit of another; 2) a beneficiary, to whom the trustee owes such duties;

[and] 3) the trust property, which is held by the trustee for the beneficiary." *Id.* at 901 (quoting

*Cabaniss v. Cabaniss*, 464 A.2d 87, 91 (D.C. 1983)). In a charitable trust, like the one alleged

14

by Plaintiffs, "'the obligation of the trustee is to apply the trust res for some form of public

benefit.'" *Id.* (quoting *Hooker v. Edes Home*, 579 A.2d 608, 611 (D.C. 1990), and George G.

Bogert et al., *The Law of Trusts and Trustees* § 411 (3d ed. 2017) ("Bogert on Trusts")).

Furthermore, "'there must be proof of the settlor's intention to create a trust.'" *Id.* (quoting

*Duggan v. Keto*, 554 A.2d 1126, 1133 (D.C. 1989)).

The D.C. Circuit concluded that Plaintiffs had plausibly alleged each of the necessary

elements.  Looking first to the text of the 2007 settlement, the court of appeals concluded that the

agreement "plausibly identifies . . . a trustee (the Foundation), trust property ($17.3 million), and

a charitable purpose ('humanitarian and legal assistance' to persons meeting specified criteria)."

*Id.* at 902.  As additional textual evidence of the intention to create a trust, the court noted that

the settlement called for the payments to the Fund to be "made in trust" and that the settlement

"subject[ed] the [LRF]'s handling of the Fund to trust-like restrictions," using "imperative

language," like "shall," "shall not," and "only" in describing how the money in the Fund could

be spent  *Id.* (internal quotation marks and citations omitted); *see also* Dkt. 66-1 at 3 (§ 2.C).

The D.C. Circuit also emphasized that the settlement barred the LRF from spending more than

$1 million per year on its own operating expenses and required regular reports on the LRF's

activities.  *Depu II*, 950 F.3d at 903.  "All of this together plausibly signals the hallmark of a

charitable trust: 'a fiduciary relationship with respect to property, subjecting the person by whom

the title to the property is held to equitable duties to deal with the property for a charitable

purpose.'"  *Id.* (quoting Restatement (Second) of Trusts § 348).  Finally, the court of appeals

observed that "circumstances surrounding the creation of the Fund" were "probative of trust

intent," including Yahoo's public statements promoting the Fund's humanitarian purpose.  *Id.*

The D.C. Circuit rejected various counterarguments pressed by Defendants.  Although Defendants argued that the settlement agreement was a mere contract, "with no trust document or announcement of trust intent in sight," settled law established that the existence of a contractual relationship does not preclude a finding of a trust relationship, "[n]or is it unusual for a trust to be established as part of a settlement agreement."  *Id.* at 903–04.  Likewise, the settlement provision disclaiming third-party beneficiaries "may bar third parties from suing for breach of contract," but trust duties are not contractual in nature and instead "arise[] from the trust relation itself."  *Id.* at 904 (internal quotation marks and citations omitted).  Next, Defendants pointed out that, under the terms of the settlement, although the first purpose of the Fund was humanitarian, the second purpose was to resolve claims against Yahoo.  *Id.*  The D.C. Uniform Trust Code, however, recognizes the validity of mixed trusts.  *Id.* (citing D.C. Code § 19-1301.03(3)).  Nor could LRF have simply used the entirety of the fund to settle claims against Yahoo, leaving nothing for the humanitarian purpose, because "trustees must act 'impartially in . . . [the distribution of] trust property,' paying 'due regard' to the 'respective interests' of each."  *Id.* (quoting D.C. Code § 19-1308.03) (alteration in original).  Finally, the D.C. Circuit found no merit in Defendants' argument that the more formal creation of a separate trust in 2009 showed that Defendants knew how to create a trust when they wanted.  *Id.* at 905. The court of appeals concluded that it could infer little, if anything, about "Yahoo's intent in executing the 2007 [s]ettlement" from the fact that "*two years later* it used more formal documents to create a different trust."  *Id.* (emphasis added).

Having concluded that Plaintiffs had plausibly alleged a trust, the D.C. Circuit turned to the question whether Plaintiffs had standing to enforce that trust and concluded that they did.  *Id.* at 905–08.  As the court explained, "[t]raditionally, 'only a public officer, usually the state

16

Attorney General' could bring an action to enforce a charitable trust." *Id.* at 905 (quoting *Fam. Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 244 (D.C. 2015)). But "in light of the 'exponential expansion of charitable institutions' and a 'busy Attorney General,' the District of Columbia has 'relax[ed]' this rule, granting standing to those with 'a special interest in continued performance of the trust distinguishable from that of the public at large.'" *Id.* (quoting same) (additional internal quotation marks omitted). The leading District of Columbia case on "special interest" standing, *Hooker v. Edes Home*, establishes two requirements: "(1) that the action challenge an 'extraordinary measure threatening the existence of the trust,' not just an 'ordinary exercise of discretion' committed to the trustees; and (2) that the plaintiffs belong to a class of potential beneficiaries that is 'sharply defined' and 'limited in number.'" *Id.* at 906 (quoting *Hooker*, 579 A.2d at 614–15).

Here, the D.C. Circuit held that both requirements were satisfied. First, Defendants did not dispute that the case satisfied *Hooker*'s first prong, and, in any event, nothing could be more threatening to the existence of the trust than the outright termination of the Fund's charitable purpose. *Id.* Second, the court concluded that Plaintiffs belonged to a class of potential beneficiaries that was "sharply defined." *Id.* (quoting *Hooker*, 579 A.2d at 614). The putative beneficiaries included "(1) Chinese persons, (2) imprisoned in China, (3) for exercising their freedom of expression, (4) online," with the criteria drawn from the text of the settlement and the terms of the subsequent guidelines. *Id.* This group was sufficiently narrow under *Hooker*, which recognized special interest standing for a similarly defined class. In *Hooker*, the relevant will and charter documents required "'beneficiar[ies] to be (1) female, (2) indigent, (3) aged, and (4) widowed,'" and later bylaws "'further require[d] her (5) to be in good health (certifiably) and (6) to have been for at least five years immediately preceding the date of application [a] resident[ ]

17

of Georgetown.'" *Id.* (quoting *Hooker*, 579 A.2d at 615) (internal quotation marks omitted).

