**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HE DEPU, *et al.*, | No. 1:17-0635-RDM |
| Plaintiffs, | |
| | Judge Randolph D. Moss |
| v. | |
| OATH HOLDINGS, INC., *et al.*, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RULE 65 MOTION FOR**
**PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of contents ................................................................................................................ i

Table of authorities ............................................................................................................ iii

I.      Preliminary statement ........................................................................................... 1

II.     Statement of facts .................................................................................................. 2

III.    Legal standard ........................................................................................................ 8

IV.     Argument ................................................................................................................ 9

        A.      Plaintiffs are likely to succeed on the merits. ......................................... 9

                1.      Plaintiffs are likely to prevail on the issue of trust intent. .......... 9

                a.      The Settlement Agreement unambiguously manifests trust intent. ........... 9

                b.      There is no ambiguity about the Settlement Agreement's
                        provisions relating to trust intent, and thus this Court will have no
                        occasion to consider extrinsic evidence on the issue. .............................. 11

                c.      Even if the Court were to consider the contemplated testimony,
                        that testimony could not overcome the Settlement Agreement's
                        manifestation of trust intent. .................................................................... 12

                d.      Even if the Court were to consider extrinsic evidence, such
                        evidence overwhelmingly supports, rather than negates, trust
                        intent. ......................................................................................................... 13

                2.      Plaintiffs are likely to prevail on the issue of the irrevocable nature
                        of the trust. ............................................................................................... 14

                3.      Plaintiffs are likely to prevail on the issue of special-interest
                        standing. ..................................................................................................... 15

                4.      Plaintiffs are likely to prevail on their claim that the Laogai
                        Defendants breached their fiduciary duties to the trust's
                        humanitarian purpose and must therefore pay damages to the
                        trust's humanitarian purpose. ................................................................. 18

                5.      Plaintiffs are likely to prevail on their claim to modify and remove
                        the LRF's status as a beneficiary of the trust. ..................................... 19

        B.      The trust's humanitarian purpose is likely to suffer irreparable harm in the
                absence of preliminary relief. ................................................................................. 20

C.      The balance of harms are in Plaintiffs' favor........................................................ 23

D.      The public interest favors a preliminary injunction. .............................................. 26

V.      Conclusion ...................................................................................................................... 26

# TABLE OF AUTHORITIES*

**Cases**

*Abdelrhman v. Ackerman*, 76 A.3d 883 (D.C. 2013) ................................................... 12

*Allard v. Pacific Nat'l Bank*, 99 Wn. 2d 394 (Wash. 1983) ........................................ 27

*Beckett v. Air Line Pilots Association*, 995 F.2d 280 (D.C. Cir. 1993) ................................ 10, 11

*Burbridge v. Howard University*, 305 A.2d 245 (D.C. 1973) ....................................... 12

*C S Nat. Bank v. Haskins*, 254 Ga. 131 (1985) ...................................................... 26

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ........................ 9

*Cobell v. Babbitt*, 52 F. Supp. 2d 11 (D.D.C. 1999) ................................................ 20

*D'Agrosa v. Coniglio*, 824 N.Y.S.2d 761 ........................................................... 13

*Family Federation for World Peace v. Hyun Jin Moon*, 129 A.3d 234 (D.C. 2015) ............ 16, 17

*Gryce v. Lavine*, 675 A.2d 67 (D.C.1996) ........................................................... 12

*He Depu v. Yahoo! Inc.*, 950 F.3d 897 (D.C. Cir. 2020) ................................... *passim*

*Hooker v. Edes Home*, 579 A.2d 608 (D.C. 1990) .................................................... 16

*In re Trusteeships Under Will of Drake*, 195 Minn. 464 (1935) .......................................... 26

*Lofchie v. Washington Square LTD*, 580 A.2d 665 (D.C. 1990) ...................................... 25

*Porter Novelli, Inc. v. Bender*, 817 A.2d 185 (D.C. 2003) ............................................ 26

*Re Sources for Sustainable Cmty. v. Bldg. Indus. Ass'n of Wash. (In re Wash. Builders Benefit Trust)*, 293 P.3d 1206 (Wash. Ct. App. 2013) ..................................... 13

*Sprint Sols., Inc. v. Mobile Now, Inc.*, No. CV 19-3752 (JDB), 2020 WL 136285 (D.D.C. Jan. 13, 2020) ................................................................... 23, 24

*Terry v. Conlan*, 131 Cal. App. 4th 1445 (2005) ..................................................... 27

*Weiner v. Mullaney*, 59 Cal.App.2d 620 (1943) .................................................... 13

*Wyman v. Roesner*, 439 A.2d 516 (D.C. 1981) ............................................. 10, 11, 12

---

* Pursuant to Local Rule 7(a), asterisks denote the authorities on which counsel chiefly relies.

*Y.M.C.A. of City of Wash. v. Covington*, 484 A.2d 589 (D.C. 1984)........................................ 9, 23

**Statutes**

D.C. CODE § 19-1308.3 ........................................................................................................ 19

**Treatises**

RESTATEMENT (SECOND) OF TRUSTS § 348 ............................................................................ 7

RESTATEMENT (THIRD) OF TRUSTS § 13 ............................................................................... 12

RESTATEMENT (THIRD) OF TRUSTS § 88 ............................................................................... 24

## I.     PRELIMINARY STATEMENT

When Yahoo[1] entrusted the $17.3 million Yahoo Human Rights Fund to the LRF in 2007, it created a trust relationship with respect to the Fund obligating the LRF to spend the money on "three purposes only," the first of which was humanitarian and legal assistance to Chinese dissidents imprisoned for online dissent. Ex. 1 at YAHOO_PROD_0000216.[2] Since then, however, the LRF has spent more than ***$10 million*** on itself, while spending a measly $700,000—or four percent of the Fund—on the Fund's humanitarian purpose. Exs. 5-18. As such, there can be little doubt that the LRF has badly violated its obligations to that purpose.

Nor can there be much doubt that neither the LRF nor the LHRO will be able to pay any judgment requiring them to restore monies to that purpose. Their tax records indicate that neither have any meaningful sources of revenue. Exs. 5-28. Indeed, while the LRF engaged in various forms of fundraising before 2007, it largely stopped doing so after the creation of the trust. Exs. 5-18. As for the LHRO, it has never engaged in fundraising. Exs. 19-28. Thus, every cent of Fund monies spent on matters unrelated to humanitarian assistance is, for all intents and purposes, monies taken from the Fund's humanitarian purpose that will never be repaid. Under well-established law, that bleak reality constitutes an irreparable injury.

The posture of this case risks deepening that injury. It is apparent that the Laogai Defendants are using Fund assets on their legal defense. On April 7, 2021, counsel for Plaintiffs asked counsel for Laogai Defendants and the Yahoo Defendants to disclose whether "any of the

---

[1] Defendants are the Laogai Research Foundation and the Laogai Research Foundation-CA ("LRF"), and the Laogai Human Rights Organization ("LHRO," and together with the LRF, the "Laogai Defendants"); Oath Holdings, Inc. ("Yahoo"), Michael Callahan ("Callahan"), and Ronald Bell ("Bell," and together with Yahoo and Callahan, the "Yahoo Defendants"); and the Estate of Harry Wu ("Wu Estate").

