# Exhibit #

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HE DEPU,  *et al,* | |
| Plaintiffs, | |
| v. | Case No. 1:17-cv-00635-RDM |
| OATH HOLDINGS, INC.,  *et al* | |
| Defendants. | |

**DECLARATION OF JEFFREY FIEDLER**

**Pursuant to 28 U.S.C. 1746, I hereby declare as follows:**

1.      My name is Jeffry Fiedler.  I am over the age of 18 and am otherwise competent to make this Declaration, and do so based on my personal knowledge of the facts it contains.

2.      I first met Harry Wu in approximately 1991.  He and I co-founded the Laogai Research Foundation in 1992.  From 1992 until 2019, with only occasional breaks in service, I have served as a member of the Board of Directors of either LRF or its supporting organization, Laogai Human Rights Organization ("LHRO"), which was founded in 2009.

3.      The LRF was established to educate the public in the United States and around the world about the vast, on-going, exploitative prison system in the People's Republic of China (PRC) known as Laogai, and related abuses by the PRC.  Mr. Wu was imprisoned for 18 years in the Laogai and subjected to torture by the Chinese government.  He wrote numerous books about his experiences.

4.      Since its inception, LRF's mission has been two-fold.  First, LRF promotes awareness of the suffering and human rights abuses not only perpetrated within the Laogai but also in other countries where minority groups, such as women or religious minorities

1

face persecution.  In connection with this educational mission, LRF has accumulated one of the largest archives of first-person accounts of survivors of the Laogai, similar to the work undertaken by others to interview survivors of the Holocaust.  Secondly it provides services to those who are harmed by the Laogai system, in the form of humanitarian assistance, such as diplomatic intervention, transportation, translation services, international outreach and help navigating various legal and immigration systems in order to provide dissidents or those threatened with persecution by the PRC with safe passage and resettlement outside China. It carried out these activities through the work of its staff including Mr. Wu, financial assistance to individuals and other entities with aligned interests, the building of a museum for educational purposes, and advocacy.

5.     In 2007, Mr. Wu informed me of a proposed settlement (the "2007 Agreement") of certain litigation between two families of Chinese dissidents and the internet company Yahoo to which LRF was to be a party.  Among other things, the 2007 Agreement provided for a lump sum payment to LRF in order to pay the plaintiffs in exchange for dismissal of their litigation, and a series of payments from Yahoo to the LRF in order to support its mission as described above to be administered and disbursed at LRF's discretion for three purposes:

    a.  To provide humanitarian and legal assistance primarily to persons in or from the PRC who have been imprisoned for expressing their views through Yahoo! or another medium;

    b.  To resolve claims primarily by such persons, or persons threatened with prosecution or imprisonment, against Yahoo or its subsidiaries or affiliates; and

    c.  For the payment of LRF's operating expenses and educational work conducted in the United States in support of human rights.

6.     The 2007 Agreement required LRF to create a separate advisory board of directors to administer the fund and included a promise that LRF, and not the separate board, would "indemnify, defend and hold Yahoo! harmless from and against any claims, liabilities, damages, attorneys fees or costs arising out of any legal or administrative proceeding initiated by or on behalf of any person" that was referred to the LRF by Yahoo.

7.     The 2007 Agreement did not prioritize any one of the three above purposes over another, nor require any minimum amount to be applied to any one of the three particular purposes.  The only constraint placed upon LRF for the administration of these funds was that in no calendar year could it exceed $1 million for LRF operating expenses.

8.     In response to Mr. Wu's request for my input on the proposed settlement draft, I raised concerns that the above indemnification language could be problematic for  LRF in that it could become subject to unlimited liability for all claims made by dissidents against Yahoo and that its liability could jeopardize the organization's survival.  My concerns were not acted on, and that clause remained in the final 2007 Agreement.  I continued to raise concerns following execution of the 2007 Agreement.  *See* related Board minutes at Attachments 1 and 5 (Feb. 5, 2008 Board Meeting Minutes at page 1; June  16, 2010 Board Meeting Minutes at page 1) .

9.     Shortly after the 2007 Agreement was finalized, LRF and Yahoo! appointed an "advisory board" for the Yahoo! Human Rights Fund to consult with LRF and Harry Wu regarding use and expenditure of the settlement fund for the three enumerated purposes.  As I testified in deposition, at no time did I or LRF's board believe that the administration of these funds created a trust or that either the LRF board or the YHRF board carried a fiduciary obligation to spend the funds in any particular proportion or priority against any of the three purposes.  While I did not serve on the YHRF, as an LRF Board Member I was

aware if their activities given their impact on LRF and its budget, and I would have routinely observed their meeting minutes which I believe accurately reflect their activities.

10.     One of the first uses of the funds paid to LRF pursuant to the 2007 Agreement was to begin exploring the creation of the Laogai Museum, which was a lifelong passion of Harry Wu's.  No one on either LRF's board or the YHRF advisory board raised any concerns about this use of the settlement funds.  See Attachments 1, 2, 3 and 4 (various 2008 Board Meeting minutes discussing expenditures).

11.     During 2008, LRF's board in consultation with the YHRF advisory board approved other expenditures ranging from administrative expenses for LRF; financial payments Chinese dissidents; legal support for Chinese dissidents, donations and grants to other non-profit institutions aligned in the effort to combat PRC abuses; and the resolution of claims by the victims of Yahoo!  See related Board minutes at Attachment 1, 2, 3 and 4.

12.     In or about June 2008, LRF hired an attorney, Susan Dorn, who specialized in non-profit law.  She advised the LRF board that continued administration of settlement claims to Yahoo! victims could jeopardize LRF's not-for-profit status.  See Legal Memo from Susan Dorn and related Board minutes at Attachments 6, 7..

13.     Because I was concerned that LRF was not heeding either my advice or that of Ms. Dorn to separate out the monies that would be used to settle Yahoo claims or obtain releases that would protect the LRF, I resigned from the LRF board in May of 2009.  See Attachment 8.

14.     In my letter of resignation, I referred back to Ms. Dorn's advice that LRF and Yahoo create a "separate trust" which would fund any settlement of a claim threatened against Yahoo.  I stated this because there was no existing trust and therefore the liability of LRF could be viewed as unlimited with regard to its claim settlement obligation.  The

creation of a new, separate trust would, to my understanding, limit the liability to the amount of funds held by the trust and not expose any other assets of LRF.

15.     Ultimately, I withdrew that resignation when it became clear to me that LRF and Yahoo were working to restructure some of the funds to be used for further Yahoo! settlements into a formal irrevocable trust that would protect LRF.  See Attachment 5 (Board Minutes from 2010 discussing separation of funds from initial "grant").

16.     During the balance of 2008, LRF's board approved the continued expenditure of Yahoo! settlement funds in the same way and proportion as described in paragraphs 10 and 11 above.  See Attachment 9.

17.     Consistent with the advice of Ms. Dorn and in part to address my concerns, in October 2009, the parties to the original Yahoo 2007 Agreement amended that document and  transferred $3.55 million of the original settlement funds being administered by LRF to a newly-created trust, called Yahoo! Irrevocable Human Rights Trust 2009 (the "Irrevocable Trust"), for the exclusive purposes of resolving claims against Yahoo! as described in 4(b) above.  The Irrevocable Trust had a defined duration of five years, it was not extended, and it expired in 2014.  All of the original funds from the 2007 settlement (exclusive of the $3.55 million transferred to the Irrevocable Trust), remained available to LRF to administer under purposes (a) and (c) of Paragraph 4.  See Attachment 10.   The remaining balance of the YHRT reverted to LRF in 2014.

I declare under penalty of perjury that the foregoing is true and correct this 28th day of September, 2021.

Jeffrey Fiedler

5

# Attachment 1

The Laogai Research Foundation
Board Meeting on 2/5/2008, 3:30-4:30 pm at
1420 K Street, 3rd Floor, NW, Washington DC 20005

Participants: Jeff Fiedler, Lodi Gyari, Harry Wu, Tienchi Martin-Liao (Board members)
        Jean Zhu (Secretary)

Executive Director, Harry Wu, greeted everyone and raised the point that since Joseph Brodecki left the board, it should think about a replacement.  Rebiya Kadeer of the American Uyghur Association and Ellen Borg, former staff member of Senator Jesse Helms, are taken into consideration.

Harry Wu briefed the board about the Yahoo Human Rights Fund, which was entrusted to LRF last December.  He recited shortly the agreement and MOU with Yahoo regarding the compensation to the victims' family and the fund.

Harry reported on LRF's purchase of a building at 1109 M Street, NW in DC. In February the remodeling work will start, and presumably, the Foundation will move in at the end of the month. The plan is to develop the Laogai museum on the main level.  The upper two levels will serve as office space for LRF and the affiliated China Information Center.

Jeff stressed that, in managing the fund, LRF will now shoulder Yahoo's responsibility for human rights issues.  He mentioned that the compensation to the families ███████████████ should be given to a trustee and separated from the fund.  This is important because of the legal situation and for taxation.

Lodi emphasized that the scenario with the Chinese dissident groups is complicated, and the Foundation must be alert in handling the fund so as not to give cause for wild speculation that could challenge the credibility of LRF/Harry.

Jeff and Tienchi suggested to have more structure in LRF's human rights work.  It should be focused on humanitarian and legal support for the victims of Yahoo or censorship and their families in China. Support can be offered both to individuals as well as to organizations.  Tienchi reported that the Foundation is working on guidelines for people to apply for support.

Harry informed the Board about the ABC-body world investigation in Dalian. He will be interviewed by ABC tomorrow.  Jeff talked about the research project on World Bank's tomato paste production in Xinjiang.

