## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HE DEPU *et al.*,

        *Plaintiffs*,

    v.

OATH HOLDINGS, INC. *et al.*,

        *Defendants*.

Civil Action No. 17-635 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

In 2007, two Chinese dissidents, Wang Xiaoning and Shi Tao, and Wang's wife, Yu

Ling, sued Yahoo for allegedly abetting Wang and Shi's prosecution and imprisonment in China

by disclosing their Yahoo email account information to the Chinese government.  Yahoo agreed

to settle the case (1) by paying $3.2 million each to the Wang family and the Shi family and (2)

by paying $17.3 million to the Laogai Research Foundation ("Foundation"), a nonprofit

dedicated to educating the public about the Chinese prison system, to establish the Yahoo

Human Rights Fund ("YHR Fund").  With respect to the latter, the settlement agreement

required that the Foundation maintain those funds separately from its other funds and stipulated

that the funds could be used only for three purposes: (1) to provide humanitarian and legal

assistance to Chinese dissidents who had been imprisoned for expressing their views through

Yahoo and other media; (2) to resolve claims against Yahoo brought by those and other

dissidents; and (3) subject to a $1 million annual cap, to cover the Foundation's operating

expenses and to pay for its educational work conducted in support of human rights.

Ten years later, Plaintiffs brought this suit against Yahoo, the Foundation, the Estate of

the Foundation's former executive director Harry Wu, the Laogai Human Rights Organization,

former Yahoo employees Ronald Bell and Michael Callahan, and other "Doe Defendants." Plaintiffs are six Chinese dissidents who either received some money from the YHR Fund or who applied for funding but were denied.  The crux of their claim is that the settlement agreement created a charitable trust; Defendants are its trustees; and Defendants violated their fiduciary duties by improperly depleting the trust's assets and, ultimately, terminating the trust's humanitarian and legal assistance program altogether.

This Court initially dismissed Plaintiffs' case for failure plausibly to allege that the settlement agreement established a charitable trust or that they have standing to sue under D.C. law.  The D.C. Circuit reversed and remanded, and, on remand, three sets of Defendants filed renewed motions to dismiss, which the Court granted in part and denied in part.  At the parties' request, the Court then set a schedule for addressing whether the settlement agreement created a charitable trust before turning to the remaining issues posed by the litigation.  That schedule culminated with an evidentiary hearing held on October 29, 2021.

Based on the evidence presented at the hearing and the parties' briefs, the Court finds that the settlement agreement created a charitable trust.

## I. BACKGROUND

Plaintiffs filed this lawsuit on April 11, 2017, invoking the Court's diversity jurisdiction. Dkt. 1.  Their complaint named seven defendants—Yahoo, Inc. ("Yahoo"), the Estate of Harry Wu, the Foundation, the Laogai Human Rights Organization, the YHR Fund, Yahoo's former general counsel Michael Callahan, and his successor, Ronald Bell—in addition to twenty unknown "Doe Defendants" who were employees or agents of the named defendants.  Dkt. 26 at 11–13 (1st Am. Compl. ¶¶ 19–27).  Among other things, Plaintiffs alleged that the settlement agreement established a trust for purposes of distributing the portions of the YHR Fund that were

set aside for humanitarian purposes and that the Defendants, as trustees, breached their fiduciary duties by permitting the depletion of the trust's assets for purposes unrelated to its humanitarian purpose.  *Id.* at 41–43 (1st Am. Compl. ¶¶ 125–31).  Plaintiffs also asserted claims for civil conspiracy against all Defendants.[1]  Dkt. 26 at 45–46 (1st Am. Compl. ¶¶ 146–49).  In response, Defendants filed four separate motions to dismiss.  *See* Dkt. 27 (Foundation); Dkt. 28 (Laogai Human Rights Organization); Dkt. 29 (Yahoo, Bell, and Callahan); Dkt. 30 (Wu Estate).[2]

On March 30, 2018, this Court (Bates, J.) granted the motions to dismiss.  *He Depu v. Yahoo!, Inc.*, 306 F. Supp. 3d 181, 185 (D.D.C. 2018) ("*Depu I*").  The Court concluded that Plaintiffs "ha[d] not plausibly alleged that Yahoo established a charitable trust in 2007 and, even if they had, they lack[ed] standing to bring these claims."  *Id.*  Plaintiffs then moved to alter or amend the Court's judgment and for leave to amend their complaint, and the Court rejected both requests.  *He Depu v. Yahoo!, Inc.*, 334 F. Supp. 3d 315, 317 (D.D.C. 2018) ("*Depu II*").

Plaintiffs appealed and, on February 28, 2020, the D.C. Circuit reversed.  *He Depu v. Yahoo!, Inc.*, 950 F.3d 897, 908 (D.C. Cir. 2020) ("*Depu III*").  The D.C. Circuit first held that Plaintiffs had plausibly alleged that the 2007 settlement agreement established a charitable trust.  *Id.* at 901–05.  As the court explained, the elements of a trust under D.C. law are "1) a trustee, who holds the trust property and is subject to equitable duties to deal with it for the benefit of another; 2) a beneficiary, to whom the trustee owes such duties; [and] 3) the trust property, which is held by the trustee for the beneficiary."  *Id.* at 901 (alteration in original) (quoting

---

[1] Plaintiffs brought other claims, including claims sounding in tort and contract law.  Because those claims were dismissed in 2018 and because Plaintiffs did not appeal their dismissal, the Court's recitation of the procedural history omits reference to those claims.

[2] The parties refer in their briefs to the Laogai Research Foundation and the Laogai Human Rights Organization collectively as the "Laogai Defendants," and Yahoo, Bell, and Callahan collectively as the "Yahoo Defendants."  *See, e.g.*, Dkt. 122 at 1; Dkt. 123-1 at 1.  The Court adopts this shorthand when referring to a distinct group of defendants.

*Cabaniss v. Cabaniss*, 464 A.2d 87, 91 (D.C. 1983)).  Most importantly, the law requires "proof of the settlor's intention to create a trust."  *Id.* (quoting *Duggan v. Keto*, 554 A.2d 1126, 1133 (D.C. 1989)).  For a charitable trust, like the one alleged by Plaintiffs, "the obligation of the trustee is to apply the trust res for some form of public benefit."  *Id.* (quoting *Hooker v. Edes Home*, 579 A.2d 608, 611 (D.C. 1990)).

Looking first to the text of the 2007 settlement agreement, the D.C. Circuit concluded that the agreement "plausibly identifies . . . a trustee (the Foundation), trust property ($17.3 million), and a charitable purpose ('humanitarian and legal assistance' to persons meeting specified criteria)."  *Id.* at 902.  The court further noted that the settlement agreement directed "that Yahoo's payments to the Foundation be 'made in trust'" and that the settlement agreement "subject[ed] the Foundation's handling of the Fund to trust-like restrictions" using "imperative language" like "shall," "shall not," and "only" in describing how the money in the Fund could be spent.  *Id.* (internal quotation marks omitted).  The D.C. Circuit also emphasized that the settlement barred the Foundation from spending more than $1 million per year on its operating expenses and required regular reports on the Foundation's activities.  *Id.* at 903.  "All of this together," the court explained, "plausibly signals the hallmark of a charitable trust: 'a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for a charitable purpose.'"  *Id.* (quoting Restatement (Second) of Trusts § 348 (Am. L. Inst. 1959)).  Finally, the D.C. Circuit observed that "circumstances surrounding the creation of the Fund" were "probative of trust intent," including Yahoo's public statements promoting the Fund's humanitarian purpose.  *Id.*

The D.C. Circuit also rejected various counterarguments pressed by Defendants.  Most notably, it rejected Defendants' argument that the terms of the settlement agreement permitted

the Foundation to deplete the YHR Fund, if necessary, to settle claims against Yahoo, leaving

nothing for the Fund's humanitarian purpose.  That argument did not move the court because

"trustees must act 'impartially in . . . [the distribution of] trust property,' paying 'due regard' to

the 'respective interests' of each."  *Id.* at 904 (alteration in original) (quoting D.C. Code § 19-

1308.03).  The D.C. Circuit also rejected Defendants' argument that a 2009 amendment to the

settlement agreement—which established the Yahoo Irrevocable Human Rights Trust—showed

that Defendants knew how to create a trust when they wanted to do so.  *Id.* at 905.  As the court

explained, one can infer little, if anything, about "Yahoo's intent in executing the 2007

[s]ettlement [a]greement" from the fact that "*two years later* it used more formal documents to

create a different trust."  *Id.* (emphasis added).

Having concluded that Plaintiffs had plausibly alleged that the settlement agreement

established a charitable trust, the D.C. Circuit also held that Plaintiffs had plausibly alleged that

they have standing to enforce that trust under D.C. law.  *Id.* at 905–08.  Only those with "a

'special interest' in continued performance of the trust distinguishable from that of the public at

large" may sue to enforce a charitable trust.  *Id.* (quoting *Fam. Fed'n for World Peace v. Hyun

Jin Moon*, 129 A.3d 234, 244 (D.C. 2015)).  To satisfy this requirement, the plaintiff must satisfy

two conditions: first, the action must "challenge an 'extraordinary measure threatening the

existence of the trust,' not just an 'ordinary exercise of discretion' committed to the trustees;"

and, second, "the plaintiff[] [must] belong to a class of potential beneficiaries that is 'sharply

defined' and 'limited in number.'"  *Id.* at 906 (quoting *Hooker*, 579 A.2d at 614–15).  Here, the

D.C. Circuit held that Plaintiffs had plausibly alleged that they satisfied both requirements.

The D.C. Circuit, accordingly, reversed and remanded for further proceedings.  *Id.* at 908.

On remand, Plaintiffs filed a second amended complaint.  Dkt. 64 (2d Am. Compl.).  This complaint names the same Defendants, except that Oath Holdings, Inc., a subsidiary of Verizon, is substituted for Yahoo as a Defendant.[3]  *Id.* at 12 (2d Am. Compl. ¶ 16).  The Second Amended Complaint includes six counts.  The first four are substantially the same claims for breach and modification of trust set forth in Plaintiffs' earlier complaints.  *Id.* at 56–60 (2d Am. Compl. ¶¶ 170–88).  The fifth count realleges a civil conspiracy, *id.* at 60–61 (2d Am. Compl. ¶¶ 189–92), and the sixth count seeks restitution against the Doe Defendants on the ground that they allegedly received trust property despite knowledge of the breach, *id.* at 61–62 (2d Am. Compl. ¶¶ 193–96).

Defendants again moved to dismiss.  *See* Dkt. 65, Dkt. 67; Dkt. 69.  On March 22, 2021, the Court granted those motions in part and denied them in part.  *He Depu v. Oath Holdings, Inc.*, 531 F. Supp. 3d 219, 225 (D.D.C. 2021) ("*Depu IV*").  Specifically, the Court (1) dismissed Count II—which sought to modify the trust by removing Callahan, Bell, and the Wu Estate as trustees—as moot, and (2) dismissed Plaintiffs' civil conspiracy claims (Count V) against the Laogai Defendants and the Wu Estate for failure to state a claim.  *Id.* at 247.  In all other respects, the Court denied the motions to dismiss.  *Id.*

In the wake of the Court's ruling, the parties proposed, and the Court adopted, a discovery schedule.  *See* Dkt. 97.  But, on May 25, 2021, Plaintiffs filed a partial motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) on the ground that the D.C. Circuit's opinion "establish[ed] the existence of an irrevocable charitable trust."  Dkt. 103-1 at 5.  Upon consideration of Plaintiffs' motion, the Court ordered Plaintiffs to address

---

[3] Plaintiffs also added greater specificity to their allegations directed at the Doe Defendants, who Plaintiffs intend to name after discovery.  *Id.* at 14–15 (2d Am. Compl. ¶¶ 28–30); *see also* Dkt. 93 at 19.

whether Federal Rule of Civil Procedure 12(c) provides a vehicle for resolution of a discrete legal issue—such as whether the settlement agreement established a charitable trust—when resolution of that legal issue would not, standing alone, dispose of any claim asserted in the litigation.  *See* Min. Order (May 26, 2021).  In response, Plaintiffs conceded that "there is no controlling authority on [the] issue," Dkt. 104 at 1, and noted that, "[o]utside this district, courts directly considering the question have split," *id.* at 2.

