## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HE DEPU, *et al*.

     Plaintiffs,

   v.

OATH HOLDINGS, INC., *et al*.

     Defendants.

No. 1:17-635-RDM

Judge Randolph D. Moss

**THIRD AMENDED COMPLAINT**

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................. 1

JURISDICTION AND VENUE ............................................................................ 4

PARTIES ................................................................................................................. 4

    A.    Plaintiffs ................................................................................................... 4

    B.    Defendants ................................................................................................ 9

        1.    The Yahoo Defendants ................................................................ 9

        2.    Estate of Harry Wu ...................................................................... 10

        3.    Laogai Research Foundation and Laogai Research Foundation-CA ........ 11

        4.    Laogai Human Rights Organization ........................................... 11

        5.    Impresa Legal Group ................................................................... 11

        6.    Yahoo Human Rights Fund .......................................................... 11

STATEMENT OF FACTS ................................................................................... 12

    A.    Yahoo was sued in 2007 for providing information about dissidents to the Chinese government, leading to their imprisonment. ............................................. 12

    B.    The Trust was established in collaboration with Wu and the LRF as a condition of the settlement of the 2007 Lawsuit. .................................................... 14

    C.    The Trust had three purposes, the first of which was the Humanitarian Purpose, which Yahoo intended would receive "most" of the Trust's assets, and which was intended to improve (and did improve) Yahoo's image with lawmakers and the public ................................................................................. 14

    D.    Yahoo gave itself and its representatives unique power and control over Trust assets. ............................................................................................................. 18

    E.    Throughout the Trust's existence, numerous insiders expressed concerns that not enough is being spent on the Humanitarian Purpose—including a thwarted, would-be whistleblower who cited her "higher standard of fiduciary duty towards the trust's [humanitarian] beneficiaries"—but failed to take meaningful action for fear of bad publicity. ............................. 21

    F.    In 2016, Wu and the LRF attempted to terminate the Humanitarian Purpose. ................................................................................................................. 28

    G.    Wu died unexpectedly in late April 2016, which led to slightly increased regard for the Humanitarian Purpose, including for fear of litigation, but the LHRO and LRF continued to breach the Humanitarian Purpose in several ways. ........................................................................................................... 29

    H.    Yahoo falsely and repeatedly denied any control over the Trust and the Humanitarian Purpose. ......................................................................................... 30

I.      Yahoo touted the Humanitarian Purpose and relied on it to defeat shareholder proposals.................................................................................. 34

J.      Defendants fundamentally failed to discharge their fiduciary duties towards the Humanitarian Purpose. ....................................................... 36

K.      Developments since the filing of this lawsuit. ....................................... 39

    1.      The LRF and LHRO established a "Humanitarian Program Grant." ....... 39

    2.      The Trustee Defendants conceded there was no obligation under the Settlement Agreement for the LRF to receive any monies from the Trust. .......................................................................................... 40

    3.      Despite that concession, the Trustee Defendants failed to prevent further dissipation of the Trust on benefiting the LRF. ........................... 40

    4.      Impresa knowingly received a significant amount of Trust assets as payment for legal fees despite being on notice that such payments may have been in breach of trust. ............................................................. 43

    5.      In May 2023, Plaintiffs were told, through counsel, that one of LHRO's current directors, Bob Suettinger, wanted to use what remained of the Trust's assets to advance the interests of himself and Wei Jingsheng, another Chinese dissident. ......................................... 45

    6.      The Trust's assets were depleted to approximately $2.6 million or less.............................................................................................................. 45

*ALTER EGO* ALLEGATIONS................................................................................. 46

SPECIAL-INTEREST ALLEGATIONS ................................................................. 47

STATUTE OF LIMITATIONS ALLEGATIONS .................................................. 51

FIRST CLAIM FOR RELIEF .................................................................................. 53

SECOND CLAIM FOR RELIEF ............................................................................. 55

THIRD CLAIM FOR RELIEF ................................................................................. 56

FOURTH CLAIM FOR RELIEF ............................................................................. 56

FIFTH CLAIM FOR RELIEF .................................................................................. 57

SIXTH CLAIM FOR RELIEF.................................................................................. 58

PRAYER FOR RELIEF ........................................................................................... 61

Plaintiffs He Depu ("Mr. He"), Li Dawei ("Li"), Wang Jinbo ("Wang"), Ouyang Yi ("Ouyang"), Xu Yonghai ("Xu"), and Xu Wanping ("Xu W.") bring this action based upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, against Oath Holdings, Inc. ("Yahoo" or "Oath"), Michael Callahan ("Callahan"), Ronald Bell ("Bell"), the Estate of Harry Wu ("Wu"), the Laogai Human Rights Organization ("LHRO"), the Laogai Research Foundation, Laogai Research Foundation-CA (together with the Laogai Research Foundation, "LRF," and together with the LHRO, the "Laogai Defendants") (Yahoo, Callahan, Bell, Wu, LHRO, and LRF are collectively referred to as "Trustee Defendants," while Yahoo and LRF are also referred to as the "Co-Beneficiary Defendants"), Impresa Legal Group ("Impresa"), and the Yahoo Human Rights Fund ("YHRF" or "Trust" or "Fund") as a nominal defendant, as follows:

## NATURE OF THE ACTION

1.     This case arises from breaches of a charitable trust created in 2007 and originally funded in the amount of $17.3 million, also known as the Yahoo Human Rights Fund. The Trust's settlor, Yahoo, intended that the Trust's primary purpose be to provide humanitarian and legal assistance to Chinese dissidents imprisoned for exercising their freedom of expression online ("Humanitarian Purpose"), and that most of its assets be applied to that purpose. *E.g.*, YAHOO_PROD_0000922 (email dated November 14, 2007 from Jerry Yang setting forth settlor's intent that "most of the fund goes to humanitarian and legal help for dissidents"); YAHOO_PROD_0000365 (email dated July 17, 2008 emphasizing the Trust's "intended purposes regarding online dissent"); LRF00079142 (meeting minutes dated October 19, 2012 in which Yahoo executive states that "he and Yahoo! originally believed Yahoo! money would go to other dissidents"). The Trust had two other beneficiaries as well, Yahoo itself and the LRF, *i.e.*, the Co-Beneficiary Defendants. Yahoo and LRF participated in the breaches of trust,

including to benefit their own interests in the Trust, making them liable to the Humanitarian Purpose regardless of their status as trustees.

2.      The Trustee Defendants breached their duties to the Humanitarian Purpose in multiple ways, principally but not exclusively by permitting a grossly disproportionate amount of Trust assets to be spent on another of the Trust's purposes, namely benefiting the LRF, and by failing to ensure sufficient Trust assets were applied to the Humanitarian Purpose. *E.g.*, D.C. Code § 19-1308.03 ("If a trust has 2 or more beneficiaries, the trustee shall act impartially in investing, managing, and distributing the trust property, giving due regard to the beneficiaries' respective interests."); LRF00006752 at LRF00006755 (board minutes dated July 23, 2010 in which Tienchi Martin-Liao, a director and would-be whistleblower, asserted without serious objection that "the proportion of [trust] funds going to humanitarian assistance is too small, only 8%" of overall trust spending); LRF00079142 at LRF00079143 (board minutes dated October 19, 2012 in which David Hantman, a Yahoo executive, states that "he and Yahoo! originally believed Yahoo! money would go to other dissidents" as opposed to the LRF); FOLEYHOAG00000212 (May 10, 2013 minutes in which LRF director Jeff Fiedler admitted that "in [the] LRF's present mission, dissident assistance does not have an important position as it should have"); YAHOOFOLEYPROD000797 (email dated May 28, 2015 in which Bell states that spending on the trust's Humanitarian Purpose "remains a disappointingly small part of the LRF budget relative to administrative costs[,]" an issue which Bell described as "an Achilles heel").

3.      Wu and the LRF were the driving forces behind the breaches. Indeed, Wu had an acknowledged conflict of interest when it came to Trust assets because he stood to personally benefit—and did personally benefit—by a diversion of Trust assets away from the Humanitarian

Purpose. *E.g.*, ECF No. 18-4 at 49. As Wu and the LRF's fellow trustees, the other Trustee Defendants had a legal obligation to stand up to Wu and the LRF and force them to stop their breaches, as well as to redress their past breaches. *E.g.*, D.C. Code § 19-1307.03(g) ("Each trustee shall exercise reasonable care to: (1) Prevent a cotrustee from committing a serious breach of trust; and (2) Compel a cotrustee to redress a serious breach of trust."). However, instead doing so, the other Trustee Defendants stood idly by and even enabled Wu and the LRF's breaches. Worse, they did so not because they substantively agreed with Wu or the LRF regarding the Humanitarian Purpose, but because they simply lacked the will to take the necessary steps to make sure that purpose was carried out, and because they wanted to avoid a scandal. Moreover, the LRF and the LHRO remain trustees and have a duty to redress breaches of trust committed while Wu was alive, such as by suspending the use of Trust assets for the benefit of the LRF, and by attempting to replenish wrongfully depleted Trust assets. Because they refuse to do so, and because they are using Trust assets to deny having any fiduciary duties to the Humanitarian Purpose at all, their breaches are ongoing. *E.g.*, RESTATEMENT (SECOND) OF TRUSTS § 223 (1959) (trustees may be liable to beneficiaries if they neglect to take steps to redress past breaches of trust).

4.     Indeed, because Wu was also the chair of the LHRO's board, as well as its president until Wu's death, Wu's breaches were also attributable to the LHRO during those times.

5.     Impresa knowingly benefited from those breaches by accepting as payment monies it knew were potentially trust assets for legal work that was fundamentally inimical to the Humanitarian Purpose, including work aimed at denying the existence of any fiduciary duty to that purpose at all. *E.g.*, EAB000174 at EAB000178, EAB000180, EAB000184, EAB000185, EAB000186, EAB000187, EAB000189, EAB000196, EAB000197, EAB000200, EAB000201,

EAB000204, and EAB000208 (checks dating from June 2019 through March 2022 indicating transfers of Trust assets from LHRO to Impresa of over $700,000 dating from after this action was filed, with the bulk of those transfers dating from after the D.C. Circuit's February 2020 opinion holding that the existence of a trust had been plausibly alleged).

## JURISDICTION AND VENUE

6.      This action arises under the laws of the District of Columbia, including the common law of the District of Columbia, and the District of Columbia Uniform Trust Code.

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because it is an action between citizens of a State and citizens of a foreign state, and the amount in controversy exceeds $75,000.

8.      Venue is proper in the District Court for the District of Columbia, pursuant to 28 U.S.C. § 1391(b)-(d), because a substantial part of the unlawful conduct occurred in the District of Columbia, and because a substantial part of the property that is the subject of this action is located in the District of Columbia.

## PARTIES

### A.      Plaintiffs

9.      Plaintiff He Depu (defined above as "Mr. He") is a citizen and resident of China, domiciled in Beijing. He was detained on November 4, 2002 and was eventually charged and convicted of "inciting subversion of state power."[1] The evidence at trial consisted largely of his email communications and "provocative" articles published online or with his signature, including evidence transmitted through Mr. He's Yahoo email account. The verdict repeatedly quoted from evidence obtained by the Beijing Municipal Public Security Bureau's "Public

---

[1] Quotations from Chinese proceedings have been translated from the original Chinese.

Information Cyberspace Security Division." On November 6, 2003, Mr. He was sentenced to eight years' imprisonment by the Beijing Municipal First Intermediate People's Court. Mr. He was released in 2011. Mr. He is a past beneficiary of the Trust, and is a potential future beneficiary. Mr. He previously applied to and received funding from the Trust, but not as much as he would have had Defendants administered the Trust lawfully. Specifically, while he was imprisoned, Mr. He's wife learned about the Trust's existence from Liu Xiaobo, who recommended she apply to it on Mr. He's behalf in the amount of $30,000 USD. She did so, but only $10,000 USD was provided. Later, Wu and the LRF told Mr. He that more could be provided to Mr. He and his family if Mr. He helped Wu and the LRF dissuade Yu Ling from pursuing efforts to recover her rightful share of settlement monies. Mr. He continues to voice dissenting opinions in China online. Mr. He suffered the following injuries: (1) receiving less than he would have but for the unlawful diversion of Trust assets away from its Humanitarian Purpose; (2) losing the opportunity to obtain meaningful funding as a result of the unlawful diversion of Trust assets away from its Humanitarian Purpose to such an extent that that purpose was fundamentally violated; (3) a significant and ever-worsening decrease in the likelihood of a meaningful restoration of that opportunity as a result of Defendants' ongoing failures to protect and restore that purpose.

10.     Plaintiff Li Dawei (defined above as "Li") is a citizen and resident of China, domiciled in Tianshui city, Gansu province. Li was detained on April 15, 2001, on charges of "subversion of state power," and was eventually convicted. The verdict against him said that his "criminal" activities included using the internet to publicize an open letter, and "using the internet" to send letters to activists outside of China, as well as using the internet to collect information. This included activity conducted using Li's Yahoo email account. The Tianshui

Municipal Intermediate People's Court in Gansu Province sentenced Li to 11 years' imprisonment on July 17, 2003. Li was released in 2012. Li is a past beneficiary of the Trust, and is a potential future beneficiary. Li previously applied to and received funding from the Trust, but not as much as he would have had Defendants administered the Trust lawfully. Specifically, in or around December 2012, Li applied for funding from the Trust in the amount of 50,000 RMB, or approximately $8,000 USD. Li was eventually given $1,000 USD. Li continues to voice dissenting opinions in China online. Li suffered the following injuries: (1) receiving less than he would have but for the unlawful diversion of Trust assets away from its Humanitarian Purpose; (2) losing the opportunity to obtain meaningful funding as a result of the unlawful diversion of Trust assets away from its Humanitarian Purpose to such an extent that that purpose was fundamentally violated; (3) a significant and ever-worsening decrease in the likelihood of a meaningful restoration of that opportunity as a result of Defendants' ongoing failures to protect and restore that purpose.