The class in this case was thus sufficiently defined.  As for the whether the beneficiary class was

also "limited in number," *id.* at 907 (quoting same at 614–15), the D.C. Circuit concluded that

Plaintiffs had plausibly alleged that the proposed class consisted of between 800 and 1,200

people, which was similar to the class at issue in *Hooker*, which numbered "'in the hundreds, if

not the thousands.'" *Id.* (quoting *Hooker*, 579 A.2d at 611).

   Defendants countered that the class of qualified beneficiaries could grow over time, but

the *Hooker* court had rejected a similar argument.  *Id.* at 907.  In that case, "the defendants

contended that the 'class of potential beneficiaries includes "all women" and so is limitless

because any woman could [in the future] become poor and widowed' (and, presumably, move to

Georgetown)." *Id.* (quoting *Hooker*, 579 A.2d at 615) (alternation in original).  But the D.C.

Court of Appeals held in *Hooker* that the relevant standing inquiry should focus on the "present

members" of the class.  *Id.* (quoting same).  The D.C. Circuit thus held both that Plaintiffs had

plausibly alleged the existence of a trust and that they had standing to enforce that trust.  It thus

reversed and remanded.  *Id.* at 908.

   On remand, the remaining six Plaintiffs filed their currently operative Second Amended

Complaint.  Dkt. 64.  This complaint names the same Defendants, except that Oath Holdings, a

subsidiary of Verizon, is substituted for Yahoo as a Defendant.  This is because, "[a]ccording to

counsel for Yahoo! Inc. and Verizon, and to a sworn declaration provided to Plaintiffs by in-

house counsel for Verizon before the filing of [the Second Amended C]omplaint, Yahoo! Inc.

(now known as Altaba Inc.) transferred certain assets and liabilities making up [] Yahoo! Inc.'s

operating business to Verizon, effective June 2017."  *Id.* at 12 (2d Am. Compl. ¶ 16).  And this

lawsuit was among the transferred liabilities.[4]  *Id.*  Plaintiffs also added greater specificity to their allegations against the Doe Defendants, who Plaintiffs promise to name after discovery.  *Id.* at 14–15 (2d Am. Compl. ¶¶ 28–30).  The Second Amended Complaint breaks the Doe Defendants into three categories: the Doe Trustees, who served as trustees of the Fund and participated in the breach; the Doe Abettors, who assisted in the trustees' breaches; and the Doe Recipients, who took money from the Fund despite knowing about both the Fund's humanitarian purpose and the present lawsuit.  *Id.*

The Second Amended Complaint includes six counts.  The first four are substantially the same claims for breach and modification of trust as in the prior complaints.  *Id.* at 56–60 (2d Am. Compl. ¶¶ 170–88).  The fifth count realleges a civil conspiracy.  *Id.* at 60–61 (2d Am. Compl. ¶¶ 189–92).  And the sixth count is a new claim for restitution against the Doe Recipients, who allegedly took trust property despite knowledge of the breach.  *Id.* at 61–62 (2d Am. Compl. ¶¶ 193–96).  Defendants have again moved to dismiss, filing three separate motions—one from Oath Holdings, Callahan, and Bell ("Yahoo Defendants"), Dkt. 65, Dkt. 66; one from the LRF and the LHRO ("Laogai Defendants"), Dkt. 67, Dkt. 68; and one from the Wu Estate, Dkt. 69, Dkt. 70.  Those motions are now fully briefed and ripe for decision.

## II.  LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) is designed to "test[ ] the legal sufficiency of a complaint."  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

---

[4]  Oath Holdings, Bell, and Callahan continue to refer to themselves, collectively, as the "Yahoo Defendants," and, for the sake of clarity and consistency, the Court will do the same.

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Although "detailed factual allegations" are not required, the complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555).  In assessing a Rule 12(b)(6) motion, a court may consider only "the facts contained within the four corners of the complaint," *Nat'l Postal Prof'l Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 28 (D.D.C. 2006), along with "any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record," *U.S. ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011).

Although Defendants invoke only Rule 12(b)(6) in their motions to dismiss, some of their arguments related to justiciability are jurisdictional and are thus properly considered under Rule 12(b)(1).  Federal courts are courts of limited subject-matter jurisdiction that "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of an action for lack of subject-matter jurisdiction.  When a defendant files a motion to dismiss for lack of subject-matter jurisdiction, the plaintiff bears the burden of establishing jurisdiction.  *Id.*; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

A Rule 12(b)(1) motion may take one of two forms.  First, a Rule 12(b)(1) motion may raise a "facial" challenge to the Court's jurisdiction, contesting the legal sufficiency of the jurisdictional allegations contained in the complaint.  *See Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006).  For a facial challenge, the Court must accept the allegations of the complaint as true and must construe "the complaint in the light most favorable to the non-

moving party." *Id.*; *see also I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1188 (D.C. Cir. 2003).  In this sense, the Court must resolve the motion in a manner similar to a motion to dismiss under Rule 12(b)(6).  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

Alternatively, a Rule 12(b)(1) motion may pose a "factual" challenge to the Court's jurisdiction.  *See Erby*, 424 F. Supp. 2d at 182–83.  When framed in this way, the Court "'may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant,' but 'must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss.'"  *Id.* (quoting *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).  The Court may consider the complaint, any undisputed facts, and "'the [C]ourt's resolution of disputed facts.'"  *Id.* (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

Defendants here mount only a facial attack on Plaintiffs' jurisdictional allegations, so the Court will resolve Defendants' motions based on the allegations in the Second Amended Complaint.

### III. ANALYSIS

Each group of defendants makes unique arguments and challenges different sets of Plaintiffs' claims.  Many of these arguments were raised (but not resolved) in the prior round of motions, but Defendants raise at least one new argument as well.  The Court will consider Defendants' challenges to each count of the Second Amended Complaint in turn.

A.    **Count I: Breach of Trust**

1.    *Revocable or Irrevocable Trust*

The Laogai Defendants, joined by the Wu Estate, argue that the breach of trust claim

must be dismissed on the ground that the purported trust was revocable and thus Defendants, as

trustees, did not owe any duties to Plaintiffs as beneficiaries.  Dkt. 68 at 6–9; Dkt. 70 at 4–5.