[2] Citations to "Ex. __" are to exhibits to the concurrently filed Declaration of Times Wang.

Laogai Defendants' legal expenses have been paid, directly or indirectly, using Fund assets." Ex. 37. On April 16, counsel for the Laogai Defendants responded by declining to share that information. Ex. 38. As such, it is apparent the answer is yes. Indeed, the Laogai Defendants' tax records reflect substantial spending on legal fees since Plaintiffs filed this action. *E.g.*, Exs. 16-17 at Part I, Line 16a (reflecting a substantial increase in the LRF's legal fees during the period immediately after Plaintiffs filed this action). And though neither has provided their tax records or other financial information for 2020 or 2021, it stands to reason that their legal fees for this case will increase significantly now that the case is in discovery, exacerbating the irreparable injury to the Fund's humanitarian purpose.

Mitigating and preventing that irreparable injury is the purpose of this motion. Thus, for the reasons below, the Court should preliminary enjoin the LRF and the LHRO from spending any remaining monies traceable to the $17.3 million Fund that they control on anything other than humanitarian and legal assistance to Chinese dissidents imprisoned for online dissent.

## II.     STATEMENT OF FACTS

On November 9, 2007, the Settlement Agreement was reached, resolving an action entitled *Wang Xiaoning et al. v. Yahoo!, Inc. et al.*, No. 07-cv-02151 (N.D. Cal.). Ex. 1 at YAHOO_PROD_0000216. Although the LRF was not a party to that action, and thus had no claims to dismiss as part of the Settlement Agreement, it was made a party to the agreement. *Id.* at YAHOO_PROD_0000216-17 (no dismissal of claims by the LRF). That was because the Settlement Agreement provided that the LRF was to serve as the trustee of three buckets of monies paid by Yahoo, each of which was expressly made "in trust" to the LRF. *Id.* at YAHOO_PROD_0000217. The first bucket consisted of $3.2 million to the family of plaintiff Wang Xiaoning. The second bucket consisted of $3.2 million to the family of plaintiff Shi Tao. *Id.* And the third bucket consisted of $17.3 million to establish the Fund. *Id.*

Recognizing that the monies did not belong to the LRF, the LRF opened three new bank accounts to receive the payments, each of which was titled in the name of the monies' equitable beneficiaries. Ex. 2 at YAHOO_PROD_0000235. The "Title on Account" for the payment benefiting the family of plaintiff Wang Xiaoning named his wife Yu Ling: "The Laogai Research Foundation Fundraising Account: Harry Wu/Yu Ling." *Id*. For plaintiff Shi Tao, the "Title of Account" named his mother Gao Qinsheng: "The Laogai Research Foundation Fundraising Account: Harry Wu/Gao Qinsheng." *Id.* And for monies at issue here, the title named the Fund: "The Laogai Research Foundation Fundraising Account: Harry Wu/YHR Fund." *Id.*

This was in keeping with the LRF's obligation, imposed on it by Yahoo, not to commingle the Settlement Agreement monies with the LRF's own money. Ex. 1 at YAHOO_PROD_0000217. Yahoo also imposed other obligations, including that the LRF report to Yahoo about how the Fund was being spent, *id.* at YAHOO_PROD_0000218-19; that the LRF establish a Board of Directors that would "have the power and authority to direct the activities and expenditures of the YHR Fund, subject to the restrictions set forth in this agreement[,]" *id.* at YAHOO_PROD_0000221; and that the LRF "consult with Yahoo! regarding the composition and membership of the Board of Directors before making any appointments to the Board." *Id.*

Of course, the most important obligation Yahoo imposed on the LRF was that the Fund be spent on "three purposes only: (a) to provide humanitarian and legal assistance primarily to persons in or from the People's Republic of China who have been imprisoned for expressing their views through Yahoo! or another medium; (b) to resolve claims primarily by such persons, or persons threatened with prosecution or imprisonment, against the Yahoo! Entities or any Yahoo! subsidiary or affiliate; and (c) for payment of Foundation operating expenses and the

Foundation's educational work conducted in the United States in support of human rights, to the extent provided below." *Id.* at YAHOO_PROD_0000218.

Yahoo did not impose any limits on how much could be spent on the first two purposes. *Id.* To the contrary, with respect to the first purpose, Yahoo required that the LRF and its then "Executive Director, Harry Wu . . . use their best efforts to maximize the benefits achieved through their use of a portion of the YHR Fund for humanitarian and legal assistance." *Id.* By contrast, Yahoo *did* impose a $1 million per year limit on the third purpose, the LRF's operating expenses. *Id.* According to Yahoo's then-CEO Jerry Yang, and consistent with the text of the Settlement Agreement, that was meant to "make sure most of the [F]und goes to humanitarian and legal help for dissidents, and not to the [LRF's] operating expenses." Ex. 4 at YAHOO_PROD_0000922.

Unfortunately, the LRF failed to abide by these obligations—badly. Based on the LRF's latest publicly available tax records, the vast majority of the Fund—upwards of $10 million—has been spent on the LRF's operating expenses, while a comparatively puny $700,000 has been spent on humanitarian and legal help for dissidents.

Below is a summary of the LRF's spending on each category, as gleaned from its tax records.

| Tax Year | LRF humanitarian spending[3] | LRF operating and administrative expenses[4] |
|---|---|---|
| 2007 | $135,987 | $939,617 |

---

[3] Figures from Ex. 7 at Part II, Line 43; Exs. 8-13 at Part IX, Line 24; Ex. 14 at Schedule F, Part III; Ex. 15 at p. 15; Exs. 16-17 at Part I, Line 25; and Ex. 18 at Part I, Line 25 and Part XV.

[4] Figures obtained by subtracting humanitarian spending from the LRF's total expenses, as reported at Ex. 7 at Part I, Line 17; Exs. 8-15 at Part I, Line 18; and Exs. 15-18 at Part I, Line 26.

| Tax Year | LRF humanitarian spending[3] | LRF operating and administrative expenses[4] |
|---|---|---|
| 2008 | $177,540[5] | $1,299,332 |
| 2009 | $248,495 | $1,272,692 |
| 2010 | $54,910 | $1,493,303 |
| 2011 | $28,424 | $1,270,306 |
| 2012 | $20,852 | $1,323,080 |
| 2013 | $22,496 | $1,236,751 |
| 2014 | $19,802 | $1,301,791 |
| 2015 | $1,578 | $1,054,436 |
| 2016 | $0 | $903,508 |
| 2017 | $0 | $1,262,437 |
| 2018 | $0[6] | $722,185 |
| TOTAL | $708,506 | $14,079,438 |

As for how much of that spending is traceable to the Fund, the Laogai Defendants' tax

records once again tell the story.

| Tax Year | LRF Net Assets[7] | LHRO Net Assets[8] | Laogai Defendants' Net Assets |
|---|---|---|---|
| 2005 | $35,532 | N/A | $35,532 |
| 2006 | $50,887 | N/A | $50,887 |
| 2007 | $16,268,275 | N/A | $16,268,275 |
| 2008 | $14,962,895 | N/A | $14,962,895 |
| 2009 | $8,934,749 | N/A | $8,934,749 |
| 2010 | $1,982,807 | $4,839,981 | $6,822,788 |
| 2011 | $2,540,252 | $5,337,669 | $7,877,921 |
| 2012 | $2,803,158 | $5,187,770 | $7,990,928 |
| 2013 | $2,785,512 | $4,832,093 | $7,617,605 |

[5] The LRF reported $727,540 in humanitarian aid, but $550,000 of that was actually spent on the Fund's second purpose, namely settling claims against Yahoo. *See* Ex. 3 at YAHOO_PROD_0000587. As such, Plaintiffs have not counted that amount towards the LRF's spending of Fund monies on humanitarian assistance.