The Board regards the recruitment of Ms. Theresa Harris to LRF with great satisfaction.  Her legal qualifications will be a significant asset for LRF's future work.

# Attachment 2

# MINUTES

## Meeting of the Board of Directors of the Laogai Research Foundation

April 9, 2009

A meeting of the Board of Directors of the Laogai Research Foundation (LRF) was held at 1109 M St. NW, Washington, DC 20005 on Thursday, April 9, 2009, beginning at approximately 4:00 pm.

Harry Wu, Tienchi Martin-Liao, Lodi Gyari, Jeffrey Fiedler, and Dr. Maochun Yu, being all the members of the Board, were present and acting throughout the meeting.  Also present by invitation was Kirk Donahoe.  Mr. Wu chaired the meeting.  Mr. Donahoe recorded the minutes.

The focus of the meeting was to review the finances of the Laogai Research Foundation and discuss its ongoing programming as well as plans for future projects.

Financial Overview

Mr. Wu called the meeting to order and began by distributing to the Board the following documents: the 2008 expense report of the Yahoo! Human Rights Fund (YHRF), the first quarterly expense report for the current year, and the proposed budget for 2009. He noted that the YHRF expense report did not include the approximately $1.45 million that had been spent to purchase LRF's building. He further explained that of the approximately $17.4 million in original funds, about $14 million had been invested and that to date the investment had declined in value by about $2 million. The YHRF's cash holdings stood somewhere between $300,000 and $400,000.

Mr. Fiedler observed that the expenses as reported in the first quarterly report were slightly over budget but were more or less in line with the overall projections. Upon motion duly made and seconded, it was

RESOLVED:  To approve the 2009 budget.

Responding to an inquiry by Mr. Fiedler, Mr. Wu assured the Board that LRF's account was scheduled to be audited as usual, and agreed to mail copies of the audit report to the Board members once it had been received, after which the Board will discuss and approve the audit by teleconference. Mr. Fiedler warned that because the YHRF account had so much money, it was possible that it would be subject to an audit by the government at some point in the future.

Discussion of Ongoing and Future Projects

Mr. Wu updated the Board on the ongoing work of LRF and the Laogai Museum, including: plans to publish a Laogai photo book with Umbrage Editions, which is slated to be released on October 1, 2009; Mr. Wu's anticipated participation in the Oslo Freedom Forum and Ms. Liao's anticipated participation in the World Uyghur Congress this coming May;

1

preparations for hosting a conference commemorating the 20th anniversary of the Tiananmen Square massacre in early June, consisting of panel discussions, a press conference, and a photo exhibition; and plans to produce a traveling exhibition from the museum material which will go to Hong Kong and Taiwan in the fall, and later to Europe. He also noted that the museum's current special exhibit on *Laogai in Tibet* would be replaced by a special exhibit on Tiananmen Square on June 1st and that eventually the museum would produce an exhibit on the Uyghurs as well. Moreover, Mr. Wu mentioned that His Holiness the Dalai Lama may visit the museum on his trip to Washington, DC in October.

Mr. Fiedler cautioned that the traveling exhibition might get caught up in Customs which could cause major complications, advising that someone be available at each destination to receive the shipments. He also proposed that Mr. Wu might want to schedule an event in Hong Kong during the exhibition, suggesting that if Hong Kong authorities denied him entry the resulting media attention could help drive traffic to the exhibition. Mr. Fiedler and Mr. Yu concurred that there are probably a great deal of Laogai artifacts outside of China which people might be willing to donate to the museum, and suggested that LRF put out another round of advertisements seeking such items in Hong Kong and Taiwan immediately after the traveling exhibition had passed through those areas.

On the subject of the June 4th press conference, Mr. Wu informed the Board that he intended to seek the participation of Speaker Nancy Pelosi, Congressman Chris Smith, Congressman Frank Wolf, Congressman Thaddeus McCotter, Senator Sam Brownback, and Senator Russ Feingold among others. Mr. Fiedler suggested that LRF expand upon its base of support among Democrats. The Board put forth some possible names including Congresswoman [Sheila Jackson-Lee] of Texas, Congressman Sherrod Brown, and Senator Jim Webb.

Mr. Wu discussed the museum further, stating that he was not satisfied with the breadth of content currently on display and with the quality of the video available for viewing but that there had not been enough time to do more. He also said he was considering hiring another employee to help launch the traveling exhibition. He expressed that he wants to continue conducting research in three areas: 1) "classicide" and those prisoners still in the Laogai, 2) Laogai products, and 3) execution and the harvesting of prisoners' organs.

Mr. Yu and Mr. Fiedler urged that LRF translate into English and publish an anthology of selected excerpts from the Black Series, as this was a very unique and powerful means of documenting the stories of Laogai survivors. Mr. Wu said that he wanted to wait until the series stood at 30 volumes before doing so, and Ms. Liao added that, given the number of books she is currently editing, the series would reach that number by year's end. Mr. Yu offered to write a review essay of the series and submit it to the New York Review of Books.

Mr. Wu also spoke briefly about his idea to write a play, similar to *Speak Truth to Power*, in which actors would narrate the stories of a selection of Laogai victims. The script could be distributed to universities and performed by members of their student bodies. The Board generally agreed that this would be a worthwhile endeavor, but that it would have to be edited by a professional.

There being no further business to come before the meeting, and upon motion duly made and seconded, it was

RESOLVED:  To adjourn.

The meeting was adjourned at approximately 5 pm.

A true record.

_____
Kirk Donahoe, Recorder of Minutes

# Attachment 3

## MINUTES

### Meeting of the Advisory Board of the Yahoo! Human Rights Fund

April 15, 2008

A meeting of the Advisory Board of the Yahoo! Human Rights Fund (the "Fund") was held at the offices of the Laogai Research Foundation, 1109 M St NW, Washington DC on April 15, 2008, beginning at approximately 9:45am.

Harry Wu, Tienchi Liao, Michael Samway, Lucie Morillon, being all of the members of the Advisory Board, were present and acting throughout the meeting.  It was noted that Theresa Harris has resigned from the board. Also present by invitation were Nicole Kempton and Gare Smith. Mr. Wu chaired the meeting. Ms. Kempton recorded the minutes.

The focus of the meeting was to discuss the troubling developments in the cases involving dissidents ███████████ and to discuss the activities of the Fund during the first quarter.

The meeting was called to order by Mr. Wu. The following topics were discussed:

### I.    Administrative Matters

Mr. Wu opened the meeting by explaining that Ms. Harris resigned from the board due to a conflict of interest stemming from her work with Morton Sklar.  The need for a replacement was discussed.

Next, Mr. Wu explained that Ms. Kempton would be taking minutes today in light of Mr. Donahoe's absence.

Next, Mr. Wu noted that he prepared a budget for examination by the board, but that due to Mr. Donahoe's absence this could not be distributed at the meeting today. Ms. Morillon questioned whether this budget represented only the first quarter and Mr. Wu explained that it did.

*For Action: The Board will search for a replacement for Ms. Harris.*

*For Action: Mr. Wu will email the budget to the board.*

### II.    General Overview

Mr. Wu then gave a general overview of the recent activities of the Fund. He explained that funds were now being spent primarily on the publication of the Laogai photojournalism book by Umbrage Editions, due out in October, as well as the Foundation and Museum's new

website, which will be launched imminently. Mr. Samway asked when the new website would be live and Mr. Wu explained that it should be very soon.

Next, Mr. Wu explained that Ms. Liao has also been to Hong Kong and Taiwan to explore the possibilities of doing a traveling exhibition there. Mr. Samway and Ms. Liao discussed the political conditions in Hong Kong. Ms. Liao explained that there will be street demonstrations, along with panel discussions at the universities there. Mr. Wu, Mr. Samway, and Ms. Liao discussed the political complications of operating in Hong Kong. Mr. Samway asked where in Taiwan the exhibition will be held and Ms. Liao explained that it will be in Taipei and Kaohsiung. Mr. Wu explained that he does not have travel restrictions to go to Taiwan.

Next, Mr. Wu explained that he will be going to Oslo for the Human Rights Foundation conference. He mentioned that Ms. Kempton has already been to Oslo to meet with organizations there, and that this conference will be attended by human rights luminaries from all over the world, and that Mr. Wu will be one of the first speakers. Ms. Kempton also contacted with the Holocaust Museum in Oslo, and they would like to do some programming with LRF.  Ms. Kempton also connected with some organizations in Sweden, including Birgitta Ohlsson, the foreign affairs spokesperson for the Liberal Party.  Other opportunities for activities in Europe were also discussed.

Next, Mr. Wu explained that Ms. Liao is going back to Cologne, Germany to become LRF's European Director. She will handle all activities in Europe.

Next Mr. Wu discussed other staffing changes at LRF. Mr. Donahoe will be leaving the organization soon to attend graduate school, so LRF will be adding more people to the staff. Mr. Wu said the interviewees are very well qualified, but that he was frustrated that some of the prospective employees from mainland China are not aware of modern Chinese history. Mr. Samway asked what the employees will be doing, and Mr. Wu explained that they will be helping with the administration, and some of Mr. Donahoe's duties.

Next, Mr. Wu explained that one of his major projects will be to set up a play, and that he wants to have masks depicting dissidents from all periods of PRC history and that their stories would be told in the first person. He would like to have a Chinese version and English version and for it to be shown next year.