The Court then held a status conference on Plaintiffs' motion.  *See* Min. Entry (June 2, 2021).  The Court expressed doubt that it could resolve the question whether the settlement agreement established a trust in the context of Plaintiffs' motion for judgment on the pleadings (or a motion for summary judgment) because Plaintiffs were not seeking the entry of judgment on any claim.  June 6, 2021 Hrg. Tr. (Rough at 1–2).  In response, counsel for Plaintiffs stated that they were indifferent with respect to the proper procedural vehicle but that, however possible, they wanted to obtain an early decision on "the existence of a trust."  *Id.* at 5.  The parties agreed to confer regarding how the case should proceed, *id.* at 18, and the Court denied the motion for judgment on the pleadings without prejudice, *see* Min. Order (June 2, 2021).

On June 9, 2021, the parties submitted a joint status report requesting that the Court "schedule an evidentiary hearing" on or after October 7, 2021 "to adjudicate the question whether the Settlement Agreement . . . created a charitable trust within the meaning of the law of the District of Columbia."  Dkt. 105 at 1–2.  The parties further proposed a focused schedule for discovery on the "[t]rust [i]ssue," to begin on June 25, 2021, and to continue on a "rolling basis." *Id.*  In addition, Plaintiffs notified the Court of their intention to file a motion for preliminary injunction, "seeking to preclude the [Foundation] and the [Laogai Human Rights Organization] from further spending funds it obtained from the Settlement Agreement," except for making cash

payments to Chinese dissidents and their families.  *Id.* at 2.  In light of the parties' joint status

report, the Court ordered focused discovery "on the question of whether the Settlement

Agreement . . . created a charitable trust within the meaning of D.C. law;" approved the parties'

proposed briefing schedule; and scheduled an evidentiary hearing for October 29, 2021.  Min.

Order (June 10, 2021).  The Court stayed "all discovery and discovery-related deadlines

unrelated to the question of whether the settlement agreement created a trust."  *Id.*

On July 2, 2021, Plaintiffs moved for a preliminary injunction, arguing that "absent an

injunction requiring [the Laogai Defendants] to spend [YHR Fund] assets only on the trust's

humanitarian purpose, a post-litigation judgment requiring them to pay damages to that purpose

is likely to be an empty victory."  Dkt. 108-1 at 28.  The Court held a hearing on that motion on

September 8, 2021, *see* Min. Order (Sept. 8, 2021), and denied the motion on September 27,

2021, *see He Depu v. Oath Holdings, Inc*., No. 17-cv-635, 2021 WL 4399528, at *1 (D.D.C.

Sept. 27, 2021) ("*Depu V*").  Among other things, the Court concluded that Plaintiffs "failed to

carry their burden of demonstrating that they [would] suffer imminent and irreparable injury in

the absence of preliminary injunctive relief," *id.* at *3–4; failed to show that the balance of

hardships weighed in favor of granting preliminary relief; *id.* at *5; and failed to demonstrate that

they are likely to succeed on merits, *id.*  In particular, the Court was unpersuaded that a marginal

diminution in the value of the YHR Fund justified preliminary relief, particularly given the

burden an injunction would have placed on the ability of the Laogai Defendants to litigate the

case and the exceedingly thin evidentiary showing that Plaintiffs offered on the merits.  *Id.*

On October 29, 2021, the Court held an evidentiary hearing on the question whether the

2007 settlement agreement created a charitable trust.  In advance of the hearing, the parties

submitted trial briefs, Dkt. 121; Dkt. 122; Dkt. 123; Dkt. 124, and responses, Dkt. 126; Dkt. 127;

Dkt. 128; Dkt. 129.  At the hearing, the Court heard testimony from Defendant Michael

Callahan, who served as Yahoo's general counsel from August 2003 to July 2012 and also

served on the Board of the Laogai Human Rights Organization, and Jeffrey Fiedler, who co-

founded the Foundation in 1992.  *See* Dkt. 135 at 39 (Callahan); *id.* at 111 (Fiedler); Dkt. 121-2

at 10 (Callahan Dep. 9:15–11:8).  The parties also introduced more than eighty exhibits, *see* Dkt.

135 at 3–7, including deposition testimony from Jerry Yang, Yahoo's co-founder and former

CEO, *see* Pl. Ex. 1; Michael Samway, former Yahoo deputy general counsel and YHR Fund

Board member, *see* Pl. Ex. 3; and Theresa Harris, a former YHR Fund Board member, *see* Pl.

Ex. 4.

## II.  FINDINGS OF FACT

Based on the entire record before the Court, including the evidence and testimony offered

at the October 29, 2021 hearing, the Court makes the following factual findings:

Yahoo is a global web services provider.  Founded by Jerry Yang and David Filo in 1995,

the company quickly became "one of the major players in the dot-com frenzy of the late 1990s."

*Yahoo! American company*, Britannica, https://www.britannica.com/topic/Yahoo-Inc (last visited

May 11, 2022); *see also* Dkt. 123-1 at 20 (Yang Decl. ¶ 1).  In 2007, Yang became Yahoo's

Chief Executive Officer.  *Id.*  That same year, two imprisoned Chinese dissidents, Wang

Xiaoning and Shi Tao, and Wang's wife, Yu Ling, sued Yahoo, alleging that the company

abetted their arrest and imprisonment in China.  *See generally* Complaint, *Wang v. Yahoo! Inc.*,

No. 07-cv-2151, 2007 WL 1230526 (N.D. Cal. Apr. 18, 2007); Amended Complaint, *Wang v.

Yahoo! Inc.*, No. 07-cv-2151, 2007 WL 1908759 (N.D. Cal. May 19, 2007); *see also Depu III*,

950 F.3d at 899.  According to the *Wang* plaintiffs, Yahoo's Chinese subsidiary turned Wang

and Shi's private email records and other information over to Chinese authorities after they

expressed pro-democracy views, and Yahoo's actions aided and abetted their arrest, imprisonment, and torture.  Amended Complaint at 1, *Wang v. Yahoo! Inc.*, No. 07-cv-2151, 2007 WL 1908759.

After the lawsuit was filed, Yang and Yahoo's general counsel at the time, Michael Callahan, were called to testify before the U.S. House Committee on Foreign Affairs about assistance that Yahoo provided to the Chinese government, which the Chinese government used to oppress dissidents.  Dkt. 123-1 at 4, 6 (Yang Dep. 12:20–21, 14:10-18); *Yahoo! Inc.'s Provision of False Information to Congress: Hearing Before the H. Comm. on Foreign Affs.*, 110th Cong. 16, 22 (2007) (hereinafter "2007 House Hearing").  Yu Ling and Shi Tao's mother, Gao Qinsheng, attended the hearing with Harry Wu, executive director of the Laogai Research Foundation in Washington, D.C.  Dkt. 123-1 at 4–5 (Yang Dep. 12:23–13:9); *see also* 2007 House Hearing at 7, 12.  The Laogai Research Foundation is a non-profit organization that Wu established to educate the public about China's "exploitative prison system," also known as the "Laogai."  Dkt. 122-1 at 2 (Fiedler Decl. ¶ 3).  Wu himself had been imprisoned for eighteen years in the Laogai system.  *Id.*

During the congressional hearing, Members of Congress criticized Yahoo for failing to provide relief to the *Wang* plaintiffs and for its activities in China more broadly.  Committee Chairman Tom Lantos called the company's behavior "outrageous" and admonished Yang and Callahan that, "while technologically and financially you are giants, morally you are pygmies."  2007 House Hearing at 50 (statement of Rep. Lantos).  Some committee members urged Yang and Callahan to settle with the *Wang* plaintiffs as soon as possible.  *See*, *e.g.*, *id.* at 39 (statement of Rep. Smith) ("So settle [the case] and settle it, I would say, generously in their favor.  That would be one way you could convey to the committee and I think to your shareholders, the

American people, and especially to the victims that you . . . recognize that there are true victims because of this complicity.").  At the same time, the committee members praised Wu as "one of freedom's heroes in the world."  *Id.* at 12 (statement of Rep. Pence).

After the hearing, Yang met with Wu, Gao, and Yu—as members of the committee had urged.  Dkt. 123-1 at 4–5 (Yang Dep. 12:20–13:20); 2007 House Hearing at 39 (statement of Rep. Smith); *id.* at 56 (statement of Rep. Delahunt).  Yang had never met Wu before.  Dkt. 123-1 at 5 (Yang Dep. 13:10–23).  The meeting was short but emotional for all involved, including Yang.  *Id.* at 7 (Yang Dep. 15:13–15); *id.* at 8 (Yang Dep. 16:5–10).  Before the meeting's end, Yang told Wu that he would like to reach a negotiated resolution with the *Wang* Plaintiffs and to "do[] something to support human rights efforts more broadly."  *Id.* at 9 (Yang Dep. 17:11–22).  There was no specific discussion of creating a fund during that meeting.  *Id.* (Yang Dep. 17:19).

The *Wang* plaintiffs assigned power of attorney to Wu, who then engaged in discussions with Yang about a possible settlement agreement.  Dkt. 123-1 at 20 (Yang Decl. ¶ 3).  The YHR Fund was the product of those discussions.  *See* Pl. Ex. 23 at 1–3.  On November 9, 2007, Yahoo, the *Wang* plaintiffs, Gao, Wu, and the Foundation entered a Memorandum of Understanding setting forth their intent to execute a "Final Settlement and Release Agreement" pursuant to which Yahoo would take certain actions "[i]n exchange for the dismissal with prejudice" of the *Wang* lawsuit.  Yahoo Defs. Ex. 4 at 1.  Yahoo agreed to make payments of $3.2 million to the Wang family and $3.2 million to the Shi family and, as relevant here, to "establish a fund," which would become the YHR Fund, "with the payment terms to be finalized [in the agreement] in the amount of $17.3 million with the Laogai Research Foundation to be used to further its humanitarian activities and projects in the People's Republic of China."  *Id.*

Yahoo's goal in negotiating the settlement agreement was twofold: first, to address litigation against Yahoo, and, second, to "help people who have suffered from expressing their views online," regardless of "whether or not they were Yahoo! users."  Pl. Ex. 1 at 6–7 (Yang Dep. 18:16–23:9).  With respect to the second purpose, "the idea was to ask" Wu, who was an expert on human rights, particularly with respect to China, "to help [Yahoo] assess, evaluate, and, if needed, provide[] . . . humanitarian or financial assistance to people that he saw as those people who are affected" by government repression.  *Id*. at 6 (Yang Dep. 18:18–19:12).   In other words, the settlement was intended to resolve litigation and, beyond that business interest, to "partner" with Wu to provide humanitarian and legal assistance to Chinese dissidents (and perhaps others) who were imprisoned for expressing their political views using Yahoo or other online services or media.  *Id.* at 7 (Yang Dep. 22:4–23:9).