11.     Plaintiff Wang Jinbo (defined above as "Wang") is a citizen and resident of China, domiciled in Linyi city, Shandong province. Wang was detained on May 24, 2001, for "inciting subversion of state power," was eventually convicted on December 4, 2001, and sentenced to four years' imprisonment by the Linyi Municipal Intermediate People's Court in Shandong Province. The verdict was based in part on Wang's exercise of his freedom of expression, and on activity conducted using Wang's Yahoo email account. Wang was released in 2005. Wang is a past beneficiary of the Trust, and is a potential future beneficiary. Wang previously applied to and received funding from the Trust, but not as much as he would have had Defendants administered the Trust lawfully. Specifically, in 2008, Wang applied for $20,000 USD based on advice from Liu Xiaobo. An award of $4,000 USD was approved, but only $3,000 USD was ever

6

paid. Wang continues to voice dissenting opinions in China online. Wang suffered the following injuries: (1) receiving less than he would have but for the unlawful diversion of Trust assets away from its Humanitarian Purpose; (2) losing the opportunity to obtain meaningful funding as a result of the unlawful diversion of Trust assets away from its Humanitarian Purpose to such an extent that that purpose was fundamentally violated; (3) a significant and ever-worsening decrease in the likelihood of a meaningful restoration of that opportunity as a result of Defendants' ongoing failures to protect and restore that purpose.

12.     Plaintiff Ouyang Yi (defined above as "Ouyang") is a citizen and resident of China, domiciled in Suining city, Sichuan province. Ouyang was detained by the Chengdu Municipal Public Security Bureau in December 2001 and was eventually convicted on charges of "incitement of subversion of state power." The verdict against him cited email evidence, including an open letter to the Chinese Communist Party distributed via email, and "sent using email to overseas websites and propagated online," and other evidence and information transmitted through, and activities conducted using Ouyang's Yahoo email account. On March 1, 2002, the Chengdu Municipal Intermediate People's Court in Sichuan Province sentenced Ouyang to two years' imprisonment. Ouyang was released in 2004. Ouyang is a potential future beneficiary and joined this lawsuit at Mr. He's encouragement to ensure the Trust's Humanitarian Purpose is carried out. Ouyang continues to voice dissenting opinions in China online. Ouyang suffered the following injuries: (1) losing the opportunity to obtain meaningful funding as a result of the unlawful diversion of Trust assets away from its Humanitarian Purpose to such an extent that that purpose was fundamentally violated; and (2) a significant and ever-worsening decrease in the likelihood of a meaningful restoration of that opportunity as a result of Defendants' ongoing failures to protect and restore that purpose.

13.     Plaintiff Xu Yonghai (defined above as "Xu") is a citizen and resident of China, domiciled in Beijing. On October 13, 2003, Xu was arrested in Hangzhou and charged with "suspicion of illegally providing state secrets and information" outside of China. The charges related to an investigative report Xu and others had compiled on the persecution of Christian "house churches" in China. The verdict against Xu cited evidence that this report had "been provided to foreign personnel through email." Xu used his Yahoo email account to transmit some of the evidence cited against him. On August 6, 2004, Xu was sentenced to two years' imprisonment. Xu was released in 2006. Xu is a potential future beneficiary of the Trust, and joined this lawsuit as Mr. He's encouragement to ensure the Trust's Humanitarian Purpose is carried out. Xu continues to voice dissenting opinions in China. Xu suffered the following injuries: (1) losing the opportunity to obtain meaningful funding as a result of the unlawful diversion of Trust assets away from its Humanitarian Purpose to such an extent that that purpose was fundamentally violated; and (2) a significant and ever-worsening decrease in the likelihood of a meaningful restoration of that opportunity as a result of Defendants' ongoing failures to protect and restore that purpose.

14.     Plaintiff Xu Wanping (defined above as "Xu W.") is a citizen and resident of China, domiciled in Chongqing. Xu W. has served a total of 20 years in prison for political dissent, most recently from 2005 to 2014. Xu W. was released from prison on April 29, 2014. The verdict against Xu W. relied on Xu W.'s online activity as evidence, including emails and articles Xu. W. sent, received, and published using his Yahoo email account. Xu W. is still an active political dissident and activist. In early 2016, Xu W. applied for funding from the Trust. Defendant Harry Wu responded in March 2016, informing Xu W. that the LRF had deliberated the matter, concluded that the Trust's Humanitarian Purpose should be terminated; that that

purpose was, in fact, terminated; and that Wu would personally assist Xu W. in the amount of $500 USD, which Wu eventually sent to Xu W. by check. Xu W. is a potential beneficiary of the Trust. As such, he suffered the following injuries: (1) receiving less than he would have but for the unlawful diversion of Trust assets away from its Humanitarian Purpose; (2) losing the opportunity to obtain meaningful funding as a result of the unlawful diversion of Trust assets away from its Humanitarian Purpose to such an extent that that purpose was fundamentally violated; (3) a significant and ever-worsening decrease in the likelihood of a meaningful restoration of that opportunity as a result of Defendants' ongoing failures to protect and restore that purpose.

### B.     Defendants

#### 1.     The Yahoo Defendants

15.     Defendant Oath Holdings, Inc. (defined above as "Yahoo" or "Oath Holdings"), is the entity that owns the liability of Yahoo! Inc. (now known as Altaba Inc.) associated with this action. In or around June 2017, Yahoo! Inc. transferred certain assets and liabilities making up Yahoo! Inc.'s operating business to Verizon, effective June 2017. This action was one of those liabilities. In or around September 2021, a fund managed by affiliates of Apollo Global Management, Inc. acquired Verizon Media, which included Oath Holdings, Inc. For readability, Oath Holdings, Inc. will be referred to either as Yahoo or Oath Holdings, or some combination thereof, depending on context.

16.     Oath Holdings, Inc. is located in Sunnyvale, California.

17.     Yahoo was a defendant in the 2007 Lawsuit (defined below), the settlement of which resulted in the creation of the Trust. Yahoo was a trustee of the Trust and its Humanitarian Purpose and owed fiduciary duties to Plaintiffs and to the Trust and its Humanitarian Purpose.

18.     Defendant Michael Callahan (defined above as "Callahan") was Executive Vice President, General Counsel, and Corporate Secretary at Yahoo from December 1999 to July 2012. Callahan was a trustee of the Trust and its Humanitarian Purpose, and a member of the board of directors of LHRO (defined below), until his departure from Yahoo. As trustee and director, Callahan owed fiduciary duties to Plaintiffs and to the Trust and its Humanitarian Purpose. Callahan is a resident of California. Callahan was compensated for his services as trustee and director, including by Yahoo.

19.     Defendant Ronald Bell (defined above as "Bell") was General Counsel and Corporate Secretary at Yahoo. Bell was a trustee of the Trust and its Humanitarian Purpose, and was a member of the board of directors of LHRO until 2016. As trustee and director, Bell owed fiduciary duties to Plaintiffs and to the Trust and its Humanitarian Purpose. Bell is a resident of California. Bell was compensated by Yahoo for his services as trustee and director.

20.     Bell notified the LHRO board on January 7, 2016, that because of the termination of the YIHRT (defined below), Yahoo's role on the LHRO board was no longer relevant, and that he was resigning from the board effective January 8, 2016.

21.     Defendants Yahoo, Callahan, and Bell are collectively referred to as the "Yahoo Defendants."

### 2.     Estate of Harry Wu

22.     Defendant Estate of Harry Wu is the estate of Harry Wu (defined above as "Wu"), who was a trustee of the Trust and its Humanitarian Purpose, and Executive Director of LHRO and LRF. As trustee and director, Wu owed fiduciary duties to Plaintiffs and to the Trust and its Humanitarian Purpose. Wu was a resident of Virginia. Wu passed away on April 26, 2016. Wu was compensated for his services as trustee and director, including by Yahoo, the LRF, and the LHRO.

### 3.      Laogai Research Foundation and Laogai Research Foundation-CA

23.      Defendant Laogai Research Foundation is a 501(c)(3) non-profit corporation, organized under the laws of the Commonwealth of Virginia. Defendant Laogai Research Foundation-CA is a 501(c)(3) non-profit corporation, organized under the laws of the State of California. (The Laogai Research Foundation and the Laogai Research Foundation-CA were previously together defined as "LRF.") The LRF's principal place of business is 1901 18th St. NW, Washington, DC, 20009. LRF was Wu's *alter ego* when Wu was alive, as Wu dominated and controlled all aspects of the LRF's operations. The LRF was and remains a trustee of the Trust and its Humanitarian Purpose, and owed and continues to owe fiduciary duties to Plaintiffs and to the Trust and its Humanitarian Purpose.

### 4.      Laogai Human Rights Organization

24.      Defendant Laogai Human Rights Organization (defined above as "LHRO") is a 501(c)(3) non-profit corporation organized under the laws of the District of Columbia. The LHRO's principal place of business is 1901 18th St. NW, Washington, DC, 20009. LHRO was established to administer a portion of the Trust's assets. The LHRO was and remains a trustee of the Trust and its Humanitarian Purpose. The LHRO owed and continues to owe fiduciary duties to Plaintiffs and the Trust and its Humanitarian Purpose.

### 5.      Impresa Legal Group

25.      Impresa Legal Group (defined above as "Impresa") is a law firm with offices in Arlington and Alexandria, Virginia. Impresa has represented the Laogai Defendants on various legal matters, including this litigation.

### 6.      Yahoo Human Rights Fund

26.      Defendant Yahoo Human Rights Fund (defined above as the "YHRF" or "Trust" or "Fund") is a trust fund established in 2007 and fully funded in 2008 primarily to provide

humanitarian and legal assistance to persons in China who have been imprisoned for exercising their freedom of expression online. Given the possibility that the Trust currently holds title to assets necessary to grant Plaintiffs complete relief, it is named as a nominal defendant.

## STATEMENT OF FACTS

**A.      Yahoo was sued in 2007 for providing information about dissidents to the Chinese government, leading to their imprisonment.**

27.      Yahoo was one of the first international internet companies to operate in China, and in the early 2000s, many Chinese dissidents used Yahoo's email services to communicate and disseminate information, including information that the Chinese Communist Party ("CCP") considered subversive. These users believed that, as an American company ostensibly respectful of First Amendment ideals such as freedom of expression, Yahoo would resist inevitable CCP efforts to obtain their private information, which the CCP would use to punish them and to eliminate dissent. Unfortunately, Yahoo failed to live up to these ideals, and instead readily turned over user information to the CCP, fully aware of the likely consequences. As a result, many Yahoo users were imprisoned based on evidence provided by Yahoo.

28.      In 2007, two such imprisoned Yahoo users, Wang Xiaoning ("Wang X.") and Shi Tao ("Shi"), along with Wang X.'s wife, Yu Ling, brought a lawsuit against Yahoo ("2007 Lawsuit") in the U.S. District Court for the Northern District of California. *See Wang Xiaoning, Shi Tao, Yu Ling et al. v. Yahoo!, Inc. et al.*, No. 07-02151-CW, ECF No. 51 (N.D. Cal., July 30, 2007) (amended complaint). The lawsuit alleged, among other things, that Yahoo was liable under the Alien Tort Statute, 28 U.S.C. § 1350, the Torture Victim Protection Act, 28 U.S.C. § 1350, the Electronic Communications Privacy Act, 18 U.S.C. § 2701, and the common law of California. *See id*.

29. The Shi Tao case in particular had by then attracted significant public attention. Shi was a journalist and editor at a business newspaper who was imprisoned for attempting to shed light on CCP efforts to control and suppress dissent in advance of the 15th anniversary of the 1989 Tiananmen Square massacre. Specifically, he sent his notes from a staff meeting about those efforts to a New York-based website, using his Yahoo email account. His eventual conviction and ten-year prison sentence relied on detailed evidence about that account provided by Yahoo.

30. In a 2006 Congressional hearing that touched on Shi's case, Yahoo's then general counsel, Callahan, defended Yahoo by claiming that when Yahoo complied with the Chinese government's request, it had "no information about the nature of the investigation." In 2007, however, evidence came to light showing that was not true, as the subpoena-like documents issued by Chinese authorities to Yahoo specifically stated that the investigation related to "provision of state secrets," a well-known euphemism employed by the CCP to suppress dissent.

31. Yahoo's dishonesty amplified already intense criticism, and led to an additional Congressional hearing on November 7, 2007 before the U.S. House Committee on Foreign Affairs. *Yahoo! Inc.'s Provision of False Information to Congress: Hearing Before the H. Comm. on Foreign Affs.*, 110th Cong. 16, 22 (2007). That hearing was attended by Yu Ling, a plaintiff in the 2007 Lawsuit, and wife of the imprisoned plaintiff Wang X. Accompanying Yu Ling was Wu, who served as Yu Ling's translator. Present for Yahoo were Callahan and Yahoo's then CEO, Jerry Yang ("Yang"). During that hearing, Yahoo was denounced by several lawmakers. For example, Committee Chairman Tom Lantos told Yang and Callahan that, "while technologically and financially you are giants, morally you are pygmies." Meanwhile, Wu was

13

praised as by future Vice President of the United States Mike Pence as "one of freedom's heroes in the world."

**B.     The Trust was established in collaboration with Wu and the LRF as a condition of the settlement of the 2007 Lawsuit.**

32.     Immediately after the hearing, in an anteroom at the Capitol, Yang met with Yu Ling, Wu, and others, and Yu Ling agreed to settle the 2007 Lawsuit. In exchange: (1) Yahoo would pay compensation to the plaintiffs; (2) Yahoo would finance a trust fund to provide financial assistance to imprisoned Chinese dissidents; and (3) Yang would directly advocate to the Chinese government for Wang X.'s release.