Reversing the common law presumption, the Uniform Trust Code, as adopted by the District of

Columbia, provides that "[u]nless the terms of a trust expressly provide that the trust is

irrevocable, the settlor may revoke or amend the trust."  D.C. Code § 19-1306.02(a).  And if a

trust is revocable, the trustees owe duties only to the settlor: "While a trust is revocable, rights of

the beneficiaries are subject to the control of, and the duties of the trustee are owed exclusively

to, the settlor."  *Id.* § 19-1306.03(a).  The Laogai Defendants and the Wu Estate thus argue that,

even assuming they were trustees of the Fund, they owed duties only to Yahoo, not the

beneficiaries.

Plaintiffs respond in two ways.  First, they argue in a footnote that Rule 12(g)(2) bars the

Laogai Defendants and the Wu Estate from raising this argument, which they could have pressed

earlier but did not, in a successive motion to dismiss.  See Dkt. 77 at 25 n.12.  Rule 12(g)(2)

provides that "a party that makes a motion under this rule must not make another motion under

this rule raising a defense or objection that was available to the party but omitted from its earlier

motion," with certain exceptions set forth in Rule 12(h)(2) or (3).  Fed. R. Civ. P. 12(g)(2).  One

of those exceptions, as provided in Rule 12(h)(2)(B), permits successive motions on the ground

that a plaintiff "[f]ail[ed] to state a claim upon which relief can be granted," so long as the

second motion is filed under Rule 12(c), which allows motions for judgment on the pleadings.

Fed. R. Civ. P. 12(h)(2)(B).  Because the standard for assessing a motion for judgment on the

pleadings under Rule 12(c) "is essentially the same" as the standard applied to a motion to dismiss under Rule 12(b)(6), *Von Kahl v. Bureau of Nat'l Affs., Inc.*, 934 F. Supp. 2d 204, 212 (D.D.C. 2013), the Court sees little harm in considering this new argument on the merits, as though the Laogai Defendants and the Wu Estate had filed a motion for judgment on the pleadings with respect to this issue.  The purpose of Rule 12(g) is to prevent unnecessary delay, but here, "by allowing and addressing any new arguments from Defendant about issues that have not yet received a ruling, the Court is able to significantly advance the progress of this litigation," especially given that the Court would need to consider the remainder of Defendants' renewed motions to dismiss in any event.  *United States ex rel. Scott v. Pac. Architects & Eng's, Inc.*, No. 13-cv-1844, 2020 WL 224504, at *3 (D.D.C. Jan. 15, 2020).  Having treated Defendants' motion as a motion for judgment on the pleadings, however, the Court will not permit Defendants to file yet another motion for judgment on the pleadings raising this same defense.

On the merits, Plaintiffs argue that the 2007 settlement agreement expressly makes the trust irrevocable.  As Plaintiffs point out, D.C. law provides that "'[r]evocable,' as applied to a trust, means revocable by the settlor without the consent of a person holding an adverse interest." D.C. Code § 19-1301.03(15).  Here, the settlement agreement "may be amended, modified, canceled, or waived only by written instrument executed by each of the parties."  Dkt. 66-1 at 10 (§ IV.O).  As such, Plaintiffs argue, Yahoo as the settlor could not unilaterally revoke the trust, and the trust was, therefore, irrevocable.

Because Plaintiffs invoke the Court's diversity jurisdiction, the Court's task is to resolve this question of D.C. law in the same way that the D.C. Court of Appeals would.  *See Depu II*, 950 F.3d at 901.  This task poses some difficulty because, as far as the Court can tell, the D.C.

Court of Appeals has never interpreted D.C. Code § 19-1306.02(a),[5] and delineating the scope of

that provision is thus a matter of first impression under D.C. law.  Despite the lack of precedent,

the Court concludes that Plaintiffs have plausibly alleged that "the terms of [the] trust expressly

provide that the trust is irrevocable."  D.C. Code § 19-1306.02(a).  True enough, the settlement

does not use the word "irrevocable."  But as the D.C. Circuit explained in *Depu II*, "[n]o magic

words are required" in the trust formation process under D.C. law.  950 F.3d at 902 (quoting

*Cabaniss*, 464 A.2d at 91).  The terms of the settlement expressly provided that the settlement

could be modified only with the consent of all parties, meaning that the trust could not be

revoked by the settlor alone.  Were it considering this question, the D.C. Court of Appeals would

likely hold that an express statement that a trust cannot be revoked is, for all intents and

purposes, an express statement that the trust is irrevocable.

A Florida state court reached a similar conclusion under the identical provision of the

Uniform Trust Code.  In that case, the relevant trust document provided that the settlor "waive[d]

all right, power and authority to alter, amend, modify, revoke or terminate this trust instrument

and the trust hereby evidenced" and did not include any provision authorizing the settlor to

unilaterally amend or revoke the trust.  *Nelson v. Nelson*, 206 So. 3d 818, 819 (Fla. Dist. Ct.

App. 2016).  Based on this language, the court held that "there [was] no ambiguity on the face of

the Trust instrument" that it created an irrevocable trust.  *Id.*  Here, likewise, the settlement

agreement "may be amended, modified, canceled, or waived only by written instrument executed

by each of the parties."  Dkt. 66-1 at 10 (§ IV.O).  That language unambiguously prohibits

---

[5]  The D.C. Court of Appeals referred to this section in one opinion, but the court stated only that
the provision does not apply to trusts established prior to March 10, 2004, when the change in
law was enacted.  *See In re Durosko Marital Tr.*, 862 A.2d 914, 921 n.4 (D.C. 2004).

unilateral revocation by Yahoo.  Plaintiffs have plausibly alleged that the Fund was an irrevocable trust.

In reply, the Laogai Defendants argue that the trust was revocable because the settlement agreement did not require Yahoo to fully fund the YHRF, instead making the additional installment payments contingent on LRF's satisfactory performance.  Dkt. 83 at 3.  But there is a crucial distinction between the power to withhold future payments and the power to revoke past payments.  In the relevant sense, revoke means to "annul, repeal, [or] rescind."  *Revoke*, Oxford English Dictionary (3d ed. 2010).  Because Yahoo lacked the unilateral power under the settlement to annul the creation of the Fund or to rescind its past payments, the trust was irrevocable.