[6] The LRF reported $96,250 in contributions, gifts, and grants paid in tax year 2018, but as can be seen from Ex. 18 Part XV, none of that constituted humanitarian assistance.

[7] Figures from Exs. 5-7 at Part I, Line 21; Exs. 9-14 at Part I, Line 22; and Exs. 15-18 at Part II, Line 30

[8] Figures from Exs. 19-25 at Part I, Line 22; Exs. 25-27 at Part II, Line 30; and Ex. 28 at Part II, Line 29.

| Tax Year | LRF Net Assets[7] | LHRO Net Assets[8] | Laogai Defendants' Net Assets |
|---|---|---|---|
| 2014 | $2,561,060 | $3,772,042 | $6,333,102 |
| 2015 | $2,435,766 | $5,692,542 | $8,128,308 |
| 2016 | $2,481,032 | $5,183,352 | $7,664,384 |
| 2017 | $2,214,491 | $4,034,751 | $6,249,242 |
| 2018 | $2,160,055 | $3,219,291 | $5,379,346 |
| 2019 | Unknown | $2,770,223 | Unknown |

As can be seen, the Laogai Defendants' assets ballooned in tax year 2007, the year the Fund was created. Further, as the below indicates, while the LRF previously obtained contributions and grants from sources other than the Fund (mainly governmental sources), for many years now, its sole source of contributions and grants has been the LHRO.

| Sources of LRF's contributions and grants[9] | | | | |
|---|---|---|---|---|
| Tax Year | Direct public support/fundraising events/other | Government | Related organization (LHRO) | Total contribution and grants |
| 2005 | $9,604 | $298,032 | N/A | $307,636 |
| 2006 | $22,515 | $298,000 | N/A | $320,515 |
| 2007 | $18,314,748 | $280,000 | N/A | $18,594,748 |
| 2008 | $3,155 | $280,000 | N/A | $283,155 |
| 2009 | $15,324 | $53,000 | N/A | $68,324 |
| 2010 | $13,729 | $0 | $2,214,292 | $2,228,021 |
| 2011 | $10,455 | $0 | $1,850,000 | $1,860,455 |
| 2012 | $316,395 | $0 | $1,112,400 | $1,428,795 |
| 2013 | $15,088 | $0 | $1,093,000 | $1,108,088 |
| 2014 | $5,452 | $0 | $1,000,000 | $1,005,452 |
| 2015 | $0 | $0 | $841,000 | $844,512 |
| 2016 | $0 | $0 | $785,270 | $785,358 |
| 2017 | $0 | $0 | $760,936 | $760,936 |
| 2018 | $0 | $0 | $539,549 | $539,549 |

As for the LHRO, its articles of incorporation make clear that was created with the express mission of advancing the Fund's first and third purposes. In particular, its articles

---

[9] Figures from Exs. 5-7 at Part I, Line 1; Exs. 8-14 at Part VIII, Line 1; and Exs. 15-18 at Schedule B.

provide that the LHRO's purposes are to help the LRF provide "humanitarian and legal assistance primarily to persons in or from the People's Republic of China who have been imprisoned for expressing their views," and to help it with its "ongoing operational expenses[.]" Ex. 32 at YAHOO_PROD_00006000. These, of course, are the Fund's first and third purposes.

Meanwhile, the LHRO's tax records make clear that it has only ever been funded by monies traceable to the Fund.

| Sources of LHRO's contributions and grants[10] | | | | |
|---|---|---|---|---|
| Tax Year | Direct public support/fundraising events/other | Government | Related organization (LRF) | Total contribution and grants |
| 2010 | $0 | $0 | $5,313,361 | $5,313,361 |
| 2011 | $0 | $0 | $3,412,896 | $3,412,896 |
| 2012 | $0 | $0 | $0 | $0 |
| 2013 | $0 | $0 | $0 | $0 |
| 2014 | $0 | $0 | $0 | $0 |
| 2015 | $3,073,420[11] | $0 | $0 | $3,073,420 |
| 2016 | $0 | $0 | $0 | $0 |
| 2017 | $0 | $0 | $0 | $0 |
| 2018 | $0 | $0 | $0 | $0 |

Given the foregoing facts, several things are clear.

**First**, when Yahoo transferred the monies constituting the Fund to the LRF, it intended to create "'a fiduciary relationship with respect to [the Fund], subjecting the person by whom title

---

[10] Figures from Exs. 5-7 at Part I, Line 1; Exs. 8-14 at Part VIII, Line 1; and Exs. 15-18 at Schedule B.

[11] This amount was previously held in a separately created 2009 non-charitable trust designed to carry out the Fund's second purpose of resolving claims against Yahoo. *See* Exs. 29-30 (documents relating to 2009 trust). A separate vehicle was needed because significant conflicts were being generated by the LRF being tasked with handling Yahoo's legal matters for Yahoo's benefit, including, from the LRF's perspective, putting the LRF's 26 U.S.C. § 501(c)(3) status at risk. *See* Ex. 31 at YAHOO_PROD_0000199 and Ex. 32 at YAHOO_PROD_0000342 ("Mr. Wu indicated that he was strongly opposed to the notion that LRF would in any represent Yahoo! from a legal standpoint and stated that under no circumstances would he be willing to instruct beneficiaries of the Fund not to sue Yahoo!.")

to the property is held [*i.e.*, the LRF] to equitable duties to deal with the property for a charitable purpose.'" *He Depu v. Yahoo! Inc.*, 950 F.3d 897, 903 (D.C. Cir. 2020) (quoting RESTATEMENT (SECOND) OF TRUSTS § 348). In other words, the Settlement Agreement manifests an intent on Yahoo's part to create a trust over the Fund of which the LRF would be trustee—including of the Fund's charitable, humanitarian purpose.