Next, Mr. Wu discussed the continuation of the humanitarian assistance program. So far, the highest amount granted to a dissident is $20,000. $15,000 USD is 1 million RMB, which is a lot of money in China.  Mr. Wu also explained that the organization is also busy trying to help some of the dissidents' families come to the US if they want to.   Another significant development is that ██████████████████ have been released. The Fund gave them $4,500 each and asked them to go about their life quietly. Mr. Samway asked who these people were and Mr. Wu explained that they were part of the ████████████████, a small group of about 7 people who wanted to discuss politics and reform in China.  They were a very loose

association, but were infiltrated by a Chinese agent. They were arrested and put in jail. The Chinese agent later retracted his statements and fled to Thailand. Four people were sentenced – 2 for ten years and 2 for eight years. The government didn't care that the agent retracted his statement, and two of them have just been released after having been jailed for eight years.

Next, the ██████████████ issue was discussed.  Mr. Wu explained that ████ ████ came to LRF for a meeting, and Mr. Smith was also present at that time. His language was more conciliatory than in previous interactions. ██████████████



██████████████ asked if this means that there is a settlement rather than the dissidents taking Yahoo! to court.  Mr. Wu said that he doesn't care if they sue Yahoo! as well.  Mr. Samway clarified that they have to agree not to sue Yahoo!, but Mr. Wu disagreed and said that he will only agree to give them assistance, nothing more. Ms. Morillon said that the dissidents should be satisfied with the amount and drop the issue, but asked if it is still legally possible for them to sue Yahoo!. Mr. Smith explained that this would best be dealt with by setting up two trusts, and that all he needs in order to do this are bank statements from Mr. Wu which have not been provided yet. So far, all the humanitarian cases have not had a direct link with Yahoo!. There are other cases relating to Yahoo! that have to be dealt with separately, because LRF could lose their 501(c)3 status if they are perceived as acting in Yahoo's benefit.

Next, Mr. Samway suggested that the Yahoo! cases involving ████████████ ██████████████ but there was discussion of the possibility of the Fund filling out an application form on behalf of the dissidents. The degree of Yahoo!'s involvement in their case was also discussed. It was generally agreed that while the evidence from Yahoo! played a part, Yahoo! was not the determining cause of their arrest.  It was generally agreed that it is difficult to determine the severity of the case relative to the other 42 cases handled by the Fund, and thus difficult to determine what amount they should be awarded, particularly without a formal application.

Next, Mr. Wu discussed ██████████████ ██████████████ and the victims was also discussed.  Mr. Samway pointed out that it isn't clear that they are all after the same thing, which makes the situation difficult to deal with.

Next, Ms. Morillon asked where we go from here, and if they are expecting the Fund to make a proposal to the dissidents? If the board made a specific offer would that help? Perhaps more collective action on behalf of the group would be more effective? Mr. Smith said that the

form can be filled out by anyone, so a board member could submit the form on behalf of the victims. The previous 42 forms were filled out by both dissidents and their families. Ms. Morillon asked about the victim's motives, whether they want the money or to publicly shame Yahoo!.  Mr. Wu said he thought money was their primary motive, and Mr. Samway said that ███████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████. No one knew whether he would seek asylum once he is released.

Next, the progress of the discussions with ███████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Mr. Samway also pointed out that he feels that their efforts to denigrate Yahoo! are also somewhat strange, given that Yahoo! has spent two years trying to get this Fund off the ground, along with other activities to help dissidents and their families.

Next, Ms. Morillon wanted to know what the Fund should do about the application. Mr. Samway and Mr. Smith suggested several approaches: one is that Mr. Smith continue to try to reason with ██████, and another possibility is that the Fund moves to make a resolution to offer them a set amount of money.

Ms. Morillon had to exit the meeting at 10:43 for another appointment.

Mr. Smith, Mr. Wu and Mr. Samway discussed how best to solve the issue in everyone's best interest. Mr. Wu made clear he doesn't believe Yahoo! should be discussing specific numbers with the dissidents, and Mr. Samway made the point that ███████████ knows that he has to come to the Fund for assistance.

Ms. Liao raised the point that these dissidents might not be the last of these types of cases. Mr. Samway said that they are now directing all cases towards the Fund, but Ms. Liao noted her concern that the Fund could run out very quickly if all of the cyber dissidents file large claims.

Mr. Wu then made some suggestions to Mr. Samway about how Yahoo! should handle any bad publicity from this case. It was generally agreed that they should calmly explain that they are simply trying to help dissidents. Ms. Liao made the point that Mr. Wu has already tried to offer them funds, which they rejected. Mr. Smith said that that ██████████ this action made the application form null and void because the Fund did not require an application from them at that time. Mr. Wu countered by saying that he sent an application form to China to prove that they had received the money, explaining that the application form operated like a receipt.

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

**For Action:** *Mr. Samway will update Mr. Jerry Yang and Mr. Michael Callaghan of the situation.*

Next, the board discussed that Ms. Kempton will take over Mr. Donahoe's duties as recorder of minutes. Ms. Liao will be present for the next meeting via phone if she is not able to be here physically.

There being no further business, and upon the motion duly made and seconded, it was

RESOLVED:  To adjourn.

Mr. Wu adjourned the meeting at 11am.

After the meeting was adjourned, there was discussion about setting up the trusts.  It was generally agreed that Mr. Wu should forward the necessary bank statements to Mr. Smith as soon as possible so that LRF's 501(c)3 status is protected.

A true record.

_____
Nicole Kempton, Recorder of Minutes

# Attachment 4

**MINUTES**

**Meeting of the Board of Directors of the Yahoo! Human Rights Fund**

May 30, 2008

A meeting of the Advisory Board of the Yahoo! Human Rights Fund (the "Fund") was held at 1109 M St. NW, Washington, DC 20005 on Friday, May 30, 2008, beginning at approximately 12:45 pm.

Harry Wu, Tienchi Liao, Theresa Harris, Michael Samway, Lucie Morillon, being all the members of the Board of Directors, were present and acting throughout the meeting. Also present by invitation was Kirk Donahoe. Mr. Wu chaired the meeting. Mr. Donahoe recorded the Minutes.

The focus of the meeting was to review a summary of the cases which have been reviewed by the Laogai Research Foundation (LRF) to date, to discuss the future direction of the Fund and how the Fund should best be administered.

The meeting was called to order by Mr. Wu. The following topics were discussed:

**1. Current Activities of LRF**

Mr. Wu opened the meeting by reviewing the major projects currently underway at LRF.

*Laogai Museum*

Construction on the museum continues at a rapid pace and is almost complete. In order for the museum to be compliant with relevant regulations, the building will have to include a handicap-accessible entrance and restroom. Mr. Wu would now like to extend the museum into the basement of the building, which would be a suitable location for visitors to view films, including more than 40 interviews of Laogai survivors recorded by LRF, which still require editing, as well as pieces produced by news agencies and others.

The Hoover Institution has agreed to return materials to Mr. Wu which he had originally donated to its archives. These materials include many original documents from the Chinese Communist Party's Central Committee. Additionally, in approximately one week's time, Mr. Wu would like to place an advertisement in a newspaper, asking for overseas Chinese who possess any materials relevant to the Laogai to donate them to the museum. The exhibits in the museum will be organized by time period.

September remains the museum's anticipated opening month. Mr. Wu would like to invite House Speaker Nancy Pelosi to the grand opening, and will coordinate with her to select a suitable date. Much work still needs to be done in preparation for the opening, including the printing of posters, tickets, etc.

*Laogai Handbook*

1

CONFIDENTIAL

The newest edition of LRF's *Laogai Handbook* is almost complete, and will likely be printed in August. As before, this book will be sent to most major American and European universities and embassies. Notably, many of the Laogai facilities have been rebuilt or refurbished in recent years, which will be reflected in this edition of the book.

*Black Series*

With the publication of two books by Liao Yiwu dealing with the persecution of China's landlord class after the Communist revolution, this series of Chinese language memoirs by Laogai survivors now stands at 22, with an additional three to four volumes in print. Mr. Wu hopes to publish about 18 more volumes, to bring the total to 40.

## 2.   Review of Fund and Claimants

Mr. Wu distributed a list of ten individuals who had already received payments from the Fund. In addition to these ten individuals, Mr. Wu noted that there are seven to nine applicants whose cases were still being processed.

(A discussion of several particular cases followed. Due to the sensitive nature of those cases, the record of that discussion should remain highly confidential and has therefore been omitted in this version of the Minutes. A confidential version of the Minutes including the record of this discussion has been recorded, but should not be transmitted via the Internet or other potentially unsecure means.)

**For Action:**  *It was the sentiment of the Board that when reviewing cases it would be helpful to view a list which provided a brief description of each case in English. Such a list should be prepared for Board Members in future meetings.*

## 3.   Expansion of Support to Non-Internet-Related Cases

Mr. Wu informed the Board that the Fund had received applications from about six or seven individuals who hold positions in the Chinese Democratic Party. As their cases have no direct relation to internet issues however, and are thus outside of the scope of the Settlement Agreement, the Board will need to make a decision as to whether or not to offer them any support. Mr. Wu anticipated that there will be more of such cases in the future and queried the Board as to whether there should be a set rule in making such determinations.

Ms. Harris inquired as to the possibility that there are other individuals who more closely fell within the scope of the Settlement Agreement that had not yet been identified. Ms. Morillon again offered to provide LRF with a list of cyber-dissidents that the staff of Reporters Without Borders could identify as being in need of support. She raised the concern that offering support to applicants in cases unrelated to the Internet could result in LRF being flooded with more applications in the future. Ms. Morillon then suggested that Mr. Wu and LRF make judgments when offering support to these applicants as to what amount of funding would be reasonable and sustainable. She further proposed, and Mr. Samway and Ms. Harris agreed, that the Fund be able to provide support to any individual who faced an imminent threat to his or her safety, but that providing support in cases unrelated to Yahoo! or the Internet should only occur under exceptional circumstances.