On November 13, 2007, Yang emailed Wu a draft agreement and noted, "if we can agree to the spirit, then we can let our lawyers work out the details."  Pl. Ex. 13 at 1.  Wu, the Foundation, and the *Wang* plaintiffs' families were represented by Foley Hoag, while Yahoo was represented by O'Melveny & Myers.  Dkt. 135 at 81 (Callahan).  The draft agreement included provisions for "the dismissal with prejudice of the [*Wang* lawsuit];" the payment of "a total of $3.2 million USD jointly to Shi Tao and his family, and a total of $3.2 million USD jointly to Wang Xiaoning and his family;" and the payment of $17.3 million to the Foundation to establish the YHR Fund.  Pl. Ex. 13 at 2–3.  The draft agreement specified that the $17.3 million "sum shall be maintained separately from other Foundation funds and shall be known at the 'Yahoo! Human Rights Fund.'"  *Id.* at 3.  The draft further provided: "<u>All Payments Made in Trust to Foundation.</u>  The payments to the Foundation shall be made to the Foundation in four equal installments on ____ [DATES TO BE NEGOTIATED]."  *Id.*

The draft agreement stipulated that "[t]he YHR Fund  may be used for three purposes only: (a) to provide humanitarian and legal assistance primarily to persons in the People's Republic of China who have been imprisoned for expressing their views through Yahoo! or another online service or medium; (b) to resolve claims primarily by such persons, or persons threatened with prosecution or imprisonment, against the Yahoo! Entities or any Yahoo! Subsidiary or affiliate; and (c) for payment of Foundation operating expenses," subject to various restrictions.  *Id.*  Those restrictions included, most notably, a requirement that the Foundation and Wu "use their best efforts to maximize the benefits achieved through their use of a portion of the YHR Fund for humanitarian and legal assistance," and a $500,000 annual cap on the amount that the Foundation could "use for its operating expenses."  *Id.* at 3–4.  Finally, the draft agreement required that the Foundation provide Yahoo with "semi-annual reports . . . regarding" certain activities.  *Id.* at 4.

That same day, and just one week after the congressional hearing, Yahoo issued a press statement titled, "Yahoo! Inc. Reaches Settlement on Lawsuit and Works to Establish Human Rights Fund."  Pl. Ex. 25 at 1.  According to the statement, Yahoo was "working to create a separate humanitarian relief fund to provide support to . . . political dissidents and their families."  *Id.*  The statement then quoted Yang, stating that Yahoo was "committed to making sure our actions match our values around the world" and that, in light of that commitment, Yahoo would "establish a Human Rights Fund to provide humanitarian and legal aid to dissidents who have been imprisoned for expressing their views online."  *Id.*  In a document circulated internally and entitled "Background Q and A on Litigation Settlement," Yahoo's staff was instructed to emphasize the humanitarian nature of the settlement agreement.  *Id.*  If asked, for example, "Did Yahoo! decide to settle the case because of pressure from Congress?" staff

was instructed to respond, "[t]his was not a legal calculation but a humanitarian decision made by [Yang] and the company." *Id.* at 2. And, if asked "[w]ho is eligible to apply to the Human Rights Fund?" staff was directed to respond that "Yahoo! is working to establish a humanitarian fund for . . . dissidents and their families." *Id*. The announcement attracted significant press attention. *See, e.g.*, *Yahoo Settles Lawsuit by Families of Chinese Journalists*, N.Y. Times (Nov. 14, 2007), https://www.nytimes.com/2007/11/14/business/worldbusiness/14iht-yahoo.1.8330877.html.

Yahoo and Wu exchanged more drafts of the settlement agreement, each of which included the following caption to the paragraph requiring Yahoo to make payments to the Foundation to establish the YHR Fund: "<u>All Payments Made in Trust to Foundation.</u>" *See, e.g.*, Pl. Ex. 29 at 3 (Nov. 14, 2007 draft); Pl. Ex. 32 at 3 (Nov. 16, 2007 draft); Pl. Ex. 57 at 6 (Nov. 19, 2007 draft); Pl. Ex. 33 at 3 (Nov. 20, 2007 draft). According to Callahan, the parties never discussed the inclusion of this language or its significance. *See* Dkt. 135 at 84 (Callahan). Nor did they discuss whether the agreement would create a charitable trust. *Id.* They added more "trust" language to the portion of the agreement about the *Wang* plaintiffs, however; as of November 14, 2007, "payments to the [*Wang* plaintiffs] [would] be made to the Foundation and [would] be held by the Foundation in separate trust accounts in the name of" the families. Pl. Ex. 29 at 3. There was a sense of urgency, especially on Yahoo's part, to finalize the agreement. On November 20, 2007—just two weeks after the censorious congressional hearing where Yang met Wu for the first time, and one week after the first draft of the settlement agreement had been shared—Yang sent Wu an updated draft of the agreement with a cover message stating "thank you for your patience!" Pl. Ex. 33 at 1. By November 26, 2007, Wu had opened a bank account for the YHR Fund, and he had shared that account information with Yang. Pl. Ex. 14 at 3.

The final settlement agreement, signed in December 2007 but made "effective as of November 9, 2007," comprises ten pages and contains three "terms and conditions" in section II. *See* Pl. Ex. 14 at 11–22. First, section II.A, titled "Dismissal of All Pending Litigation Between the Parties," provides that, "[i]n consideration of the promises contained in this Agreement, [the *Wang* plaintiffs], directly or through their authorized representatives, have agreed to the dismissal with prejudice of the Action against Yahoo!, Inc. and Yahoo! Hong Kong Ltd." *Id.* at 11.

Second, section II.B, titled "Payment by Yahoo! Inc. to the Families," states that Yahoo "will pay a total of $3.2 million" to each plaintiff and his family. *Id.* at 12. It further states:

1. <u>Monies to Be Held In Trust For Families by Laogai Research Foundation ("The Foundation")</u>. The payments to the Wang and Shi Families will be made to the Foundation and will be held by the Foundation in separate trust accounts in name of the Wang Family and the Shi Family. The monies from the separate trust accounts will be distributed by the Laogai Research Foundation to the respective families, and will not be used for any other purpose.

2. <u>Foundation Obligations to Wang and Shi Families.</u> The Foundation shall take responsibility for distributing the $3.2 million USD trust accounts to the Wang and Shi Families in a manner that best effectuates the Parties' intention that those families' needs are provided for while Wang and Shi remain imprisoned. In fulfilling that responsibility, the Foundation shall be guided by the wishes and instructions of Wang Xiaoning and Yu Ling for the Wang family, and Shi Tao and Gao Qinsheng for the Shi family.

*Id.*

Finally, section II.C is titled "Payment by Yahoo!, Inc. to the Foundation to Establish the Yahoo! Human Rights Fund." *Id.* It states: "Yahoo! Inc. will make payments totaling a maximum of $17.3 million to the Foundation subject to the conditions noted below. These payments shall be maintained separately from other Foundation funds and shall be known as the

'Yahoo! Human Rights Fund' or 'YHR Fund.'"  *Id.*  Following this introductory paragraph, the

agreement includes Section II.C.1, titled "<u>All Payments Made in Trust to Foundation</u>."  *Id.*  That

paragraph provides that "[t]he payments to the Foundation shall be made in four installments,"

and it establishes quarterly dates for each, with the first payment required "upon signing."  *Id.*

This paragraph further provides that "[p]ayment of the Second, Third[,] and Fourth Installments

is contingent upon a satisfactory review by Yahoo!, Inc. of the disbursements from the YHR

Fund during the previous quarter.  For purposes of this paragraph, a 'satisfactory review' is one

that confirms that such disbursements conform with the purposes of the YHR Fund."  *Id.*

Section II.C.2 of the agreement is titled "Foundation Use of Yahoo! Human Rights

Fund."  *Id.* at 13.  That section provides as follows:

> <u>Foundation Use of Yahoo! Human Rights Fund.</u> The YHR Fund may be used
> for three purposes only: (a) to provide humanitarian and legal assistance
> primarily to persons in or from the People's Republic of China who have been
> imprisoned for expressing their views through Yahoo! or another medium; (b)
> to resolve claims primarily by such persons, or persons threatened with
> prosecution or imprisonment, against the Yahoo! Entities or any Yahoo!
> subsidiary or affiliate; and (c) for payment of Foundation operating expenses
> and the Foundation's educational work conducted in the United States in support
> of human rights, to the extent provided below.

> (i)　　In their implementation of paragraph 2(a), above, the Foundation and its
> Executive Director, Harry Wu, agree to use their best efforts to maximize
> the benefits achieved through their use of a portion of the YHR Fund for
> humanitarian and legal assistance.

> (ii)　　In their implementation of paragraph 2(b), above, the Foundation and its
> Executive Director, Harry Wu, agree to use their best efforts to evaluate
> and, as appropriate, use YHR Fund monies to settle claims against the
> Yahoo! Entities or any Yahoo! subsidiary or affiliate (collectively,
> "Yahoo!").  Yahoo! may refer such claimants to the Foundation, which
> will attempt to settle their claims using the YHR Fund.  The Foundation
> shall not make any such settlement payment without first obtaining a
> release in a form approved in advance in each case by Yahoo!.  Persons
> entering into such settlements or providing such releases shall not be
> deemed third-party beneficiaries of this Agreement.  The Foundation
> hereby agrees to use the YHR Fund to indemnify and hold Yahoo!

       harmless from and against any claims, liabilities, damages, attorneys' fees, or costs arising out of any legal or administrative proceeding initiated by or on behalf of any person referred to the Foundation by Yahoo!.

(iii)    Pursuant to paragraph 2(c), above, the Foundation may use for its operating expenses up to $1 million USD of the YHR Fund in each calendar year (prorated for 2007).   The Foundation will provide notification to Yahoo! concerning the amount of the YHR Fund that is used each year for the operating and educational expenses of the Foundation.

*Id.*  Those paragraphs set forth the exclusive "three purposes" of the Fund.  *See* Hr. Tr. at 45

(Callahan) (describing the agreement as "settl[ing] litigation and creat[ing] the Yahoo Human

Rights Fund with the three purposes").  Section II.C.2 goes on to impose further requirements on

the Fund, however:

(iv)    The YHR Fund shall not be used to fund or support in any manner, directly or indirectly, any litigation, claim, or complaint, before any court, administrative body, legislative body, or any other forum, anywhere in the world, by any person or entity, against Yahoo!.

(v)    The YHR Fund shall be used only in conformity with the civil and criminal laws of the United States and of other countries in which it may be expended.  The YHR Fund shall not be used for political purposes of any kind and shall not be given to, or used to support or assist, directly or indirectly, any governments, political parties, or armed organizations.

(vi)    The Foundation shall provide the Yahoo! Entities semiannual reports, in June and December of each year, regarding all of its activities pursuant to paragraphs II.B. and II.C. of the Agreement.

*Id.* at 13–14.

       The agreement also contains various "waivers and releases" and "additional and

miscellaneous provisions."   *Id.* at 14–20.  One provision, section IV.C.3, states that

Harry Wu and the Laogai Research Foundation hereby warrant and represent that they will establish a Board of Directors for the YHR Fund.  The Board of Directors shall have the power and authority to direct the activities and expenditures of the YHR Fund, subject to the restrictions set forth in this agreement.  Harry Wu and the Laogai Research Foundation shall consult with

17

Yahoo! regarding the composition and membership of the Board of Directors before making any appointments to the Board.

*Id.* at 16.  Of relevance here, section IV.L, titled "Headings," states that "[s]ection and paragraph headings contained in this Agreement are for convenience and shall not be considered for any purpose in construing this Agreement."  *Id.* at 19.

On November 26, 2007, the Foundation opened three new accounts at Bank of America—two for the *Wang* plaintiffs, and one for the YHR Fund.  Dkt. 121-13 at 2–3.  The "Title on Account" for each, respectively, was listed as (1) "The Laogai Research Foundation Fundraising Account: Harry Wu/Yu Ling," (2) "The Laogai Research Foundation Fundraising Account: Harry Wu/Gao Qinsheng," and (3) "The Laogai Research Foundation Fundraising Account: Harry Wu/YHR Fund."  *Id.* at 3.  On or about December 7, 2007, Jamie Vogel, a member of Yahoo's finance team, instructed Yahoo's treasury office to make payments to the Foundation pursuant to the settlement agreement.  Dkt. 123-2 at 7.  Vogel instructed that three payments be made: two separate payments of $3.2 million to each of the *Wang* plaintiffs' families, "to be held in a trust by Laogai Research Foundation," and one payment of $4.4 million "to establish Yahoo! Human Rights Fund at Laogai Research Foundation."  *Id.*  The latter payment was to be made to "the Laogai Research Foundation—Harry Wu/YHR Fund" at Bank of America.  *Id.*

On or around February 25, 2008, the Foundation posted a statement on its website announcing the creation of the YHR Fund.[4]  The two-page statement was entitled "Yahoo!