33.     Attorneys for plaintiffs in the 2007 Lawsuit were not present at this meeting. Indeed, Wu insisted that the attorneys be terminated, and that he would lead the negotiations on the plaintiffs' behalf. Following the November 7, 2007 meeting, Wu continued to discuss a settlement with Yahoo on the plaintiffs' behalf. During those discussions, Yahoo agreed to create a human rights fund, to be administered by Wu and the LRF, as part of the settlement. That fund would become the Yahoo Human Rights Fund, *i.e.*, the Trust at issue in this case.

34.     For Yahoo, the creation of such a fund, and the collaboration with Wu and the LRF, promised to be a relatively sure way of not just quelling Congress's criticisms, but gaining its favor. Indeed, as David Hantman, then Yahoo's Vice President of Global Public Policy testified, he was "excited" by the prospect of working with Wu, given Wu's positive reputation among the lawmakers at the hearing. Hantman Dep. 50:10-14.

**C.     The Trust had three purposes, the first of which was the Humanitarian Purpose, which Yahoo intended would receive "most" of the Trust's assets, and which was intended to improve (and did improve) Yahoo's image with lawmakers and the public**

35.     On November 13, 2007, Yahoo sent Wu and the LRF a draft of the settlement agreement that described this aspect of the settlement as follows:

**C. Payment by Yahoo! Inc. to the LaoGai Research Foundation ("Foundation") to Establish the Yahoo! Human Rights Fund.** Yahoo!, Inc. will pay $17.3 million to the Foundation. This sum shall be maintained separately from other Foundation funds and shall be known as the "Yahoo! Human Rights Fund."

    1. All Payments Made in Trust to Foundation. The payments to the Foundation shall be made to the Foundation in four equal installments on _____ [DATES TO BE NEGOTIATED].

…

    3. Foundation Use of Yahoo! Human Rights Fund. The YHR Fund may be used for three purposes only: (a) to provide humanitarian and legal assistance primarily to persons in the People's Republic of China who have been imprisoned for expressing their views through Yahoo! or another online service or medium; (b) to resolve claims primarily by such persons, or persons threatened with prosecution or imprisonment, against the Yahoo! Entities or any Yahoo! subsidiary or affiliate; and (c) for payment of Foundation operating expenses to the extent provided below.

…

    (i) In their implementation of paragraph 3(a), above, the Foundation and its Executive Director, Harry Wu, agree to use their best efforts to maximize the benefits achieved through their use of a portion of the YHR Fund for humanitarian and legal assistance.

…

    (iii) Pursuant to paragraph 3(c), above, the Foundation may use for its operating expenses up to $500,000 USD of the YHR Fund in each calendar year (prorated for 2007) for the next _____ years, but in no event more than a total of $ _____ USD.

36.    Thus, the proposal at this juncture was that the fund would be called the "Yahoo! Human Rights Fund" and that it would have three purposes: (1) providing humanitarian assistance to imprisoned dissidents ("Humanitarian Purpose"); (2) settling claims against Yahoo brought by such dissidents ("Yahoo Purpose"); and (3) paying for the LRF's operating expenses ("LRF Purpose"). That said, as between the Humanitarian Purpose and the LRF Purpose, the draft plainly intended to privilege the Humanitarian Purpose. That is evident from the fact that the draft proposed to require that Wu and the LRF "use their best efforts to maximize the

benefits achieved through their use of a portion of the YHR Fund for humanitarian and legal assistance[,]" without setting a cap of any kind on how much could be spent on that purpose, while simultaneously setting such a cap on the LRF Purpose.

37.    Any possible ambiguity in that regard was conclusively laid to rest the next day, when, in transmitting a revised draft, Yahoo (through Yang) told Wu and the LRF that Yahoo "would like to make sure most of the fund goes to humanitarian and legal help for dissidents, and not to the operating expenses." YAHOO_PROD_0000922.

38.    Additional drafts were exchanged in the ensuing weeks and the final settlement agreement ("Settlement Agreement") was executed in December, though it was made "effective as of November 9, 2007."

39.    Wu did not consult with the underlying plaintiffs on the specific terms and conditions of the Settlement Agreement, which the Settlement Agreement provided were to remain confidential. Indeed, Wu instructed Liao Tienchi ("Liao"), then an employee and board member of the LRF, not to disclose the amounts contained in the Settlement Agreement to the plaintiffs. No Chinese translation of the Settlement Agreement was provided to the plaintiffs (none of whom could read English).

40.    As with the November 13, 2007 draft, the final Settlement Agreement provided that the Trust could only be used for the Humanitarian Purpose, the Yahoo Purpose, and the LRF Purpose. As with that draft, Wu and the LRF were required to use their best efforts to maximize the benefit achieved through the Humanitarian Purpose, with no cap being put on how much could be spent on that purpose. Similarly, as with that draft, a cap *was* imposed on the LRF Purpose, namely that no more than $1 million per year could be spent on that purpose.

41.     That Yahoo intended that the Settlement Agreement privilege the Humanitarian Purpose made sense. After all, Yahoo's impetus for entering into the Settlement Agreement was in large part the heavy criticism it had endured regarding its role in the imprisonment of Chinese dissidents who'd engaged in online dissent. At least some of that criticism was taken to heart, in that, as Yang testified, he had "an emotional meeting" after the hearing with Yu Ling, the wife of one such dissident, Yang Dep. 16:2–22, and in that, not long after, Yahoo felt a need to provide "humanitarian or financial assistance to . . . people who are affected" by Chinese political repression. *Id.* 18:16–22:6.

42.     Moreover, Yahoo's contemporaneous statements about the Trust—to lawmakers as well as the public—focused almost entirely on the Trust's Humanitarian Purpose, with the LRF Purpose mentioned only in passing at best, and with the Yahoo Purpose never mentioned at all. That too makes sense, given that the Trust's Humanitarian Purpose was self-evidently the purpose that would yield the greatest reputational benefit for Yahoo. Indeed, as Hantman testified, he *did* "work[] hard" to use the Humanitarian Purpose to improve Yahoo's reputation among lawmakers. Hantman Dep. at 52:3-11 ("We were always getting questions about the China issue after that hearing. … [I]t was a public hearing. And it was damaging reputationally. … I worked hard to create a storyline of 'here's all the things we're doing on this issue.' And [the Yahoo Human Rights Fund] was … one of those things.").

43.     Given all this, it was only natural that Yahoo intended that "most" of the Trust assets to go to the Humanitarian Purpose, and that the Settlement Agreement included features to ensure that occurred. After all, if the bulk of the Trust did *not* go to that purpose, that would have effectively made a liar out of Yahoo.

**D.** **Yahoo gave itself and its representatives unique power and control over Trust assets.**

44.     With respect to Trust management, the Settlement Agreement provided that Wu and the LRF would hold the Trust assets in trust, while a board would be established with the "power and authority to direct the activities and expenditures of the" Trust, with Yahoo having the right to be consulted as to board membership. As a result of that arrangement, a board entitled the Yahoo Human Rights Fund Board or Yahoo Human Rights Fund Advisory Board ("Fund Board") was created in early 2008, with Michael Samway ("Samway"), Vice President and Deputy General Counsel of Yahoo, as one of five members. The other four were Wu, Liao, Lucie Morillon, Washington Bureau Director of Reporters Without Borders USA, and Theresa Harris, Deputy Director of the World Organization for Human Rights USA.

45.     Among the Fund Board's first orders of business was adopting governance documents. In that regard, Samway, on Yahoo's behalf, drafted proposed guidelines that other members of the Fund Board ultimately agreed to. The guidelines required, among other things, that Yahoo always have a representative on the Fund Board, and that Yahoo's representative's presence be required for the Fund Board to be able to achieve a quorum. They also provided that all disbursements of Trust assets required board consensus, which, combined with the quorum provision, meant that disbursements required Yahoo's approval, through its representative.

46.     All this gave Yahoo unique power over Trust affairs not possessed by any other member of the Fund Board, including Wu. The combined effect of these provisions meant that, for all practical purposes, Yahoo's approval was required for all disbursements of Trust assets. Put another way, if Yahoo *disapproved* of any disbursement, such a disbursement could not be made under the operative guidelines.

47.     That Yahoo wanted such power made sense. The Trust bore Yahoo's name, and Yahoo was also a beneficiary of the Trust via the Yahoo Purpose. Thus, for both reputational and financial reasons, it was only natural that Yahoo would want both visibility into, and influence over, Trust affairs.

48.     That influence would only increase in the ensuing years. In 2009, for several reasons, Trust assets previously in the possession of the LRF were redistributed to two newly created entities over which Yahoo had even more control: the Laogai Human Rights Organization, which would administer the Trust's Humanitarian Purpose as well as the LRF Purpose, and the Yahoo! Irrevocable Human Rights Trust 2009, which would administer the Yahoo Purpose.

49.     With respect to the LHRO, and similar to the Fund Board, Yahoo had the right to appoint one board member, who would also serve as Vice President of the LHRO. Further, as with the Fund Board, a quorum of the LHRO board could not be achieved without the presence of Yahoo's representative. But with the creation of the LHRO, Yahoo gained a new power, namely that of explicit veto power over LHRO spending in the form of check-signing authority. Indeed, two signatures were required for LHRO to be able to issue checks: Wu's and that of Yahoo's representative.

50.     That Yahoo possessed such power, control, and authority over Trust assets through the LHRO was recognized by all, including Yahoo itself. For example, in a July 23, 2010 meeting of the LHRO board, it was suggested that the LHRO should not be involved in the daily operations of the LRF. LRF00006752. Gare Smith, a Foley Hoag lawyer who had been involved with the Trust since before even its formal creation, stated that that was not what Yahoo

wanted, and that Yahoo instead wanted to "perform oversight duties"—a statement with which Yahoo's representative, Callahan, agreed. *Id.*

51.    As another example, in 2011, Wu and the LRF wanted $322,000 from the LHRO, but Callahan's signature (in addition to Wu's) was required. Wu and the LRF pressed Callahan to sign the check quickly, complaining that Callahan was holding up needed funding for the LRF, and calling Callahan the "finanl [sic] decision maker." YAHOO_PROD_006262.

52.    Similarly, in 2012, Yahoo considered pulling out of the Trust's affairs over the lack of transparency on the part of Wu, the LRF, and the LHRO. When other members of the LHRO board suggested that Yahoo should reconsider, Hantman, who was Yahoo's representative at the time, noted the requirement that a Yahoo representative be present for a quorum and stated that if Yahoo were unable to pull out, they would simply refuse to appoint such a representative, creating a "stalemate" situation in which checks would not be signed. LRF00079142; LRF00052252.

53.    Indeed, such was Yahoo's influence over Trust assets that, at his deposition, Miles Yu ("M. Yu"), a friend of Wu's who'd served on both the LRF and LHRO boards, and who was sometimes troubled by Wu's use of Trust assets, noted that he did not want Yahoo to pull out of the LHRO because he valued Yahoo's ability to "check" Wu when it came to spending Trust assets. Yu Dep. 184:18-185:8 ("Q Did Harry want Yahoo! to stay on? A That's a very complicated question because I think he want Yahoo! to be a part of the organization because Yahoo! is a big company and it did provide money. But yet, Harry Wu wants Yahoo! to stay without the -- the power to check on how the funds should be dispensed. And I fought against it. . . . I see. You valued Yahoo!'s ability to check Harry Wu when it came to spending? A That's correct.").

54.     Given all this, it is clear that the Yahoo Defendants had actual authority over the Trust's affairs, authority they voluntarily assumed and had the lawful right to exercise. As such, they were at a minimum de facto trustees of the Trust, with attendant fiduciary duties to the Trust's Humanitarian Purpose.

55.     As discussed further below, the Yahoo Defendants failed to live up to those responsibilities. Instead, they allowed Wu and the LRF to spend minuscule amounts of Trust assets on the Trust's Humanitarian Purpose—and in one year, *zero* on that purpose—while simultaneously spending enormous amounts on the LRF itself—in some years, even exceeding the $1 million cap. The Yahoo Defendants did this despite *knowing and subjectively believing* that insufficient amounts of Trust assets were being spent on the Humanitarian Purpose. And they did this because they lacked the will to meaningfully confront Wu and the LRF about insufficient humanitarian spending, and because they feared doing so would create a scandal and generate bad publicity.

> **E.    Throughout the Trust's existence, numerous insiders expressed concerns that not enough is being spent on the Humanitarian Purpose—including a thwarted, would-be whistleblower who cited her "higher standard of fiduciary duty towards the trust's [humanitarian] beneficiaries"—but failed to take meaningful action for fear of bad publicity.**

56.     From the very beginning of the Trust, it was apparent to all that Wu and the LRF had a substantial appetite for spending Trust assets for the benefit of the LRF. Indeed, by July 2008, before the Trust had even been fully funded, Wu and the LRF had *already* spent substantially more than $1 million of the Trust's assets on themselves. Thus, in July 2008, before transferring the final installment of Trust assets to Wu, Samway felt the need to emphasize to Wu and the LRF the "need to use the Fund for its intended purposes regarding online dissent[,]" as well as the need for "transparency mechanisms for the [Fund] Board to have better visibility into the applications for assistance and payments from the Fund and also with respect to the

21

overall expenses of the Fund." As Samway described it to Yang later in the same thread, these comments were aimed at Wu, and were meant to "re-emphasiz[e] that we need to make sure the Y! Human Rights Fund and Laogai Research Foundation houses are in order."