      2.     *Status as Trustees*

The Laogai Defendants also argue that the breach of trust claim should be dismissed as to them because they were never trustees of any trust.  Dkt. 68 at 9–10.  But this argument is just a repackaging of the one that the D.C. Circuit has already rejected.  If the 2007 settlement created a trust, as Plaintiffs have plausibly alleged, then there can be no doubt that the LRF and its successor the LHRO were trustees of that trust.  Indeed, the D.C. Circuit said as much in its opinion in *Depu II*, observing: "[t]he [a]greement plausibly identifies all of" the elements of a trust, including "a trustee (the Foundation)."  950 F.3d at 902.  Although the D.C. Circuit's decision merely identified the LRF as a trustee of the Fund in a parenthetical, that conclusion was far from dicta.  Rather, it was a key element of the D.C. Circuit's holding that Plaintiffs had plausibly alleged a trust.  This Court is, of course, bound by the D.C. Circuit's holding that the compliant plausibly alleges that the LRF was a trustee.

In any event, the settlement agreement made clear that the LRF would be a trustee of the Fund. The Restatement (Second) of Trusts defines a "trustee" simply as a "person holding property in trust." Restatement (Second) of Trusts § 3.[6] Here, the settlement provided that Yahoo, as the trust's settlor, would "make payments totaling a maximum of $17.3 million to the [LRF] subject to [several] conditions," adding that "[t]hese payments shall be maintained separately from other [LRF] funds and shall be known as the 'Yahoo! Human Rights Fund.'" Dkt. 66-1 at 3 (§ II.C). All of these payments were "[m]ade in [t]rust." *Id.* Plaintiffs thus plausibly allege that the LRF held the property in the Fund and that the organization, accordingly, was a trustee of the Fund. As for the LHRO, Plaintiffs also plausibly allege that the LRF, along with other Defendants, transferred all or a portion of the Fund's assets to the LHRO, which would be responsible for supporting the LRF in carrying out the humanitarian purpose. Dkt. 64 at 25 (2d Am. Compl. ¶ 59). This purported amendment to the settlement arguably made the LHRO a trustee, because it was then holding trust property. Plaintiffs have, accordingly, plausibly alleged that the Laogai Defendants were trustees of the Fund.

3.    *Statute of Limitations*

The Yahoo Defendants do not seek total dismissal of Count I, but instead argue only that the breach of trust claim should be dismissed against Callahan because the claim is time-barred as to him. Dkt. 66 at 9–14. Under the Uniform Trust Code, as adopted by the District of Columbia, "[a] beneficiary may not commence a proceeding against a trustee for breach of trust more than one year after the date the beneficiary . . . was sent a report that adequately disclosed the existence of a potential claim for breach of trust and informed the beneficiary of the time

---

[6] As the D.C. Circuit explained in *Depu II*, "[b]ecause the D.C. Court of Appeals cites Bogert on Trusts and the Restatement (Second) of Trusts as authoritative in applying the common law of the District," federal courts applying D.C. law "do so as well." 950 F.3d at 901 n.2.

allowed for commencing a proceeding."  D.C. Code § 19-1310.05(a).  Where, as here, no such

report was made, "a judicial proceeding by a beneficiary against a trustee for breach of trust must

be commenced within 3 years after the first to occur of: (1) [t]he removal, resignation, or death

of the trustee; (2) [t]he termination of the beneficiary's interest in the trust; or (3) [t]he

termination of the trust."  *Id.* § 19-1310.05(c).  The Yahoo Defendants argue that Callahan "has

not been a trustee of any entity since July 2012," meaning that Plaintiffs needed to file suit by

July 2015 to comply with the statute of limitations.  Dkt. 66 at 11.

Because invocation of the statute of limitations is an affirmative defense, courts are

hesitant to grant pre-answer motions to dismiss on statute-of-limitations grounds.  *See Firestone*

*v. Firestone*, 76 F.3d 1205, 1208–09 (D.C. Cir. 1996) (per curiam).  A statute-of-limitations

defense may be raised under Rule 12(b)(6) only "when the facts that give rise to the defense are

clear from the face of the complaint," *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578

(D.C. Cir. 1998), and a district court should grant a motion to dismiss on statute-of-limitations

grounds only if it is satisfied that the claim "is conclusively time-barred," *Firestone*, 76 F.3d at

1209; *see also Jones v. Changsila*, 271 F. Supp. 3d 9, 24 (D.D.C. 2017); *Perrow v. District of*

*Columbia*, 435 F. Supp. 3d 9, 12 (D.D.C. 2020); *Friedman v. Gov't of Abu Dhabi, U.A.E.*, 464 F.

Supp. 3d 52, 71 (D.D.C. 2020); *Stewart v. Int'l Union, Sec., Police & Fire Pros. of Am.*, 271 F.

Supp. 3d 276, 280 (D.D.C. 2017).

To be sure, at least some of the relevant dates are uncontested and clear from the face of

the complaint.  Plaintiffs allege that Callahan worked for Yahoo "from December 1999 to July

2012" and that he "was a trustee of the Trust and its humanitarian purpose, and a member of the

board of directors of LHRO . . . , until his departure from Yahoo."  Dkt. 64 at 12 (2d Am.

Compl. ¶ 20).  Plaintiffs thus acknowledge that Callahan resigned or was removed as a trustee as

of July 2012 and that the limitations period ordinarily would have expired in July 2015. Plaintiffs argue, however, that equitable tolling should save their claims because they could not have known about Defendants' breaches of the trust, given Defendants' efforts to keep secret the breaches (and even the nature of the trust). *Id.* at 54–55 (2d Am. Compl. ¶ 169).