**Second**, of the $17.3 million Fund, at most only around $6 million remains. **Third**, by spending so much of the Fund on itself, and so little on humanitarian and legal assistance, the LRF has badly violated its obligations as a trustee of the Fund's humanitarian purpose. **Fourth**, by continuing to transfer so much Fund monies to the LRF without requiring the LRF to spend more on humanitarian assistance, the LHRO has similarly violated its obligations as a trustee of that purpose. **Fifth**, given that neither the LRF nor the LHRO has demonstrated any willingness or ability to raise revenue or obtain funding from any source other than monies traceable to the Fund, neither will be able to pay any judgment requiring them to restore wrongfully spent money to the Fund's humanitarian purpose.

Given all this, and as discussed in more detail below, Plaintiffs are entitled to a preliminary injunction requiring the Laogai Defendants to stop spending any remaining monies traceable to the Fund on anything other than the Fund's humanitarian purpose—that is, humanitarian and legal assistance to Chinese dissidents imprisoned for online dissent.

## III.   LEGAL STANDARD

Under both D.C. and federal law, a preliminary injunction analysis "consists of four considerations: (1) whether the moving party is in imminent danger of suffering irreparable harm in the absence of preliminary relief; (2) whether there is substantial likelihood that the moving party will prevail on the merits; (3) whether the moving party will suffer more harm if the relief is not granted than will the opposing party if relief is granted; and (4) whether the public interest

will be served by issuance of the injunction." *Y.M.C.A. of City of Wash. v. Covington*, 484 A.2d

589, 591 (D.C. 1984). *See also, e.g.*, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d

290, 297 (D.C. Cir. 2006) ("To warrant preliminary injunctive relief, the moving party must

show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable

injury if the injunction were not granted, (3) that an injunction would not substantially injure

other interested parties, and (4) that the public interest would be furthered by the injunction.")

## IV.   ARGUMENT

### A.   Plaintiffs are likely to succeed on the merits.

Plaintiffs are likely to succeed on their claim that the Fund is an irrevocable charitable

trust established in part for the purpose of providing humanitarian and legal assistance to Chinese

dissidents imprisoned for online dissent, as well as their claim that Defendants were trustees who

breached their fiduciary duties to that purpose. Indeed, in all the briefing thus far, Defendants

have not disputed that, *if* they owed fiduciary duties to Fund's humanitarian purpose, they have

breached those duties. Instead, their defense strategy has focused on technical legal arguments,

not factual ones. Plaintiffs have now defeated those arguments, and, as discussed below,

Defendants are unlikely to alter that reality through additional discovery.

#### 1   Plaintiffs are likely to prevail on the issue of trust intent.

##### a.   The Settlement Agreement unambiguously manifests trust intent.

There is little doubt that Plaintiffs will prevail on the key issue in this case: whether the

Settlement Agreement created a charitable trust. After all, the facts leading to that conclusion are

essentially all contained in the unalterable text of the Settlement Agreement itself. And, as the

D.C. Court of Appeals has made clear, "[i]f the intent [to establish a trust] is manifest in the

language of the [instrument], the inquiry ends there." *Wyman v. Roesner*, 439 A.2d 516, 520 (D.C. 1981).

Here, the D.C. Circuit has already construed the Settlement Agreement and concluded that trust intent *is* manifest therein. First, citing *Beckett v. Air Line Pilots Association*, 995 F.2d 280, 287 (D.C. Cir. 1993) for the principle that trust intent may be manifested by "the articulation of all the essential elements of a trust," it noted that the Settlement Agreement "identifies all of them: a trustee (the Foundation), trust property ($17.3 million), and a charitable purpose ("humanitarian and legal assistance" to persons meeting specified criteria)." *He Depu*, 950 F.3d at 902.

The D.C. Circuit then noted that "the Settlement Agreement specifically directs that Yahoo's payments to the Foundation be 'made in trust.'" *Id.* This too manifested trust intent, as "the *Bogert* treatise states that in the context of a transfer to a charitable corporation (like the Foundation), if the transfer 'used the word "in trust," that language may be used to find an intent to make the corporation a trustee.'" *Id.* (cleaned up).

The D.C. Circuit further noted that manifestation of trust intent can be found in the "articulation of the 'specifics necessary to implement and administer the trust.'" *Id.* (citing *Beckett*, 995 F.2d at 287). Here, too, it held that the text of the Settlement Agreement included such a manifestation. "[T]he Settlement Agreement subjects the Foundation's handling of the Fund to trust-like restrictions, and does so in imperative language." *Id.* at 902. "It prohibits the Foundation from commingling Fund monies with its own general funds . . . , an indicator of trust intent." *Id.* "It provides that the money 'may be used for three purposes *only*,' '*shall not* be used' for specified prohibited purposes, and includes specific mechanisms to remedy 'any disbursements that do not conform to the stated purposes' of the Fund." *Id.* at 902–03. "The

Agreement also bars the Foundation from spending more than $1 million per year of the Fund on its own operating expenses . . . and requires it to provide semi-annual reports of its activities." *Id.* at 903.

Thus, under the D.C. Circuit's construction of the Settlement Agreement, trust "intent is manifest in the language of the [Settlement Agreement.]" *Wyman*, 439 A.2d at 520. As such, under D.C. law, "the inquiry ends there." *Id.* Therefore, Plaintiffs are virtually certain to prevail on the issue of trust intent—and thus, on the issue of the creation of a charitable trust.

> **b.      There is no ambiguity about the Settlement Agreement's provisions relating to trust intent, and thus this Court will have no occasion to consider extrinsic evidence on the issue.**

During a hearing on June 2, 2021, the Yahoo Defendants indicated that they will present testimony from Yahoo corporate representatives that Yahoo did not intend for the Settlement Agreement to create a trust. But it is black-letter law that, absent a showing of ambiguity in the Settlement Agreement, such testimony is extrinsic evidence that is inadmissible for the purposes of disputing trust intent. *E.g.*, *Wyman*, 439 A.2d at 520; *Abdelrhman v. Ackerman*, 76 A.3d 883, 890 (D.C. 2013) ("But we do not reach the issue of the parties' subjective intent where the text is unambiguous."). And given that Defendants previously argued to the D.C. Circuit that the Settlement Agreement's "plain and *unambiguous* terms. . . reflect no charitable trust intent[,]" Ex. 34 at 23 (emphasis added), they cannot now argue otherwise.

In all events, the fact that Defendants intend to dispute Plaintiffs' *interpretation* of the Settlement Agreement with respect to trust intent does not render it ambiguous. *Gryce v. Lavine*, 675 A.2d 67, 69 (D.C.1996) ("A contract is not rendered ambiguous merely because the parties disagree over its proper interpretation."). Rather, Defendants must show that the Settlement Agreement's provisions manifesting trust intent are "fairly susceptible of different constructions

or interpretations, or of two or more different meanings." *Burbridge v. Howard University*, 305 A.2d 245, 247 (D.C. 1973).