2

YAHOO_PROD_0000422

Mr. Wu expressed that he would like to be able to provide a small amount of money to any such applicants. He noted that the gap between the amount the Fund had granted thus far and the amount that was available was rather large. He noted that his strategy thus far has been to grant $10,000 to applicants who can clearly prove that they meet the criteria publicized by the Fund, such as when it is clearly demonstrated by a court verdict, and that this amount of money is generally regarded as being very large by most of the applicants.

### 4. Discussion of Possible New Projects the Fund Could Support

Mr. Wu observed that the Fund is currently financing two programs: creation of the Laogai Museum and provision of humanitarian and legal support to victims of internet censorship in China. In his opinion, it may be a good idea to use the Fund to support another project.

Ms. Harris inquired if any funding had been given to organizations thus far, to which Mr. Wu responded had not occurred. Mr. Wu further stated that he would not consider giving funding to any organizations within mainland China. Ms. Harris also asked if any funding had been given to legal defenders within China. Mr. Wu replied that this has also not occurred as of yet, but that the Fund would possibly do so in the future. Ms. Harris expressed that offering support to lawyers who defend cyber dissidents such as Hu Jia and others could potentially have a huge impact, by encouraging more lawyers in China to take on human rights cases.

Mr. Wu encouraged the Board to consider other possible projects that may be suitable for support. He put forward several possible ideas, including establishing a Fellowship or Scholarship to support study of the Laogai, creating some other type of award, or working together with Amnesty International in a program that could provide more precise estimates of the number of executions carried out in China each year.

### 5. Discussion of Mission and Operational Guidelines

Mr. Wu distributed the Mission and Operational Guidelines drafted by Mr. Samway and based on an earlier version drafted by Ms. Harris and Ms. Liao to all the members of the Board. He instructed the Board to review the document and offer any comments at future date.

Mr. Wu queried Mr. Samway as to the possible effects that a change in ownership of Yahoo! Inc. could have on the Fund. Mr. Samway emphasized that such a possibility is one of the reasons why the Mission and Operational Guidelines are needed, but that the survival of the Fund in its current state is, in his opinion, independent of Yahoo!'s state of affairs. As such, LRF will be able to continue in managing the day-to-day affairs of the Fund.

The Board unanimously **agreed** to endorse the Mission and Operational Guidelines as a framework which the Board could further develop in the next few months.

### 6. Financial Management of the Fund

Ms. Harris queried Mr. Wu as to whether anyone was helping with the investment of the Fund. Mr. Wu then informed the Board that he had arranged for a company specializing in non-profit work to assist with the financial management of the Fund beginning sometime in June. Mr.

3

YAHOO_PROD_0000423

Samway advised Mr. Wu that this company should examine the tax status of LRF to determine if it will change from "public charity" to "private foundation".

      **For Action:**  *Per the request of the Board Members, a representative of said company should be made available to brief the Board on the financial management of the Fund at a future Board meeting.*

7.  **Administrative Matters**

      The minutes from the March 20, 2008 Board meeting, which were previously distributed to the Board members, were approved by all Board members present.

      The next Board meeting, to be held via teleconference, was tentatively scheduled for Thursday, June 19, 2008, with the time to be determined.

There being no further business, and upon the motion duly made and seconded, it was

RESOLVED:  To adjourn.

The meeting was adjourned at approximately 3 p.m.

A true record.

                    _____
                    Kirk Donahoe, Recorder of Minutes

CONFIDENTIAL        YAHOO_PROD_0000424

Attachment 5

**Laogai Research Foundation Board Meeting Minutes**

**Wednesday, June 16, 2010**

Teleconference to discuss proposed investment plan

Directors Present: Harry Wu, President; Jeff Fielder, Director; Yu Maochun (Miles), Director

Officers Present: Nicole Kempton, Treasurer; Megan Fluker, Secretary

Absent: Lodi Gyari, Director (traveling outside the US and unable to join by phone)

Proceedings:

- Meeting was called to order at 9:10 by Harry Wu.
- The board voted on two resolutions.
- *Resolution 1 – Separate Account for Yahoo Funds*.  Mr. Fiedler moved to establish a separate account for all funds originating from Yahoo, with Mr. Wu (President) and Ms. Kempton (Treasurer) as co-signers on the accounts.  Monies originating from the initial Yahoo grant should not be mixed with Laogai Research Foundation general operating funds. Mr. Yu seconded.  The board members present unanimously passed the resolution.
- *Resolution 2 – Investment of $3 Million of Yahoo Funds.*  Mr. Fiedler moved to approve the investment plan and resolution proposed by PNC Bank, with Mr. Wu (President) and Ms. Kempton (Treasurer) as co-signers.  The bank officer at PNC Bank has proposed putting $1.5 in a "ladder investment" of bonds. The first bond would mature in 2011, at which point it would be reinvested unless the LRF Board chose not to reinvest. After the first bond matures, LRF will have bonds maturing every 2-6 months over the next 2.5 years. Every time a bond matures it will be reinvested unless the LRF board chooses to liquidate it. The total length of these bond investments is 3.75 years, and the bank predicts an average yield of 5.5%. The remaining $1.5 million would be invested in mutual funds. This would be for 3 years with an expected return of between 5% and 6%. This investment could be liquidated at any time. Both investments are considered conservative, with the bonds being the safest and the mutual funds carrying slightly more risk.  The proposed resolution from PNC Bank will be attached to these minutes.  Mr. Yu seconded the motion.  The board unanimously passed the resolution.
- Meeting adjourned at 9:29am.

Minutes recorded by Megan Fluker, Secretary

# Attachment 6

# DORN & HANSON, P.C.

*ATTORNEYS SERVING THE NONPROFIT WORLD*

1625 MASSACHUSETTS AVENUE NW, SUITE 450
WASHINGTON, DC 20036-2246

SUSAN E. DORN                    (202) 986-3300                    ASSOCIATE
MICHELLE A. HANSON            FAX (202) 986-0823
                              www.dornhansonlaw.com            _____
                                                              MICHAEL MCCABE

## MEMORANDUM

CONFIDENTIAL
Attorney-Client Privileged

    To:    Harry Wu

    From:    Susan Dorn

    Date:    June 23, 2008

    Re:    Yahoo! Human Rights Fund and 501(c)(3) status

You asked us to review the Confidential Settlement, Release, and Foundation Agreement, dated November 9, 2007, between Yahoo! and Yahoo! Hong Kong Ltd. and Wang Xiaoning, Shi Tao, Yu Ling, Gao Qinsheng, Harry Wu, and Laogai Research Foundation (the "Agreement") and the Mission and Operational Guidelines of the Yahoo! Human Rights Fund of the Laogai Research Foundation (the "Fund"). The issue is whether the Agreement or the Fund's structure poses any tax or other legal problems for the Laogai Research Foundation ("LRF"). The settlement agreement between Yahoo! and the Laogai Research Foundation, Shi Tao, and Wang Xiaoning was not structured as would be a typical claim settlement. As a result, the settlement appears to create a variety of liabilities and penalties that will be imposed on both Laogai Research Foundation *and* Yahoo!. The remainder of this memorandum sets out our concerns, as well as identifies a number of alternative approaches to accomplish what we believe to be both organizations' desires.

## I.   Analysis

The Fund's current structure presents problems for LRF. LRF's role in the Agreement and Fund could be viewed as acting as a claim settler on behalf of Yahoo! and this role is not consistent with its stated charitable purpose. Under the Internal Revenue Code, tax-exempt organizations are defined in §501(a) as follows:

    Corporations, and any community chest, fund or foundation, organized and
    operated exclusively for religious, charitable, scientific, testing for public

safety, literary or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual. . . .

The Internal Revenue Service (the "IRS" or "Service") is clear that charitable purposes are not served "[w]hen an organization operates for the benefit of private interests, such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled directly or indirectly by such private interests, the organization by definition does not operate 'exclusively' for exempt purposes." This thinking has been underscored recently by the widespread revocation of c3 status of debt relief/settlement organizations. To cite but one action, in PLR 200809037 an organization's §501(c)(3) status was revoked because the IRS found that the entity functioned primarily for the purpry of debt relief and debt settlement.

Likewise, in the case of the Agreement and the Fund, LRF will be viewed by the Service on behalf of Yahoo! for the settlement of prisoner's claims. Facts indicating as such include that the Agreement encompasses both a "settlement" and a "Foundation Agreement." Also, the LRF is to hold monies in trust and acting as a de facto trustee, will determine how to distribute monies to the families of individuals who have suits against Yahoo! In the portion of the Agreement creating the Fund, the second stated purpose of the Fund is to "resolve claims primarily by [persons in or from the People's Republic of China who have been imprisoned for expressing their views through Yahoo! or another medium] threatened with prosecution or imprisonment against the Yahoo! Entities or any Yahoo! subsidiary or affiliate." The Mission and Operational Guidelines of the Fund also make the same statement. Moreover, Yahoo! is to refer any claimants to the LRF who will attempt to settle claims using the Fund. These facts, and frankly, the entire construct of the Fund, undercut the LRF's §501(c)(3) status as an organization operated "exclusively" for a charitable purpose. Thus, the Agreement and the Fund could and should be restructured in order to protect the tax-exempt status of the LRF.

As drafted, the Agreement itself does not envision that the creation of the Fund will undercut the nonprofit status of the LRF. Section II.C.2.(v) states that the "Fund shall be used only in conformity with the civil and criminal laws of the United States." Section IV.C.3 states that "Harry Wu and Laogai Research Foundation hereby warrant and represent that the Laogai Research Foundation is a non-profit research and public education organization." Given that the LRF is a non-profit organization, and the tax code specifically prohibits a non-profit from engaging in a noncharitable function such as claims settlement, the Agreement sets up the Fund in a manner that is not in conformity with civil law. Therefore, the Agreement envisions that the LRF will continue its normal not-for-profit activities as it administers the Fund. This inherent contradiction on the face of the document is another indication that the Agreement must be restructured in order to remove the LRF from any potential role in settling claims against Yahoo!