---

[4] The record does not contain the statement in its final, posted form and, instead, includes the final draft and an email from a Foundation employee dated February 25, 2008, indicating that she would "post [the statement] on the [Foundation] . . . site[] this afternoon."  Pl. Ex. 6 at 1.  The Court finds that the statement was posted on the Foundation's website on or around that date.

Human Rights Fund Established to Help Chinese Cyber-Dissidents."  Pl. Ex. 7 at 2.  It said: "On January 1, 2008, Yahoo! and the Laogai Research Foundation created the Yahoo! Human Rights Fund to assist victims of Internet censorship and other political prisoners in China."  *Id.*  It also explained that the Fund would "provide humanitarian and legal assistance to persons in the People's Republic of China who have been imprisoned or persecuted for expressing their views using the Internet," and that "[i]ndividuals who used Yahoo!'s services to express themselves [would] be given the highest priority."  *Id.* at 3.  The statement noted that the Foundation was "honored to act as the steward of this endowment" and was "taking strategic steps to ensure the prompt and prudent use of th[e] fund."  *Id.* at 2.  "In fulfilling its responsibilities as the Fund's steward," the Foundation stated that it would expand its "human rights network," provide "humanitarian and legal assistance," and enhance its "educational work."  *Id.* at 3.

As required by the settlement agreement, *see* Pl. Ex. 14 at 16, the Foundation and Wu established a Board of Directors for the YHR Fund, *see* Dkt. 121-22 at 1–4; Dkt. 123-2 at 18. Although the Foundation referred to the Board as an "advisory board," *see*, *e.g.*, Dkt. 121-22 at 2, the settlement agreement granted the Board "the power and authority to direct the activities and expenditures of the YHR Fund, subject to the restrictions set forth in [the settlement] agreement," Pl. Ex. 14 at 16, and not merely the opportunity to advise the Foundation or others regarding YHR Fund expenditures.  The Board had five members: Tienchi Liao, Director of the Foundation; Michael Samway, Vice President and Deputy General Counsel of Yahoo; Lucie Morillon, Washington Bureau Director of Reporters Without Borders USA; Theresa Harris, Deputy Director of the World Organization for Human Rights USA; and Wu.  Dkt. 123-2 at 18; *see also* Pl. Ex. 8 at 2.  Samway—the only Board member from Yahoo—was added to the Board after he and Wu met and they agreed that Samway should join the Board, provided that Callahan

and Yang agreed.  Dkt. 123-2 at 24–25.  Callahan and Yang indicated via email to Wu that they thought Samway "would be a great addition to your Board."  *Id.* at 25.  The Board met at least four times in 2008, on March 20, May 30, August 27, and October 15, and at least once in 2009, on April 15.  *See* Pl. Ex 8 (March 2008 meeting minutes); Pl. Ex. 10 (May 2008 meeting minutes); Pl Ex. 11 (August 2008 meeting minutes); Pl. Ex. 36 (October 2008 meeting minutes); Pl. Ex. 53 (April 2009 meeting minutes).[5]

Prior to the Board's first meeting on March 20, 2008, Liao distributed two documents to the group: a "Yahoo! Human Rights Fund Advisory Board Member Agreement with the Laogai Research Foundation" and "Yahoo! Human Rights Fund in the Laogai Research Foundation Guidelines for Providing Assistance."  Dkt. 121-8 at 12; *see also* Dkt. 121-22 at 2 (member agreement); *id.* at 3–4 (guidelines).  The Board member agreement was a one-page acknowledgment of each Board member's "duties and responsibilities."  Dkt. 121-22 at 2.  Those duties and responsibilities included the following:

1.  My function on the advisory board is to provide direction for the activities of the YHRFund.

2.  As a member of the board, I am responsible for carrying out the YHRFund's mission of (a) providing humanitarian and legal assistance primarily to persons in or from the People's Republic of China who have been imprisoned for expressing their views through Yahoo! or another medium, and (b) supporting the educational work of the Laogai Research Foundation.

3.  I am responsible for annually reviewing and providing advice on the YHRFund's general strategies for achieving this mission, as developed by the director and staff of the Laogai Research Foundation.

---

[5] Plaintiffs' Exhibit 53 is a copy of Board meeting minutes dated "April 15, 2008."  Pl. Ex. 53 at 1.  Plaintiffs' exhibit list, however, refers to the document as "April 15, 2009 YHRF Board minutes."  Dkt. 133 at 6.  According to the minutes, Harris "has resigned from the Board" due to a conflict of interest.  Pl. Ex. 53 at 1.  But Harris attended Board meetings in August and October 2008, and she testified that she left the Board "sometime in late 2008."  Pl. Ex. 4 at 21 (Harris Dep. 80:4–7).  Based on those facts, the Court finds that the date in the minutes is incorrect and that the April meeting occurred in 2009.

4.      I am fiscally responsible for the financial wellbeing of the YHRFund.  It is my duty to review and approve the semi-annual reports of the YHRFund's activities, to ensure that the mission is being advanced.  The Laogai Research Foundation, as administrators of the YHRFund, will provide me with these financial reports, which allow me to meet the prudent person section of the law.

5.      I will attend advisory board meetings and be available for phone consultation.

6.      All advisory board discussions and materials are strictly confidential.  I shall not disclose confidential information about the YHRFund or its activities to any other person, except to the extent that such disclosure is required by law.  In the case of either of these exceptions, I will promptly notify all other advisory board members of the disclosure.

7.      If a majority of the members of the Advisory Board determine that I have failed to act in good faith, I must resign.

*Id.*  At the March 20 Board meeting, Wu read the Board member agreement aloud to the others.  Dkt. 121-8 at 12.  After Wu did so, Liao "expressed her understanding . . . that the term 'fiscally responsible' require[d] that there [would] be professional audits of the Fund."  *Id.* at 13.  The Board "unanimously agreed."  *Id.*

Wu also read aloud a section of the draft YHR Fund guidelines that discussed how the Fund would be administered to individuals.  *Id.*; *see also* Dkt. 121-22 at 3–4 (guidelines).  The draft guidelines stated that, "[u]pon receipt of each application from an individual, the staff of the Laogai Research Foundation [would] examine the application" and make determinations regarding the individual's qualifications for aid.  Dkt. 121-22 at 3.  They also stated that "[s]upport to individuals" and "organizations" "shall be made at the discretion of the Laogai Research Foundation."  *Id.* at 3–4.  After Wu read that portion of the draft guidelines aloud, Samway—Yahoo's representative on the Board—"asked whether the [Foundation] staff was to make determinations or if the Advisory Board would be involved also."  Dkt. 121-8 at 13.  Wu

21

"suggested that [Foundation] staff make determinations and consult with the Board if the appropriate response was not clear." *Id.* The Board tabled the issue, agreeing to "finalize[]" "[c]riteria and procedures for making determinations on assistance applicants . . . at future meetings." *Id.*

On May 6, 2008, Samway circulated more detailed draft YHR Fund guidelines for the Board's consideration, titled "Yahoo! Human Rights Fund of the Laogai Research Foundation Mission and Operational Guidelines." Pl. Ex. 9 at 1–3. These draft guidelines stated that the Fund "shall be administered by a Board of Directors." *Id.* The Board would "initially be composed of five members, including the Executive Director of the Foundation, who shall act as Chair." *Id.* Samway's proposed guidelines would have required that the Board include "at least one member appointed by the Yahoo! Entities." *Id.* His draft guidelines also provided that "[f]unds shall not be disbursed from the YHRF except with the authorization of the Board, which shall be by consensus," *id.* at 4, and they included parameters for how the Board would make decisions approving or denying "[a]pplications for [a]ssistance [f]unding," *id.* at 6. Samway's proposed guidelines thus differed from the Foundation's proposal, which would have granted discretion to the Foundation to make YHR Fund award decisions. *See* Dkt. 121-22 at 3. At a Board meeting on May 30, 2008, the Board "unanimously agreed to endorse" the new draft guidelines "as a framework which the Board could further develop in the next few months." Pl. Ex. 10 at 4. In practice, however, the Board did not review individual applications to determine who should receive funding, although it did review "spreadsheets" listing "who was being considered and the amounts that were being considered," which is why it sought "to come up with criteria" to clarify the "process." *See* Dkt. 123–1 at 55–56 (Harris Dep. 104:2–105:8).

On July 11, 2008, the Foundation sent Yahoo its request for the fourth and final installment payment for the YHR Fund, along with the semi-annual report for the YHR Fund. *See* Dkt. 123-2 at 16–20.  In response, Samway wrote that he was "arranging payment by Yahoo!" and that, in the meantime, he wanted to "re-emphasize" two points that were discussed at the Board meeting: first, "[w]e should agree on professional guidance to evaluate the tax implications the [YHR] Fund will have on [the Foundation] and Yahoo!, and consider any sensible changes or restructurings to best protect everyone and also further the goal of the Fund." *Id.* at 47.  Samway explained that he was working with Susan Dorn, an attorney representing the Foundation Board, to "understand potential tax issues" and to "formalize the documents described in the [new YHR Fund] Guidelines we all agreed [to] in principle." *Id.*  Samway added that this process "should include transparency mechanisms for the Board to have better visibility into the applications for assistance and payments from the Fund and also with respect to the overall expenses of the Fund." *Id.*

Second, Samway noted that, "[a]s a general principle, we need to use the Fund for its intended purposes regarding online dissent." *Id.*  He explained that "certain limited exceptions, all for good purposes," had been made for uses of the Fund, "including supporting some of the preparatory work for the [Foundation] Museum." *Id.*  But, he added, "[w]e should be sure to keep focused on the [YHR] Fund's purpose though." *Id.*  Samway proposed that "[o]ne approach would be to seek Board approval for distribution of funds of more than a certain amount, say, $10,000." *Id.*  He added that "[w]e should also establish criteria for what types of projects the [YHR Fund] Board should consider and also decide if they're within the scope of the Fund." *Id.*

On August 27, 2008, the Board met again, and Wu updated it on the YHR Fund's work. *See* Pl. Ex. 11 at 3.  According to the meeting minutes, he "distributed a chart listing all the beneficiaries of humanitarian support from the Fund to date, [which] indicated that 26 victims had been provided assistance so far." *Id.*  The "total amount of financial assistance disbursed equal[ed] \$120,034." *Id.*  At that point, however, notwithstanding the goal of helping dissidents targeted by the Chinese government based on their online, pro-democracy activity, "[n]ot many of the cases supported . . . involved internet issues." *Id.*  Some, for instance, "involved persons with connections to the China Democracy Party." *Id.*  Wu also updated the Board on "his plans to offer financial support from the Fund to several other organizations" and the progress of a new "Laogai Museum," which the Foundation was constructing with funds from the YHR Fund. *Id.* at 2–3.  The Board met at least two more times in October 2008 and April 2009. *See* Pl. Ex. 36; Pl. Ex. 53.  During those meetings, Wu continued to update the Board on the Fund's activities and proposals for projects that he wished to support with Fund monies.  Pl. Ex. 36 at 4–6.  The Board discussed those projects, the status of applications for assistance, and other administrative matters. *Id.*

Problems arose when some Chinese dissidents refused to accept funding from the YHR Fund, opting instead to ask for higher payments or to sue Yahoo.  Pl. Ex. 11 at 3–4.  At the August 2008 meeting, there was "uncertainty and disagreement among the members of the Board as to what would be an appropriate role for the Fund to play in addressing" these individuals' claims against Yahoo. *Id.* at 5.  Wu "indicated that he was strongly opposed to the notion that [the Foundation] would in any way represent Yahoo! from a legal standpoint." *Id.*  "To do so," Wu posited, "would jeopardize [the Foundation's] non-profit status." *Id.*  "Samway assured . . . Wu that Yahoo! did not want to instruct [the Foundation] how to act on humanitarian cases," but