57.     The houses, however, were never put into order—especially with respect to the Trust's Humanitarian Purpose. Indeed, as discovery has shown, at no point after Samway's email did Wu and the LRF ever resolve concerns about lack of transparency and good governance, with audits repeatedly showing weaknesses in the LRF's internal controls.

58.     More egregious than these administrative failings, however, was Wu and the LRF's utter disregard for the Trust's Humanitarian Purpose. While hints of such disregard had prompted Samway's July 2008 email, the evidence that Wu and the LRF were failing the Humanitarian Purpose in a fundamental way were laid bare no later than July 2010.

59.     In particular, during a July 23, 2010 meeting of the LHRO's board, Liao, who'd been present at the Trust's creation and had been a member of the Fund Board before becoming a member of the LHRO's board, pointedly asserted that "the proportion of [LHRO] funds going to humanitarian assistance is too small, only 8%." And in December that year, she sent a memo fellow board members asserting that Wu and the LRF "[o]ffend[ed] the basic agreement with Yahoo" by failing to provide "sufficient humanitarian support to the victims in or from China (only 8% from the budget, according to the financial report I have) . . . . The most part of the yearly 1 M goes to the office operation. That offends the original idea of setting up the Yahoo HR Fund." Liao warned that if Wu's conduct in this regard were allowed to continue, "[t]here will be a miserable or even catastrophic future for LRF and Yahoo HR Trust" and that Wu would "harm the organization and damage the image of Yahoo[.]"

60.     Remarkably, other than a half-hearted attempt by a single board member to justify the 8% figure during the July 2010 meeting, which attempt Liao quickly rebutted, there is no indication that anyone meaningfully disagreed with Liao's allegations in this regard. Instead, what board members *were* apparently concerned about was that Liao not make those allegations public for fear of bad publicity. For example, minutes from the July meeting reflect that Callahan's main concern with Liao's remarks was not that she was off base with respect to humanitarian assistance, but that she should maintain "confidentiality relating to the issues of YHRF and LRF, and not discuss issues with third parties." LRF00051522.

61.     Similarly, on January 17, 2011, a few weeks after Liao's December 2010 memo, a joint meeting of the LRF and LHRO boards was held, which Liao did not attend. At that meeting, attendees expressed concern that "her allegations regarding allocation of funds . . . could be harmful to LRF's public image." LRF00007757. They were also concerned that "her abrupt removal could be viewed as elimination of a 'whistle blower[.]" *Id.* What they did *not* express concern about was the *accuracy* of her allegations regarding the allocation of funds. Nor did they appear to dispute that she was, in fact, attempting to report legitimate wrongdoing—*i.e.*, attempting to blow the whistle.

62.     Instead, sometime before February 28, 2011, Liao was told she'd been removed from the LHRO board. In response, on that day, Liao emailed her fellow board members, as well as Smith, noting a "crucial point in the whole controversy" between her and Wu over the Humanitarian Purpose that "was not made clear." YAHOO_PROD_006031. That was the fact that, in her view, she had "a higher standard of fiduciary study towards the trust's [humanitarian] beneficiaries" that required her stand up to her fellow board members. *Id.* She also challenged the lawfulness of her removal under the LHRO's bylaws. *Id.*

63.     In response, the LHRO's other board members seem to have examined those bylaws, at which point they must have discovered that Article 4.7 required that directors could only be removed "for cause." Indeed, on March 11, 2011, Smith sent a purportedly privileged email to the LHRO's other board members (but not Wu) with the subject line "We have an issue." Around the same time, a special meeting was proposed to be held on March 18, 2011 to "delet[e] Article 4.7[,]" replace it with a virtually identical provision that did not have the "for cause" requirement, and, pursuant to that just-amended clause, pass a resolution that "Tienchi Martin Lao [*sic*] be, and hereby is, removed from the Board of Directors of the [LHRO], with immediate effect." LRF00006795. Because a quorum was not achieved, the meeting ended up being held a week later, when both the bylaw amendment and Liao's removal were effected, practically simultaneously. LRF00007882. Also at the meeting, to deal with the risk of scandal, Foley Hoag recommended that Liao be threatened with legal action. *Id.* That recommendation was acted on, and in the ensuing months, Foley Hoag sent no less than three threatening letters to Liao, broadly accusing her of making "false, malicious, and defamatory statements" about Wu and the LRF, and threatening her with "multiple or punitive damages" if she did not stay silent. ESTATE000001 - ESTATE000006.

64.     A few months later, at a meeting of the LRHO board, an update was provided as follows: "Liao Tienchi cease and desist letter": "The letter was sent in Spring 2011 and it appears no public comments, negative publicity, or private responses have been made. So far so good." LRF00006914.

65.     Liao was effectively silenced, but internally, concerns about the disproportionately low spending on the Humanitarian Purpose remained. So too did concerns about Wu and the LRF's lack of transparency and lack of commitment to basic principles of

good governance. Indeed, not long after expressing relief that Liao had not gone public with her allegations relating to these issues, Yahoo itself essentially repeated her concerns, both internally, as well as to Wu, the LRF, and the LHRO.

66.     In particular, in July 2012, Hantman wrote a memo to Yahoo's board of directors in which he outlined Yahoo's "Public Policy Priorities" "[i]n response to [the board's] request for more information on Yahoo!'s public policy priorities and strategy[.]" YAHOO_PROD_0005088. In a section on "Human Rights," under the heading "What we do," Hantman described "a number of core initiatives." The first was "Advocating before the U.S. and foreign governments." The second was "Partnering with well-known Chinese dissident Harry Wu in creating the Yahoo! Human Rights Fund, established to provide humanitarian and legal support to political dissidents who have been imprisoned for expressing their views online, as well as assistance for their families."

67.     But then—echoing Liao's warnings about how Wu's mismanagement of the Trust would eventually harm Yahoo's image—Hantman wrote: "The partnership comes with some risks, as Wu resists transparency and governance in his organizations[.]" That said, Hantman did not recommend taking any particular action with respect to those risks, presumably because, as he observed, "the partnership [with Wu and the LRF in connection with the Trust] has garnered us good will."

68.     A few months later, at an October 19, 2012 meeting of the LHRO board, Yahoo and Hantman's attitude changed. By then, Callahan had resigned from Yahoo, and thus, the LHRO. At the meeting, Hantman asserted that, owing to the lack of transparency regarding Trust affairs, Yahoo wanted to "pull out" of the LHRO. LRF00079142.

69.     Notably—and echoing Yang's November 2007 email regarding Yahoo's intentions for how Trust assets would be allocated—Hantman also "point[ed] out that he and Yahoo! originally believed Yahoo! money would go to other dissidents[.]" *Id.*

70.     But Hantman did not make increased spending on the Humanitarian Purpose a condition of staying involved in the Trust. Instead, Hantman said that "even if LHRO were to appropriate more money to other dissidents in [the] future . . . Yahoo! would still want to move away from their current relationship with LHRO." *Id.*

71.     And yet, despite this unmistakable expression of settlor intent regarding the importance of the Trust's Humanitarian Purpose, Trust spending on that purpose continued to remain negligible, particularly compared to spending on the LRF Purpose.

72.     Indeed, a few months after Hantman's admonition, at a May 2013 joint meeting of the LRF and LHRO boards, Jeff Fiedler, a longtime LRF director, acknowledged that "in the LRF's present mission, dissident assistance does not have [as] important [a] position as it should have[.]" FOLEYHOAG00000211.

73.     Two years later, and well into Bell's tenure as an LHRO director, nothing had changed. In a May 2015 email to a fellow LHRO director with the subject line: "confidential - laogai matters," Bell addressed Wu and the LRF's latest attempt to spend a substantial portion of Trust assets for their own benefit, this time to purchase a $2 million building. YAHOOFOLEYPROD000797. In the email, Bell said rather than buying the property, he "would rather see more money go to dissidents," as well as a few other alternatives. *Id.* He also raised "several long-term issues," the first of which was "funding for dissidents[,]" which "remains a disappointingly small part of the LRF budget relative to administrative costs"—in

other words, that the Humanitarian Purpose was being significantly compromised relative to the LRF Purpose. *Id.*

74.     A year after that, and even after Wu's death, things still had not changed. According to a September 2016 memo written by M. Yu, both the amount spent by the LRF on humanitarian assistance in the preceding year—"[o]nly 2.27% [$25,000] of the $1.1 million funded by the LHRO to the LRF"—as well as the amount budgeted and requested by the LRF from the LHRO for the upcoming quarter—"7.35% [$18,000] of the $244,600"—indicated that the Humanitarian Purpose had been improperly placed "at the very bottom of the LRF"s priority list," despite "helping . . . Chinese dissidents [being] the legally bound responsibility of the LHRO funds as stipulated in the original Articles of Incorporation and other founding documents." NonpartyMY01090. M. Yu described "this low priority" and "imbalance" as being "part of the Harry Wu legacy that "must not continue or other dissident groups may soon mount legal challenges against the LRF for . . . stray[ing] from the original mission of the LHRO fund." *Id.* Further, M. Yu recommended that, unless these and other problems were corrected by the LRF, the LHRO should not give it any more funding.

75.     Notably, at his deposition, M. Yu was asked why the LRHO "was willing to withhold funding to the LRF unless they increased dissident[] spending after Harry Wu died, why [wasn't the LHRO] willing to do it when he was alive?" M. Yu's response confirmed that there was no reason in principle that couldn't have been done. Instead, he referred to yet another aspect of Wu and the LRF's mismanagement—"the consistent refusal for LRF to sublet that $22,000 a month empty house" for which the LRF had signed a 10-year-lease—and said that "[w]hen Harry was alive, that was not a problem known to us. So Harry Wu basically lied to

us[.] . . . He said that the sublet problem has been solved, . . . while in fact, it was not." Yu Dep. 246:10-247:1.

76.    In other words, M. Yu was not able to offer any good reason the LHRO could not have insisted in increased spending on the Humanitarian Purpose relative to the LRF Purpose while Wu was alive, other than that Wu had lied to the LHRO board about other matters.

**F.    In 2016, Wu and the LRF attempted to terminate the Humanitarian Purpose.**

77.    Meanwhile, shortly before Wu's death, Wu and the LRF actually tried to terminate the Trust's Humanitarian Purpose. In late 2015, Plaintiff Xu W., a Chinese dissident who was imprisoned for approximately nine years, from 2005 to 2014 (and who had served two previous sentences, from 1989 to 1997, and from 1998 to 2001, for a total of 20 years), emailed the LRF asking for assistance from the Trust. In response, the LRF asked Xu W. to fill out an application form and to provide information about his imprisonment. The LRF then falsely claimed that the Humanitarian Purpose was funded by U.S. taxpayers, and that because of that, a lengthy process was required before it could make any disbursements to Xu W.

78.    Xu W. complied with the LRF's requests, but in March 2016, Wu wrote Xu W. directly to inform him that Wu and the LRF had decided to ***terminate the Trust's Humanitarian Purpose altogether***.

79.    Specifically, Wu and the LRF wrote to Plaintiff Xu W.:

We have received all your emails[.] … One of the main reasons that we did not reply to you for a long time was related to the humanitarian aid project of our Laogai Research Foundation. … Over the past one year or so, our Laogai Research Foundation has been considering and discussing whether this project should be continued. After repeated discussion, the conclusion reached was: ***We have decided to discontinue this project***.[2]

---

[2] Translated from Chinese.

80.     However, Wu and the LRF told Plaintiff Xu W. that "[w]e will continue our website (both in English and Chinese), the Laogai Museum, and public speeches, including those to the U.S. political circle, the U.S. Congress, parliaments of various nations in Europe, and European and U.S. media outlets, *etc*.," all funded in large part, if not in whole, by Trust assets, including assets intended for the Humanitarian Purpose.

81.     As discovery has revealed, however, neither the LRF nor the LHRO had actually formally terminated the Humanitarian Purpose at the time. Indeed, according to minutes of a joint LRF and LHRO board meeting held on April 4, 2016, Wu "want[ed] to discontinue supporting Chinese dissidents overall, unless the case is overwhelming and the applicant can really benefit from such funds[.]" LRF00052290. In other words, when Wu told Plaintiff Xu W. the previous month that the Humanitarian Purpose had already been terminated, that was not entirely true.

82.     And yet, there was a grain of truth in Wu's remarks, in that members of the LRF and LHRO boards supported the notion of further de-emphasizing the Humanitarian Purpose, but in a way that did not generate bad publicity. *E.g.*, LRF00050484 (February 2016 minutes discussing the "[s]uspension of dissident funds[,]" replacing the Humanitarian Purpose with an "annual/biannual award," and emphasizing that "[a] public statement should NOT be announced" regarding these changes).

**G.      Wu died unexpectedly in late April 2016, which led to slightly increased regard for the Humanitarian Purpose, including for fear of litigation, but the LHRO and LRF continued to breach the Humanitarian Purpose in several ways.**

83.     Wu died unexpectedly in late April 2016.

84.     Sometime thereafter, in large part because of the fear of litigation, the LHRO began requiring that the LRF increase its regard for the Humanitarian Purpose as a condition of

obtaining disbursements from the LRHO, something that could and should have been done while Wu was alive. *E.g.*, NonpartyMY01090; Yu Dep. 246:10- 247:10 (former director of both LRF and LHRO failed to identify any reason such could not have been done while Wu was alive, other than that Wu had "lied" to other directors about matters not directly related to the Humanitarian Purpose).