The Yahoo Defendants respond that the D.C. Code's statute of limitations for breach of trust claims is not subject to tolling. Dkt. 66 at 11. The comments to the Uniform Trust Code explain that the limitations provision "does not specifically provide that the statutes of limitations under this section are tolled for fraud or other misdeeds," because "the drafters prefer[ed] to leave the resolution of this question to other law of the State." Uniform Trust Code § 1005 cmt. Some states, in enacting the Uniform Trust Code, have added language specifying that the limitations period either can or cannot be tolled. *Compare* Va. Code Ann. § 64.2-796(D) (expressly permitting the statute to be tolled in cases of fraud) *with* N.H. Rev. Stat. § 564-B:10-1005 (expressly prohibiting tolling "for any reason"). The District of Columbia, however, did not add any language about tolling, one way or the other, when enacting the uniform code. More broadly, the D.C. Court of Appeals strictly enforces statutes of limitations, without permitting case-by-case tolling, in part because "the District of Columbia is one of a minority of jurisdictions that has not adopted a general equitable 'saving' statute to toll statutes of limitations in cases of reasonable mistake." *East v. Graphic Arts Indus. Joint Pension Tr.*, 718 A.2d 153, 156 (D.C. 1998). Even so, the D.C. Court of Appeals recognizes "at least two limited exceptions to [its] generally strict application of statutes of limitations: the lulling doctrine and the discovery rule." *Id.*

Whether either of those equitable doctrines applies in this case is a fact-bound question that is not suitable for resolution at the motion-to-dismiss stage. As explained above, Plaintiffs

assert certain facts suggesting that Defendants concealed the alleged mismanagement of the Fund
(and indeed, concealed the nature of the trust itself), such that Plaintiffs could not have
reasonably discovered their injury until well after their claims accrued.  Dkt. 77 at 28–31.  At this
juncture, these allegations are not sufficient for the Court to decide conclusively that the statute
of limitations should be tolled, but nor can the Court agree with the Yahoo Defendants that the
claims against Callahan are "conclusively time-barred."  *See Firestone*, 76 F.3d at 1209.  The
Court will, accordingly, reserve judgment on the Yahoo Defendants' statute of limitations
argument with respect to the claims against Callahan until after discovery, when it can consider
the matter on a more complete record.

**B.      Count II: Modification of Trust**

All three sets of Defendants move to dismiss Count II, which seeks modification of the
trust.  *See* Dkt. 66 at 15–16; Dkt. 68 at 10–13; Dkt. 70 at 5–6.  Specifically, Plaintiffs seek
modification of the trust (1) to terminate the LRF's status as a beneficiary; (2) to remove all
Defendants as trustees; and (3) "to make Chinese dissidents imprisoned for exercising their
freedom of expression online the sole beneficiaries."  Dkt. 64 at 58–59 (2d Am. Compl. ¶ 178–
83).

1.      *Mootness*

The Yahoo Defendants and the Wu Estate move to dismiss the claim seeking their
removal as trustees on mootness grounds.  They argue that they are not currently trustees of the
Fund and that they cannot, therefore, be removed from a position that they do not hold.  Plaintiffs
concede this point with respect to the Wu Estate, given that Wu is deceased and that his Estate
was never a trustee.  Dkt. 77 at 36 n.20.  Plaintiffs likewise concede that the claim is moot with
respect to Callahan and Bell, given that the Second Amended Complaint alleges only that

Callahan was a trustee until 2012 and that Bell was a trustee until 2016.  *Id.*  The Court will,

accordingly, dismiss Count II as against the Wu Estate, Callahan, and Bell.

Plaintiffs argue, however, that their claim seeking the removal of Yahoo or any successor

entity (hereinafter, "Yahoo") as a trustee is not moot.  As proof that they have plausibly alleged

that Yahoo is a trustee, Plaintiffs point to a July 18, 2017 letter from Altaba Inc., formerly known

as Yahoo Inc., indicating that "the Yahoo Human Rights Fund is now being administered by

Verizon," which had purchased Yahoo's operating business.[7]  Dkt. 64 at 36 (2d Am.

Compl. ¶ 104), *see also id.* at 64 (App'x. A).  In reply, the Yahoo Defendants disclaim any

intention to "bring factual issues into dispute" at the motion to dismiss stage.  Dkt. 81 at 10.

Instead, they argue that "even *if* the alleged trust was 'now being administered by Verizon,'

Plaintiffs' evidence for that is a letter dated in 2017, which does *not* justify an inference that

Yahoo, Oath Holdings, Verizon or any affiliated company is still administering the alleged trust

today."  *Id.*

Although a close question, the Court concludes that Plaintiffs have alleged enough—

albeit barely enough—to support a plausible inference that Yahoo remains a trustee.  *See Iqbal*,

556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged.").   To the extent that the Yahoo Defendants can disprove that allegation, they can

promptly move to dismiss for lack of subject-matter jurisdiction and can support that motion

with appropriate proof, *see* Fed. R. Civ. P. 12(b)(1), (g)(2) & (h)(3); *Achagzai v. Broad. Bd. of

Governors*, 170 F. Supp. 3d 164, 173 (D.D.C. 2016) ("[T]he Court may look beyond the

---

[7]  Oath Holdings, the successor entity that is now named as a Defendant, is a subsidiary of
Verizon.

allegations of the complaint to the extent necessary to satisfy itself that it has jurisdiction to hear the suit"), or they can move for summary judgment on that narrow question, *see* Fed. R. Civ. P. 56.  If they elect to file such a motion, they should bear in mind that the party asserting that a claim is moot bears "the initial heavy burden of establishing mootness," although once it does so, the burden shifts to "the opposing party" to show that "an exception applies."  *Honeywell Int'l v. Nuclear Regul. Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010) (quotation marks and citation omitted).

As things now stand, however, Plaintiffs have alleged that Yahoo is a trustee; they have included some specific factual support, including the 2017 letter, which was sent after the filing of this lawsuit; and the Yahoo Defendants have brought only a facial challenge to Plaintiffs' jurisdictional allegations.  The Court, accordingly, concludes that Plaintiffs have plausibly alleged that Yahoo (or a successor entity) remains a trustee of the Fund.

      2.    *Failure to State a Claim*

The Laogai Defendants move to dismiss Count II on the merits.  They argue that no provision of the D.C. Uniform Trust Code permits the modifications that Plaintiffs seek—namely, the removal of the LRF as both a beneficiary and a trustee.  Dkt. 68 at 12.  In both their complaint and their opposition to the motion to dismiss, Plaintiffs cite various provisions of the D.C. Code in support of their claim for modification. *See* Dkt. 77 at 32–37.  Of course, so long as Plaintiffs have plausibly alleged facts to support at least one legal theory in support of their proposed modifications, that is sufficient to survive the motion to dismiss.