Given the D.C. Circuit's construction of the Settlement Agreement as manifesting trust intent—indeed, as having all the "hallmarks of the charitable trust[,]" *He Depu*, 950 F.3d at 903—without any suggestion of ambiguity on the question, the Yahoo Defendants will not be able to make this showing. As such, their contemplated testimony disputing trust intent will not be admissible to dispute trust intent.

        c.    **Even if the Court were to consider the contemplated testimony, that testimony could not overcome the Settlement Agreement's manifestation of trust intent.**

Even if the Court were to consider the contemplated testimony, such testimony could not overcome the Settlement Agreement's manifestation of trust intent. Indeed, case law is replete with examples courts disregarding a settlor's self-serving denial of trust intent in the face of textual manifestation of intent. *E.g.*, *D'Agrosa v. Coniglio*, 824 N.Y.S.2d 761 (Sup. Ct. 2006) (holding that trust existed despite "Defendant vehemently den[ying] that his intention was to establish a trust and argu[ing] that the documents manifest a contract only"); *Weiner v. Mullaney*, 59 Cal.App.2d 620, 631 (1943) (holding, over settlor-defendant's denial of trust intent, that "the letters initialed by defendant sufficiently disclose a trust intent"); *Re Sources for Sustainable Cmty. v. Bldg. Indus. Ass'n of Wash. (In re Wash. Builders Benefit Trust)*, 293 P.3d 1206, 1221 (Wash. Ct. App. 2013) ("That the individual Participants, in their responses to deposition questions, denied their intent to create a trust has no bearing on the trial court's finding that the enrollment agreements created an express trust because the Participants' intent to create the trust

12

was embodied in the enrollment agreements.").[12] Thus, the contemplated testimony will not overcome the Settlement Agreement's manifestation of trust intent.

> ### d.   Even if the Court were to consider extrinsic evidence, such evidence overwhelmingly supports, rather than negates, trust intent.

Finally, even if the Court were to consider extrinsic evidence, such evidence overwhelming supports trust intent. First, Yahoo and its executives repeatedly stated, in public and in private, that they created the Fund out of genuine humanitarian impulses. For example, in a question-and-answer drafted for publicity purposes, Yahoo's response as to why it was entering the Settlement Agreement was that it "was not a legal calculation but a humanitarian decision made by Jerry [Yang] and the company." Ex. 35 at YAHOO_PROD_0000913. An accompanying press release reinforced that point, quoting Yang as saying that Yahoo was "working to establish a Human Rights Fund to provide humanitarian and legal aid to dissidents who have been imprisoned for expressing their views online[,]" and that Yahoo was taking such action to ensure "our actions match our values[.]" *Id.* Similarly, in a letter to Congress, Yahoo's outside counsel reiterated that "Yahoo! established the Yahoo! Human Rights Fund with the express purpose of providing humanitarian and legal support to political dissidents who have been imprisoned for expressing their views online, as well as [to] support their families." Ex. 36 at YAHOO_PROD_0000027.

---

[12] To the extent the contemplated testimony is that Yahoo did not realize the relationship it was creating would be considered a charitable trust, such testimony would be immaterial to the analysis. *See* RESTATEMENT (THIRD) OF TRUSTS § 13, comments a and b ("It is immaterial whether or not the settlor knows that the intended relationship is called a trust, and whether or not the settlor knows the precise characteristics of a trust relationship. The manifestation of intention requires an external expression of intention as distinguished from undisclosed intention.").

Privately, too, Yahoo's message was the same. For example, a Yahoo executive told a lawyer for two Chinese Yahoo users that "providing support to families of those harmed by their free expression" was "the very reason that Yahoo! established the YHR Fund." Ex. 39 at YHRF_PL-00016. In another private email, a Yahoo executive told an employee at the LRF that "we need to use the Fund for its intended purposes regarding online dissent." Ex. 40 at YHRF_PL-00007. And in another private email between Yang and Wu relating to drafts of the Settlement Agreement, Yang personally made edits in order "to make sure most of the [F]und goes to humanitarian and legal help for dissidents[.]" Ex. 4 at YAHOO_PROD_0000922. As the D.C. Circuit recognized, these public and private statements "are probative of trust intent." *He Depu*, 950 F.3d at 903.

Additionally, the details and mechanics of the payments Yahoo made to the LRF reveal trust intent. As discussed above, the LRF opened dedicated bank accounts for accepting monies transferred pursuant to the Settlement Agreement, including the monies constituting the Fund. Ex. 2 at YAHOO_PROD_0000235. Those accounts were titled not just in the LRF's name, but in the name of the monies' equitable beneficiaries, including, as relevant here, the "YHR Fund." *Id.* Thus, as the D.C. Circuit recognized—and as the Defendants conceded on appeal—the LRF held "legal but not equitable title to the Fund[.]" *He Depu*, 950 F.3d at 903 n.6. And, as the D.C. Circuit held, this too is probative of trust intent. *Id.*

Given all this, there can be little doubt that Plaintiffs are likely to succeed on the issue of trust intent.

        **2.**      **Plaintiffs are likely to prevail on the issue of the irrevocable nature of the trust.**

Likely in recognition of this reality, the Laogai Defendants recently attempted a last-ditch effort to avoid liability, namely the argument that the trust was revocable, such that no duties

were owed to Plaintiffs as beneficiaries of the trust's humanitarian purpose. In rejecting that argument, this Court relied on "[t]he terms of the settlement," which "expressly provided that the settlement could be modified only with the consent of all parties[.]" Dkt. 93 (Mem. Op. and Order) at 24. As such, "the trust could not be revoked by the settlor alone[,]" a fact that led inexorably to the conclusion that "the trust is irrevocable." *Id.*

Given that the irrevocable nature of the trust is also based on the unalterable terms of the Settlement Agreement, no amount of discovery is likely to alter this reality—and with it, the reality that Defendants owed duties to the trust's humanitarian purpose and its beneficiaries, such as Plaintiffs.

### 3. Plaintiffs are likely to prevail on the issue of special-interest standing.

Plaintiffs are also likely to prevail on the issue of special-interest standing under the controlling cases of *Hooker v. Edes Home*, 579 A.2d 608 (D.C. 1990) and *Family Federation for World Peace v. Hyun Jin Moon*, 129 A.3d 234 (D.C. 2015). Traditionally, private litigants like Plaintiffs could not enforce charitable trusts, for fear that charitable trusts—which, by definition, benefit many—would be depleted by vexatious litigation instituted by disappointed, self-proclaimed beneficiaries. In the District of Columbia, however, the traditional rule does not apply if the relevant beneficiary class is "sharply defined" and "limited in number," *Hooker*, 579 A.2d at 614, and if the plaintiffs are challenging an extraordinary measure taken by the trustees, as opposed to a decision within the trustees' discretion. Indeed, as the D.C. Circuit recognized, the D.C. Court of Appeals has explicitly announced a "relaxation" of the traditional rule "in light of the 'exponential expansion of charitable institutions' and a 'busy Attorney General[.]'" *He Depu*, 950 F.3d at 905 (quoting *Family Federation*, 129 A.3d at 244).

Plaintiffs are likely to prevail on this issue for several reasons. First, Defendants have never disputed that Plaintiffs are challenging extraordinary measures, thus meeting one of

15

*Hooker*'s requirements. Second, no amount of discovery is likely to alter the conclusion that a class composed of Chinese dissidents imprisoned for online dissent is "sharply defined" and "limited in number." Third, no amount of discovery can change the legal reality that the D.C. Court of Appeals has explicitly relaxed the traditional rule to account for the explosion of charitable institutions and the inability of public officials in D.C. to adequately ensure all of them are complying with their charitable missions.