Another issue is that the creation of the Fund does not constitute a charitable gift

YAHOO_PROD_0000348

because according the BNA, "to qualify as a gift, a transfer must be motivated by 'detached and disinterested generosity' or out of 'affection, respect, admiration, charity or like impulses.'"  Here, there appears to be an implicit effort on the part of Yahoo! to address the bad publicity vis a vis the LRF and also to settle potential claims (and relieving Yahoo! of at least arguable liability for such claims.)  This desire is in complete opposition to the mission of a charitable entity.

In addition to leading to the revocation of LRF's tax-exempt status, utilization of the Fund appears to be a "donor advised fund" improperly utilized for the benefit of Yahoo! and thus results in penalties for those persons participating in directing settlements in the Fund.  According to the Pension Protection Act of 2006 ("PPA"), a donor advised fund is a fund which is uniquely identified by referencing the donor, is owned and controlled by the sponsoring organization, and is, or reasonably seems will be, distributed and/or invested in accordance with the advice of the donor by reason of the donor's status as donor.[1]  The Fund as described in the Mission and Operational Guidelines seems to adhere to the definition of a donor advised fund.  In compliance with the first requirement, the Fund's name uniquely identifies that Yahoo! donated the money to create the Fund.  The second requirement is most likely fulfilled because LRF has the monies for the Fund.  However, whether LRF controls the Fund is slightly more ambiguous because Yahoo! must approve all settlements in advance.  Since the Fund will be administered by a Board of Directors, one of whom shall be appointed by Yahoo!, and all settlements must be approved in advance by Yahoo!, as conditions for the Fund, it also seems that the third requirement is met.  Therefore, the Fund would most likely be considered a donor advised fund by the IRS.

Assuming the Fund would be considered a donor advised fund, the PPA's strict guidelines regarding appropriate distribution would be applicable.  The provision that would most affect LRF is I.R.C. §1231 which states that distribution to individuals constitutes taxable distribution and that *each* such distribution will result in LRF being taxed at 20 percent of the amount distributed and the fund's management, assuming they knew it was a taxable distribution, being taxed at 5 % of that amount up to $10,000.  Since one of the Fund's purposes is to settle claims with individuals, these distributions would result in both LRF and the Fund's Board of Directors being taxed at these rates.

## II.  Possible Alternatives

Yahoo! and the LRF should agree that there is no quid pro quo, perhaps by amending and restating the agreement to remove all references to LRF using the Fund to settle claims on behalf of Yahoo!  The amended agreement can state that Yahoo! appreciates that the LRF has brought these issues to its attention and wishes to create a Fund on behalf of prisoners and the LRF.  The Fund cannot be used to settle claims.  Once the Fund is restructured to preserve the LRF's tax status, the following alternatives should be considered.

---

[1] Pension Protection Act, 26 U.S.C. § 4966(d)(2)(B) (2006).

YAHOO_PROD_0000349

A.  Judicially Approved Settlement

An alternative to the settlement agreement, that could be less risky for LRF, would be a class action lawsuit filed by Shi Tao and Wang Xaoning against Yahoo! for the purpose of obtaining a structured settlement.  A lawsuit would be necessary because structured settlement funds require a court order to be established.  Class action lawsuits can both be filed and take place under seal which would protect Yahoo! from any publicity related to the matter. A structured settlement would give LRF the flexibility to act either as a claims processor, and receive payment for services rendered, or as a beneficiary to the settlement.  This would prevent LRF from having to determine who receives compensation from the Fund while also being a potential beneficiary of the Fund.  In either role, the liability that LRF accepted in the settlement agreement would be eliminated.

However, since Yahoo! did not structure the settlement as a corporation typically would in a class action lawsuit, it is possible that Yahoo! does not believe there is any liability for their actions and that no lawsuit would actually have a claim.  The amount for which Yahoo! settled does not reflect the transfer of Yahoo!'s liability to LRF.  Yahoo! may have only settled in order to take moral responsibility for what occurred to those taken to the Laogai camps.  If this were the case, which could be better determined through direct communication with counsel at Yahoo!, then a class action lawsuit may not be plausible and a different type of settlement agreement should be agreed upon.

Yahoo!'s perspective on the legal issues related to claims by prisoners in the Laogai camps is best understood, at this point, by looking to Yahoo!'s Motion to Dismiss filed in the District Court of Northern District of California. First, Yahoo! states that a case challenging the actions of the Chinese government would be dismissed because it violates China's sovereignty, interferes with U.S. foreign policy and threatens U.S. law enforcement.  Second, Yahoo! alleges that the claims under ATS, TVPA, ECPA would fail because they are inapplicable, or if applicable, would not succeed and that there could be no legitimate claims under California law because the foreign affairs doctrine requires that international matters be handled by the federal government.  Yahoo! also stated the claims would fail because all of Yahoo!'s communications with the Chinese government would be protected by federal law.  Third, Yahoo! states that there is no claim because the plaintiffs did not and could not join the Chinese government, Chinese officials or prison guards from the Laogai camps, who would be indispensable to proceed with the a case.  Last, Yahoo! questioned whether the plaintiffs' counsel had been authorized by the plaintiffs to file a claim and thus, questioned the legitimacy of the claim.  Although there was no opinion issued, Yahoo! seems extremely confident that any claim related to this matter would either not be justiciable or fail.  This would indicate that Yahoo! does not foresee that it would be held liable.

It may also be the case that Yahoo! is not willing to acknowledge its liability due to its pending acquisition by Microsoft.  If this were the case, LRF would not want to be complicit in veiling that liability.  This may not be easily determined, but it still provides incentive to structure a settlement which would not require LRF to assume liability that

Yahoo! may or may not have.

### B.  Creation of Fund Adhering to IRS Guidelines

The settlement (upon redrafting) could instead be created as a restricted fund which may be only used for the purpose of assisting those persons wrongfully imprisoned due to any U.S. corporation which provided information to the Chinese government.  The restricted fund would have a term of five years, during which LRF would receive $1,000,000 per year, and at the end of the term, receive all remaining funds.  As such, the settlement would reflect its purpose of recompense and would define a charitable class which a tax-exempt organization such as LRF could legitimately serve.  However, LRF should be aware that a gift (even a restricted gift) of $17 million to LRF will tip the organization into private foundation status.  Such a sizable endowment from one organization means that LRF no longer can indicate that it is a publicly supported nonprofit organization.  LRF's status is then changed and it will be subject to all of the private foundation rules and excise taxes, including the 2% tax on the net investment income under §4940.  It is possible that instead of bestowing the money to LRF directly, that LRF could set up a supporting foundation to receive monies for the Fund.  A new organization could file a Form 1023 for a separate exemption from taxation as a Type I supporting organization.  A Type I supporting organization is created to support a publicly supported nonprofit organization.   The relationship between the public nonprofit and its supporting organization is that of a parent and child.  Due to the fact that the Fund is envisioned as working exclusively for the LRF, such a relationship could work well.


### III.  Conclusion

As far as we can determine, the current settlement agreement is not in the best interest of LRF or Yahoo!.  It jeopardizes LRF's tax-exempt status and could result in the taxation of LRF, its executive director, and its board members.  In order to best know how to proceed, we need to speak with legal, and perhaps financial, counsel at Yahoo! and assess their reasoning behind the original settlement.  Although it is unclear at this point why the settlement was structured as it was, it is certain that the agreement must be altered so as to be consistent with the requirements of a tax-exempt organization and better suited to aid those intended.

Attachment 7

# MINUTES

## Meeting of the Advisory Board of the Yahoo! Human Rights Fund

June 24, 2008

A meeting of the Advisory Board of the Yahoo! Human Rights Fund (the "Fund") was held via teleconference on Tuesday, June 24, 2008, beginning at approximately 2:00 pm EST.

Harry Wu, Tienchi Liao, Theresa Harris, Michael Samway, Lucie Morillon, being all the members of the Advisory Board, were present and acting throughout the meeting.  Also present by invitation were Kirk Donahoe and Susan Dorn.  Mr. Wu chaired the meeting.  Mr. Donahoe recorded the minutes.

The focus of the meeting was to review a financial summary of the Fund, to discuss the ramifications of the Fund for the tax-exempt status of the Laogai Research Foundation ("LRF"), and to review the ongoing activities, i.e. humanitarian assistance and the Laogai Museum, being supported by the Fund.

The meeting was called to order by Mr. Wu.  The following topics were discussed:

## 1.  Financial Summary of the Fund

Mr. Wu opened the meeting by reviewing a financial summary of the Fund, summaries of the Fund's investments and expenses having been distributed to all the members of the Board prior to the start of the meeting.

Mr. Wu pointed out to the Board that the money allotted to the families of Mr. Shi Tao and Mr. Wang Xiaoning had been completely removed from the Fund account and moved to separate, independent accounts by Ms. Gao Qinsheng and Ms. Yu Ling, respectively.

Mr. Wu observed that in addition to the approximately $1.5 million LRF had spent to purchase its new property, its expenses over the six months since the Fund was established amounted to nearly $500,000, meaning that LRF had spent, totally, about $2 million of the Fund's money. He further informed the Board that the Fund had been operating from an independent account since the beginning of June 2008.  Mr. Wu also noted that the first report of the Fund's activity would be submitted to Yahoo! Inc. in the next week.