24

he stressed that Yahoo wanted "some form of legal protection for itself from those who benefit from the Fund." *Id.* Harris suggested that "the best way to deal with these issues might be to give money to a third party to disburse as compensation and that perhaps the Board should look into setting up something like a[n] LLC to do so." *Id.* Based on this discussion, it was agreed that Samway and Harris would "work with . . . Dorn and the representatives of Yahoo! to determine if and how the Fund can function so as to offer support to individuals with claims against Yahoo! while (1) affording some form of legal protection to Yahoo! from said individuals and (2) protecting the non-profit status of" the Foundation. *Id.*

In September 2008, Samway received a copy of a memorandum that Dorn prepared for Wu and the Foundation earlier in the year. Dkt. 123-2 at 50–57. The memorandum addressed "whether the [settlement] [a]greement or the [YHR] Fund's structure poses any tax or other legal problems for the Laogai Research Foundation." *Id.* at 53. Dorn's topline conclusion was that "[t]he settlement agreement between Yahoo! and the Laogai Research Foundation [and the *Wang* plaintiffs] was not structured as would be a typical claim settlement" and that "the settlement appear[ed] to create a variety of liabilities and penalties that [would] be imposed on the [Foundation] *and* Yahoo." *Id.* Among Dorn's concerns was that, under the settlement agreement, "the [Foundation] is to hold monies in trust and acting as a de facto trustee" that would "determine how to distribute monies to families of individuals who have suits against Yahoo." *Id.* at 54. According to Dorn, that fact, and "frankly, the entire construct of the Fund," would "undercut the [Foundation's] § 501(c)(3) status as an organization operated 'exclusively' for a charitable purpose." *Id.* Dorn recommended "amending and restating the agreement" to preserve the Foundation's tax-exempt status. *Id.* at 55.

In 2009, Yahoo, the Foundation, and Wu sought to address these concerns by amending the settlement agreement to create two new organizations: the Yahoo Irrevocable Human Rights Trust and the Laogai Human Rights Organization ("LHRO").  Dkt. 123-2 at 58–78.  The amendment provided that the Foundation would (1) transfer $3.55 million from the YHR Fund to the Yahoo Irrevocable Human Rights Trust, which was to be created in a separate "Agreement and Declaration of Trust," and (2) transfer "the remaining funds" from the YHR Fund to the LHRO, a "newly established 501(c)(3) organization with the purpose of supporting the activities of the [Foundation] in accordance with the terms of the [settlement] [a]greement."  *Id.* at 59.  The separate agreement and declaration of trust, in turn, established the Yahoo Irrevocable Human Rights Trust "to resolve claims against Yahoo!, Inc. entities, subsidiaries or affiliates[] by . . . persons primarily in or from the People's Republic of China . . . who have been imprisoned for expressing their views through Yahoo![] or . . . persons threatened with prosecution or imprisonment for expressing their views through Yahoo!."  *Id.* at 61–62.  The trust agreement contemplated that Samway (or another person designated by Yahoo) and Wu would serve among the trustees.  *Id.* at 63.  Separately, the parties established the LHRO as a § 501(c)(3) organization "[t]o receive, maintain and administer assets in perpetuity, and to use and apply the whole or any part of the principal and income therefrom, to fund the projects and programs and administrative expenses" of the Foundation.  *Id.* at 74–78.  The initial Board of Directors included Wu, Samway, and Liao.  *Id.* at 76.

### III.  CONCLUSIONS OF LAW

The question whether the 2007 settlement agreement created an enforceable charitable trust is governed by D.C. law.  *See Depu III*, 950 F.3d at 901.  Under D.C. law, the elements of a trust are: (1) "a trustee, who holds the trust property and [who] is subject to equitable duties to

deal with it for the benefit of another;" (2) "a beneficiary, to whom the trustee owes such duties;" and (3) "trust property, which is held by the trustee for the beneficiary." *Id.* (quoting *Cabaniss*, 464 A.2d at 91). "As distinguished from a private trust, which is characterized by identified beneficiaries, . . . in a charitable trust the obligation of the trustee is to apply the trust res for some form of public benefit." *Id.* (alteration in original) (quoting *Hooker*, 579 A.2d at 611); *see also* D.C. Code § 19-1304.05(a).

Regardless of whether a trust is private or charitable, "[a] trust is created only if the settlor properly manifests an intention to create a trust." Restatement (Second) of Trusts § 23; *see also Cabannis*, 464 A.2d at 91 ("Essential to the creation of a trust is the settlor's manifestation or external expression of his intention to create a trust." (citing Restatement (Second) of Trusts §§ 2 cmt. g, 23 cmt. a)). In cases involving oral trusts and trust reformation, the D.C. Court of Appeals "demand[s] clear and convincing evidence" that the "settlor has created a trust." *In re Estate of Tuthill*, 754 A.2d 272, 275 (D.C. 2000); *see also Duggan*, 554 A.2d at 1133–34. Although it is unclear whether this rule applies to cases, like this one, that turn on whether a written instrument created a trust, the Court need not resolve that question here because, under either a preponderance or clear and convincing standard, the Court finds that the 2007 settlement agreement created a charitable trust.[6]

---

[6] The Yahoo Defendants argue that the "clear and convincing evidence" standard governs in all cases where trust creation is at issue. Dkt. 123 at 28. For several reasons, the Court is not so sure. To start, the D.C. Circuit expressed skepticism about Defendants' similar contention that "the intention to create a trust should be *clearly* manifested." *Depu III*, 950 F.3d at 902 n.3 (quotation marks omitted). In addition, although the D.C. Court of Appeals observed in *Tuthill* that "[i]n cases where a determination must be made as to whether a settlor has created a trust, we demand clear and convincing evidence," 754 A.2d at 275, that case dealt with the reformation of a trust (*i.e.* the correction of an error in a trust instrument), not the initial creation of a trust. To the extent that *Tuthill* addressed trust creation, then, it did so in dicta. The quoted text in *Tuthill*, moreover, purported only to restate a rule laid down in an earlier opinion, *Duggan v. Keto*, 554 A.2d 1126 (D.C. 1989). *See* 754 A.2d at 275. But *Duggan* did not sweep so broadly.

As the D.C. Circuit observed in *Depu III*, "[t]he principal dispute in this case centers on whether Yahoo manifested the requisite intent to create a trust." 950 F.3d at 902. Determining whether a settlor intended to create a trust requires more than a review of the relevant instrument to see if it uses the word "trust" or refers to "trustees." Rather, "[n]o particular form of words or conduct is necessary to manifest an intention to create a trust." *Cabaniss*, 464 A.2d at 91. Indeed, so long as the settlor "manifest[s] an intention to create such a relationship as constitutes a trust," it is "immaterial whether or not the settlor [even] knows that the intended relationship is called a trust, and whether or not he [even] knows the precise characteristic of the relationship

_____

That opinion, which concerned the creation of an oral trust, determined only that "[t]he test for proving an intent to create a testamentary trust from *oral evidence* is . . . clear and convincing evidence." *Duggan*, 554 A2d at 1133 (emphasis added).

    Developments in the law since *Tuthill* and *Duggan* confirm that a heightened standard of proof was warranted in those cases because they concerned issues not present in this case. In 2004, the Council of the District of Columbia codified the Uniform Trust Code ("UTC"), which requires clear and convincing evidence to prove trust reformation (as in *Tuthill*) and oral trusts (as in *Duggan*). *See* D.C. Code § 19-1304.07 (oral trusts); *id.* § 19-1304.15 (trust reformation). The UTC's commentary explains that those contexts call for a heightened standard of proof because "[oral trusts] are viewed with caution," Unif. Tr. Code § 407 cmt. (Unif. L. Comm'n 2003), and reformation may require "evidence relevant to the settlor's intention even though it contradicts an apparent plain meaning of the text [of the trust]," *id.* § 415 cmt. In contrast, the UTC includes no such requirement for proving the creation of a written trust, nor does it contain any warnings about the perils of interpreting such agreements. Furthermore, and perhaps in light of these statutory developments, no D.C. court has held that the clear and convincing evidence standard applies in cases concerning the creation of a written trust. Rather, on two occasions, the D.C. Court of Appeals has cited *Tuthill* for the narrower proposition that "[f]or purposes of trust reformation . . . clear and convincing evidence must support reformation." *In re Durosko Marital Trust*, 862 A.2d 914, 924 (D.C. 2004); *accord In re Ingersoll Trust*, 950 A.2d 672, 693 (D.C. 2008). As the D.C. Superior Court explained in a *cy pres* proceeding, it is likely that a case that "does not involve a dispute over an oral trust or a mistake in the terms of the trust document . . . do[es] not require a heightened burden of proof to ensure that the challenged actions are consistent with the settlor's original intent, and instead can be resolved under the burden of proof that typically applies in civil cases." *Trs. of the Corcoran Gallery of Art v. District of Columbia*, No. 2014 CA 003745 B, 2014 WL 5080058, at *13 (D.C. Super. Ct. Aug. 18, 2014). For present purposes, however, the Court need not decide that question because Plaintiffs prevail under either a preponderance or clear and convincing standard.

which is called a trust." Restatement (Second) of Trusts § 23 cmt. a; *see also* Restatement (Third) of Trusts § 13 cmt. a (Am. L. Inst. 2003) (same). In short, "[a] property arrangement is a trust as long as it has the characteristics, and gives rise to the rights and duties, the law recognizes as a trust." Restatement (Third) of Trusts § 5 cmt. a.

Plaintiffs advance two arguments in support of their contention that the 2007 settlement agreement created a charitable trust. First, they argue that "[t]he four corners of the Agreement unambiguously manifest trust intent." Dkt. 121 at 25. In Plaintiffs' view, "the D.C. Circuit has already construed [the agreement's] terms to support the existence of a trust," *id.*, leaving little if anything for this Court to decide. Second, they argue that the extrinsic evidence "overwhelmingly supports the existence of a trust." *Id.* at 26. That evidence includes evidence from the drafting process and the conduct of the parties during and after the agreement was executed. *Id.* at 26–30.

Defendants raise three arguments in response. First, Defendants dispute that the D.C. Circuit's threshold decision in *Depu III* "somehow preordains the outcome" at this later stage of the litigation. Dkt. 123 at 44. Second, they argue that "Yahoo did not want to impose on anyone equitable or fiduciary duties to unknown numbers of Chinese dissidents, because to do so would be against its own interest in minimizing future potential liability after settling the *Wang* [l]awsuit." *Id.* at 38. Finally, Defendants urge the Court to credit the testimony of "the individuals responsible for creating the Fund directly and implementing it," each of whom maintains that Yahoo and the Foundation "never intended to create a trust or impose enforceable fiduciary duties on a trustee." *Id.* at 29; *see also* Dkt. 122 at 6–10.

In assessing the parties' competing arguments, the Court starts where the D.C. Circuit left off in *Depu III*. That decision is neither dispositive (as Plaintiffs suggest) nor irrelevant (as

Defendants suggest).  As Defendants correctly observe, the D.C. Circuit considered only whether Plaintiffs "state[d] a claim to relief that is plausible on its face," *Depu III*, 950 F.3d at 901 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)), which required the court to accept Plaintiffs' factual allegations as true and to draw all reasonable inferences in Plaintiffs' favor. The D.C. Circuit was clear, moreover, that the question whether the evidence conclusively established "the existence of a trust" was "not before [it]."  *Id.* at 903.  But, despite that limited focus, the D.C. Circuit's opinion is illuminating with respect to the governing legal standards and relevant "indicia of trust intent" in this unique context, including the text of the 2007 settlement agreement and "the circumstances surrounding the creation of the Fund."  *Id.* 902–03. Considering those same factors but applying the more demanding standard that governs for purposes of a bench trial, the Court finds that Plaintiffs have now proven what the D.C. Circuit held that they adequately alleged.