85.     However, the LHRO and LRF continued to breach their duties to the Humanitarian Purpose in several ways. First, in response to this lawsuit, they spent large amounts of Trust assets to deny having any duties to the Humanitarian Purpose at all. Second, they continued to spend grossly disproportionate amounts of Trust assets on the LRF Purpose, amounts incommensurate with their duties to the Humanitarian Purpose. Third, they improperly characterized spending on purposes other than payments to Chinese dissidents imprisoned for online dissent as spending on the Humanitarian Purpose. Fourth, they failed to seek redress for the breaches of the Humanitarian Purpose that occurred while Wu was alive, attempting instead to cover up those breaches.

**H.     Yahoo falsely and repeatedly denied any control over the Trust and the Humanitarian Purpose.**

86.     Throughout this time, when Plaintiffs were largely powerless to act, the Yahoo Defendants concealed the fact that they were trustees of the Trust and that they had control over the Trust. Indeed, the Yahoo Defendants went so far as to outright deny any responsibility for the administration of the Trust or the Humanitarian Purpose at all.

87.     For example, after Yu Ling's 2011 Lawsuit[3] was filed, Yahoo shareholder Zhao Jing ("Zhao") made a books and records demand on Yahoo under 8 Del. C. § 220. In so doing, Zhao argued that an "inference of mismanagement" by Yahoo with respect to the Trust could be drawn from that lawsuit.

88.     In opposing the demand, Yahoo vehemently denied any responsibility for the Trust. Indeed, Yahoo refused to allow Zhao to inspect Yahoo's records on the ground that Zhao's demand "does not articulate *any* basis, let alone a credible basis, that there has been any wrongdoing by *anyone* at Yahoo!." (Emphasis added.) Instead, Yahoo pointed the finger at Wu, noting that Zhao's "allegations of wrongdoing [were made] against Harry Wu," and that, as such, they "fail[ed] to provide a credible basis to find probable wrongdoing by *anyone* at Yahoo!." (Emphasis added.)

89.     Zhao responded by pointing out that Yahoo and Wu had "partnered to establish" the Trust, arguing that Wu was therefore Yahoo's agent for the purposes of operating the Trust. Still, Zhao agreed to narrow his request to seek only documents relating to Yahoo's partnership with Wu or the LRF and the appointment of Wu and the LRF to administer and operate the Trust.

90.     Yahoo continued to resist. Indeed, Yahoo doubled down on its position that it had no responsibility for the administration of the Trust, and that nothing in Zhao's demand provided a credible basis for so inferring. Yahoo first noted that Zhao merely alleged that Yahoo "partnered" with Wu to "establish" the Trust, but that "all of your allegations of wrongdoing involve the administration of the Fund, which necessarily post-dated the establishment of the

---

[3] In 2011, Wang X. and Yu Ling were forced to file a lawsuit against Wu ("2011 Lawsuit") to recover $1 million of their settlement monies from the 2007 Lawsuit that was misappropriated by Wu. See *Yu et al. v. Wu et al.,* No. 1:11-cv-00092-JCC-JFA, ECF No. 1 (E.D. Va., Jan. 28, 2011).

Fund." Thus, Yahoo asserted that "the fact that Mr. Wu and LRF partnered with Yahoo! to establish the Fund is irrelevant to your Demand."

91.     Yahoo then argued that, although Zhao asserted that Wu was Yahoo's agent and that Yahoo relied on Wu to operate the Trust, Zhao had "no basis . . . to claim that Yahoo! manages or controls the Fund."

92.     Yahoo then went even further, using Yu Ling's 2011 Lawsuit as a *shield* against responsibility, repeatedly arguing that, rather than providing a credible basis to infer wrongdoing on Yahoo's part, it supported an inference of *Yahoo's innocence*.

93.     For example, Yahoo pointed out that, rather than supporting an inference that Yahoo was involved in the administration of the Trust, "[i]n fact, in Yu Ling's 2011 lawsuit against Harry Wu, Yu Ling alleges that the Fund is administered by Mr. Wu and the Laogai Human Rights Organization."

94.     As another example, Yahoo noted that the lawsuit "further alleges that Mr. Wu and LRF had exclusive control over her money," not Yahoo.

95.     Perhaps most audaciously, Yahoo touted the fact that "Yu Ling did not even name Yahoo! as a defendant in her suit" as a basis for inferring its innocence.

96.     Yahoo then stated that if Zhao was willing to agree to certain conditions—including tailoring his requests and entering into a confidentiality agreement—it was prepared to allow "an appropriate inspection of its books and records."[4]

---

[4] Zhao apparently did not agree, as he subsequently filed a complaint in the Delaware Court of Chancery to compel inspection. That complaint, dated February 1, 2012, repeated the same assertions that Yahoo argued did not provide "any basis, let alone a credible basis," to infer wrongdoing on Yahoo's part. According to the docket, in April 2013, a broad protective order providing for the confidential treatment of materials produced in discovery was entered, and in

97.     Yahoo similarly disclaimed responsibility in proceedings before the U.S. Securities Exchange Commission ("SEC"). For example, in 2012, Zhao proposed a shareholder resolution asking Yahoo to investigate "potentially unlawful activities of the Yahoo! Human Rights Fund."

98.     In successfully opposing Zhao's proposal, Yahoo argued to the SEC that Zhao's proposal was irredeemably unclear, to the point that it was "materially false and misleading." With respect to Trust expenditures, Yahoo argued that Zhao's proposal was deficient because it "identifies no specific allegations about . . . any transactions or operations of the Yahoo! Human Rights Fund."

99.     Yahoo also continued to obfuscate the nature of its responsibility with respect to the Trust, asserting that it "has no ownership interest in the Yahoo! Human Rights Fund." Yahoo also stated that it was "misleading" to suggest that either it or its board of directors was "able to require disclosure of information regarding" the Trust. However, given that Yahoo was itself a beneficiary of the Trust, and given that Bell, acting as Yahoo's agent, was at the time "Vice Chairman" of the LHRO, allegedly devoting 25 hours per week to the LHRO, it was actually Yahoo's statement that was at a minimum incomplete if not outright false and misleading.

100.    Finally, Yahoo yet again deflected responsibility to Wu, noting that "[t]he Human Rights Fund is administered by Harry Wu . . . with the help of a board of directors." Of course, Yahoo failed to state that its employee Bell, acting as its agent, served on this board of directors as part of his employment with Yahoo.

--------------------

July 2013, the matter appears to have settled, presumably also on a confidential basis. *See generally Zhao v. Yahoo! Inc.*, C.A. No. 7203 (Del. Ch. 2012) ("Zhao Lawsuit").

101.    In July and September 2015, certain Plaintiffs wrote letters to Yahoo and Yang, which, among other things, expressed their hope that the Trust could be run in a more transparent manner, and more for the benefit of imprisoned Chinese dissidents, particularly those who were Yahoo users. Yahoo never responded to these letters.

102.    In February 2016, Yahoo and Bell were again implored to step in to address problems with the management of the Trust. Yahoo and Bell did not respond until April 2016, and even then, only did so because they had been pressured by contact from a prominent journalist about a story relating to the Trust. In their response, Yahoo and Bell again denied responsibility for the Trust and the Humanitarian Purpose, and continued to point the finger at Wu and the LRF. Yahoo and Bell also used the confidentiality of the Settlement Agreement as a shield, stating that the Settlement Agreement's confidential nature "necessarily limits our ability to respond," and that they would not respond "point-by-point" to suggestions that Yahoo or Bell bore responsibility for the depletion of Trust assets.

103.    As discussed above, however, discovery has laid bare the falsity of the Yahoo Defendants' denials. The truth was that, for nearly entirety of the Trust's existence, the Yahoo Defendants had considerable control over Trust spending. Indeed, for much of that time, the spending of Trust assets effectively required the Yahoo Defendants' approval.

**I.    Yahoo touted the Humanitarian Purpose and relied on it to defeat shareholder proposals.**

104.    All the while, as the Yahoo Defendants stood idly by, willfully ignoring the fact that the Humanitarian Purpose was being breached, and doing nothing to prevent or redress that breach, they simultaneously advertised the Humanitarian Purpose as evidence of Yahoo's commitment to human rights, and used its existence to improve its public image among

lawmakers and the public, as well as to defeat shareholder proposals calling on Yahoo to do more to advance human rights.

105.    For example, in 2008, the City of New York Office of the Comptroller, on behalf of several New York City public pension funds who were Yahoo shareholders, made a shareholder proposal relating to internet censorship, urging Yahoo to "institute policies to help protect freedom of access to the Internet." Yahoo opposed the proposal, arguing, among other things, that it was "unnecessary" in light of "initiatives already in place at the Company," including the "establish[ment] of a Human Rights Fund, in partnership with a noted Chinese human rights activist, to provide humanitarian relief and legal support for dissidents imprisoned for expressing their views online." The proposal was defeated.

106.    In 2011, Yahoo shareholder Zhao made a shareholder proposal urging that Yahoo take various measures to protect human rights, including adopting principles protective of human rights, and specifically calling for Yahoo to "supervis[e] the abused Yahoo! Human Rights Fund" in light of information that it was being mismanaged.

107.    In opposing Zhao's proposal, Yahoo noted that it was already committed to human rights issues, citing as evidence "a number of core initiatives, including . . . [c]reating the Yahoo! Human Rights Fund," which Yahoo again described as having been "established to provide humanitarian and legal support to political dissidents who have been imprisoned for expressing their views online, as well as assistance for their families." The proposal was defeated.

108.    In 2014, Yahoo shareholder John Harrington ("Harrington") made a shareholder proposal that Yahoo create a committee "to oversee the Company's responses to domestic and international developments in human rights that affect our company." Again, Yahoo opposed this proposal on the ground that "Yahoo already has extensive policies and practices in place" with

respect to human rights, including "a number of core initiatives, including . . . [c]reating the Yahoo Human Rights Fund, which Yahoo established to provide humanitarian and legal support to political dissidents who have been imprisoned for expressing their views online, as well as assistance to their families." This proposal was defeated as well.

109.    In 2015, Harrington made a similar proposal, which Yahoo again opposed, based in part on the Humanitarian Purpose. This proposal was also defeated.

110.    Notably, at no point did Yahoo ever disclose that—as Yahoo itself knew and believed—spending on the Humanitarian Purpose was, as Bell put it, "disappointingly low."

**J.    Defendants fundamentally failed to discharge their fiduciary duties towards the Humanitarian Purpose.**

111.    In contrast to the ***over $14 million*** spent on Wu and the LRF since the establishment of the Trust, a relative pittance—less than $650,000—has been spent on the Humanitarian Purpose.

112.    For instance, since the establishment of the Trust and the Humanitarian Purpose, the LRF's reported expenditures on the Humanitarian Purpose have been as follows:

| Year | Spending that benefited the Humanitarian Purpose | Spending that benefited Wu and the LRF |
|------|---------------------------------------------------|----------------------------------------|
| 2008 | $55,987[5]                                        | $939,617                               |

---

[5] The reported amount of humanitarian aid was $135,986, but $79,969 was distributed to the following individuals and organizations: Toni Brandi, Peter Muller, Ann Noonan, Reporters Without Borders, Visual Artists Guild, Robert F. Kennedy Memorial, East Meets West and Victims of Communism Memorial.  As these distributions were obviously not payments to Chinese dissidents imprisoned for online dissent, they are not counted here. PKS00005219.

| Year | Spending that benefited the Humanitarian Purpose | Spending that benefited Wu and the LRF |
|---|---|---|
| 2009 | $127,540[6] | $1,299,332 |
| 2010 | $108,494[7] | $1,272,692 |
| 2011 | $54,910 | $1,493,303 |
| 2012 | $24,724[8] | $1,270,305 |
| 2013 | $20,352[9] | $1,323,129 |
| 2014 | $22,496 | $1,236,750 |
| 2015 | $19,802 | $1,301,791 |
| 2016 | $ 1,528[10] | $1,052,908 |
| 2017 | $0 | $903,508 |
| 2018 | $6,000 | $1,256,437 |
| 2019 | $63,250[11] | $735,185 |
| 2020 | $76,350 | $624,703 |
| 2021 | $33,800[12] | $254,704 |

[6] The reported amount of humanitarian aid was $727,540, but $550,000 was used to settle two lawsuits against Yahoo, which does not qualify as humanitarian aid. Another $50,000 was distributed to the Robert F. Kennedy Foundation. As these distributions were obviously not payments to Chinese dissidents imprisoned for online dissent, they are not counted here. PKS00005216.

[7] The reported amount of humanitarian aid was $248,494, but $140,000 was distributed to China Information Center, a non-profit organization controlled by Harry Wu. As this distribution was obviously not a payment to Chinese dissidents imprisoned for online dissent, it is not counted here. PKS00005144.

[8] The reported amount of humanitarian aid was $28,424, but $3,700 was distributed to Gabriel Berde and the Lantos Foundation for Human Rights. As these distributions were not obviously not payments to Chinese dissidents imprisoned for online dissent, they are not counted here. PKS00002815

[9] The reported amount of humanitarian aid was $20,852, but $500 was distributed the International Maitreya Foundation. As this distribution was not a payment to imprisoned dissidents, it is not counted here. PKS00005145

[10] The reported amount of humanitarian aid was $4,528, but $3,000 was distributed to the Raoul Wallenberg Committee of the United States. As this distribution was obviously not a payment to Chinese dissidents imprisoned for online dissent, it is not counted here. PKS00006178.

[11] LRF reported $83,250, but $20,000 was paid in connection with a Tiananmen Memorial Conference in Washington, DC. As this expenditure was obviously not a payment to Chinese dissidents imprisoned for online dissent, it is not counted here. LRF00153347.