With respect to the LRF's status as a beneficiary, Plaintiffs argue in their opposition to the motion to dismiss that the LRF may be removed under D.C. Code § 19-1304.12(a), which provides that a "court may modify the administrative or dispositive terms of a trust or terminate

31

the trust if, because of circumstances not anticipated by the settlor, modification or termination will further the purposes of the trust." Plaintiffs also rely on D.C. Code § 19-1304.13, which provides that, "if a particular charitable purpose is or becomes unlawful, impracticable, impossible to achieve, or wasteful," a court may "apply *cy pres* to modify or terminate the trust by directing that the trust property be applied or distributed, in whole or in part, in a manner consistent with the settlor's charitable purposes." Plaintiffs' reliance on the *cy pres* provision appears to be misplaced. As the Laogai Defendants point out, Plaintiffs do not allege that the charitable purpose of the trust has become "unlawful, impracticable, impossible to achieve, or wasteful." On the contrary, Plaintiffs want to compel the Fund to carry out its original charitable purpose.

Plaintiffs argument under § 19-1304.12(a), however, is more persuasive. They plausibly allege, based on the text of the settlement agreement and Yahoo's public statements, that Yahoo created the Fund to help Chinese dissidents who are imprisoned based on their online activity. Plaintiffs plausibly allege that Yahoo sought to limit the portion of the Fund that would go to cover the overhead expenses of Wu and the LRF. Plaintiffs also plausibly allege that only 4 percent of the Fund's initial $17.3 million went to its charitable purpose, while the LRF and Wu used well over $10 million for their own purposes. Finally, Plaintiffs plausibly allege that as of 2016, the LRF terminated the Fund's humanitarian purpose entirely while continuing to use money from the Fund for other purposes. This alleged misuse of the Fund was a circumstance not anticipated by Yahoo as the settlor, and modification of the trust to prevent further depletion of the money by the LRF may further the humanitarian purpose of the trust. At this stage in the litigation, the Court cannot yet determine whether terminating the LRF's beneficiary status will ultimately constitute an appropriate remedial measure, but for now it is sufficient to conclude

that Plaintiffs have plausibly alleged sufficient facts to support a claim for a modification of the LRF's status as a beneficiary.

Based on the same facts, Plaintiffs have pled an even stronger claim for removal of the LRF as a trustee.  The Court may remove a trustee for any of several reasons listed in the statute, including if "[t]he trustee has committed a serious breach of trust" or if "[b]ecause of unfitness, unwillingness, or persistent failure of the trustee to administer the trust effectively, the court determines that removal of the trustee best serves the interests of the beneficiaries."  D.C. Code§ 19-1307.06.  Plaintiffs have plausibly alleged that the LRF has committed serious breaches of the Fund's humanitarian purpose and has persistently failed to administer the trust effectively.  They have therefore adequately pleaded their claim for removal of the LRF as a trustee.  The Laogai Defendants' motion to dismiss Count II will be denied.

## C.    Counts III and IV: Third-Party and Principal-Agent Liability

The Yahoo Defendants move to dismiss Count III, which alleges that, "[t]o the extent Yahoo is deemed not to be a trustee of the Trust, Yahoo is liable to Plaintiffs as a third party for knowingly assisting and participating in Callahan's and Bell's breaches of trust."  Dkt. 64 at 59 (2d Am Compl. ¶ 186).  The Yahoo Defendants maintain that this claim should be dismissed because "there is no tort of aiding and abetting under District of Columbia law."  Dkt. 66 at 17 (citing *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1129 (D.C. 2015)).  And although the D.C. Court of Appeals has held that "a third party may be liable for another's alleged breaches of fiduciary duty if the third party can be shown to have induced this conduct," *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 711 (D.C. 2013) (internal quotation marks and alteration omitted), the Yahoo Defendants argue that Plaintiffs have not alleged that Yahoo induced Callahan and Bell to breach the trust.  In response, Plaintiffs cite to the common

law rule, as discussed by the Supreme Court, that third parties are liable for their "knowing participation" in a trustee's breach of trust.  *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 254 (1993) ("'[K]nowing participation' liability on the part of . . . third persons was well established under the common law of trusts.").  Plaintiffs contend that, based on the common law rule, "the D.C. Court of Appeals would recognize a claim against a third-party for knowing participation in a breach of trust."  Dkt. 77 at 41.

As a general matter, breach of trust claims arise in equity and do not sound in the law of either tort or contract.  *See Taylor v. Benham*, 46 U.S. 233, 274, (1847) ("[E]very person who receives money to be paid to another, or to be applied to a particular purpose, to which he does not apply it, is a trustee" and may be sued "in equity, as a trustee, for a breach of trust." (quotation marks and citation omitted)); *Jo Ann Howard & Assocs., P.C. v. Cassity*, 868 F.3d 637, 645 (8th Cir. 2017) ("Trust law, not tort law, impose[s]" a trustee's duties.); *Packard v. Provident Nat. Bank*, 994 F.2d 1039, 1047 (3d Cir. 1993) ("[T]he law of trusts is different from the law of torts."); *see also* Restatement (Second) of Trusts § 169 cmt. c (explaining that a trustee's "duties are not contractual in nature.").  As such, in an action for breach of trust under the common law, "the remedies of the beneficiary against the trustee are exclusively equitable." Restatement (Second) of Trusts § 197; *see also* Bogert on Trusts § 861 ("Equity is primarily responsible for the protection of rights arising under trusts, and will provide the beneficiary with whatever remedy is necessary to protect him and recompense him for loss.").

As Plaintiffs argue, in addition to the direct liability of a trustee, "[a] third person who, although not a transferee of trust property, has notice that the trustee is committing a breach of trust[,] and participates therein is liable to the beneficiary for any loss caused by the breach of trust."  Restatement (Second) of Trusts § 326.  Whether that third-party liability for "knowing

participation" is an extension of the Court's equitable power to remedy a trustee's breach of fiduciary duty or whether the third party's participation in the breach of trust is a tortious act presents a more difficult question.  The Court need not answer that question at this stage of the litigation, however, because the Court concludes that the D.C. Court of Appeals would hold, in either case, that the rule is incorporated in D.C. law.

To the extent that the "knowing participant" rule arises in equity, the D.C. Court of Appeals would likely recognize the rule as part of the District's common law.  There is no indication that the Uniform Trust Code upsets the common law rule.  Rather, "[t]he common law of trusts and principles of equity supplement" the uniform code, "except to the extent modified by" statute.  D.C. Code § 19-1301.06.  In fact, the Uniform Trust Code appears to assume the applicability of the rule of third-party liability for "knowing participation," by providing for an exception to that rule.  The code provides that "[a] person other than a beneficiary who in good faith assists a trustee, or who in good faith and for value deals with a trustee, *without knowledge* that the trustee is exceeding or improperly exercising the trustee's powers is protected from liability as if the trustee properly exercised the power."  D.C. Code § 19-1310.12 (emphasis added).  The implication is that someone *with knowledge* of the trustee's breach would not enjoy such protection.