Indeed, of these, only the nature of the beneficiary class is even *theoretically* susceptible to factual challenge. But even then, it is difficult to see how Defendants could persuasively develop the facts in a way that will lead to their ultimate victory. As a practical matter, it makes little sense to allow a case to proceed past a doctrine meant to prevent vexatious litigation, only to enforce that doctrine *after* the litigation—which is undisputedly *not* vexatious—has completed discovery. That is especially the case given that, unlike Article III standing, the traditional rule against charitable beneficiary standing is *not* a question of jurisdiction.

Further, given the D.C. Circuit's opinion, it is hard to imagine what facts Defendants could even *theoretically* develop. As both the D.C. Circuit and the D.C. Court of Appeals have made clear, the way to analyze the beneficiary class is to take a snapshot of that class at the time of filing. *He Depu*, 950 F.3d at 907 (analysis focuses on class's "present members"); *Hooker*, 579 A.2d at 615 (same). Thus, Defendants cannot try to prove that the PRC government is becoming more repressive in a way that expands the beneficiary class.

Indeed, given that D.C. Circuit upheld Plaintiffs' *first* amended complaint, *see He Depu* at 901 n.1 ("we find that both complaints are sufficient to survive a motion to dismiss"), it is doubtful that discovery into the numerical size of the class at *any* point in time can help Defendants.

Unlike the second amended complaint, Plaintiffs' first amended complaint did *not* include a numerical estimate of the size of the class. *See* Dkt. 26 at 39–40 (1st Am. Compl. ¶¶ 119–123). Instead, it merely alleged that a beneficiary class composed of "(1) Chinese persons (2) who are imprisoned in China (3) for exercising their freedom of expression (4) online" had "interests distinct from that of the general public." *Id.* at 49 (1st Am. Compl. ¶ 119). It further alleged that it was "not easy to become a beneficiary"; that there were not "so many persons meeting these requirements that the beneficiary class is uncertain and limitless"; that there was no "difficulty in identifying who falls within the class of beneficiaries"; and that Plaintiffs were "entitled to preference in the distribution of Trust assets, compared to distributes who do *not* meet the requirements of the above-described class."  *Id.* (1st Am. Compl. ¶¶ 120-22). Given that these allegations are based, ultimately, on the unalterable text of the Settlement Agreement and other documents, *see He Depu*, 950 F.3d at 906 (noting that criteria set forth in the "[t]he Settlement Agreement and subsequent guidelines have a . . . narrowing effect" on the nature of the class), and given the D.C. Circuit's holding that these allegations were sufficient to meet *Hooker*, it is difficult to see how Defendants can meaningfully improve their position on this issue through discovery.

Even if Plaintiffs *were* required to prove the numerical size of the class, Defendants have little chance of prevailing. Plaintiffs have fully disclosed both the data and methodology on which Plaintiffs' estimate of 800-1,200 members is based. Dkt. 64 at 51 (2nd Am. Compl. ¶¶ 159–62). Given that the source of the data consists of respected non-governmental organizations, as well as a U.S. government database, Defendants are unlikely to be able to meaningfully discredit that data through discovery. And because Plaintiffs' methodology tends to *inflate* the size of the class, contra Plaintiffs' interests in this action, that methodology too is

unlikely to come under meaningful attack as the litigation proceeds. Indeed, though Defendants have had many chances to dispute the reasonableness of that methodology, they have not meaningfully tried to do so.

> **4.     Plaintiffs are likely to prevail on their claim that the Laogai Defendants breached their fiduciary duties to the trust's humanitarian purpose and must therefore pay damages to the trust's humanitarian purpose.**

Finally, Plaintiffs are likely to prevail on their claim that the Laogai Defendants breached their fiduciary duties to the trust's humanitarian purpose, entitling them to damages payable to that purpose. Indeed, none of the Defendants have ever disputed that, if a charitable trust exists, the non-humanitarian spending described above constitutes a breach of that trust. They have never argued, for example, that the terms of the trust permitted them to spend such large amounts of the trust's assets for their own benefit, and so little on the trust's humanitarian purpose. Given that, the only plausible way that discovery will be helpful to them is if it turns out that they spent *more* on the trust's humanitarian purpose than as described above. But there is every reason to believe that discovery will show the opposite. The Laogai Defendants had every incentive to maximize the publicly disclosed amounts. Discovery is thus more likely to show these amounts were overstated rather than understated—and that the Laogai Defendants' breaches are even *worse* than they appear.

To be sure, the LRF has argued that as a matter of *contract*, it was entitled to spend $1 million a year of the Fund on itself. *See* Dkt. 20-1 at 3 ("Thus, the expenditures are in fact *not* a breach of the Yahoo Settlement, but an integral part of the Settlement.") (emphasis in original). But given that Plaintiffs' claim sound in trust, this argument is inapposite. Moreover, to the extent the Settlement Agreement is ambiguous on the relative priority of humanitarian spending versus spending on the LRF, that ambiguity is emphatically resolved in Plaintiffs' favor by

Yang's email to Wu emphasizing that he wanted to "make sure *most* of the [F]und goes to humanitarian and legal help for dissidents, and *not* to the [LRF's] operating expenses." Ex. 4 at YAHOO_PROD_0000922 (emphasis added). In all events, given that the provision cited by the LRF makes clear that $1 million a year is a *ceiling* for the trust's spending on the LRF, and given that *no* ceiling is set for spending on the trust's humanitarian purpose, it cannot reasonably be disputed that it was and remains a breach of duty to the trust's humanitarian purpose to spend the trust's assets so disproportionately on the LRF. *E.g.*, *He Depu*, 950 F.3d at 904 ("[W]here a trust has multiple beneficiaries, trustees must act 'impartially in the distribution of trust property,' paying 'due regard' to the 'respective interests' of each.") (quoting D.C. CODE § 19-1308.3) (modifications omitted).

As for remedies, "[i]t is well established that a trustee is accountable in damages for breaches of trust." *Cobell v. Babbitt*, 52 F. Supp. 2d 11, 24-25 (D.D.C. 1999). Thus, Plaintiffs are likely to prevail on their claim that the Laogai Defendants owe damages to the trust's humanitarian purpose.