## 2.  Discussion of LRF's Tax Exempt Status

Mr. Wu introduced Ms. Susan Dorn, an attorney and partner at Dorn & Hanson, P.C., to the Board.  Mr. Wu had asked Ms. Dorn to review the Confidential Settlement, Release, and Foundation Agreement establishing the Fund (the "Agreement") as well as the proposed Mission and Operational Guidelines of the Fund to determine whether the Fund's structure posed and tax or other legal problems for LRF.

Ms. Dorn shared her assessment with the Board.  She began by stating that the settlement could provoke unintended consequences, including liabilities and penalties, for both LRF and

Yahoo! management.  Ms. Dorn explained that in her analysis of both the language of the Agreement and the structure of the Fund, LRF is seen as taking on the apparent role of a claim settler for Yahoo!.  Because such a function is inconsistent with the IRS's view of a charitable purpose, the arrangement would likely result in a revocation of LRF's status as a 501(c)(3) organization in addition to tax penalties for all persons who participate in directing settlements in the Fund.

Ms. Dorn then suggested that the Fund be restructured to preserve LRF's tax-exempt status and offered several alternatives for consideration. One possibility is that a class action lawsuit be filed against Yahoo! in order to obtain a structured settlement, which would allow LRF to act either as a claims processor or a beneficiary to the settlement.  By preventing LRF from making determinations as to who receives compensation from the Fund, the liability that it accepted in the original settlement agreement would be eliminated. The entire process could take place under seal to protect Yahoo! from publicity.

If Yahoo! was not agreeable to pursuing a structured settlement, another option would be to redraft the settlement in a way that divorced it from Shi Tao and Wang Xiaoning while also creating a charitable donation to LRF.  This restricted fund could then be used to assist a broader class of persons, such as those who were wrongfully imprisoned due to the actions of U.S. corporations. Still, a gift in the size of $17 million would cause LRF to be designated as a private foundation rather than a publicly supported nonprofit organization, and would thus subject it to a number of excise taxes and rules, including a limit on the amounts of individual donations.  This dilemma could be resolved by creating a new organization to house the money from Yahoo! with the sole purpose of supporting LRF.

Ms. Dorn expressed that it was difficult to determine what the best course of action for LRF would be without knowing what intentions Yahoo! had in drafting the original settlement agreement in the way that it did.  Mr. Samway stated that he was personally not involved in the settlement agreement and, as such, could not provide clarification on that matter, but that he did not wish to harm the nonprofit status of LRF.  He volunteered to convey these questions to the appropriate people at Yahoo! and to initiate a conversation between Yahoo! and the Board, represented by Ms. Dorn and Ms. Harris.

**For Action:**  *Mr. Samway and Ms. Harris will work with Ms. Dorn and the legal representatives of Yahoo! to determine what amendments to the settlement agreement Yahoo! would be agreeable to and what amendments would be in the best interest of both LRF and Yahoo!.*

### 3.  Update on Progress of Laogai Museum

Mr. Wu updated the Board on the progress of the Laogai Museum, noting that a wheelchair lift had been delivered and that painting was about to begin on the exterior of the building.  Mr. Wu stated that John Raisian had agreed to return to him the Laogai materials that he had donated to the Hoover Institution's archives over the years, and that he had also arranged for more manpower to process the materials which will be archived and displayed in the museum. Mr. Wu still expects that the museum will open in late September.  Mr. Samway confirmed that

he will attend the grand opening, and the Jerry Yang and Michael Callahan would also attempt to be there.

Mr. Samway mentioned that he had been in contact with IT people at Yahoo!, per Mr. Wu's request, in order to determine what kind of equipment Yahoo! might be able to provide for the small theater that will be in the basement of the building. He will contact Mr. Donahoe in the future to coordinate the details.

### 4.   Discussion of Possible New Beneficiaries of Fund

Mr. Wu informed the Board that there were two people in China with whom LRF was experiencing difficulty in making contact – Mr. Li Zhi and Mr. Jiang Lijun.  Mr. Samway said that the China Democracy Party ("CDP") had hired a lawyer for their lawsuit on behalf of Li Zhi, but noted that it seemed that they had not talked to Li Zhi.  Mr. Wu added that the CDP wanted to sue Yahoo! and the PRC together, and that he did not expect the Court to side with them.  As for Mr. Jiang, Mr. Wu reminded the Board that he had been in talks with someone from Human Rights in China who was later fired.

Mr. Wu stated that LRF would continue contacting other people.  He brought to the attention of the Board the cases of three or four individuals involved in a democratic party in Sichuan Province who had recently been released from prison and had asked for assistance from the Fund.  Mr. Wu said he was inclined to provide them with a small amount of support, perhaps $3,000 each, even though their situation was not covered within the scope of the settlement agreement.  He asked the members of the Board for their opinions on this matter.

Ms. Liao agreed with Mr. Wu that these were special cases.  She also pointed out, however, that there were dozens of democratic party members who had been persecuted and that there were several people who had been imprisoned in the last three to four weeks for publishing articles online, especially after the earthquake in Sichuan.  She advised that some of these individuals also be considered for receiving assistance from the Fund.

Ms. Morillon and Mr. Samway expressed that they trusted in Mr. Wu's judgment, but stressed that these types of cases must be treated as exceptions and not as the rule. Ms. Morillon also informed Mr. Wu that within the next day she would be sending him a list of reporters and cyber-dissidents, including Mr. Huang Qi, for consideration as potential beneficiaries of the Fund.

### 5.   Administrative Matters

The minutes from the May 30, 2008 Board meeting, which were previously distributed to the Board members, were approved by all Board members present.

The next Board meeting was tentatively scheduled to be held in late July, with the exact date yet to be determined, sometime after Ms. Dorn has had an opportunity to meet with representatives from Yahoo! and formulate a new proposal for the Board.

There being no further business, and upon the motion duly made and seconded, it was

RESOLVED:  To adjourn.

The meeting was adjourned at approximately 3 p.m.

A true record.

_____
Kirk Donahoe, Recorder of Minutes

Attachment 8



7/17/2008

Dear Tienchi,

Thank you for the payment notice and for your hard work on all these important items.  I'm arranging payment by Yahoo! now, getting the appropriate internal approvals and signatures.  Pardon the delay, it's been a busy time at Yahoo!.  We should be able to wire the funds very shortly.

I also want to briefly re-emphasize two points, which we've all discussed at the YHRF Board meetings.

- We should agree on professional guidance to evaluate the tax implications the Fund will have on LRF and Yahoo!, and consider any sensible changes or restructurings to best protect everyone and also further the goal of the Fund.  At Harry and the Board's request, I've spoken with Susan Dorn, whom I understand represents the LRF Board.  We'll work with Susan and the YHRF Board to understand potential tax issues and also work to formalize the documents described in the YHRF Guidelines we all agreed in principle at our last in-person YHRF Board meeting.  This should include transparency mechanisms for the Board to have better visibility into the applications for assistance and payments from the Fund and also with respect to the overall expenses of the Fund.
- As a general principle, we need to use the Fund for its intended purposes regarding online dissent.  We have made certain limited exceptions, all for good purposes, including supporting some of the preparatory work for the LRF Museum.  We should be sure to keep focused on the Fund's purpose though.  One approach would be to seek Board approval for distribution of funds of more than a certain amount, say, $10,000.  We should also establish criteria for what types of projects the YHRF Board should consider and also decide if they're within the scope of the Fund.  Also, I believe LRF is reaching the limit on administrative expenses for the year, and we'd recommend LRF give an estimate of remaining expenses proposed to draw-down from the Fund.  Ideally we all agree that the Fund should be around for many years to come!

I'm in California early next week and then in Asia at the end of the week and into the following week.  I look forward to speaking with you and Harry at the end of July.  In any case, I'll have my cell phone, and you can always reach me, even while traveling.  Jerry, Callahan, and I want to thank you again for your partnership with Yahoo!, including through these challenging but important Fund issues.  I'll speak to you soon.

Sincerely,

Michael

Michael Samway
VP & Deputy General Counsel
Yahoo! Inc.

Yahoo! Business & Human Rights Program
http://ycorpblog.com/2008/05/07/business-and-human-rights/
http://yhoo.client.shareholder.com/press/human-rights-free-expression.cfm

Michael Samway / TC
7/17/2008

---

**From:** tienchi liao [mailto:tienchimartin@gmail.com]
**Sent:** Tuesday, July 15, 2008 1:09 PM
**To:** Michael Samway
**Cc:** harry w
**Subject:** Re: request for the fourth payment of the YHRF

- Show quoted text -

**Exhibit 0047**

Jeffrey Fiedler

↩Reply  ↩Reply to all  ➡Forward  Invite Michael to Gmail
**Your message has been sent.**

|  | to | show | 10:23 am (0 | ↩ Reply |
|---|---|---|---|---|
| tiench | Michael | detail | minutes | ↩ Reply to all ➡ Forward ↩ Print ↩ Add tienchi to Contacts list |
| i liao | , harry | s | ago) | ↩ Delete this message ↩ Report phishing ↩ Show original ↩ Message text garbled? |

Hi, Michael,

Thank you so much for arranging the fourth Yahoo payment. I do understand that Yahoo is extremly busy in the recent time.
The points you mentioned here are also our concern. We are happy that you talked to Ms. Susan Dorn in terms of the YHRF's tax situation and the guideline. We need to work out the documents soon so that in the next meeting the board can approve it.
As to the usage of the fund, the purpose, amount and the limitation, I think your thoughts is right and valuable. I will discuss with Harry. We may make some suggestions at the next meeting.
Wish you a good and sucessful trip.