## A.     The Settlement Agreement

As the D.C. Circuit observed in *Depu III*, "[a]n intention to create a trust may . . . be revealed by articulation of 'the specifics necessary to implement and administer the trust'" in a written instrument.  *Depu III*, 950 F.3d at 902 (quoting *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 287 (D.C. Cir. 1993)).  A charitable trust is "a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose."  Restatement (Second) of Trusts § 348.  Here, the 2007 settlement agreement contains each of "the specifics necessary to implement and administer" a charitable trust.  *See In re Strack*, 524 F.3d 493, 499 (4th Cir. 2008) ("At bottom, '[i]f the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a

trust is created.'" (alteration in *In re Strack*) (quoting *Broaddus* v. *Gresham*, 26 S.E.2d 33, 36 (Va. 1943)).

As the D.C. Circuit explained, the settlement agreement "subjects the Foundation's handling of the [YHR] Fund to trust-like restrictions, and does so in imperative language." *Depu III*, 950 F.3d at 902.  To form a trust, a donor must create a "binding obligation on the recipient of the property."  Elizabeth Deleery *et al.*, *Bogert's The Law of Trusts and Trustees* § 48 (2021) (hereinafter "Bogert on Trusts").  In trust litigation, it is common for courts to confront questions about whether a donor intended to "control or direct the disposition intended," which would evince trust intent, or merely intended to "advise or influence the discretion of the [recipient]," which would not.  *Id.* (quoting *Phillips v. Phillips*, 19 N.E. 411, 413 (N.Y. 1889)); *see also Cabaniss*, 464 A.2d at 91–92 (explaining that the use of "imperative, as distinguished from precatory," language is indicative of trust intent).  The 2007 settlement agreement employs mandatory language: It specifies that the YHR Fund "may be used for three purposes *only*," including the provision of "humanitarian and legal assistance primarily to persons in or from the People's Republic of China who have been imprisoned for expressing their views through Yahoo! or another medium," resolving claims against Yahoo!, and paying for a portion of the Foundation's operating and educational expenses.  Pl. Ex. 14 at 13 (emphasis added).  It requires the Foundation and Wu "to use their best efforts to maximize the benefits achieved through their use of a portion of the YHR Fund for humanitarian and legal assistance."  *Id.*  It imposes a $1 million per year limit on the Foundation's use of the Fund to pay its operating expenses and requires the Foundation to report those expenditures to Yahoo.  *Id.*  It forbids the Foundation from using the YHR Fund to support litigation or administrative or legislative action against Yahoo.  *Id.*  It provides that "[t]he YHR Fund *shall* be used *only* in conformity with the civil and

criminal laws of the United States and other countries in which it may be expended." *Id.*
(emphases added).  It provides that "[t]he YHR Fund *shall not* be sued for political purposes of
any kind *shall not* be given to, or used to support or assist, directly or indirectly, any
governments, political parties, or armed organizations." *Id.* at 13–14 (emphasis added).  And, as
the D.C. Circuit stressed, the settlement agreement "includes specific mechanisms to remedy
'any disbursements that do not conform with the stated purposes' of the Fund." *Depu III*, 950
F.3d at 902.

   The requirement that the Foundation "maintain[]" the YHR Fund "separately from other
Foundation funds" provides further confirmation of Yahoo's intent to create a charitable trust.
Pl. Ex. 14 at 12.  "[A] trust is created" when the settlor manifests "the intention . . . that
[property] shall be kept or used as a separate fund for the benefit of the payor or a third person."
*In re Strack*, 524 F.3d at 499 (quoting *Broaddus*, 26 S.E.2d at 36); *see also In re Pro. Air Traffic
Controllers Org. (PATCO)*, 26 B.R. 337, 343 (Bankr. D.D.C. 1982), *aff'd*, 724 F.2d 205 (D.C.
Cir. 1984).  In contrast, no trust is created when "property is transferred by one person to another
who agrees in consideration thereof to assume a personal liability to a third person."
Restatement (Second) of Trusts § 14 cmt. f.  The following example from the Restatement
(Second) of Trusts illustrates the difference: Suppose A pays $1,000 to B, who, in turn, agrees to
pay the money to C.  If the agreement permits B to spend the $1,000 as his own, so long as he
agrees to pay $1,000 to C, then there is no trust.  But, if the agreement requires B to *set aside* the
$1,000 and to pay those funds to C, then B is a trustee with respect to those funds.  *See*
Restatement (Second) of Trusts § 14 cmt. f, illus. 1.  Here, the settlement agreement required the
Foundation to set aside the $17.3 million in a separate account, which was designated as the
YHR Fund; specified how those funds could—and could not—be used; and limited the amount

of those funds that the Foundation could draw on to pay its operating expenses.  Pl. Ex. 14 at 12–
13.  Any suggestion that the Foundation was the beneficiary of the YHR Fund or that it was
entitled to use the Fund as it saw fit—and without regard for the interests of the charitable
beneficiaries—is put further to rest by Section IV.C.3 of the settlement agreement.  That
provision requires the Foundation and Wu to "establish a Board of Directors for the YHR Fund,"
provides that the Board "shall have the power and authority to direct the activities and
expenditures of the YHR Fund," and requires that the Board abide by "the restrictions set forth
in" this settlement agreement.  *Id.* at 16.

The D.C. Circuit also relied on the agreement's use of the words "in trust" when referring
to the YHRF.  *Depu*, 950 F.3d at 902.  The agreement uses the word "trust" in two places: first,
in paragraph II.B, which describes Yahoo's payments to the two plaintiff families, and, second,
in paragraph II.C, which establishes the YHR Fund and requires Yahoo to make four
"installment" payments totaling $17.3 million to the Fund.  Pl. Ex. 14 at 12.  The heading for the
paragraph setting forth the payment schedule reads as follows:
"All Payments Made *in Trust* to Foundation."  *Id.* (emphasis added).  Citing the Bogert treatise,
the D.C. Circuit observed that the use of the words "in trust" in the header "may be used to find
an intent to make [a] corporation a trustee."  *Depu III*, 950 F.3d at 902 (citing Bogert on Trusts
§ 324).

In response, the Yahoo Defendants now point to Section IV.L of the agreement, which
provides that "[s]ection and paragraph headings contained in this Agreement are for convenience
and shall not be considered for any purpose in construing this Agreement."  Pl. Ex. 14 at 19.
According to the Yahoo Defendants, this clause is "fatal to Plaintiffs' argument."  Dkt. 123 at 42.
The Court is unpersuaded for two reasons.

First, to the extent the Yahoo Defendants maintain that the Court must ignore the use of the word "trust" in the heading of the settlement agreement and that, in the absence of that word or a similar term in the text of the agreement itself, there is no basis to conclude that the settlement agreement created a trust, both the D.C. Circuit and this Court have already rejected that proposition. As discussed above, "[n]o formal or technical language is required" to create a trust. Bogert on Trusts § 45. "[I]n some cases, courts have found that settlors expressed intent to create a trust even though they did not use the words 'trust' or 'trustee,' and did use language seemingly appropriate to" other kinds of legal relationships. *Id.* § 45 & n.11 (citing cases); *see also Cabaniss*, 464 A.2d at 91; *Valentini v. Shinseki*, 860 F. Supp. 2d 1079, 1105 (C.D. Cal. 2012) ("No 'magic words' are needed to create a charitable trust.").

Second, even if the disclaimer precludes the Court from relying on headers for purposes of construing the settlement agreement, the central question before the Court is whether Yahoo intended to create a trust, and the use of the word "trust" has *some* bearing on that question. Defendants tell the Court that they had no intent to create a trust and, indeed, that the possibility never crossed their minds. *See* Dkt. 135 at 84–86 (Callahan). The presence of the word "trust" in the section of the settlement agreement that established the YHR Fund is at odds with that contention. Defendants' sole answer to this problem is that "none of the witnesses know" how or why the word "trust" appears in a provision that, according to Defendants, was not intended to impose "fiduciary obligations" on the Foundation or others. *Id.* at 28. According to Defendants, if Yahoo, "a sophisticated party," had intended to create a trust, it would have engaged in formal processes for doing so, such as "engag[ing] counsel experienced in creating trusts." Dkt. 123 at 32. But Yahoo did engage sophisticated counsel when drafting the settlement agreement, and those lawyers surely saw the phrase "Payments Made in Trust to Foundation" in each iteration,

including the final, executed version. Indeed, the settlement agreement occupies fewer than ten

pages, and the header at issue appears in one of a handful of key provisions. To be sure, in the

absence of other indicia of intent to establish a trust, the Court might disregard the heading.

Here, however, just the opposite is the true. The settlement agreement required the Foundation

to place the funds at issue in a separate account, required the Foundation to use those funds for a

charitable purpose, and limited the Foundation's authority to use the funds for other purposes.

Under these circumstances, the Court declines to credit Defendants' contention that they never

even considered the possibility that the agreement would create a charitable trust.[7]

Defendants make little effort to reconcile their position with the settlement agreement's

"trust like restrictions" and "imperative language" highlighted in the D.C. Circuit's opinion.

*Depu III*, 950 F.3d at 902. They make no effort, for example, to explain why, if the parties did

not intend to create a charitable trust, the Foundation is required to maintain the YHR Fund

assets in a separate account; why the Foundation may not spend more than $1 million a year on

operating expenses; why the Foundation and Wu were required to establish a Board of Directors

for the Fund; or why the Fund "may be used for three purposes only." Pl. Ex. 14 at 13. Instead,

the Yahoo Defendants argue that the settlement agreement "does not articulate all the essential

elements of a trust" because it "name[s] no trustees," Dkt. 123 at 20, and "does not purport to

---

[7] This case, accordingly, is unlike *United States Conference of Mayors v. Great-West Life & Annuity Insurance Co.*, 288 F. Supp. 3d 4 (D.D.C. 2017), which the Yahoo Defendants cite as support for their contention that this Court must ignore the use of the word "trust" in the section header. *See* Dkt. 123 at 43. That case stands for the unremarkable proposition that courts should heed a "contract's instruction not to rely on the headings for substantive guidance." *Great-West*, 288 F. Supp. 3d at 9–10. Here, in contrast, the Court is relying on the word "trust" not for substantive guidance, but rather as evidence that undermines Defendants' contention that the parties to the settlement agreement never even considered whether they were creating a trust.

impose equitable duties on anyone, an essential element to form a trust," Dkt. 126 at 13.  The Court is unpersuaded.

In considering Defendants' motions to dismiss, this Court and—more importantly—the D.C. Circuit rejected the contention that the settlement agreement failed to establish a charitable trust because it did not name any trustees.  As the Court explained in *Depu IV*, "the settlement agreement ma[k]e[s] clear that the [Foundation] would be a trustee of the Fund."  531 F. Supp. 3d at 238.  Similarly, the D.C. Circuit held in *Depu III* that the settlement agreement "plausibly identifies" all of the elements of a trust, include "a trustee (the Foundation)."  950 F.3d at 902.

Although a more demanding standard applies at this stage of the proceeding, the plain language of the settlement agreement requires the same result.  As the Court explained in *Depu IV*, the Restatement (Second) of Trusts defines a "trustee" as a "person holding property in trust."  *Id.* (quoting Restatement (Second) of Trusts § 3).  Here, the settlement provides that Yahoo, as the trust's settlor, would "make payments totaling a maximum of $17.3 million to the Foundation subject to [several] conditions," adding that "[t]hese payments shall be maintained separately from other Foundation funds and shall be known as the 'Yahoo! Human Rights Fund.'"  Pl. Ex. 14 at 12.  And, in fact, Yahoo transferred $17.3 million to a bank account controlled by the Foundation, titled "The Laogai Research Foundation Fundraising Account: Harry Wu/YHR Fund."  Dkt. 121-13 at 3.  Those conditions are sufficient to establish that the Foundation serves as trustee, even if the word "trustee" is not used in the agreement.  The principle that "[n]o 'magic words' are needed to create a . . . trust" applies with equal force to the word "trustee," and it is of no consequence that the word does not appear in the agreement

because the agreement charges the Foundation with holding the Fund in a separate account to serve the charitable purposes of the trust.[8] *Valentini*, 860 F. Supp. 2d at 1105.