[12] LRF reported $40,200, but $6,400 was used to provide "indirect financial aid to Chinese scholars for their human rights projects." As this distribution was not a payment to imprisoned dissidents, it is not counted here. LRF00153347.

| Year | Spending that benefited the Humanitarian Purpose | Spending that benefited Wu and the LRF |
|---|---|---|
| 2022 | $20,000 | Unknown |
| **TOTAL** | **$635,234** | **$14,964,367** |

113.    Moreover, even these small amounts may be inflated. For instance, in 2014, LRF claimed $22,496 was distributed to "6 qualified individuals," and that "payments ranged from $500 to $3,000." However, even if all six received the maximum $3,000 amount, the total would only be $18,000.

114.    Given these discrepancies, and given the extent of the misconduct described herein, no faith can be placed in even these reported figures, which are likely inflated.

115.    Additionally, numerous facts surrounding the irregular nature of how Wu and the LRF handled what little humanitarian aid they did disburse, raise further doubts about the accuracy of these figures. For example, in May 2010, Wu drafted a financial report claiming that a payment to 2010 Nobel Peace Prize recipient Liu Xiaobo ("Liu") qualified as humanitarian assistance. However, Liao objected, saying that the payment was in fact funded by a National Endowment for Democracy grant, and was not humanitarian assistance, but was in fact payment for certain of Liu's written work.[13] The Yahoo Defendants were or should have been aware of these facts.

116.    As other additional examples, Wu and the LRF: (1) failed to provide a Chinese version of the website announcing the Humanitarian Purpose; (2) failed to make a Chinese version of the application form available; (3) failed to respond to numerous inquiries and applications; (4) rejected applications on the basis of personal vendettas; (5) routinely asked

---

[13] As a result of Liao's objections, Wu directed that Liao be removed from LRF's board, and Liao was voted off the board.

applicants to sign blank application forms without filling them out; (6) sent recipients small amounts of cash without asking for an application or providing receipts; and (7) sent recipients payments in amounts that were less than the amounts LRF had previously indicated had been approved, with no explanation. The Yahoo Defendants were or should have been aware of these facts.

> **K.    Developments since the filing of this lawsuit.**
>
> **1.    The LRF and LHRO established a "Humanitarian Program Grant."**

117.    In 2018, after the filing of this lawsuit, the LRF and LHRO established a "Humanitarian Program Grant." But the "Grant" fails to comply with the Humanitarian Purpose for several reasons. First, from publicly available information, it does not appear as if it is awarded to imprisoned Chinese dissidents. Instead, it appears that it is awarded to U.S. organizations registered with the Internal Revenue Service under Section 501(c)(3) of the Internal Revenue Code. Second, it has no apparent nexus with online activity. Third, despite the fact that the monies for the "Grant" presumably come from the Trust, the "Grant" requires the recipient to characterize the funding as having been provided by the LRF, presumably in an attempt to rehabilitate the organization's image in the wake of the controversies described here. This requirement in no way benefits imprisoned Chinese dissidents or the Trust's Humanitarian Purpose. Instead, it benefits the LRF.

118.    Given that the "Humanitarian Program Grant" plainly deviates from the terms of the Trust, the LRF and LHRO were required to obtain judicial approval if they intended for it to satisfy the Trust. By not seeking judicial approval, despite Plaintiffs having already pointed out that such approval is necessary for the modification of a charitable trust, Defendants worsened their pre-existing breaches of trust, and arguably committed new ones.

119.    Moreover, as described above, the amounts currently being spent on benefiting the LRF far outweigh any amounts that can be remotely characterized as humanitarian spending. For example, from the LRF's latest publicly available tax filing, for the fiscal year ending September 30, 2020, $624,703, or **89%**, of the LRF's total expenditures were for the benefit of the LRF, while only $76,350, or **11%**, was in the form of "[c]ontributions, gifts, [or] grants paid[.]"

120.    In all events, even if the "Humanitarian Program Grant" complies with the Humanitarian Purpose, and it does not, it is too little, too late. It cannot absolve the LRF and LHRO of the breaches of trust prior to it, much less their ongoing breaches of trust, which include a total failure to even attempt to seek redress for past breaches.

> **2.    The Trustee Defendants conceded there was no obligation under the Settlement Agreement for the LRF to receive any monies from the Trust.**

121.    In 2019, the Trustee Defendants conceded that there was no obligation under the Settlement Agreement to spend even one penny of the Trust's assets on benefiting Wu or the LRF. Indeed, they stated that "the entire $17.3 million sum could have been used to settle other dissidents' claims against Yahoo" without running afoul of the Settlement Agreement.

122.    As a result, the Trustee Defendants' failure to protect the Humanitarian Purpose from Wu and the LRF's massive overspending of Trust assets on benefiting Wu and the LRF themselves cannot be attributed to any belief that they were constrained from preventing such overspending (which belief would be negligent in any event). That they nevertheless failed to prevent such spending was therefore willful, intentional, in bad faith, and/or with reckless indifference to the Humanitarian Purpose.

> **3.    Despite that concession, the Trustee Defendants failed to prevent further dissipation of the Trust on benefiting the LRF.**

123.    Having conceded that they do not believe that any obligation exists under the Settlement Agreement to spend *any* amount of the Trust's assets for the LRF's benefit, the Trustee Defendants nevertheless continue to allow large amounts of such spending, while refusing to adequately protect and restore the Humanitarian Purpose.

124.    Indeed, during the litigation, the LRF produced a patently self-serving document entitled "Statistics: LRF Humanitarian Support after the Death of Harry Wu." LRF00153347. The document is plainly intended to defend the LRF and its board of directors with respect to the Humanitarian Purpose, at least in the years after Wu's death. The problem is that, in so doing, it effectively *admits* that the LRF engaged in massive breaches of the Humanitarian Purpose while Wu was alive, while failing to mention any effort to obtain redress for those breaches.

125.    As for the document's description of the LRF's activities with respect to the Humanitarian Purpose in the post-Wu years, it claims that "the LRF financially supported about 740 victims in China or from China and spent about a total of USD219,800 on them. In addition, two LRF-paid staff members have been involved in the activities of that financial aid. Therefore, the monetary amount of humanitarian support is about 30-50% of all LRF's operational budget yearly."

126.    But here, too, there are problems. First, there is no indication that any of the recipients were actually within the scope of the Humanitarian Purpose, *i.e.*, that they were Chinese persons who actually served time in prison for online dissent. Indeed, the words "online" and "internet" do not appear anywhere in the document.

127.    Second, with respect to the claim that "740" "victims" received funding, the vast majority of this figure comes from a line item that claims that, in connection with the "Tiananmen Square Memorial Conference and Demonstration for Tiananmen Massacre on June

4 2019 Washington DC[,]" "[a]bout 500-1000 people" who were "previous political victims in China in the demonstration were given assistance totaling "USD20,000[.]"

128.     But given the inability to specify the number of recipients with precision, it is unclear whether this item even actually reflects disbursements to specific individual. Moreover, even if it did, it would reflect disbursements in the average amount of $20 to $40 per recipient, a pitifully low amount. Additionally, given that the disbursement was apparently to victims of the June 4, 1989 crackdown, it is dubious that the disbursements had any nexus with *online* dissent, as the Humanitarian Purpose requires.

129.     More fundamentally, characterizing that $20,000 as having directly benefited 500 to 1,000 individuals contradicts the LRF's tax filings, which state that that $20,000 was paid to "THOMAS MARSH – SCULPTOR" for something described as the "TIENANMEN SQUARE MEMORIAL SCULPTURE."

130.     Third, given that, for years, the Humanitarian Purpose received only in the range of 3-8% of Trust spending, and given that the Humanitarian Purpose was intended to the beneficiary of "most" of the Trust's spending, even spending "30-50% of all LRF's operational budget yearly" is grossly insufficient, because that necessarily means that 50-70% of the LRF's post-Wu spending—which is funded *entirely* by the Trust—benefitted the LRF itself. While a ratio of 70:30 spending on the LRF Purpose versus the Humanitarian Purpose is a less egregious breach of the Humanitarian Purpose than the ratios that prevailed while Wu was alive, it is still a breach of that purpose.

131.     Fourth, the reference to "two LRF-paid staff members" suggests that the LRF is attempting to claim its salary expenditures as constituting "humanitarian support." But why salaried personnel are required to effectuate humanitarian spending is not explained. After all, it

should not be difficult to find volunteers willing to carry out the Humanitarian Purpose for no pay at all.

132.    Finally, the document effectively admits that the LRF was not entitled to $1 million per year from the LHRO. After all, the document suggests that, in the four fiscal years from 2018 and 2022, the amount spent on the LRF Purpose did not exceed $1 million *total*. Meanwhile, there has been no formal change in the underlying governance structure of, and relationship between, the LRF and LHRO. Thus, if such low levels of spending on the LRF Purpose were permissible in the four years between 2018 and 2022, they were permissible in prior years as well.

### 4.    Impresa knowingly received a significant amount of Trust assets as payment for legal fees despite being on notice that such payments may have been in breach of trust.

133.    Impresa has represented the Laogai Defendants in this action from the outset, and has known since the outset that its legal fees in this action have been paid out of assets that Plaintiffs have alleged are the Trust's assets. In early 2017, before the initial complaint was filed, counsel for Plaintiffs contacted Impresa about Plaintiffs' allegations that the Fund was a trust and that the Laogai Defendants had breached their fiduciary duties by, among other things, failing to adequately administer the Trust for the benefit of the Humanitarian Purpose. Impresa was therefore put on notice that monies traceable to the Trust were potentially subject to a trust.

134.    Meanwhile, instead of requiring that some or all of its fees be paid out of undisputed assets, such as monies raised by the Laogai Defendants from sources other than the Trust, Impresa opted to receive payment exclusively from monies traceable to the Trust. In other words, it knowingly chose to receive payment out of disputed assets.

135.    Discovery has revealed large checks from the LHRO to Impresa. Given that all of the LHRO's assets are traceable to the Trust, these checks were drawn on trust assets. And given

that Impresa was aware that all of the LHRO's assets are traceable to the Trust, Impresa accepted payment out of assets it knew were potentially subject to a trust.

136.    Moreover, a significant amount of those payments were in breach of the Laogai Defendants' fiduciary duty to the Humanitarian Purpose.

137.    It is *necessarily* a breach of trust for a trustee to use trust assets to escape their own liability for past or ongoing breaches of trust, given that trustees have a duty to redress such breaches of trust, and using trust assets to escape liability for such breaches is the opposite of what that duty requires. It is even more of a breach of trust for a trustee to use trust assets to deny the existence of a trust or of fiduciary duties altogether.

138.    Here, this action seeks to hold the Laogai Defendants liable, in their capacities as trustees, for past and ongoing breaches of the Humanitarian Purpose. Instead of using Trust assets to redress those breaches, the Laogai Defendants have chosen to use Trust assets to try to escape liability for those breaches, and even to deny the existence of a trust and of fiduciary duties. Moreover, they have done so without engaging in any meaningful attempt to *avoid* using Trust assets to do so. For example, there is no evidence that the Laogai Defendants have tried to fundraise the costs of their defense in this action so that such costs can be paid for out of assets other than Trust assets. As such, by using Trust assets to pay Impresa in an effort to avoid past and ongoing liability to the Humanitarian Purpose, and to deny the existence of any fiduciary duties to that purpose—especially without meaningfully attempting to use assets other than Trust assets to do so—the Laogai Defendants have breached their duties to the Humanitarian Purpose. And because Impresa has been on notice of these facts from the outset, it is liable to the Humanitarian Purpose under the trust-law principle that a trust beneficiary may recover trust property transferred to a third party if the transfer was a breach of the trustee's fiduciary duty and

the third party had reason to know that the trustee's action was a breach of its duty. This is particularly true of transfers of Trust assets to Impresa after the D.C. Circuit's February 2020 opinion, and even more true of transfers after the District Court's May 2022 opinion, because those decisions made it increasingly less subject to reasonable debate that those were transfers of Trust assets.

139.   The Laogai Defendants have also used Trust assets to pay Impresa's legal fees in actions other than this one, such as an action brought by a former director, Ann Noonan. Because the Laogai Defendants' use of Trust assets in that regard potentially benefited the Humanitarian Purpose by preserving Trust assets, Plaintiffs do not seek restitution of such fees.

> **5.      In May 2023, Plaintiffs were told, through counsel, that one of LHRO's current directors, Bob Suettinger, wanted to use what remained of the Trust's assets to advance the interests of himself and Wei Jingsheng, another Chinese dissident.**

140.   In May 2023, Plaintiffs were told, through counsel, that one of LHRO's current directors, Bob Suettinger, wanted to use what remained of Trust assets to advance the joint interests of himself and Wei Jingsheng, a Chinese dissident. If true, these allegations further call into question the LHRO's fitness to remain a trustee of the Humanitarian Purpose.

> **6.      The Trust's assets were depleted to approximately $2.6 million or less.**

141.   As of the filing of this complaint, the Trust's assets consist of a building with a market value of approximately $2.5 million, and approximately $100,000 or less in cash, representing a $14.7 million depletion from the initial $17.3 million corpus. Of that $14.7 million, only about $600,000, or 4%, was spent on the Humanitarian Purpose. And even if 100% of the remaining assets are spent on the Humanitarian Purpose, which is exceedingly unlikely given current trends, only about 18% of the initial $17.3 million corpus will have been spent on the Humanitarian Purpose.

*ALTER EGO* ALLEGATIONS

142.    When Wu was alive, Wu and the LRF were *alter egos* of each other. Wu

dominated the operation of the LRF, had *de facto* control over the LRF, and unilaterally made all

spending decisions. Moreover, although the LRF sometimes held formal board meetings, and

sometimes kept written minutes of those meetings, the board had no actual control over Wu.