But, even if the rule is derived instead from tort law, the Court concludes that the D.C. Court of Appeals would still adopt the "knowing participant" rule.  At least some courts have taken the position that third parties who participate in breaches of trust have committed torts. *See, e.g.*, *Granewich v. Harding*, 985 P.2d 788, 793–94 (Or. 1999); *see also Eaton ex rel. Johnson v. Eaton*, 83 S.W.3d 131, 135 (Tenn. Ct. App. 2001) ("[I]f a third person intentionally causes or assists an agent to violate their fiduciary duty to the principal, the third person is

subject to liability in tort for any harm they have caused the principal.").  Likewise, the

Restatement (Second) of Torts provides that "[a] person who knowingly assists a fiduciary in

committing a breach of trust is himself guilty of tortious conduct and is subject to liability for the

harm thereby caused."  Restatement (Second) of Torts § 874, cmt. c.  If the rule does sound in

tort, then it would be akin to the aiding and abetting theory of liability.

      Although, as the Yahoo Defendants point out, the D.C. Court of Appeals has yet to adopt

that theory of liability, it has not exactly repudiated it either.  In the *Pietrangelo* case that the

Yahoo Defendants cite, the court explained that "[t]he separate tort of aiding-abetting has not

yet, to [the court's] knowledge, been recognized *explicitly* in the District."  68 A.3d at 711

(quoting *Flax v. Schertler*, 935 A.2d 1091, 1107 (D.C. 2007)).  The D.C. Court of Appeals thus

left open the possibility that it might recognize the tort of aiding and abetting the breach of a

fiduciary duty in the future.  The D.C. Circuit, for its part, has been more forward leaning on this

question, predicting that the D.C. Court of Appeals will eventually recognize the tort of aiding

and abetting tortious activity: "The separate tort of aiding-abetting has not yet, to our knowledge,

been recognized explicitly in the District, but the existence of the civil conspiracy action

suggests a high probability that the legal rationale underlying aiding-abetting would also be

accepted."  *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983).  That is, given that "[a]n

agreement to participate in a wrongful course of action suffices to create vicarious liability," the

D.C. Circuit concluded that "[i]t seems likely that the District's courts would also find vicarious

liability for support of wrongful action through knowing substantial aid or encouragement."  *Id.*

In support of this line of reasoning, moreover, the D.C. Circuit relied on the D.C. Court of

Appeals' decision in *Int'l Underwriters, Inc. v. Boyle*, 365 A.2d 779, 784 (D.C. 1976), a case

that "involved allegations of induced breaches of fiduciary duty," *Halberstam*, 705 F.2d at 479

n.11.  Nearly four decades later, the D.C. Circuit's prediction has not yet come true.  But the mere passage of time, without any intervening D.C. law, is insufficient reason to depart from the D.C. Circuit's analysis.  As such, the Court concludes that the D.C. Court of Appeals would likely recognize "knowing participant" liability, even if such liability sounds in tort.

The Yahoo Defendants' motion to dismiss Count III will therefore be denied.[8]

## D.      Count V: Civil Conspiracy

The Laogai Defendants and the Wu Estate move to dismiss Plaintiffs' civil conspiracy claim on two grounds.  Dkt. 68 at 13; Dkt. 70 at 6–7.  First, they argue that the civil conspiracy claim is barred by "law of the case" because Judge Bates "already dismissed the count of civil conspiracy with prejudice" and "[t]his ruling was not appealed to the District of Columbia Circuit Court of Appeals."  Dkt. 70 at 7.  In *Depu I*, the Court explained that civil conspiracy "is not an independent cause of action under District of Columbia law," but rather "'depends on the performance of some underlying tortious act.'"  306 F. Supp. 3d at 194 (quoting *Halberstam*, 705 F.2d at 479).  The Court dismissed the civil conspiracy claim for lack of an underlying tortious act because "Plaintiffs have not alleged any torts in the amended complaint, and all of their other claims will be dismissed."  *Id.*  In their opening briefing on appeal, Plaintiffs made no mention of the civil conspiracy claim, instead stating that the issues on appeal were whether the settlement had created a trust and whether Plaintiffs had standing to enforce that trust.  Appellants' Br. 2–3, *Depu II*, No. 18-7161 (Apr. 15, 2019).  They also assigned error to the trial court's denial of their motion for reconsideration and their motion to amend.  *Id.*

---

[8]  This holding may be of little consequence, however, because the Yahoo Defendants did not move to dismiss Count IV, which also seeks to hold Yahoo vicariously liable for the acts of Callahan and Bell, albeit on a slightly different theory.

A district court is generally "bound by its previous unappealed . . . determination[s]." *United States v. Thomas*, 572 F.3d 945, 948–49 (D.C. Cir. 2009).  This is because, under the law of the case doctrine, "the same issue presented a second time in the same case in the same court should lead to the *same result*."  *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996). Accordingly, "a legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, governs future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time," *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995) (quotation marks, brackets, and citation omitted).

Here, the Court is satisfied that Plaintiffs' appeal did encompass the grounds on which their civil conspiracy claim was dismissed, as well as their attempt to amend their complaint to replead their civil conspiracy claim.  This Court's holding in *Depu I* on the civil conspiracy claim was premised, at least in part, on the dismissal of "all of [Plaintiffs'] other claims," including their breach-of-trust claims.  306 F. Supp. 3d at 194.  And, although Plaintiffs did not separately appeal the dismissal of their civil conspiracy claim, they did appeal the dismissal of the breach-of-trust claims that they maintain form the basis for their civil conspiracy claim.  Of course, it might have been more prudent for Plaintiffs specifically to reference their civil conspiracy theory of liability on appeal.  But the Court is persuaded that the D.C. Circuit's reversal on the breach-of-trust claims also reversed the Court's dismissal of the civil conspiracy claim, premised as it was on the dismissal of the breach-of-trust claims.  As such, the earlier dismissal of the breach of trust claims is not the law of the case.