        **5.**     **Plaintiffs are likely to prevail on their claim to modify and remove the LRF's status as a beneficiary of the trust.**

Plaintiffs are also likely to prevail on their claim to modify and remove the LRF's status as a beneficiary of the trust. This Court held that, "based on the text of the settlement agreement and Yahoo's public statements," it was plausible that the trust was created "to help Chinese dissidents who are imprisoned based on their online activity." Dkt. 93 (Mem. Op. and Order) at 32. It further held that it was plausible that "Yahoo sought to limit the portion of the Fund that would go to cover the overhead expenses of Wu and the LRF." *Id.* It further held that it was plausible that "only 4 percent of the Fund's initial $17.3 million went to its charitable purpose, while the LRF and Wu used well over $10 million for their own purposes." *Id.* And, it held that it

was plausible that "[t]his alleged misuse of the Fund was a circumstance not anticipated by Yahoo as the settlor, and modification of the trust to prevent further depletion of the money by the LRF may further the humanitarian purpose of the trust." *Id.*

Now that limited discovery is underway, it is clear that the foregoing is not just plausible, but probable. Yang's email to Wu emphasizing that "most of the Fund [should] go to humanitarian and legal help for dissidents, and not to the [LRF's] operating expenses[,]" Ex. 4 at YAHOO_PROD_0000922, leaves little room for doubt that the current state of affairs—as reflected in the Laogai Defendants' tax records in black and white—is the exact opposite of what Yahoo anticipated. And there is virtually no chance that additional discovery will somehow reveal that, in fact, Yahoo wanted the LRF to spend the bulk of the Fund on itself, contra Yang's email.

Given all this, Plaintiffs are likely to prevail on their claim to modify the trust to remove the LRF's status as a beneficiary of the Fund. (Indeed, a preliminary modification of the trust in this way is in some ways the essence of this motion.) Certainly, it is difficult to imagine how the LRF might prevail on this claim as discovery proceeds. For example, it is difficult to imagine that discovery will reveal that Yahoo in fact intended that the LRF spend the bulk of the $17.3 million on the LRF, as opposed to on the trust's humanitarian purpose.

For the foregoing reasons, Plaintiffs are likely to prevail on the merits of their request that the trust's remaining assets be spent on the trust's humanitarian purpose, and on their request that the Laogai Defendants pay damages for their breaches of that purpose.

### B.   The trust's humanitarian purpose is likely to suffer irreparable harm in the absence of preliminary relief.

Because the Laogai Defendants have no meaningful revenue outside of trust assets, the trust's humanitarian purpose will suffer irreparable harm absent preliminary relief. Indeed,

Plaintiffs seek damages for wrongful past *and* future spending to the detriment of that purpose. Although the precise amount of damages is to be determined, it is at least in the several millions of dollars. But as the above examination of the Laogai Defendants' tax records makes clear, there is no realistic prospect that they will be able to pay such a damages award. Their current assets consist almost entirely, if not entirely, of trust assets. They have no apparent willingness or ability to engage in fundraising. Meanwhile, they seem intent on continuing to spend trust assets for their own benefit—including on their legal fees in this litigation. Given all this, it is clear that absent preliminary relief, "plaintiffs [will] not [be able to] obtain the main relief they seek"—the restoration of wrongfully depleted assets to the trust's humanitarian purpose—such that "the harm that the court [is being asked to] enjoin[] [is] both imminent and irreparable." *Y.M.C.A.*, 484 A.2d at 593.

This is true even though the harm Plaintiffs is trying to prevent is principally in the nature of monetary loss, because "monetary loss is an irreparable harm 'where the defendant would become insolvent or otherwise judgment-proof prior to the conclusion of litigation[.]'" *Sprint Sols., Inc. v. Mobile Now, Inc.*, No. CV 19-3752 (JDB), 2020 WL 136285, at *8 (D.D.C. Jan. 13, 2020) (quoting *Carabillo v. ULLICO Inc. Pension Plan & Tr.*, 355 F. Supp. 2d 49, 55 (D.D.C. 2004). *aff'd sub nom. Carabillo v. Ullico Inc.*, 198 F. App'x 1 (D.C. Cir. 2006)). *See also*, *e.g.*, *Elliot v. Kiesewetter*, 98 F.3d 47, 58 (3d Cir. 1996) (irreparable harm exists where injunction "is necessary to prevent the consumption, dissipation or fraudulent conveyance of the assets that the party pursuing the [injunction] seeks to recover in the underlying litigation"); *Hudson Nat. Bank v. Shapiro*, 695 F. Supp. 544, 550 (S.D. Fla. 1988) ("If the accounts are not enjoined, the funds will most likely be dissipated, the BANK will be unable to regain its *res*, and the fraud on the BANK, and the public, will continue."); *In re Focus Media Inc.*, 387 F.3d 1077, 1086 (9th Cir.

21

2004) (evidence that disputed assets were being dissipated "raise[d] the specter of irreparable harm" justifying preliminary injunction).

Indeed, the evidence suggests that the Laogai Defendants are *already* unable to pay damages for past breaches, given that they obviously cannot use remaining trust assets to pay such damages.[13] Thus, even if the Laogai Defendants' future spending will *not* be funded by trust assets, the trust's humanitarian purpose would *still* suffer irreparable harm absent preliminary relief. The fact that the Laogai Defendants' future spending *will* be funded by trust assets—and will thus *deepen* their breaches of trust (to the extent such spending is non-humanitarian)— doubly entitles Plaintiffs to preliminary relief.

Indeed, this Court was confronted with a factually similar situation in *Sprint*. There, Judge Bates held that irreparable harm existed "because Mobile Now has *already spent* approximately $7 million of the $11.2 million mistaken payment."  No. CV 19-3752 (JDB), 2020 WL 136285, at *7. Thus, Judge Bates found a "strong indication" of future dissipation constituting irreparable harm. Additionally, Judge Bates found that irreparable harm existed because absent an injunction, an award requiring the defendant to "return the $11.2 million" would be an "empty victory." *Id.*

So too here. The Laogai Defendants have *already* spent the bulk of the monies traceable to the Fund, and have no apparent intention of stopping. Nor do the Laogai Defendants do not seem willing or able to fundraise or generate non-trust revenue. Instead, they seem intent on

---

[13] That is, unless the Court finds that proportion of the $17.3 million Fund that should have been spent on the trust's humanitarian purpose is less than whatever remains of monies traceable to the Fund at the time of judgment. But given that only about $700,000 has been spent on that purpose, and given that only around $6 million traceable to the Fund seems to remain, that is exceedingly unlikely—especially in light of emerging evidence about Yahoo's and Yang's contemplated allocation of Fund spending.

dissipating trust assets on all manner of spending other than the trust's humanitarian purpose, including their legal fees in this action. As such, absent an injunction requiring them to spend trust assets only on the trust's humanitarian purpose, a post-litigation judgment requiring them to pay damages to that purpose is likely to be an empty victory. Thus, irreparable harm exists.

### C. The balance of harms are in Plaintiffs' favor.

The requested injunction does little more than require that trust spending comply with the trust's humanitarian purpose. As such, there is little basis to conclude that the injunction would cause *any* harm to Defendants.

To be sure, the Laogai Defendants may complain that the injunction would prevent them from paying their lawyers in this litigation. But Plaintiffs are not seeking an injunction to prevent the Laogai Defendants from paying their lawyers. Plaintiffs are *only* seeking an injunction to require that the Laogai Defendants spent *trust* assets on the trust's humanitarian purpose. Non-trust assets are beyond the scope of Plaintiffs' motion, and Plaintiffs have no objection to or interest in what the Laogai Defendants do with *non*-trust assets.