Tienchi

- Show quoted text -

YHRF_PL-00008

11/28/2016                                    Gmail - Fwd: Resign from the Board

 **Gmail**                                    Yaxue Cao <yaxuecao@gmail.com>

---

## Fwd: Resign from the Board
2 messages

---

**tienchi liao <tienchimartin@gmail.com>**                    Mon, Nov 21, 2016 at 7:56 AM
To: Yaxue Cao <yaxuecao@gmail.com>

雅學，這是JeffFiedler的辭LRF board member的邮件。不到一个月，我回到DC，他就在理事会上帮着吴把我給踢出了理
事会，當时在場的是Jeff, Harry Wu, Lodi, Gyari,余茂春和我5名理事。Nicole Kempton是紀錄者。我從沒收到那次會議的
Minute.
Tienchi
--------- Forwarded message ---------
From: **Fiedler, Jeff** <JFiedler@iuoe.org>
Date: 2009-05-14 2:03 GMT+02:00
Subject: RE: Resign from the Board
To: "tienchimartin@gmail.com" <tienchimartin@gmail.com>


No – Harry does not listen to me and I am tired of yelling at him.  I am willing to help him but not as a director.

---

**From:** tienchi liao [mailto:liaotienchi@yahoo.com]
**Sent:** Wednesday, May 13, 2009 7:53 PM
**To:** Fiedler, Jeff
**Subject:** Re: Resign from the Board


Jeff,


Would you please reconsider your decision? I am afraid that your resign will have no shocking effect on Harry. He will
and can not change his character. Your vaccancy will  very likely be replaced by a yesman or woman, which can only
deteriorate the situation. At the moment you are almost the only person who could still have a little grip on Harry.


The past three weeks I am working in Germany, far away from the daily routine in DC office. I find out that I can work
more concentrated and much better. This option (work in Germany and not in DC) serves me fine, but I am not so well
informed with all the happenings in LRF. Maybe that is the reason why Harry sends me out?


Jeff, please please do not give up your responsibility to LRF. I will be back to DC in a week, may be we can meet and
discuss about an alternative.


Warm regards


Tienchi

---

YHRF_PL-00009

--- On **Wed, 5/13/09, Fiedler, Jeff <*JFiedler@iuoe.org*>** wrote:

> From: Fiedler, Jeff <JFiedler@iuoe.org>
> Subject: Resign from the Board
> To: "Harry Wu" <exchange2060@gmail.com>
> Cc: "tienchi liao" <liaotienchi@yahoo.com>, "lodigg@savetibet.org" <lodigg@savetibet.org>
> Date: Wednesday, May 13, 2009, 4:29 PM
>
> Harry:
>
>
> From what I understand is about the happen with the payment of victims by the Foundation without getting a release  or creating a Yahoo trust separate from the Foundation, confirms again that you refuse to listen to the advice of anyone on your staff or seek professional legal advice when it is necessary.

Not getting a release may be a good thing vis a vis the Foundation since to do so would endanger the LRF's legal status as a non-profit.  Setting up a separate trust is probably the legally proper thing to do even if it results in less money for the LRF and complicates the situation of the current victims. The root of all of these problems is the agreement you signed with Yahoo in the first place which contained the clause I and others told you would give you problems.  Never should the LRF be legally responsible for the actions of Yahoo or any other company.

The Foundation must be run strictly unemotionally and professionally.  But you are managing it more as a personal fiefdom than a professional organization, which puts all of the Directors at risk and abuses their friendship.

I am not exactly sure what is happening with the two latest victims, but it seems you are the only one who actually has any knowledge.  The Board has not approved any action.  You may be within your rights as the Executive Director, but that does not mean that any of us have to stand by while you create serious problems for the Foundation that may be brought out in an IRS audit which is surely to occur given the amounts of money in the Foundation's various accounts.

As you know, I have never thought that your management of the Foundation was motivated at all by personal gain.  That being said, it is fair to observe that you nearly always believe you are right and everyone else is wrong, and that your vision and view is the only one that should determine Foundation decisions.

You have not listened to my counsel for a number of years, certainly not on the Yahoo matter.  Yes, you sometimes ask my opinion, but then ignore  my advice and do what you want any way.  My contribution to the LRF is more window-dressing than anything else.  Therefore, as you worsen an already bad situation, I have no choice but to resign.  I hereby do so.


Sincerely,


Jeff


Jeffrey L. Fiedler

YHRF_PL-00010

Attachment 9

# MINUTES

## Meeting of the Advisory Board of the Yahoo! Human Rights Fund

### August 27, 2008

A meeting of the Advisory Board of the Yahoo! Human Rights Fund (the "Fund") was held on Wednesday, August 27, 2008, beginning at approximately 10:00 am EST.

Harry Wu, Tienchi Liao, Theresa Harris, Michael Samway, Lucie Morillon, being all the members of the Advisory Board, were present and acting throughout the meeting. Also present by invitation was Kirk Donahoe. Mr. Wu chaired the meeting. Mr. Donahoe recorded the minutes.

The focus of the meeting was to discuss the obligations of the Fund to support certain claimants whose cases involved Yahoo! and who present a particular challenge to the Fund. The meeting also served to update the Board on activities currently being supported by the Fund, primarily the Laogai Museum and humanitarian assistance, as well as projects which the Laogai Research Foundation ("LRF") is planning to support with the Fund in the future.

The meeting was called to order by Mr. Wu. The following topics were discussed:

1. **Update on Progress of Laogai Museum**

Mr. Wu informed the Board that work on the Laogai Museum was expected to be complete in mid-October. There are currently five people working full time and four people working part-time on the museum. The museum will include a film viewing area which has already been furnished with a large screen television and will present interviews recorded by LRF of 40-60 dissidents talking about their personal experiences in the Laogai from 1949 onward. Additionally, the museum will also feature digital screens that will display information on numerous Laogai prisoners. Mr. Wu is planning to hold a grand opening of the museum soon after work is complete and will schedule it at a time that is convenient for House Speaker Pelosi to attend.

Mr. Wu reminded the Board that even if China were to become a democracy the next day, the world would still need to be concerned about its history regarding the Laogai. While some 25 million people and 12 million people were estimated to have been imprisoned in the Gulag and in Hitler's concentration camps, respectively, the number of those that have been imprisoned within the Laogai is more than those numbers combined.

The other members of the Board all offered to assist Mr. Wu in preparing for the opening of the Laogai Museum in whatever way they could.

2. **Other Organizations LRF Would Like the Fund to Support**

Mr. Wu apprised the Board of his plans to offer financial support from the Fund to several other organizations. They include: the China Human Rights Foundation, which has been

CONFIDENTIAL

nominating three persons (one each from mainland China, Taiwan, and the U.S.) annually to receive an award of $2,000 each since 1991; the Victims of Communism Memorial Foundation, which is planning to construct a virtual museum next year, followed by a physical museum in the next 5-10 years; and Freedom House, which receives 70% of its budget from the State Dept. but has no program for China, focusing instead mostly on Russia and Europe. With regard to the latter, Mr. Wu further mentioned that he would like to assist Freedom House in undertaking a program to commemorate the 20th anniversary of the Tiananmen Square massacre, which will take place next year. Mr. Wu has not entered into any formal agreement with Freedom House as of yet and intends to present any such agreements to the Board for review.

### 3. Review of Humanitarian Support Distributed by Fund

Mr. Wu distributed a chart listing all the beneficiaries of humanitarian support from the Fund to date. The chart indicated that 26 victims had been provided assistance so far, with the total amount of financial assistance disbursed equaling $120,034. Mr. Wu observed that not many of the cases supported thus far involved internet issues; some involved persons with connections to the China Democracy Party.

Mr. Wu also updated the Board on the cases of the two Chinese dissidents who LRF had helped to escape to Thailand, each accompanied by a family member, and receive refugee status from the United Nations High Commissioner for Refugees. The two men, along with another man who was already granted asylum in Canada several years ago, played a large role in the Tiananmen Square demonstrations of 1989 and spent more than 10 years in prison as a result. Mr. Wu feels very confident that the State Dept. will arrange to bring these four individuals to the U.S. soon.

### 4. Discussion of Challenges and Obligations Regarding Cases Involving Yahoo!

Mr. Wu noted that of the four people whose verdicts clearly mention Yahoo!, two have already been compensated: Shi Tao and Wang Xiaoning. Gao Qinsheng and Yu Ling, the mother and wife of these two men, respectively, have completely withdrawn their compensation from the Fund's account, but Yu Ling has generously donated one million dollars to LRF in support of its humanitarian work.

The other two individuals are Jiang Lijun and Li Zhi. Mr. Wu described how LRF contacted Jiang Lijun in March and, though he was initially pleased at the prospect of receiving support from the Fund, having even sent LRF authorization papers and other materials, he later asked Mr. Wu to end his involvement in his case and not to contact him regarding his case again. LRF later learned that he was cooperating with Zheng Cunzhu, who was suing Yahoo! in California, but it appeared that Li Zhi did not want to be represented by him either. Another person named in the lawsuit, Guo Quan, a professor from Nanjing, is reported to have removed his name from the suit, but Zheng Cunzhu has indicated that another well-known dissident will join the suit.

As for Li Zhi, Mr. Wu explained that LRF initially worked with two sources in an attempt to contact him but was unsuccessful. Later, however, LRF became aware that another beneficiary of the Fund, Deng Yongliang, had a connection to Li Zhi and would be willing to

2

YANG-0000179

contact him on behalf of LRF. After doing so, LRF learned that Li Zhi had not divorced his wife as previously thought, and subsequently asked Deng Yongliang to transfer $3,000 to her for financial assistance. However, Li Zhi's wife rejected the money, claiming they did not want to cause any trouble for themselves. Mr. Wu opened the floor for discussion regarding these cases.