The settlement agreement's requirement that the Foundation establish a Board to direct the Fund's activities is not at odds with the Foundation's designation as a trustee.  As noted above, the settlement agreement required the Foundation and Wu to establish a Board of Directors, which would have the "power and authority to direct the activities and expenditures of the YHR Fund," Pl. Ex. 14 at 16, while the Fund assets were to be held by the Foundation.  A trust instrument "may divide responsibilities between trustees, for example, between trustees who hold and invest the trust assets," such as the Foundation, and "a committee who makes decisions about distributions for charitable purposes," such as the Board of Directors.  Bogert on Trusts § 391.  "This method of administration is not uncommon" in charitable trusts.  *Id.*; *see also, e.g.*, *Petition of U.S. on Behalf of and For Benefit of Smithsonian Inst.*, 485 F. Supp. 1222, 1238 (D.D.C. 1980) ("[T]he trustee of a charitable trust may join with another in administering the trust."); *Perkins v. Citizens & S. Nat'l Bank*, 8 S.E.2d 28, 34 (Ga. 1940); *Bank of Del. v. Allmond*, 183 A.2d 188, 191 (Del. Ch. Ct. 1962).  Here, moreover, although the parties have yet to present evidence regarding the actual allocation of trust duties, there is some evidence before the Court that at least suggests that the Foundation took it upon itself to make decisions regarding the expenditure of YHR Fund assets, without obtaining advance approval from the Board of Directors.  *See, e.g.*, Dkt. 123–1 at 55–56 (Harris Dep. 104:2–105:8).  In any event, as

---

[8] The Yahoo Defendants argue that Plaintiffs' claims against them "should be dismissed with prejudice" because Plaintiffs "offer no evidence that Yahoo, . . . Callahan, or . . . Bell were 'trustees' of any trust or had any fiduciary duties under the Settlement Agreement."  Dkt. 126 at 7–8.  That question, however, is not properly before the Court at this time.  Rather, at the parties' request, the Court permitted focused discovery and an early trial on the question whether the settlement agreement created a trust.  The Yahoo Defendants remain free to press this alternative argument at an appropriate time.

discussed below, both entities had at least certain duties relating to their administration of the Fund.

The fact that the settlement agreement does not specify particular "equitable duties" that the trustees must perform does not mean that the agreement failed to create a trust. The Yahoo Defendants are correct that "the role of a trustee is far more complex than a person who pays out money to a beneficiary" because "[a] trustee . . . is 'subject to equitable duties.'" Dkt. 123 at 34. (quoting *Cabannis*, 464 A.2d at 91). But those equitable duties follow from the creation of a trust; they need not be specified to create a trust in the first place. "The creation of a trust . . . results . . . in the creation of duties of the trustee to the beneficiary; but the duties result from the trust relation, and are not based upon an agreement or contract." Restatement (Second) of Trusts § 74 cmt. a; *see also Depu III*, 950 F.3d at 904. The Yahoo Defendants argue, for example, that "the Settlement Agreement does not impose any duties to invest the Fund or administer it prudently as required under D.C. Code §§ 19-1308.03[–.04]." Dkt. 123 at 36. But the agreement need not spell out that duty; D.C. trust laws, which are adopted from the Uniform Trust Code, "govern[] the duties and powers of a trustee" by default, "[e]xcept as otherwise provided in the terms of the trust." D.C. Code § 19-1301.05.

Nor is there any doubt that the Foundation understood that it was undertaking these duties. At the first meeting of the Board of Directors on March 20, 2008, the Foundation's Director read to the Board the "Board Member Agreement with the Laogai Research Foundation," which identified the "duties and responsibilities" of the Board. Dkt. 121-22 at 2. Those "duties and responsibilities" included "fiscal[] responsib[ility] for the financial wellbeing of the [Fund]" and the "duty to review and approve the semi-annual reports of the [Fund's] activities to ensure that the [Fund's purpose] is being advanced." *Id.* The Foundation, as

"administrators of the Fund," undertook to "provide [Board members] with these financial reports, which [would] allow [Board members] to meet the prudent person section of the law." *Id.* Finally, if the Board determined that a particular Board member "failed to act in good faith," that Board member agreed pursuant to his "duties and responsibilities" to resign. *Id.* These duties, which were proposed by the Foundation and agreed to by the Board, mirror the types of fiduciary duties that trustees traditionally assume. *See, e.g.*, Restatement (Third) of Trusts § 76 ("The trustee has a duty to administer the trust, diligently and in good faith, in accordance with the terms of the trust and applicable law."). Moreover, as noted above, the Court need not decide for present purposes whether the Board's assumption of these duties relieved the Foundation of the same obligations or whether those obligations were shared. *See Smithsonian*, 485 F. Supp. at 1238 ("[A] trustee is not relieved of his obligations when they are voluntarily assumed and performed by another."). The parties remain free to address the proper allocation of responsibility, if necessary, at a later date. What matters for now is that the settlement agreement did, in fact, create a charitable trust.

The Yahoo Defendants also argue that the settlement agreement imposes no enforceable duties on the Foundation. *See* Dkt. 123 at 34; Dkt. 126 at 21. The Restatement (Second) of Trusts explains that "[a] charitable trust is not created unless the settlor manifests an intention to impose enforceable duties." Restatement (Second) of Trusts § 351 cmt. c. As a result, "if the settlor merely expresses a suggestion or wish that the transferee should apply the property to charitable purposes, leaving it to the transferee to follow the suggestion or comply with the wish only if he desires to do so, a charitable trust is not created and the transferee holds the property for his own benefit." *Id.* But, as explained above, the settlement agreement does far more than make suggestions or express aspirations; it directs that the Foundation to use the Fund assets "for

three purposes only," and it further directs that those assets "shall not be used" for various, specified activities.  Pl. Ex. 14 at 13–14.  The Yahoo Defendants respond that it could have expended all of the Fund's assets on activities unrelated to humanitarian and legal assistance to Chinese dissidents.  *See* Dkt. 123 at 36–37.  But the D.C. Circuit rejected a similar contention in *Depu III*, noting that "where a trust has multiple beneficiaries, trustees must act 'impartially in . . . [the distribution of] trust property,' paying 'due regard' to the 'respective interests of each.'" 950 F.3d at 904 (quoting D.C. Code § 19-1308.03).

Finally, the Yahoo Defendants argue that the agreement does not signal that Yahoo wanted to impose on a trustee "duties to unknown numbers of Chinese dissidents."  Dkt. 126 at 10.  It bears emphasis, however, that this case involves a charitable trust, which—unlike a private trust—is not "characterized by identified beneficiaries who enjoy equitable ownership of the property and for whose benefit the trustees are obliged to act."  *Hooker*, 579 A.2d at 610. "[I]n a charitable trust," by contrast, the trustee must "apply the trust res for some form of public benefit, and persons who receive[] advantages from the administration of the trust do so because they are conduits through whom the social gains flow."  *Id.* (alteration in *Hooker*) (quoting Bogert on Trusts § 411).  Given this lack of identified beneficiaries, "the traditional rule" for charitable trusts has been that

> only a public officer, usually the state Attorney General, has standing to bring an action to enforce the terms of [a charitable] trust.  Principally, the rationale for vesting exclusive power in a public officer stems from the inherent impossibility of establishing a distinct justiciable interest on the part of a member of a large and constantly shifting benefited class, and the recurring burdens . . . of vexatious litigation . . . would result from recognition of a cause of action by . . . individuals.

*Id.* at 612 (citations omitted).  The fact that the settlement agreement fails to specify particular beneficiaries, accordingly, carries little weight in the context of a charitable trust.

To be sure, as the D.C. Circuit explained in *Depu III*, Plaintiffs face a separate hurdle: to establish that they have "special interest" standing, they must prove that "the action challenge[s] an 'extraordinary measure threatening the existence of the trust,' not just an 'ordinary exercise of discretion' committed to the trustees[] and that [they] belong to a class of potential beneficiaries that is 'sharply defined' and 'limited in number.'"  950 F.3d at 906 (quoting *Hooker*, 579 A.2d at 614–15).  Because this requirement "is distinct from Article III standing, which all parties and [the D.C. Circuit] agree the plaintiffs have," *id.* at 905 n.11, the Court need not decide at the threshold whether Plaintiffs are entitled to bring an action to enforce the terms of the trust.  And, at the parties' request, the Court has agreed to decide whether the settlement agreement created a charitable trust first.  Although recognizing that this presents a substantial question, it is premature to reach the question on the limited record and briefing that is currently before the Court.

## B.    **Extrinsic Evidence**

As the D.C. Circuit explained in *Depu III*, in addition to considering the written instrument, D.C. law also "expressly authorizes examination of 'extrinsic circumstances'" to determine whether a settlor intended to create a trust.  950 F.3d at 903 n.7 (quoting *Cabaniss*, 464 A.2d at 91–92); *see also Cabaniss*, 464 A.2d at 91–92 (citing Restatement (Second) of Trusts §§ 23–25) (identifying "extrinsic circumstances and evidentiary factors pertinent to a determination of a settlor's intention to create a trust").  Plaintiffs highlight a litany of extrinsic evidence that, in their view, "overwhelmingly supports the existence of a trust."  Dkt. 121 at 26.  That evidence includes: (1) "[t]he drafting process," (2) "[t]he lack of a pre-existing relationship between Yahoo and the [Foundation]," (3) "[t]he fact that Yahoo was also a beneficiary," (4) "[t]he lack of any reversion or condition subsequent," (5) "[t]he fact that Yahoo transferred Fund

monies to a bank account controlled by the [Foundation]," (6) "[t]he fact that [the] account was titled in the name of . . . the Fund," and (7) "[t]he parties' words and conduct with respect to the Fund." *Id.* at 26–32. For their part, Defendants rely principally on testimony from witnesses, including Yang, Callahan, and Harris, who assert that they never intended to establish a trust. *See* Dkt. 123 at 29. In the Court's view, four categories of extrinsic evidence are probative of Yahoo's intent.

*First*, Yahoo's impetus for negotiating a settlement agreement that provided humanitarian assistance to Chinese dissidents who expressed their views through Yahoo and other online media supports Plaintiffs' contention that the agreement established a charitable trust. Yahoo was severely rebuked at the 2007 hearing of the House Committee on Foreign Relations, *see generally* 2007 House Hearing, and it entered into the settlement agreement just days after that hearing, *see* Pl. Ex. 14 at 20. Chairman Lantos, for example, told Yang: "I described in some detail, and I trust with some clarity, what in our view Yahoo! did wrong. Yahoo! collaborated with the Chinese police apparatus in the imprisonment of a freedom-loving Chinese journalist." 2007 House Hearing at 28. Although focused on only a handful of identified dissidents, Chairman Lantos (and other members of the committee) made clear that their concern was more pervasive, asserting that Yahoo "should have taken every conceivable step to prevent the automatic compliance with a request from the Chinese police apparatus, and to this day, Yahoo! has failed to change any of its practices in order to prevent such collaboration in the future." *Id.* at 4. To this, he added: "I do not believe that America's best and brightest companies should be playing integral roles in China's notorious and brutal political repression apparatus." *Id.*

Immediately after the hearing, Yang met with Wu and two family members of Chinese dissidents. According to Yang's own account, this "was an emotional meeting for everyone,

including" Yang.  Pl. Ex. 1 at 5 (Yang Dep. 16:2–22).  It was, then, shortly after that difficult hearing and meeting that Yahoo agreed to provide "humanitarian or financial assistance to people that [Wu] saw as those people who are affected" by Chinese political repression.  *Id.* at 6–7 (Yang. Dep. 18:16–22:6).  "[T]he motives which may reasonably be supposed to have influenced the settlor in making the disposition" are among the relevant circumstances that the Court must consider, *Cabaniss*, 464 A.2d at 92, and, here, Yahoo's motive was—in its own words—"to mak[e] sure our actions match our values around the world" by "establish[ing] a Human Rights Fund to provide humanitarian and legal aid to dissidents who have been imprisoned for expressing their views online," Pl. Ex. 25.