143.    Indeed, Jeff Fiedler, one of LRF's co-founders, resigned from the LRF's board

multiple times because Wu ignored his advice. For example, in 2009, Fiedler accused Wu of

"managing [the LRF] more as a personal fiefdom than a professional organization," that "you

nearly always believe you are right and everyone else is wrong, and that your vision and view is

the only one that should determine Foundation decisions." YHRF_PL-00010. Fiedler told Wu

that his "contribution to the LRF is more window-dressing than anything else" and that he had

"no choice but to resign." *Id.*

144.    At some point, Fiedler returned to the LRF's board, only to resign again, in 2011,

for essentially the same reasons. As Fiedler wrote on that occasion, Wu's "view is that the LRF

is your creation and an extension of you personally. You further believe that laws, rules and

regulations apply to others but not yourself. You make agreements and then break them. You

treat your friends as enemies when they don't tell you what you want to hear—that is, when you

don't play the game of agreeing with them only to later act as if you never made an agreement.

Gare and others have give you their best advice both legal and non-legal only to have you ignore

it regularly compounding your problems. You do not abide by the by-laws adopted by the Board

including your vote. You have surrounded yourself with a staff that fears you and will do

whatever you want without advising you that it is the wrong course (if you consult them at all). I

will no longer be legally responsible for your actions which I perceive as increasingly dangerous

to both the Foundation and yourself. This decision is irrevocable unlike my resignation some

years ago when I mistakenly was taken in by your assurances that things would change for the better—they have not." FOLEYHOAG00000099.

145.    Similarly, Wu was described as "the only driving force" of the LRF by Yang Fengshi ("Yang"), an associate of Wu's, who also stated that the LRF had an "operating model of 'one-man-driving-all.'" NONPARTYMY00546. Following Wu's death, Yang recommended that the LRF no longer be "directed by a single person," and that the "LRF should now be led by a real board of directors." *Id*. As such, Wu and the LRF were *alter egos* of each other when Wu was alive. *See Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 104 (D.D.C. 2014) (finding plaintiff adequately alleged Wu was *alter ego* of LRF). Moreover, because the Yahoo Defendants received regular reports from Wu and the LRF in their role as trustees and as directors of the LHRO, the Yahoo Defendants knew of Wu's dominance and control of the LRF at all relevant times.

## SPECIAL-INTEREST ALLEGATIONS

146.    Plaintiffs are members of a sharply defined and numerically limited class of Trust beneficiaries, namely the primary beneficiaries of the Trust's Humanitarian Purpose, with interests that are distinguishable from that of the public at large. Specifically, the Trust's Humanitarian Purpose is primarily intended to benefit: (1) persons in or from the PRC (2) who are imprisoned in the PRC (3) for exercising their freedom of expression (4) online.

147.    These criteria define a class of preferred beneficiaries with sufficient particularity that the "sharply defined" element is met.

148.    As for the requirement that the class of preferred beneficiaries be "limited in number," that is met because the number of persons meeting the criteria above, though difficult to know with certainty, is not so large as to make the class of preferred beneficiaries effectively limitless, such that their interests are indistinguishable from the public's interest. In particular,

47

given the Settlement Agreement's requirement that preferred beneficiaries be "imprisoned," applicants would have to have gone through the judicial process in the PRC and been sentenced to a prison term, which they then served. That excludes people whose speech rights were repressed in other ways, such as via fines, reprimands, threats, administrative measures not involving the formal judicial system, and so on. *E.g.*, Black's Law Dictionary, Prison, (6th ed. 1991) (defining "prison" to include a "correctional institution for incarceration of felony offenders for terms of one year or more").

149.    The number of people meeting this criteria cannot be known with certainty, but it is unlikely to be so large as to be effectively limitless. Indeed, as Wu and the LRF themselves noted, as early as 2008, there were "almost no new applicants" for the Humanitarian Purpose. LRF00004336. Similarly, as late as 2015, Wu and the LRF stated that "very few dissidents submit funding requests" as a justification for not spending more on the Humanitarian Purpose. FOLEYHOAG00000009.

150.    That the number of preferred beneficiaries is unlikely to be so large as to be effectively limitless, that is further confirmed by the fact that the number of individuals reported to have received funding from the Trust has declined over the years, as follows:

| LRF tax year | Number of reported recipients of humanitarian assistance |
|:---:|:---:|
| 2008 | 0 |
| 2009 | 40 |
| 2010 | 40 |
| 2011 | 20 |
| 2012 | 9 |
| 2013 | 11 |
| 2014 | 6 |
| 2015 | 6 |
| 2016 | 0 |

151.    It is also bolstered by the analysis of William Farris, the author of a legal casebook entitled "State Prosecutions of Speech in the People's Republic of China," and probably the world's foremost expert on the topic.

152.    In particular, in April 2023, Mr. Farris published an analysis attempting to answer the question: "How many people in the PRC have had their rights to freedom of speech and publication (as those rights are understood in the U.S. and similar jurisdictions) violated by the PRC government?"[14]

153.    After discussing several aspects of the question, Mr. Farris's conclusion, "based on [his] familiarity with the available data, is the answer is 'it depends on what you are counting[.]" For example, if one were considering people who were "subjected to prior restraints on publishing," the number would be "[a]ll of China's 1.4 billion population[.]" If, however, one were considering people "subjected to informal and administrative punishments[,]" such as being "invited for tea"—*i.e.*, "being interviewed by public security or state security officials because of your speech or your civic actions"—the number "is likely in the tens of thousands." If one were considering people who have been "detained" in some way, the number "is likely somewhere in the area of 10-20 thousand."

154.    Most relevant here, he concluded that if one were considering people who have been "imprisoned"—as the Settlement Agreement does—the number "is likely in the thousands."

155.    Mr. Farris's conclusion further supports Plaintiffs' special interest, especially considering that Mr. Farris's conclusion is overinclusive, in that it is not limited to those who have been imprisoned for speech that occurred online.

---

[14] http://blog.feichangdao.com/2023/04/202304-how-many-in-china-punished-speech.html

156.     Indeed, even the LRF's self-serving September 2022 memo supports the conclusion that the number of preferred beneficiaries is unlikely to be so large as to be effectively limitless. As discussed above, that memo claims "740" individual recipients of financial assistance between 2018 and 2022. But the memo also states that between "500-1000" of those recipients were given assistance because they were "previous political victims in China in the [June 4, 1989] demonstration[.]" LRF00153347. Given that such recipients are plainly not members of the preferred beneficiary class, even the LRF's own self-serving memo supports the conclusion that the number of preferred beneficiaries is unlikely to be so large as to be effectively limitless.

157.     Discovery has bolstered Plaintiffs' special interest by revealing that there was no real difficulty in determining if a particular applicant met the criteria for preferential treatment under the Trust's Humanitarian Purpose, as the record is devoid of evidence that such was ever a significant problem.

158.     It has also bolstered Plaintiffs' special interest by revealing that, but for the threat of litigation, and the fact of this litigation, there was a strong possibility that the Laogai Defendants would have effectively terminated the Humanitarian Purpose. Indeed, minutes of February and April 2016 LHRO board meeting show that the LHRO was planning to surreptitiously suspend the Humanitarian Purpose. LRF00050484 (February 2016 minutes discussing the "[s]uspension of dissident funds[,]" replacing the Humanitarian Purpose with an "annual/biannual award," and emphasizing that "[a] public statement should NOT be announced" regarding these changes); LRF00052288 (April 2016 minutes discussing "discontinu[ing] supporting Chinese dissidents overall, unless the case is overwhelming and the applicant can really benefit from such funds" and other restrictions). Indeed, Wu expressly told Plaintiff Xu W.

around that time that the Humanitarian Purpose had been terminated. That termination was either never finalized, or was reversed, but only as a result of Wu's death, as well as fear of litigation. *E.g.*, NonpartyMY01090 (September 2016 internal memo decrying the LRF's "low priority" of the Humanitarian Purpose and the spending "imbalance" as being "part of the Harry Wu legacy" and as something that "must not continue or other dissident groups may soon mount legal challenges against the LRF for … stray[ing] from the original mission of the LHRO fund").

159.    Moreover, Plaintiffs are not challenging any of the Trustee Defendants' particular decisions on whether to fund a particular dissident's application. Rather, Plaintiffs are challenging a yearslong course of conduct that systematically elevated the LRF Purpose over the Humanitarian Purpose to such an extent that the Humanitarian Purpose has been all but ignored entirely, as well as the threatened termination of the Humanitarian Purpose altogether.

### STATUTE OF LIMITATIONS ALLEGATIONS

160.    This action, which commenced on April 11, 2017, is not time-barred because:

- before April 11, 2014: (1) no trustee other than Callahan was removed, resigned, or died; (2) Plaintiffs' interest in the Trust and its Humanitarian Purpose had not terminated; and (3) the Trust's Humanitarian Purpose had not been terminated;

- Plaintiff Xu W. was imprisoned until April 29, 2014;

- the breach of trust claim against Callahan is subject to tolling under District of Columbia law;

- this is an action to enforce the charitable purpose of a charitable trust;

- Plaintiffs bring equitable claims against Defendants as trustees, to enforce their rights under the Trust and its Humanitarian Purpose, and there was no clear or continuing repudiation of those rights before April 11, 2014;

- there was a fiduciary relationship of trust and confidence between Plaintiffs and Defendants, mitigating any duty to inquire;

- the breach of the Trust and its Humanitarian Purpose arose from the cumulative effect of non-humanitarian spending, with the violative

51

character of the non-humanitarian spending not becoming evident until it was repeated over many years, resulting in the clear repudiation of the Trust's Humanitarian Purpose and clear injury to Plaintiffs, such that the specific moment of breach is imprecise. To give an example, suppose a $100 trust benefits three people equally. If $10 is spent on one beneficiary, but not the other two, without any clear indication to the other two that the remainder will not be spent on them, it cannot be that the other two beneficiaries' failure to sue upon the spending of the initial $10 means their later suit is time-barred—particularly if, as here, the terms and conditions of the trust were kept hidden from them until years after the $10 was spent. As such, the lawful or unlawful nature of any particular expenditure, and whether such an expenditure materially breached the Trust and its Humanitarian Purpose cannot reasonably be ascertained without discovery;

- Defendants repeatedly refused to answer questions put to them about the administration of the Trust and its Humanitarian Purpose by Plaintiffs, Plaintiffs' representatives, and various third parties, and administered Trust assets in a deliberately non-transparent and obfuscating manner, thereby concealing and prolonging the misconduct;

- the Trust's Humanitarian Purpose was not definitively terminated until 2016; and

- before April 11, 2014, Plaintiffs did not and could not reasonably have known of a right to maintain this action, even with reasonable diligence, because: (1) the Yahoo Defendants repeatedly disclaimed responsibility over the Trust and its Humanitarian Purpose; (2) Plaintiffs did not obtain key non-public facts and documents contradicting the Yahoo Defendants, including internal emails and Trust documents, until 2016, and only obtained this information after conducting an investigation, beyond what could be expected of reasonable persons in their circumstances; (3) whether the Trust and its Humanitarian Purpose had been, was being, or would be fundamentally violated could not reasonably have been ascertained before April 11, 2014 based on publicly available information; (4) there was no clear repudiation of the Trust's Humanitarian Purpose before April 11, 2014; (5) the facts necessary to suggest an illegal violation of the Trust's Humanitarian Purpose—such as the facts that spending of Trust's assets on the LRF's expenses was a "limited exception" to that purpose, and that the Yahoo Defendants exercised considerable control over Trust assets—were concealed by Defendants, and could not have been uncovered with reasonable diligence; and (6) at that time, the publicly available Forms 990 for LRF and LHRO suggested that 57% or more of the initial $17.3 million Trust corpus remained intact, which was insufficient to provide notice at the time that the Trust's Humanitarian Purpose had been, was being, or would be fundamentally violated.

**FIRST CLAIM FOR RELIEF**
**(Breach of Trust under the Common Law, and in Violation of the District of Columbia**
**Uniform Trust Code, D.C. Code § 19-1301.01, *et seq.*)**
**Against the Trustee Defendants**

161.    Plaintiffs re-allege and incorporate all the allegations of this complaint with the same force and effect as if fully restated herein.

162.    The Trustee Defendants were trustees of the Trust and its Humanitarian Purpose, including as trustees *de son tort*, constructive trustees, implied trustees, or *de facto* trustees, and currently, at least the LHRO remains a trustee. As such, each had a duty to use reasonable care to prevent co-trustees from committing a breach of trust, including breaching the Trust's Humanitarian Purpose, as well as a duty to obtain redress if such a breach occurred. The LHRO continues to have such duties.

163.    The Trustee Defendants breached these duties by failing to administer the Trust and its Humanitarian Purpose with reasonable care, loyalty, and impartiality, including by permitting the substantial depletion of Trust assets in violation of its Humanitarian Purpose, while benefiting from the Trust and its Humanitarian Purpose, including by enjoying the Trust's reputation-enhancing effects, by relying on the existence of the Trust and its Humanitarian Purpose to defeat shareholder proposals relating to human rights, by allocating and using Trust assets for their own benefit and in violation of the Trust's Humanitarian Purpose, by terminating the Trust's Humanitarian Purpose, by failing to obtain redress for these breaches, and by continuing to allow the depletion of Trust assets on benefiting the LRF and the LHRO, to the detriment of the Trust's Humanitarian Purpose.

164.    Yahoo and Bell further breached their duties as trustees by completely abandoning their duties with respect to the Trust and its Humanitarian Purpose in 2015 or 2016, leaving Trust assets substantially in the control of Wu and the LRF, who they knew or should

have known were not trustworthy, and who they knew or should have known would spend Trust assets in violation of the Trust's Humanitarian Purpose, and without taking adequate precautions against that violation.

165.    The Laogai Defendants further breached their duties by using Trust assets to pay for their attempts to deny even the existence of a trust, and to pay for their defense of this action generally. They have also breached their duties to the Humanitarian Purpose by failing to even attempt to seek redress for past breaches of that purpose.