On the merits, the Laogai Defendants and the Wu Estate argue that the civil conspiracy claim must be dismissed because Plaintiffs have failed to allege an underlying tort.  Dkt. 68 at

13; Dkt. 70 at 6–7.  They characterize Plaintiffs' underlying claims as "statutory," "quasi-contractual," and "claims of breach."  Dkt. 68 at 13; Dkt. 70 at 7.  This position is in some tension with the Yahoo Defendants' assertion that Plaintiffs' related "knowing participant" claim is, in fact, a tort claim.  In any event, precedent from the D.C. Court of Appeals has hinted that plaintiffs might be able, in at least some circumstances, to premise a civil conspiracy claim on unlawful acts that are not necessarily traditional torts.  To be sure, the D.C. Court of Appeals has quoted approvingly from the D.C. Circuit's opinion in *Halberstam*, 705 F.2d at 479, including its reference to an "underlying tortious act."  *See Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000).  At the same time, however, in its own recitation of the governing test, the D.C. Court of Appeals has, at least at times, referred instead to an "unlawful act."  *Id.*  Under D.C. law, a civil conspiracy requires:

> (1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme.

*Id.*

The question then becomes whether a breach of trust is the type of "unlawful act" that can support a civil conspiracy claim.  At least one prior opinion from this Court, albeit from fifty years ago, suggests that a breach of trust can serve as the "unlawful object" of a civil conspiracy.  *See Blankenship v. Boyle*, 329 F. Supp. 1089, 1099 (D.D.C. 1971).  As Judge Gesell explained in that case, "[t]he gist of a civil conspiracy . . . is not the agreement itself, but the civil wrong alleged to have been done pursuant to the agreement; the allegation of conspiracy bears only upon evidentiary and other formal matters."  *Id.*  "The civil wrong" in *Blankenship* was "a breach of trust; and it is settled that where a third person 'has knowingly assisted the trustee in committing a breach of trust, he is liable for participation in the breach of trust.'"  *Id.* (quoting 4

Scott on Trusts § 326 (3d ed. 1967)).  With respect to the debate discussed above about whether third-party "knowing participant" liability derives from equity or from tort, the Court in *Blankenship* thus appears to take the position that it derives from tort.

At least for present purposes, however, the Court need not resolve the exact nature of a third party's liability for participation in violating a trust.  Regardless of whether the breach of trust alleged in this case is considered a tort or some other form of unlawful conduct, civil conspiracy is "'not independently actionable'" and, instead, is simply "'a means for establishing vicarious liability for the underlying'" wrong.  *Exec. Sandwich Shoppe, Inc.*, 749 A.2d at 738 (quoting *Halberstam*, 705 F.2d at 479).  Here, only the Laogai Defendants and the Wu Estate move to dismiss the civil conspiracy claim, and, according to Plaintiffs, they are trustees, not third parties.  On Plaintiffs' theory, therefore, the Laogai Defendants and the Wu Estate are directly, rather than vicariously, liable for the breach of trust.  That is, because Plaintiffs contend that the Laogai Defendants and Wu are or were themselves trustees of the Fund, Plaintiffs' remedies do not turn on a theory of vicarious liability, and, absent circumstances not alleged here, the remedies that Plaintiffs have against the Laogai Defendants and Wu "are exclusively equitable."  Restatement (Second) of Trusts § 197.  Plaintiffs have alleged no theory of liability against the Laogai Defendants and Wu that goes beyond the law of trusts, and the civil conspiracy claim against them must, accordingly, be dismissed.[9]

---

[9] As for the Yahoo Defendants, Plaintiffs plead in the alternative both that the Yahoo Defendants are trustees and that they are third parties.  To the extent they are trustees, the same logic would apply, and the civil conspiracy claim could not be maintained.  To the extent the Yahoo Defendants are third parties, however, their alleged participation in the breach of trust might have been a tortious or otherwise unlawful act that could form the basis for a civil conspiracy claim.  The Court need not decide that question at this juncture, however, because the Yahoo Defendants did not move to dismiss the civil conspiracy claim.

The Court will, therefore, grant the Laogai Defendants' and the Wu Estate's motions to dismiss with respect to the civil conspiracy claim.

**E.     Count VI: Restitution**

Finally, the Yahoo Defendants move to dismiss Count VI, which Plaintiffs bring against the Doe Recipients for restitution.  Dkt. 64 at 61–62 (2d Am. Compl. ¶¶ 193–96).  The Yahoo Defendants move to dismiss this claim on the ground that "restitution is an equitable remedy and not a separate cause of action."  Dkt. 66 at 17.  The Yahoo Defendants devote only two sentences to this argument in their motion to dismiss, and the Court need not pause long on this argument either.  First, as Yahoo Defendants acknowledge, Count VI "is not alleged against the Yahoo Defendants," and it is thus doubtful that the Yahoo Defendants are in a position to seek the dismissal of the claim.  *Id.*  In any event, here again, it appears that the common law of trusts is at odds with the Yahoo Defendants' position.  They are, of course, correct that restitution is an equitable remedy, but under the law of trusts, a party may bring an action for restitution as well.  Plaintiffs allege that the Doe Recipients are "wrongly in receipt of trust property."  Dkt. 77 at 44.  As the Supreme Court has recognized in explaining the common law of trusts,

> [I]t has long been settled that when a trustee in breach of his fiduciary duty to the beneficiaries transfers trust property to a third person, the third person takes the property subject to the trust, unless he has purchased the property for value and without notice of the fiduciary's breach of duty.  The trustee or beneficiaries may then maintain an *action for restitution* of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom.

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250 (2000) (emphasis added).  Regardless of how the claim is denominated, Plaintiffs may maintain a claim for restitution of trust property taken by third parties with notice of the alleged breach.  The Yahoo Defendants' motion to dismiss Count VI will therefore be denied.

41

**CONCLUSION**

For the foregoing reasons, it is hereby **ORDERED** that Defendants' motions to dismiss are **GRANTED** in part and **DENIED** in part.  Plaintiffs' claims in Count II for removal of Callahan, Bell, and the Wu Estate as trustees are hereby **DISMISSED** as moot, and Plaintiffs' civil conspiracy claims against the Laogai Defendants and the Wu Estate are **DISMISSED** for failure to state a claim.  The motions to dismiss are otherwise **DENIED** in all other respects.

**SO ORDERED**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 22, 2021