More to the point, to the extent the Laogai Defendants argue they would be harmed by the injunction because they do not have non-trust assets that they could use to pay their lawyers, that should not be viewed as a cognizable harm. For one, it would be a "harm" largely of the Laogai Defendants' own making, given that there is nothing stopping them from trying to fundraise their legal expenses, which they are apparently unwilling to do. More fundamentally, unless the Laogai Defendants can show that they are *entitled* to use the trust to pay their legal expenses, it would be putting the cart before the horse to deem their inability to do so a "harm."

Indeed, given that the Laogai Defendants continue to dispute even the *existence* of a trust, *see* Dkt. 100 at 1 (Laogai Defs.' Answer ¶ 3) ("Defendants specifically deny that the Settlement created a trust as alleged."), they are estopped from arguing that the trust entitles them to such

spending. *E.g.*, *Lofchie v. Washington Square LTD*, 580 A.2d 665, 668 (D.C. 1990) ("The independent doctrine of judicial estoppel precludes a litigant from playing fast and loose with a court of justice by changing his position according to the vicissitudes of self-interest, for such conduct is an affront to judicial dignity."); *Porter Novelli, Inc. v. Bender*, 817 A.2d 185, 188 (D.C. 2003) (applying the doctrine of judicial estoppel to prevent a litigant from "taking one side of an issue at trial and saying the opposite on appeal").

In fact, Plaintiffs have not been able to find a single case in which a court permitted a defendant who denied either the existence of a trust or their status as trustees to nevertheless claim that they are entitled to use trust assets to defend breach of trust claims against them. To the contrary, trust law makes clear that, even when a trustee defendant does *not* adopt the egregious tactic of denying the existence of a trust, a trustee who has committed a breach of trust is ordinarily not entitled to indemnification. *E.g.*, RESTATEMENT (THIRD) OF TRUSTS § 88 (when a "trustee is found to have committed a breach of trust, indemnification is ordinarily unavailable"); *C S Nat. Bank v. Haskins*, 254 Ga. 131, 143 (1985) ("While a trustee may be entitled to attorney fees incurred in the protection and preservation of the estate, he is not entitled to charge the trust estate with fees for defending his own maladministration against the justifiable complaint of the beneficiaries.") (internal quotation marks and modification omitted); *In re Trusteeships Under Will of Drake*, 195 Minn. 464, 468–69 (1935) ("As already pointed out, the trustee by refusing to concede his liability on the $2,500 mortgage item in effect brought on this litigation. To hold that he was entitled to his fees and attorneys' fees for carrying on the litigation, although as defendant, is not justified. To say to a trust beneficiary that even if he succeeds in [establishing a breach of trust] he must nevertheless pay the trustee's attorneys' fees and the trustee's fees for contesting the [breach] is unreasonable. In effect it amounts to this:

24

That a beneficiary, who has cause to have the account of his trustee surcharged in a substantial amount, can be called upon by the trustee to face the prospect that, if he wants to litigate the question of the trustee's liability, he will have to pay not only his own but the trustee's attorneys' fees and the trustee's fees for contesting the claim, even if the beneficiary succeeds in the action."); *Allard v. Pacific Nat'l Bank*, 99 Wn. 2d 394, 407 (Wash. 1983) ("a trial court abuses its discretion when it awards attorney fees to a trustee for litigation caused by the trustee's misconduct"); *Terry v. Conlan*, 131 Cal. App. 4th 1445, 1464 (2005) ("Sholly has not participated in this litigation as a neutral trustee to defend the trust and protect its assets; rather, she has consistently pursued her own interests and those of her siblings, to the detriment of Ione. As such, she must bear her own costs in this litigation, rather than be reimbursed from the trust.").

Such a rule makes sense. Otherwise, a perverse incentive would be created where defendants could totally deplete trust assets on litigating the existence of a trust, only to turn around and say that they were entitled to do so under trust law when they lose on that issue.

Thus, even if the Laogai Defendants could simultaneously disclaim the existence of a trust when it comes to their liability and rely on the existence of a trust when it comes to their legal fees—and they cannot under the doctrine of judicial estoppel—the normal operation of trust law would *still* prohibit them from spending trust assets on their defense in this action. This is doubly true of the LRF, which is spending trust assets to prevent its removal as both a beneficiary and as a trustee. *E.g.*, Dkt. 93 (Mem. Op. and Order) at 32-33 (holding that Plaintiffs had plausibly alleged "misuse of the Fund" by the LRF warranting its potential removal as a beneficiary, as well as "serious breaches of the Fund's humanitarian purpose" warranting its removal as trustee).

Given the lack of any plausible basis to conclude that the Laogai Defendants are entitled to spend trust assets on their legal fees in this action, the fact that an injunction might prevent them from doing so should not be considered a "harm" that needs to be balanced. As such, the balance of harms also favors an injunction.

### D.      The public interest favors a preliminary injunction.

Finally, the public interest favors a preliminary injunction. Given that the trust's humanitarian purpose is ultimately meant to benefit freedom of expression on the internet—which is self-evidently to the public's benefit—preliminarily requiring that the trust's assets be spent on that purpose cannot but advance the public interest. Moreover, there is evidence that further spending on the Laogai Defendants' non-humanitarian purposes—including its legal expenses here—would not advance the public interest, given the low reputation of the Laogai Defendants in the community of Chinese human rights activists. Dkt. 64 at 30 (2nd Am. Compl. ¶ 75 n. 4) (citing *New York Times* article regarding the "tarnished legacy" of Harry Wu and the LRF owing to the misconduct that is the subject of this action). Thus, it is in the public interest to issue a preliminary injunction.

## V.      CONCLUSION

This Court should issue a preliminary injunction requiring that trust assets be spent only on the trust's humanitarian purpose of providing humanitarian and legal assistance to Chinese dissidents imprisoned for online dissent.[14]

---

[14] If such an injunction will threaten the trust in some other way, such as by putting trust assets at risk of liability to innocent third parties, Plaintiffs are open to a more tailored injunction aimed at avoiding such an outcome. But given the Laogai Defendants' litigation position that no trust exists, and given that discovery is currently limited to that issue, Plaintiffs have not been able to gather the necessary information about the trust to know whether and to what extent such risks exist.

Dated: July 2, 2021                    **NORTH RIVER LAW PLLC**
                                       */s/ Times Wang*
                                       Times Wang (D.C. Bar 1025389)
                                       1300 I Street NW, Suite 400E
                                       Washington, DC 20005
                                       Telephone: (202) 838-6489
                                       twang@northriverlaw.com

                                       **SLARSKEY LLC**
                                       David Slarskey (admitted *pro hac vice*)
                                       Evan Fried (admitted *pro hac vice*)
                                       420 Lexington Ave., Suite 2525
                                       New York, NY 10170
                                       Telephone: (212) 658-0661
                                       dslarskey@slarskey.com
                                       efried@slarskey.com

                                       *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that I served the foregoing document on counsel of record by email on July 2, 2021.

/s/ Times Wang
Times Wang