Mr. Wu also brought to the Board's attention the case of ████ which similarly served to complicate the Fund's work. ████ was sentenced to four years in prison for his role as a student leader in Anhui Province during the Tiananmen Square demonstrations of 1989. He claims that information concerning Yahoo! was brought up during his interrogation, but there was no mention of Yahoo! in his verdict. He arrived in the U.S. this past June and, after approaching LRF, he was offered $10,000 in support from the Fund. However, ████ rejected the offer and then proceeded to publicize through a web site allegations that the offer was meant to secure an assurance from him that he would not sue Yahoo. Mr. Wu responded on that same web site, stating that LRF has never attached any such conditions to its humanitarian assistance and has never asked any of the beneficiaries to do anything regarding Yahoo! Later, some individuals contacted Mr. Wu on behalf of ████ and again sought to acquire financial assistance for him. Mr. Wu declined to do so, explaining that ████ had already rejected his offer of support.

Mr. Samway informed the Board that representatives of Jiang Lijun and Li Zhi, who appear to be in direct contact with the two individuals, have approached Yahoo! independently and asked for compensation amounting to multiple millions of dollars. While the representatives have not threatened to sue Yahoo!, it was made clear that that was an option. Mr. Samway expressed that Yahoo!'s primary objective was to do the right thing, but also noted that, even though he feels the legal cases of these two individuals were not very strong, Yahoo! obviously has an interest in not being sued. Moreover, Mr. Samway conveyed Yahoo!'s sense that resolving these cases would clearly be consistent with the objectives and the original intent of the Fund and so they should not be treated separately. As such, it was Mr. Samway's opinion that these cases should be directed to LRF and the Advisory Board should consider providing an appropriate amount of financial support that takes into consideration the sustainability of the Fund.

Ms. Liao said she believed more cases would follow those of Jiang Lijun, Li Zhi, and Tao Jun, wherein valid claimants are opting not to accept assistance from the Fund and instead choosing to pursue higher amounts of compensation from Yahoo! directly. She stated that the stance Yahoo! took with the current cases would have very important consequences – if Yahoo! showed too much regret it would be inundated with similar claims against it in the future. Ms. Liao suggested that Yahoo! firmly reject all requests for compensation and direct all such cases to the Fund.

Ms. Morillon agreed with the sentiment that these individuals most likely wanted more money. Noting that the Fund was created to address this issue, she inquired about the possibility of offering more than ten to twenty thousand dollars. She also asked if the Olympics could be having an effect, to which Mr. Wu and Ms. Liao replied that they certainly did.

Ms. Harris questioned whether these cases might indicate that the Fund was not achieving its purpose. She asserted that these were individuals who should be benefiting from the Fund,

CONFIDENTIAL                                                    YANG-0000180

and queried whether there could be other factors that would explain why these individuals were rejecting the Fund's support, perhaps including a fear of repercussions by the Chinese government for cooperating with Mr. Wu. She further proposed that if such a response was common then the Board should seriously review the manner in which the Fund is operating. In response, Ms. Liao reiterated her opinion that money, and not a fear of working with Mr. Wu, was primarily responsible for motivating these individuals to reject the Fund's support. Mr. Samway added that they were most likely receiving advice from a number of different people, and that political considerations within the human rights community clearly had some influence. Ms. Harris stated that the solution to the political issues was to make the operation of the Fund more transparent to the public.

Regarding the legal issues pertaining to the relationship between the Fund and Yahoo!, there was uncertainty and disagreement among the members of the Board as to what would be an appropriate role for the Fund to play in addressing the claims of these individuals. Mr. Wu indicated that he was strongly opposed to the notion that LRF would in any way represent Yahoo! from a legal standpoint and stated that under no circumstances would he be willing to instruct beneficiaries of the Fund not to sue Yahoo!. To do so, he said, would jeopardize LRF's non-profit status, a claim which Mr. Samway argued was not necessarily true. Mr. Wu also expressed that he was concerned about supporting individuals who were directed to LRF by Yahoo! because he did not want to create the perception that he was advising Yahoo! on law suits or acting under their instructions. Moreover, he proposed that Mr. Samway's membership in the Board not be made known to the public as it would demonstrate a connection between Yahoo! and LRF.

Mr. Samway assured Mr. Wu that Yahoo! did not want to instruct LRF how to act on humanitarian cases. As Mr. Wu is the expert on human rights, he explained, it would be ideal for LRF to deal with claimants directly rather than placing Yahoo! in the middle. However, Mr. Samway stated that Yahoo! would like to establish some form of legal protection for itself from those who benefit from the Fund and that he would consult Susan Dorn to determine whether or not this was possible.

Ms. Liao concurred with Mr. Wu in that LRF could not legally ask beneficiaries to refrain from suing Yahoo!; however, she noted that common sense would seem to dictate that they should not do so. Ms. Harris agreed that as long as the amount of support was sufficient it should provide at least a moral argument against suing Yahoo!, however the admissibility of such an argument in a court is somewhat complicated and unclear. Ms. Harris further explained that the legal problems have arisen because the original lawsuit against Yahoo! wasn't set up like a class-action lawsuit. She suggested that the best way to deal with these issues might be to give money to a third party to disburse as compensation and that perhaps the Board should look into setting up something like a LLC to do so. Ms. Harris also agreed that anyone, including Yahoo!, should be able to recommend cases to LRF and asked that the Advisory Board consider playing a larger role in determining compensation.

*For Action:  Mr. Samway and Ms. Harris will work with Ms. Dorn and the representatives of Yahoo! to determine if and how the Fund can function so as to offer support to individuals with claims against Yahoo! while (1) affording some form of legal protection to Yahoo! from said individuals and (2) protecting the non-profit status of LRF.  Ultimately,*

4

*documentation, including operational guidelines, should be drafted that reflects whatever consensus is reached.*

**5.  Administrative Matters**

Mr. Wu regretted that he could not provide an updated financial report to the Board at that time, owing to the fact that the accountant managing the Fund was on vacation.  He offered to send the Board members a report the next week.

The minutes from the June 24, 2008 Board meeting, which were previously distributed to the Board members, were approved by all Board members present.

The next Board meeting was tentatively scheduled to be held on October 15th at 10:00 am.

There being no further business, and upon the motion duly made and seconded, it was

RESOLVED:  To adjourn.

The meeting was adjourned at approximately 12:00 p.m.

A true record.

_____
Kirk Donahoe, Recorder of Minutes

CONFIDENTIAL

YANG-0000182

# Attachment #"

EXHIBIT 6

### MAY __, 2009 AMENDMENT
### TO CONFIDENTIAL SETTLEMENT, RELEASE,
### AND FOUNDATION AGREEMENT

Yahoo! Inc. ("Yahoo!"), Harry Wu and Laogai Research Foundation ("Foundation") parties to the November 9, 2008 Confidential Settlement and Foundation Agreement ("Agreement") between Yahoo!, Inc. and Yahoo! Hong Kong Ltd., on the one hand, and Wang Xiaoning, Shi Tao, Yu Ling, Gao Qinsheng, Harry Wu, and Laogai Research Foundation, on the other hand (collectively, the "Parties"), hereby enter into this May __, 2009, Amendment to that Agreement.  They do so in consideration of the promises set forth in this Amendment and for other consideration, receipt and sufficiency of which is hereby acknowledged.

This Amendment is entered into with reference to the following facts:  (1)  Yahoo!, Inc. has made all payments to the Foundation required by Section II (C) of the Agreement. (2) Pursuant to the Agreement, all such funds were to be maintained by the Foundation in a YHR Fund.  (3)  The Parties wish to relocate all monies remaining in the YHR Fund.  (4) The Foundation represents that it will transfer all funds remaining in the YHR Fund (the "Funds") pursuant to the terms of this Amendment.

The Parties therefore agree as follows:

1.  Upon the signing of this Amendment, the Foundation shall: (a)  transfer $3,550,000 (three million) of the Funds to The Yahoo! Irrevocable Human Rights Trust 2009 ("Trust") created by the May _, 2009 Agreement and Declaration of Trust between Yahoo, Inc., Harry Wu and Michael Samway ("Trust Agreement"); and (b) transfer the remaining funds to a newly established 501(c)(3) organization with the purpose of supporting the activities of the Foundation in accordance with the terms of the Agreement.

2.  All such Funds shall be subject to, and shall only be used in accordance with, the provisions and restrictions of Section II (C)(2) of the Agreement, and all funds transferred to the Trust shall also be subject to, and shall only be used in accordance with, the Trust Agreement.

3.  Upon the termination of the Trust, any remaining funds in the Trust shall be distributed in accordance with the provisions of the Trust Agreement.

4.  All of the "Additional and Miscellaneous Provisions" in Section IV of the Agreement shall also apply to this Amendment.

1

**EXHIBIT 3**
**128**

June 12 **IN WITNESS WHEREOF**, the Parties hereby execute this Agreement, effective as of ~~May~~, 2009.


HARRY WU                          LAOGAI RESEARCH FOUNDATION



_Harry Wu_                        By _Harry Wu_

                                  Its _Executive Director_



YAHOO!, INC.                      District of Columbia : SS
                                  Subscribed and Sworn to before me, in my presence,
                                  this _12th_ day of _June_    _2009_

By _Michael A. Samway_            _Kathern M. Thomson_
                                  Notary Public, D.C.
                                  My commission expires _Oct. 14, 2013_



                                  KATHERN M. THOMSON
                                  Notary Public, District of Columbia
                                  My Commission Expires October 14, 2013

2

**EXHIBIT 3**
**129**