Against this backdrop, it is difficult to believe that Yahoo intended merely to make a gift to the Foundation or that it did not intend to bind the Foundation to use the YHR Fund to provide humanitarian and legal assistance to Chinese dissidents who are imprisoned for expressing their views through Yahoo or other online media.  Anything short of the creation of a charitable trust would have done little to squelch the criticism that Yahoo faced or to meet Yang's goal of "help[ing] people," regardless of whether they were Yahoo users, "who have suffered from expressing their views online."  Pl. Ex. 1 at 7 (Yang Dep. 22:18–23:9).

*Second*, the fact that Yahoo chose Wu and the Foundation to administer the YHR Fund further supports the Court's finding that Yahoo intended to create a charitable trust.  Like motive, "the relationship between and financial position of the parties" matters for purposes of discerning the settlor's intent, *Cabaniss*, 464 A.2d at 92, and, here, Yahoo had no prior relationship with Wu or the Foundation.  Yahoo chose Wu and the Foundation because it viewed them "as experts in issues related to human rights in China and capable of using the Fund monies for the intended purposes set forth in the [s]ettlement [a]greement."  Dkt. 123-1 at 21 (Yang

Decl. ¶ 8).  Yahoo also "viewed Harry Wu as someone who was respected by Congress as a human rights expert."  *Id.* (Yang Decl. ¶ 9); *see also* Pl. Ex. 1 at 6–7 (Yang Dep. 20:19–22:6). Yahoo owed Wu and the Foundation nothing and had no history with either.  What it valued is precisely what one would value in a trustee: expertise regarding the relevant subject matter and the capacity to make decisions consistent with the charitable purpose of the trust.

*Third*, the Foundation's actions in implementing the agreement are also probative of its understanding that it had assumed the role of a trustee.  In public statements, the Foundation referred to itself as a "steward" of the Fund, and as "taking strategic steps to ensure the prompt and prudent use of th[e] fund."  Pl. Ex. 7 at 2–3.  Wu and the Foundation, at least at times, referred to Fund recipients as "beneficiaries."  Dkt. 121-9 at 1; Dkt. 121-10 at 3.  The Foundation also recognized its responsibilities to act as the "administrator[] of the" Fund and to provide the Board with "financial reports" to enable the Board to "meet the prudent person section of the law."  Dkt. 121-22 at 2.  The Foundation also understood that the Board had "duties and responsibilities" for "carrying out the [Fund's] mission of (a) providing humanitarian and legal assistance primarily to persons in or from the People's Republic of China who have been imprisoned for expressing their views through Yahoo! or another medium, and (b) supporting the educational work of the . . . Foundation."  *Id.*  This language, although not exclusive to trust law, reflects the Foundation's understanding that the YHR Fund was created as a charitable trust and that this status carried with it certain fiduciary duties.  It does not reflect, as the Laogai Defendants claim, that "the parties created a contract that [merely] resulted in a *gifting* to [the Foundation] of $17.3 million to be used for [the] three [designated] purposes."  Dkt. 128 at 21 (emphasis added).

*Fourth*, Yahoo's participation in the administration of the Fund is also probative of the company's efforts to "control or direct [its] disposition," which, although not dispositive, is consistent with the intent to create a trust.  Bogert on Trusts § 48.  The Yahoo Defendants insist that the agreement did not "give Yahoo any right of control or oversight over how the Funds were spent."  Dkt. 126 at 15.  But the agreement required the Foundation to "consult with Yahoo! regarding the composition and membership of the Board of Directors before making any appointments to the Board."  Pl. Ex. 14 at 16.  That consultation resulted in Samway's appointment to serve as one of the Board's five members.  In that role, Samway sought to "re-emphasize" the "need to use the Fund for its intended purposes regarding online dissent."  Dkt. 123-2 at 47 (email from Samway to Liao).  He also advanced proposals for the Board to "establish criteria for what types of projects the [YHR Fund] Board should consider and also decide if they're within the scope of the Fund," *id.*, and to adopt a rule that "[t]he members of the Board shall . . . consist of at least one member appointed by the Yahoo! Entities," Pl. Ex. 9 at 3. Those proposals, which the Board agreed to in principle, *see* Pl. Ex. 10 at 4, signal Yahoo's initial and continuing interest in ensuring that the Fund was used for the purposes envisioned by Yang and Yahoo, including its charitable purpose, which is probative of trust intent.

In response, the Yahoo Defendants argue that Plaintiffs have failed to carry their burden because "every witness who has testified" will say there was "never inten[t]. . . to create a trust." Dkt. 123 at 28.  According to the Yahoo Defendants, when courts determine whether a party intended to create a trust, they typically "rely on 'language or . . . conduct[] in light of all surrounding circumstances' because the settlor is often deceased."  *Id.* at 29 (quoting *Cabaniss*, 464 A.2d at 91).  "[T]his case is distinguishable," the Yahoo Defendants maintain, "because here, there is no need to guess at the settlor's intent.  Key players and decision makers, except for

. . . Wu, are alive and will be able to testify about their intent, and thus the Court has the benefit of hearing from the individuals responsible for creating the Fund directly." *Id.*

Although this testimony bears consideration, the Court is unpersuaded that it carries the near-conclusive weight that the Yahoo Defendants assign it. As the D.C. Court of Appeals explained in reversing a grant of summary judgment to the settlor of an *inter vivos* trust on a question of trust interpretation, a settlor's "affidavit is not dispositive" because "[i]t is only his after-the-fact factual assertion as to what he intended" when the trust was supposedly formed. *In re Durosko Marital Trust*, 862 A.2d 914, 924–25 (D.C. 2004). The court further observed that "[t]he terms of a trust are determined by the settlor's intention at the time of creation of the trust, and not by his subsequent intention." *Id.* Other courts have reached similar conclusions. *See, e.g., D'Agrosa v. Coniglio*, No. 2909/06, 2006 WL 1867968, at *4 (N.Y. Sup. Ct. July 6, 2006) (unpublished); *see also, e.g., Beckett*, 995 F.2d at 287 (holding that a party intended to create a trust despite the party's assertions to the contrary); *Weiner v. Mullaney*, 59 Cal. App. 2d 620, 631 (Ct. App. 1943) (same). Some courts, moreover, have embraced the broad principle that "[a]n express trust may arise even though the parties in their own minds did not intend to create a trust . . . [A]n objective rather than a subjective test is applied. It is a manifestation of intention which controls and not the actual intention where that differs from the manifestation of intention." *McGhee v. Bank of Am.*, 131 Cal. Rptr 482, 485 (Ct. App. 1976) (quoting 1 Scotts on Trusts (3d. ed. 1967)); *see also Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 46 A.3d 473, 495 (Md. Ct. Spec. App. 2012) (citing Austin Wakeman Scott & William Franklin Fratcher, *The Law of Trusts* § 2.8 (4th ed. 1989)) (same), *aff'd*, 68 A.3d 843 (Md. 2013); *Weststeyn Dairy 2 v. Eades Commodities Co.*, 280 F. Supp. 2d 1044, 1077 (E.D. Cal. 2003) (same). For present purposes, the Court need not decide whether the District of Columbia has adopted (or would

46

adopt) that rule because the evidence, considered as a whole, firmly supports Plaintiffs' claim that the settlement agreement established a charitable trust.

The testimony of Yahoo's witnesses, in any event, cuts both ways. To be sure, those witnesses testified that they did not intend to create a "trust." *See, e.g.*, Dkt. 135 at 42–43 (Callahan); *id.* at 131 (Fielder); Dkt. 123-1 at 37 (Samway Dep. 133:13–17). But whether Yahoo intended to create a "trust" in the formal sense is immaterial. *See* Restatement (Third) of Trusts § 13; Restatement (Second) of Trusts § 23 (same). What matters is that it intended to enter an agreement that included the essential "elements of a trust"—that is, Yahoo intended to contribute the trust property, it intended that the Foundation (and possibly the Board) serve as a trustee, and it designated a beneficiary (or here, a charitable purpose). *See Depu III*, 950 F.3d at 902. The Yahoo witnesses' testimony supports a finding that Yahoo intended each of these things, even if it (at least arguably) failed to recognize that the "precise characteristics of a trust relationship" were contained in the settlement agreement. Restatement (Third) of Trusts § 13.[9]

---

[9] As discussed above, it is far from clear that the parties to the settlement agreement were oblivious to the possibility that they were, in fact, creating a charitable trust. None of the witnesses could explain why the settlement agreement contains a heading stating: "All Payments Made *in Trust* to Foundation." Pl. Ex. 14 at 12. Callahan, for example, testified that he "d[oesn't] know why 'in trust' appears in the header" and he "[doesn't] know if it was a mistake or not." Dkt. 135 at 50 (Callahan). Counsel for the Yahoo Defendants represented at the evidentiary hearing that "none of the witnesses know" why the term "in Trust" was used, but that it might have been "carryover language." *Id.* at 28. Counsel for the Laogai Defendants posited that "in Trust" is "similar to use of the phrase 'in God we trust," a "term of art used to say 'we trust you'. . . [and] nothing more." *Id.* at 32. Given the sophistication of the parties and their representation by counsel in drafting the settlement agreement, it seems unlikely that *no one* noticed that multiple iterations of the agreement, including the final version, referred to the creation of a "trust." It may well be that no one focused on this aspect of the agreement because it was not the most pressing issue at hand. But failing to focus on a question is different than having no knowledge whatsoever that a legally significant term appears in one of the key paragraphs of a relatively short, and presumably thoroughly reviewed, contract.

Jerry Yang, for example, testified in his deposition that he "would say [the agreement is] a contract.  It's a contract between us and [the Foundation], and that's what contracts are."  Dkt. 123-1 at 17–18 (Yang Dep. 80:25–82:3).  But Yang, who is not a lawyer, *see* Pl. Ex. 1 at 23 (Yang Dep. 88:3), also testified that Yahoo "structured the [s]ettlement [a]greement" so that "Yahoo's . . . obligation was to pay money to create the Fund," and "Wu and the [Foundation] were then obligated . . . to use the Fund for its intended purposes."  Dkt. 123-1 at 21 (Yang Decl. ¶ 10).  Notably, those purposes included the charitable purpose of "provid[ing] humanitarian and legal assistance primarily to persons in or from . . . China."  Pl. Ex. 14 at 13.  Similarly, Callahan testified that "Yahoo did not intend to create a trust at the settlement agreement stage."  Dkt. 135 at 42–43 (Callahan).   He also testified, however, that "[t]he overall intention was just obviously to settle the two [lawsuits], but also to create the Human Rights Fund that would be used to the [Foundation's] discretion for the purposes that were enumerated in the settlement agreement." *Id.* at 85 (Callahan).  That structure—a donor paying money to a donee, who maintains an obligation to spend the money for a charitable purpose—is demonstrative of trust intent.  *Cf. In re Strack*, 524 F.3d at 499 ("At bottom, '[i]f the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust is created.'" (alteration in *In re Strack*) (quoting *Broaddus*, 26 S.E.2d at 36); *see also* Restatement (Second) of Trusts § 14 (explaining the difference between a trust and a contract for the benefit of a third party).  In any event, even if the Foundation was permitted to exercise discretion in the expenditure of the trust funds, "discretion is hardly remarkable as a matter of trust law; the terms of a trust often give the trustee discretion in carrying out a duty, while leaving the duty itself mandatory." *Beckett*, 995 F.2d at 287.

## CONCLUSION

For all of these reasons, the Court finds by clear and convincing evidence that the 2007

settlement agreement established a charitable trust under D.C. law.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  May 12, 2022