166.    By their conduct, the Trustee Defendants breached duties of trust owed to Plaintiffs and caused the Trust's assets to be systematically and unlawfully depleted in violation of the Trust's Humanitarian Purpose, threatened to cause the Trust's Humanitarian Purpose to be unlawfully terminated, and are causing it to become increasingly difficult to protect and restore the Trust's Humanitarian Purpose by allowing Trust assets to be depleted as this litigation has proceeded.

167.    Plaintiffs are entitled to equitable relief from the Trustee Defendants, including: an injunction against further breaches of trust; an injunction to compel the Trustee Defendants to redress breaches of trust by paying money or restoring Trust property; an accounting; the appointment of a special fiduciary to take possession of Trust property and to administer the Trust; the suspension of Trustee Defendants as trustees; the removal of Trustee Defendants as trustees; the denial of compensation to trustees; voiding the Trustee Defendants' actions as trustees; the imposition of a lien or constructive trust on Trust property; and tracing of Trust property and recovery of it or its proceeds.

168.    Plaintiffs are also entitled to damages from Trustee Defendants for their breaches of trust in the amount required to restore the value of the Trust assets devoted to the Trust's

Humanitarian Purpose to what they would have been had the breaches not occurred, or in the amount of the profit to Trustee Defendants by reason of their breaches, whichever is greater.

169.    Plaintiffs are also entitled to punitive damages from Yahoo, the LRF, and the LHRO, payable to the Trust's Humanitarian Purpose, because their breaches of trust were and are willful, intentional, in bad faith, and/or with reckless indifference to the Trust's Humanitarian Purpose.

**SECOND CLAIM FOR RELIEF**
**(Modification of Trust)**
**Against all the LRF and the LHRO**

170.    Plaintiffs re-allege and incorporate all the allegations of this complaint with the same force and effect as if fully restated herein.

171.    The Trust should be modified under D.C. Code § 19–1304.12 to modify or terminate the LRF's status as a beneficiary of the Trust, and to remove the LRF and LHRO as trustees, because the continuation of such terms would be impracticable or wasteful or impair the administration of the Trust and its Humanitarian Purpose.

172.    The Trust should be modified under D.C. Code § 19–1304.10 to modify or terminate the LRF's status as a beneficiary of the Trust, and to remove the LRF and LHRO as trustees, because continued provision of Trust assets to the LRF, and the LRF and LHRO's continued service as trustees, would further the unlawful breach of the Trust's Humanitarian Purpose, and would be unlawful, wasteful, and contrary to public policy.

173.    The Trust should be modified to modify or terminate the LRF's status as a beneficiary of the Trust, and to remove the LRF and LHRO as trustees, because their breaches of trust, including Wu and the LRF's self-dealing, were, and the LRF and LHRO's breaches continue to be, so egregious, reckless, willful, intentional, and in bad faith, that to allow the LRF to continue to be a beneficiary, and to allow the LRF and LHRO to continue to serve as trustees,

55

would subvert the interests of justice—particularly since the LRF and LHRO have taken the position there is no obligation to spend any of the Trust's assets on the LRF at all.

174.    Finally, the Trust should be modified to make Chinese dissidents imprisoned for exercising their freedom of expression online the sole beneficiaries of the Trust because that would further the Trust's Humanitarian Purpose.

**THIRD CLAIM FOR RELIEF**
**(Third-Party Liability for Breach of Trust)**
**Against Wu, Yahoo, Bell, Callahan, and the LRF,**
**(In the Alternative to the First Claim for Relief against Them)**

175.    Plaintiffs re-allege and incorporate all the above allegations of this complaint with the same force and effect as if fully restated herein.

176.    A third person who knowingly assists or participates in a trustee's breach of trust is liable to the beneficiary.

177.    To the extent Wu, Yahoo, Bell, or Callahan are deemed not to be trustees of the Trust, they are liable to Plaintiffs for aiding and abetting, and knowingly assisting and participating in, the LRF's and the LHRO's breaches of trust.

178.    Further, to the extent the LRF is deemed to not to have been a trustee of the Trust upon the transfer of Trust assets to the LHRO, it is liable to Plaintiffs for aiding and abetting, and knowingly assisting in, the LHRO's breaches of trust after the LHRO became a trustee.

**FOURTH CLAIM FOR RELIEF**
**(Principal-Agent Liability for Breach of Trust)**
**Against Yahoo**
**(In the Alternative to the First Claim for Relief against Yahoo)**

179.    Plaintiffs re-allege and incorporate all the allegations of this complaint with the same force and effect as if fully restated herein.

180.    To the extent Yahoo is deemed not to be a trustee of the Trust or its Humanitarian Purpose, Yahoo is liable for the acts of its agents Callahan and Bell. Yahoo required Callahan

and Bell to serve as trustees of the Trust and its Humanitarian Purpose as a condition of Callahan and Bell's employment, and Callahan and Bell agreed. Callahan and Bell were compensated by Yahoo for serving as trustees. Yahoo had the right to remove Callahan and Bell as trustees, directed Callahan and Bell in the exercise of their duties as trustees, and made clear that, in serving as trustees, Callahan and Bell were to protect the interests of Yahoo.

**FIFTH CLAIM FOR RELIEF**
**(Civil Conspiracy)**
**Against all Defendants other than Impresa**
**(In the Alternative to the First Claim for Relief against Them)**

181.    Plaintiffs re-allege and incorporate all the allegations of this complaint with the same force and effect as if fully restated herein.

182.    The Yahoo Defendants, Wu, the LRF, and the LHRO, entered into a tacit agreement that, to avoid a scandal, Wu and the LRF would be effectively permitted to (wrongfully) all but ignore the Trust's Humanitarian Purpose, without any meaningful pushback.

183.    The agreement served each of their interests in various ways. Wu and the LRF benefited financially by receiving assets that would otherwise have gone to the Humanitarian Purpose. The Yahoo Defendants and LHRO benefited by avoiding the cost and burden that proper administration of the Humanitarian Purpose would have required of them. Yahoo further benefited by being able to continue enjoying the reputation-enhancing benefits of the Humanitarian Purpose, as well as the ability to rely on the existence of the Trust and its Humanitarian Purpose to defeat shareholder proposals. And all benefited by avoiding the public embarrassment that would have ensued had the scandal been revealed, given that all were intimately familiar with the Trust, its Humanitarian Purpose, its governance documents, public statements made about that purpose, and Wu and the LRF's undermining of that purpose, such

57

that none could credibly deny knowledge of the fact that Wu and the LRF were in breach of the Humanitarian Purpose.

184.    Overt acts in furtherance of this tacit agreement include: (1) the Yahoo Defendants consistently voting in favor of transferring Trust assets to Wu and the LRF, despite knowing of, and even voicing concerns about, Wu and the LRF's failure to adequately attend to the Humanitarian Purpose; (2) the LRHO actually transferring Trust assets to Wu and the LRF, despite concerns about Wu and the LRF's failure to adequately attend to the Humanitarian Purpose;  (3) the Yahoo Defendants publicly denying responsibility for the administration of the Trust or its Humanitarian Purpose; and (4) the Yahoo Defendants publicly touting the Humanitarian Purpose, despite knowing it was being undermined.

185.    As a result of the agreement and the acts in furtherance of the agreement, the Humanitarian Purpose was and continued to be breached, harming Plaintiffs.

**SIXTH CLAIM FOR RELIEF**
**(Restitution)**
**Against Impresa**

186.    Plaintiffs re-allege and incorporate all the allegations of this complaint with the same force and effect as if fully restated herein.

187.    When a trustee breaches their fiduciary duties and transfers trust property to a third party, the third party takes the property subject to the trust, unless the third party purchased the property for value and without notice of the breach. It is sufficient that the recipient know that the property "may have been" transferred in breach of fiduciary duty. *In re Main, Inc.*, 239 B.R. 59, 70 (Bankr. E.D. Pa. 1999). Using trust assets to defend against a claim that a trust exists constitutes a breach of trust and fiduciary duty. *Id.* at 68 (holding that using trust assets to fund litigation adverse to the trust is a breach of fiduciary duty).

188.    Here, Impresa has taken Trust property, namely monies traceable to the Trust, while being on notice that payment of such monies was adverse to the Humanitarian Purpose and thus in breach of that purpose.

189.    In particular, the Laogai Defendants have been using Trust assets to pay Impresa to litigation the position that the Laogai Defendants do not owe *any* fiduciary duties to the Humanitarian Purpose *at all*. Such conduct is difficult if not impossible to square with the Laogai Defendants' fiduciary duties to that purpose. That is especially true given that the Laogai Defendants have not engaged in any meaningful attempts to engage in fundraising of any kind, much less to fundraise the costs of their defense in this action, so as to avoid depleting Trust assets, which failure constitutes a continuing breach of the Humanitarian Purpose. The Laogai Defendants' failure to even try to fundraise their defense costs in this case, and to use Trust assets instead, constitutes a particularly egregious breach of their duties to the Humanitarian Purpose.

190.    As for Impresa, they have long known that their fees are being paid out of assets claimed to be Trust assets. A significant portion of their fees have been paid by the LHRO, and the LHRO has no apparent assets other than Trust assets.

191.    Plaintiffs seek from Impresa restitution of all monies traceable to Trust assets and paid to Impresa by the Laogai Defendants for litigation adverse to the Humanitarian Purpose.

**SEVENTH CLAIM FOR RELIEF**
**(Co-beneficiary liability for participating in breaches of trust)**
**Against Yahoo and LRF**

192.    Plaintiffs re-allege and incorporate all the allegations of this complaint with the same force and effect as if fully restated herein.

193.    Under general principles of trust law, a beneficiary is liable to its co-beneficiaries for participating in a trustee's breach of the trust. *See* RESTATEMENT (SECOND) OF TRUSTS §

256(4) ("If one of several beneficiaries participates with the trustee in a breach of trust . . . , [that] beneficiary is personally liable to the extent of the loss, and [the beneficiary's] interest is subject to a charge for the amount of loss . . . .); RESTATEMENT (THIRD) OF TRUSTS § 104 (1)(c) ("A beneficiary is not personally liable to the trust except to the extent . . . the trust suffered a loss resulting from a breach of trust in which the beneficiary participated . . . ."); RESTATEMENT (THIRD) OF TRUSTS § 104, cmt. f. ("Certainly, the beneficiary participates in a breach of trust if the beneficiary performs, or joins in performing, an act the beneficiary knows is a breach. Otherwise, the question of what conduct of the beneficiary constitutes participation in a breach of trust is a question of degree. For example, a beneficiary has participated in a breach of trust if the beneficiary induced the misconduct knowing that it would or might be a breach of trust."); SCOTT AND ASCHER ON TRUSTS § 25.2.6.3, at 1866 ("Although there is not the same fiduciary relationship between trust beneficiaries as there is between them and the trustee, there is enough of a fiduciary element in their relationship to make it inequitable for one to seek to obtain an advantage over another."); BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 191 ("Co-beneficiaries . . . are in a fiduciary relation to each other in the sense that one beneficiary may not secretly secure for himself a special advantage in the trust administration.").

194.    Yahoo and the LRF were, along with the Humanitarian Purpose, beneficiaries of the Trust. Both Yahoo and the LRF participated in the breaches of the Humanitarian Purpose in various ways, including by approving transfers and expenditures that constituted those breaches, covering up those breaches, and refusing to seek redress for those breaches. Moreover, they did so to protect their own interests in the Trust, including their interests as beneficiaries of the Trust. Thus, even if they were not at times trustees per se, they are nonetheless liable to the Humanitarian Purpose in their capacities as co-beneficiaries of the Trust.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.      Damages, with interest, against all Defendants to which Plaintiffs may be entitled pursuant to each of the counts alleged in this Complaint, including punitive damages.

B.      Disgorgement of all monies, with interest, taken by Wu and the LRF and used to their benefit and to the detriment of Plaintiffs in such amounts, including but not limited to the disgorgement and sale of real property, as necessary to satisfy the judgment awarded herein.

C.      Restoration of Trust assets, to be deposited in a constructive trust.

D.      Restitution from Defendant Impresa.

E.      Accounting of Trust assets and expenditures since the establishment of the Yahoo Human Rights Fund.

F.      Constructive trust over all remaining Trust assets.

G.      Creation of a constructive trust into which Defendants shall pay damages, disgorgement, and restitution.

H.      Tracing of Trust assets wrongfully disposed of and recovery of such assets or their proceeds.

I.      Modification of the Trust to make Chinese dissidents imprisoned for exercising their freedom of expression online the sole beneficiaries of Trust assets.

J.      The removal of the LRF and LHRO as trustees.

K.      The appointment of a special fiduciary to take possession of Trust property and to administer the Trust.

L.      Plaintiffs' reasonable attorneys' fees and costs, including under D.C. Code § 19-1310.04 and the Uniform Trust Code § 1004, upon which D.C. Code § 19-1310.04 is based.

M.      Such other and further relief, including any additional equitable relief, as the Court may deem just and proper.

Dated: March 29, 2024                        By: *Times Wang* _____
                                             **FARRA & WANG PLLC**
                                             Times Wang (D.C. Bar 1025389)
                                             1300 I St. NW, Suite 400E
                                             Washington, DC 20005
                                             (202) 505-6227
                                             twang@farrawang.com

                                             **SLARSKEY LLC**
                                             David Slarskey (admitted *pro hac vice*)
                                             Evan Fried (admitted *pro hac vice*)
                                             420 Lexington Ave., Suite 2525
                                             New York, NY 10170
                                             Telephone: (212) 658-0661
                                             dslarskey@slarskey.com
                                             efried@slarskey.com

                                             *Counsel for Plaintiffs*