# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

HE DEPU, *et al.*,

                  Plaintiffs,

       v.

OATH HOLDINGS, INC., *et al.*,

                 Defendants.

Case No. 17-0635 (RDM)

Judge Randolph D. Moss

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT MICHAEL CALLAHAN'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ........................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................................ 2

    A.   To quell a legal, political, and public relations scandal, Yahoo created the Yahoo
Human Rights Fund. ..................................................................................................... 2

    B.   Callahan joins the board of directors of the Laogai Human Rights Organization. ......... 4

    C.   Yahoo's public statements about the Yahoo Human Rights Fund mask the defendants'
chronic mismanagement of it. ....................................................................................... 6

    D.   Michael Callahan was directly involved in the Yahoo Human Rights Fund's gross
mismanagement and the defendants' breaches of trust. .................................................. 9

    E.   The plaintiffs bring this lawsuit to try and save, replenish, and reform the Trust. ....... 12

    F.   The claims against Callahan. ...................................................................................... 14

ARGUMENT .................................................................................................................. 15

  I.    CALLAHAN'S MISCONDUCT INJURED THE CHARITABLE TRUST *RES* AND
PLAINTIFFS CAN SUE HIM AS A RESULT. ...................................................................... 16

  II.   THE PLAINTIFFS' CLAIMS AGAINST CALLAHAN ARE TIMELY. ......................... 21

    A.   The aiding and abetting and civil conspiracy claims against Callahan are timely........ 21

       1.   If the breach of trust statute supplies the relevant statute of limitations, the plaintiffs'
claims are timely. ........................................................................................................ 21

       2.   If the catchall statute of limitations applies, the plaintiffs' claims are timely........... 24

          a.   The discovery rule under D.C. law. ..................................................................... 24

          b.   The Court should apply the discovery rule. .......................................................... 26

          c.   Applying the discovery rule, the plaintiffs' claims accrued no earlier than
November 2016. ......................................................................................................... 29

    B.   The breach of trust claim against Callahan is timely. .................................................. 34

    C.   Xu Wanping's claims in particular are timely. ........................................................... 39

CONCLUSION ............................................................................................................... 40

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A1 Team USA Holdings, LLC v. Bingham McCutchen LLP*,
  998 A.2d 320 (D.C. 2010) ............................................................................... 37

*Brin v. S.E.W. Investors*,
  902 A.2d 784 (D.C. 2006) ........................................................................ Passim

*Cabaniss v. Cabaniss*,
  464 A.2d 87 (D.C. 1983) .......................................................................... 16, 19

*California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*,
  582 U.S. 497 (2017) ........................................................................................ 37

*Cardozo v. United States*,
  315 A.3d 658 (D.C. 2024) ............................................................................... 39

*Cevenini v. Archbishop of Washington*,
  707 A.2d 768 (D.C. 1998) ............................................................................... 31

*Cobell v. Norton*,
  260 F. Supp. 2d 98 (D.D.C. 2003) .................................................................. 27

*Commonwealth Land Title Ins. Co. v. KCI Techs., Inc.*,
  922 F.3d 459 (D.C. Cir. 2019) ........................................................................ 25

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
  603 U.S. 799 (2024) ........................................................................................ 29

*Coster v. Crookham*,
  468 N.W.2d 802 (Iowa 1991) .......................................................................... 16

*Depu v. Oath Holdings, Inc.*,
  715 F. Supp. 3d 1 (D.D.C. 2022) ....................................................... 2, 3, 4, 14

*Diamond v. Davis*,
  680 A.2d 364 (D.C. App. 1996) ................................................................. 25, 26

*Doe v. Medlantic Health Care Group, Inc.*,
  814 A.2d 939 (D.C. 2003) .................................................................... 26, 29, 33

*Donovan v. Bierwirth*,
  680 F.2d 263 .................................................................................................... 18

*East v. Graphic Arts Industry Trust*,
  718 A.2d 152 (D.C. 1998) ................................................................. 25

*Farris v. Compton*,
  652 A.2d 49 (D.C. 1994) .............................................. 25, 26, 29, 30

*ForUsAll, Inc. v. United States Dep't of Lab.*,
  691 F. Supp. 3d 14 (D.D.C. 2023) ................................................. 18

*Graden v. Conexant Sys. Inc.*,
  496 F.3d 291 (3d Cir. 2007) ............................................................ 16

*Hancock v. Homeq Servicing Corp.*,
  2007 WL 1238746 (D.D.C. Apr. 27, 2007) ................................... 22

*Harman v. United States*,
  718 A.2d 114 (D.C. 1998) ............................................................... 40

*Harris v. Ladner*,
  828 A.2d 203 (D.C. 2003) ............................................................... 25

*He Depu v. Oath Holdings, Inc.*,
  531 F. Supp. 3d 219 (D.D.C. 2021) .............................................. 22

*He Depu v. Yahoo! Inc.*,
  950 F.3d 897 (D.C. Cir. 2020) ........................................................ 19

*Henderson v. Bank of New York Mellon, N.A.*,
  332 F. Supp. 3d 419 (D. Mass. 2018) ........................................... 27

*Hosey v. Burgess*,
  319 Ark. 183 (1995) ........................................................................ 16

*In re Estate of Delaney*,
  819 A.2d 968 (D.C. 2003) ............................................................... 26

*Interdonato v. Interdonato*,
  521 A.2d 1124 (D.C. 1987) ............................................................. 26

*J.H. Westerman Co. v. Fireman's Fund Ins. Co.*,
  499 A.2d 116 (D.C. 1985) ............................................................... 37

*Jones v. Kirchner*,
  835 F.3d 74 (D.C. Cir. 2016) .......................................................... 39

*Malachowski v. Bank One, Indianapolis*,
　　590 N.E.2d 559 (Ind. 1992) ............................................................................ 34

*Marzorati v. MedStar-Georgetown Med. Ctr., Inc.*,
　　265 F. Supp. 3d 24 (D.D.C. 2017) .................................................................. 24

*Meinhard v. Salmon*,
　　249 N.Y. 458 (1928) ....................................................................................... 18

*Moshier v. Fisher*,
　　449 P.3d 145 (Utah 2019) ............................................................................... 20

*Nader v. Democratic Nat. Comm.*,
　　567 F.3d 692 (D.C. Cir. 2009) ....................................................................... 22

*Pelt v. Utah*,
　　611 F. Supp. 2d 1267 (D. Utah 2009) ............................................................ 27

*Peters v. Riggs Nat. Bank, N.A.*,
　　942 A.2d 1163 (D.C. 2008) ............................................................................ 38

*Price v. Akaka*,
　　928 F.2d 824 (9th Cir. 1990) .......................................................................... 17

*Radbod v. Moghim*,
　　269 A.3d 1035 (D.C. 2022) ............................................................................ 34

*Ray v. Queen*,
　　747 A.2d 1137 (D.C. 2000) ................................................................. 28, 33, 34

*Tr. Under Will of Augustus T. Ashton, Deceased Dated Jan. 20*,
　　260 A.3d 81 (Pa. 2021) ................................................................................... 17

*Wagner v. Sellinger*,
　　847 A.2d 1151 (D.C. 2004) ................................................................. 20, 29, 33

*Washington v. Reno*,
　　35 F.3d 1093 (6th Cir. 1994) .......................................................................... 17

*Wilbur v. KeyBank Nat. Ass'n*,
　　962 F. Supp. 1122 (N.D. Ind. 1997) ............................................................... 27

**Statutes**

　　28 U.S.C. § 1658(b) ........................................................................................ 38

D.C. Code § 12-302 ............................................................................................... 39, 40

D.C. Code § 12-310 ...................................................................................................... 37

D.C. Code § 12-301(8) .................................................................................................. 24

D.C. Code § 19-1310.05 .......................................................................................... 35, 37

D.C. Code § 19-1301.06 ............................................................................................... 36

D.C. Code § 19-1308.13 ............................................................................................... 39

D.C. Code § 19–1301.10(c) .......................................................................................... 17

D.C. Code § 19-1310.05(a) ...................................................................................... 22, 38

D.C. Code § 19-1310.05(c) ................................................................................. 22, 35, 38

D.C. Code § 19–1310.02(a)(1) ...................................................................................... 17

N.H. Rev. Stat. § 564-B:10-1005(d) ............................................................................. 36

D.C. Code § 19-1310.05(c)(1) .................................................................................. 23, 22

§ 19-1310.05(c)(2) ........................................................................................................ 23

§ 19-1310.05(c)(3) .................................................................................................. 23, 36

## Rules

Fed. R. Civ. P. 56(a) .................................................................................................... 15

## Other Authorities

Bogert's The Law of Trusts and Trustees .................................................. 16, 18, 19, 27

Restatement (Third) of Trusts § 39 (2003) ..................................................... 17

Uniform Trust Code (2023), § 1005 ........................................................................ 36, 35

## INTRODUCTION

Michael Callahan moves for summary judgment on the theory that his breaches of trust and related misconduct in connection with the Yahoo Human Rights Fund ("Trust") couldn't have caused any of the injuries personally experienced by the plaintiffs, and on the theory that they sued him too late in any event. These arguments fail because they combine fundamental misunderstandings of the applicable law with an inadequate understanding of the record.

The relevant injury in a breach of a charitable trust case is the injury to the charitable trust *res* and the charitable purpose, not a particular plaintiff's personal injuries, damages, or losses. Given that Callahan's motion does not dispute the existence of evidence that his misconduct caused a multimillion-dollar depletion of the Trust *res* here—to the considerable detriment of the Trust's humanitarian purpose—it matters not at all for purposes of trust liability whether he caused the specific injuries the plaintiffs alleged in an abundance of caution for Article III purposes.

As for timeliness, the relevant statute is one of limitations, not of repose, as demonstrated by its text, context, and legislative history. Meanwhile, Callahan and the other defendants assiduously worked for years to hide the facts of their massive disregard for the humanitarian purpose—as well as its enforceable nature under trust law—behind layers of corporate secrecy, confidentiality obligations, and misleading public spin about the Trust. Considering that the plaintiffs are formerly imprisoned Chinese dissidents who don't speak English and can't travel freely, it is frankly extraordinary that they were able to uncover the facts necessary to bring this lawsuit at all. The most critical of these facts were contained in the confidential 2007 settlement agreement creating the Trust, and that document was uncovered only in November 2016. Given that this suit was brought in April 2017, the claims are timely.

For these reasons and those below, Callahan's motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.**    **To quell a legal, political, and public relations scandal, Yahoo created the Yahoo Human Rights Fund.**

In November 2007, Yahoo and its chief executive officer, Jerry Yang, became embroiled in a scandal after two imprisoned Chinese dissidents and their families sued the company, alleging that it had aided and abetted the dissidents' arrest, imprisonment, and torture in China for expressing pro-democracy views; the company had turned over the dissidents' private email records to the Chinese government. *Depu v. Oath Holdings, Inc.*, 715 F. Supp. 3d 1, 8–9 (D.D.C. 2022). Yang and Yahoo's then-general counsel, Michael Callahan, were called to testify on Capitol Hill. *Id.* at 9. They were excoriated by several members of Congress and the press coverage was stinging. *Id.* Certain members urged Yahoo and Yang to settle the suits "generously." *Id.* at 9.[1]

Yahoo, Yang, and Callahan immediately began settlement negotiations with the dissident plaintiffs, who had appointed Harry Wu (not a lawyer) to serve as their representative. *Id.* at 9. The plaintiffs' family members had attended the hearing with Wu, a Chinese democracy activist who at the time was the executive director of the Laogai Research Foundation ("LRF") in Washington, D.C., a non-profit organization that Wu founded. *Id.*

Yang wanted to settle the cases and also do "something to support human rights efforts more broadly," *id.*, and after more negotiations with Wu, the parties agreed on the contours of a settlement structure: Yahoo would settle the lawsuits by paying $3.2 million to each family of the two dissident plaintiffs, and it would separately establish a $17.3 million fund that became known as the "Yahoo Human Rights Fund." *Id.* at 10.

---

[1] Unless otherwise specified, all internal citations, quotation marks, and alterations are omitted from quotations throughout this brief, and all emphases are added.

Eager to rehabilitate its public image, Yahoo issued a press release touting the settlement one week after the disastrous Capitol Hill hearing. *Id.* at 10–11. After some additional negotiations, the settlement agreement was finalized. *Id.* It created the Yahoo Human Rights Fund, a charitable trust under D.C. law ("Trust"). *Id.* at 12. A confidential document, the settlement agreement provided that the Trust:

> may be used for three purposes only: (a) to provide humanitarian and legal assistance primarily to persons in or from the People's Republic of China who have been imprisoned for expressing their views through Yahoo! or another medium; (b) to resolve claims primarily by such persons, or persons threatened with prosecution or imprisonment, against the Yahoo! Entities or any Yahoo! subsidiary or affiliate; and (c) for payment of Foundation operating expenses and the Foundation's educational work conducted in the United States in support of human rights, to the extent provided below.

*Id.* at 12.

With respect to the Trust's first purpose—its humanitarian purpose—the settlement agreement had a provision requiring that the LRF and Wu "agree to use their best efforts to maximize the benefits achieved through their use of a portion of the YHR Fund for humanitarian and legal assistance." *Id.* at 12. By contrast, with respect to the Trust's third purpose—the LRF operating expenses purpose—the settlement agreement imposed an annual cap: "[p]ursuant to paragraph 2(c), above, the [LRF] may use for its operating expenses up to $1 million USD of the YHR Fund in each calendar year (prorated for 2007)," and the LRF was required to "provide notification to Yahoo! concerning the amount of the YHR Fund that is used each year for the operating and educational expenses of the" LRF. *Id.* at 13. Yang inserted the cap during the settlement negotiations, telling Wu and Callahan that "i included the $1mm cap for operating

expense" because "i would like to make sure most of the fund goes to humanitarian and legal help for dissidents, and not to the operating expenses." Ex. 1 at 1.[2]

### B.    Callahan joins the board of directors of the Laogai Human Rights Organization.

The Trust's governance structure changed over time. Initially, Wu and the LRF established an "advisory" board of directors for the Trust. *Depu*, 715 F. Supp. 3d at 15. That board's "discussions and materials [were] strictly confidential," and each board member was told not to "disclose confidential information about the YHRFund or its activities to any other person, except to the extent that such disclosure is required by law." *Id.* at 15.

In 2009, at Yahoo's insistence and over Wu's resistance, *see* Ex. 8 at 1, the Trust's governance structure changed, and two new entities were created: the Yahoo Irrevocable Human Rights Trust ("YIHRT") and the Laogai Human Rights Organization ("LHRO"). *Depu*, 715 F. Supp. 3d at 18. The impetus for this change was two-fold.

First, the LRF's tax lawyers advised that the Yahoo Human Rights Fund's structure threatened the LRF's nonprofit status, because it placed the LRF in the role of holding money that would be used to settle human rights lawsuits brought against Yahoo (a non-charitable purpose). *Id.* The YIHRT solved this problem by allocating and then segregating $3.55 million from the Yahoo Human Rights Fund to the YIHRT, which was dedicated to resolving such lawsuits. *Id.*

Second, Yahoo had private concerns about Wu's management of the Trust funds, so it created the LHRO as a closely related entity of the LRF to control the Trust funds. As Yahoo's then-Vice President for Global Public Policy, David Hantman, recounted to Yahoo's board of

---

[2] Per this Court's standing order, Dkt. 80 at 6 (¶ 14), pin cites are to the page of the PDF.

directors in a July 2012 internal memorandum, the Trust had "garnered us good will" but the partnership with Wu and the LRF had come with "some risks, as Wu resists transparency and governance in his organizations." Ex. 2 at 9. This was polite. An LHRO board member (Maochung "Miles" Yu) privately described Wu's management style with respect to the Trust as "bullying" and "insanity." Ex. 3 at 1.

More fundamentally, the LRF was not at all equipped to manage a $17.3 million fund. *E.g.*, Ex. 9 at 3 (Foley Hoag email noting that the LRF was not even "aware of how many LRF accounts exist or how much money is in those accounts"); Ex. 10 at 1, 4 (LHRO board member Nan Richardson warning about Wu's "evident inability to manage an NGO properly" and "bemoaning the lack of Harry's record keeping"). As a result, and from inception, the Trust was rampantly mismanaged by Wu. His very first act, in 2008, was to spend $1.4 million of Trust monies to buy a building, Ex. 4 at 1, and hundreds of thousands more to create a museum out of it, *id.* at 2—expenditures which even he later described as being "in excess of the $1 million limit," and as "contradict[ing] the explicit language of the settlement agreement." Ex. 3 at 2. In July 2011, the LRF's outside auditors issued a letter that the LRF had significant deficiencies in its internal controls, Ex. 5 at 9, 11, and a year later, issued another letter reiterating those deficiencies, while adding several more, including that the LRF's spending was likely in breach of the settlement agreement. Ex. 10 at 11–12. When the U.S. Internal Revenue Service later investigated the LRF, it found several categories of violations—including, again, relating to internal controls, and that Wu had even used Trust monies to make a political contribution to a favored legislator, in contravention of the LRF's 501(c)(3) status. Ex. 6 at 1–3.

The LRF's inability to operate functionally and Wu's imperious management style resulted in a new governance structure: (1) the Trust monies would be managed by the LHRO, a

"supporting organization" for the LRF that would be created for this purpose; (2) the LHRO board's vice chairman would be a Yahoo representative; (3) no LHRO funds could be spent without the signature of both Wu and the Yahoo representative; and (4) $3.55 million of the Trust monies would be placed in a new trust, called the YIHRT, which would be designated for managing the Trust's Yahoo claims resolution purpose. The purpose of these changes was to ensure that Yahoo had more oversight and control of Trust monies. *E.g.*, Ex. 3 at 2 (Wu: "Since December 2007 LRF and Yahoo signed the Settlement of Agreement. Yahoo transfer 17.3 million to LRF. . . . After one year and seven months (6/2009) Yahoo request to control the money, and I agree."); Ex. 7 at 1 (Foley Hoag: that the LHRO "won't be able to take action on money . . . without Mike [Callahan] . . . was the intent of [a] provision" governing quorum); Ex. 10 at 6 ("Yahoo insisted on the creation of the LHRO" due to a lack of "any real [LRF] records that could be relied on"); Ex. 11 at 6 (Yahoo 30(b)(6) Dep. at 19:10-21) (LHRO was created in part because "Yahoo! had an interest [in] visibility into the entire enterprise [of the Yahoo Human Rights Fund] given it[] was one of the . . . components of Yahoo!'s business in human rights work").

    **C.**    **Yahoo's public statements about the Yahoo Human Rights Fund mask the defendants' chronic mismanagement of it.**

None of the concerns that led to the new governance structure were publicly known. Rather, what was public was the picture the Yahoo defendants had painted of a Yahoo Human Rights Fund that was operating with success, providing meaningful humanitarian assistance to Chinese dissidents, and managed in partnership with their new ally, Harry Wu.

An internal memorandum to Yang after the hearing, for example, advised that it was "critical to meet with Congressional members now and make the personal connections that will pay political and public dividends down the road," that visiting members of Congress "with

Harry Wu is also an important gesture that will be noticed by Congress and the media," and that Yang needed to project an image to "the media and the public that Yahoo! is a responsible global company that is taking action." Ex. 12 at 1.

In communications with high-level government officials, Yahoo beat the drum of the Yahoo Human Rights Fund. In April 2008, Yang returned to Washington, D.C., meeting with (among others) then-Speaker of the House Nancy Pelosi; Yahoo's corporate communications personnel reported internally that "the coverage is positive, highlighting Jerry's remarks, the Yahoo! Human Rights Fund and Yahoo!'s efforts on human rights issues." Ex. 13 at 1. It did the same with then-Secretary of State Condoleezza Rice and (later) then-Secretary of State Hillary Clinton. Ex. 14 at 1–2 (2008 letter to then-Secretary of State Condoleezza Rice touting the fact that Yahoo "recently established the Yahoo! Human Rights Fund to provide humanitarian and legal support to political dissidents who have been imprisoned for expressing their views online, as well as support for their families"); Ex. 15 at 2 (2009 letter to then-Secretary of State Hillary Clinton touting how Yahoo "established the Yahoo! Human Rights Fund to provide humanitarian and legal support to dissidents imprisoned for expressing their views online, as well as support for their families.").

When shareholders raised human rights concerns about Yahoo's business, Yahoo responded by pointing to its establishment of the Yahoo Human Rights Fund. *E.g.*, Ex. 16 at 27–30 (rejecting the City of New York Office of the Comptroller's shareholder proposal to "institute policies to help protect freedom of access to the Internet" on the ground that the proposal was "unnecessary" based in part on the fact that "the Company has established a Human Rights Fund,

in partnership with a noted Chinese human rights activist, to provide humanitarian relief and legal support for dissidents imprisoned for expressing their views online").[3]

The campaign worked. Yahoo successfully crafted a public image that it was a noble, forward-thinking tech company at the cutting edge of the corporate social responsibility movement, and the Yahoo Human Rights Fund was a major investment burnishing this public image. *See* Ex. 13 at 1 (Yang spoke publicly about Yahoo wanting "to be the best corporate citizen we can be" and repeatedly touted how the Trust was "a human-rights fund to help victims of government censorship"). As recounted in a memo to Yahoo's board of directors, this success had allowed Yahoo "to rehabilitate our reputation" after the disastrous 2007 Capitol Hill hearing and thereby "prevent regulation that would essentially prohibit us from doing business in China and many other countries." Ex. 2 at 3.

Yahoo had tied itself to Harry Wu publicly, so it also cared about Wu's image. In March 2009, Gare Smith (a Foley Hoag lawyer working for Yahoo) emailed Yahoo to emphasize "Harry's credibility on Capitol Hill," noting how, at an event about Tibet, Wu had "received a hug from Richard [Gere] and kisses from both [Nancy] Pelosi and [Ileana] Ros-Lehtinen," and how, "when *each* of them spoke, they recognized Harry as *the* pre-eminent human rights activist with respect to China." Ex. 17 at 1 (emphasis in original). "Obviously," Smith wrote, "I pass this along as additional evidence that with Harry on our side," Yahoo's critics "will have a very hard time getting traction on Capitol Hill." *Id.* As another example, in April 2011, Smith again emailed Yahoo about "the grand opening of the new Laogai Museum." Ex. 18 at 1. "The highlight of the evening," Smith wrote, was when Annette Lantos—related to Tom Lantos, the

---

[3] Most of these communications mentioned only the Trust's humanitarian purpose; the claims resolution purpose was never publicly disclosed, and the purpose of benefiting the LRF was mentioned only in passing if at all.

congressman who'd called Yahoo executives "moral pygmies" at the disastrous November 2007 hearing—"gushed about how wonderful it was that Yahoo! hade made the museum possible! No other company or entity was mentioned in this regard . . . . Coming from Annette Lantos, that brought the entire human rights in China issue full circle for Yahoo! in a way that could never have been anticipated." *Id.* "It was," he concluded, "a good day for both Harry and Yahoo!" *Id.*

### D.    Michael Callahan was directly involved in the Yahoo Human Rights Fund's gross mismanagement and the defendants' breaches of trust.

Even after the creation of the LHRO, the dissonance between the public image of the Trust that Yahoo cultivated and its private reality was stark. From the beginning, the Yahoo "Human Rights" Fund spent astonishingly little money on "human rights," *i.e.*, its humanitarian purpose. Yahoo internally observed that Wu saw the $17.3 million as zero-sum: that "every dollar that goes to" a purpose other than the LRF was "a dollar Harry essentially loses." Ex. 19 at 1; *see also, e.g.*, Dkt. 18-4 at 49 (LHRO conflict of interest form acknowledging that Wu had a conflict of interest arising out of Wu's control of the LRF). Thus, Wu agitated for terminating the humanitarian purpose altogether as early as 2010. Ex. 20 at 2 ("Harry recently announced that he does not intend to provide additional funds to any other individuals or groups"). Wu found the dissidents ungrateful. Ex. 21 at 3 ("Mr. Wu suggested that the board review LRF's policies concerning dissident relief in light of recent events. He proceeded to recall stories of dissidents who, upon receiving relief money, defame[d] Mr. Wu[.]"). In an interview with *The New York Times*, Wu "made little effort to hide his disdain for Chinese human rights activists who sought grants, describing them as greedy, deceitful and ungrateful." *See* Andrew Jacobs, "Champion of Human Rights in China Leaves a Tarnished Legacy," *The New York Times* (Aug. 13, 2016), https://www.nytimes.com/2016/08/14/us/champion-of-human-rights-in-china-leaves-a-tarnished-

legacy.html (hereinafter, Jacobs, "Champion of Human Rights in China Leaves a Tarnished Legacy").

Callahan had a front-row seat to all of this. As Yahoo's general counsel and the LHRO's first vice chairman of the board, Callahan had "joint control" of the LHRO's bank accounts, and his signature was required for the issuance of all checks to the LRF. Ex. 22 at 1. Moreover, the LHRO bylaws provided that his attendance was required before the LHRO could even have a quorum to spend any money. Ex. 7 at 1. He was well aware of the extreme mismanagement of the Trust.

An August 9, 2011 summary of the Trust's spending (prepared by Foley Hoag) highlighted the extreme dysfunction, showing that, in the preceding 10 months, the LHRO had blown past the $1 million cap and provided *over $2 million* to the LRF. Ex. 9 at 1–2. Attempts to confirm the justification for exceeding the cap—namely that the LRF somehow had run out of money—were a challenge because "[n]either the LRF nor the LHRO Board are aware of how many LRF accounts exist or how much money is in those accounts," including Trust monies. *Id.* at 3. As for the humanitarian purpose, Foley Hoag's summary consisted of a single, depressing line: "To date, the LHRO has not approved or disbursed *any* funding for dissident individuals[.]" *Id.* Knowing this, Callahan never voted against providing Wu and the LRF with their requested distributions from the Trust or exercised his unique role on the board to ensure more accountability, even though it was apparent very little if any money was making its way to Chinese dissidents. *E.g.*, Ex. 23 at 21 (Callahan Dep. at 79:2-22) ("Q: Do you see that Gare writes: 'The Board will also want to take a very clear position with respect to its expectation that other dissidents will be provided with funding in the future. Harry recently announced that he does not intend to provide any additional funds to any other individuals or groups.' . . . Did you,

as a board member, tell Harry that he couldn't just stop funding dissidents? A: I don't recall that I had that conversation with Harry.").

Callahan did more than fail to act. He actively took steps to make things worse. In 2010 and early 2011, Tienchi Liao, previously a close confidant of Wu's and variously an officer and director of both the LRF and the LHRO, sounded the alarm. In July 2010, she warned Callahan that "the humanitarian help has so low proportion in the whole budget, it is unacceptable," that Wu's financial reports contained "wrong information" and "mistakes" that were "made on purpose to misleading the people," and that Wu was "determined" to remove her so that she would stop "pointing finger" at him and to hinder her ability to "prevent a bit from further wrong-doings in the organization." Ex. 24 at 6. In response, Callahan told Liao that "we have been working on these issues already for some time" and that "[t]he most important thing to Yahoo! is that this money be used to help dissidents without undue difficulties on their end." *Id.* at 5. That was lip service. So, in December 2010, Liao wrote a more detailed memo to Callahan and others specifically warning that Wu was violating "the duty of care" to the humanitarian purpose by "provid[ing] not sufficient humanitarian support to the victims in or from China (only 8% from the budget . . .)," by having "no qualified office staff . . . working on this issue," by having "[n]o effective and ethical management," such that "[t]here exists not even a website about the Yahoo HR Fund," which meant that "[p]eople do not know how to apply." *Id.* at 9. She added that Wu was also violating the "duty of loyalty" "put[ting] his personal interest above the interest of the organization." *Id.*

Callahan's response was suppression. He worked with Wu and others and voted to remove Liao from the LHRO board. Ex. 23 at 15 (Callahan Dep. at 57:12-25) ("I remember that, at some point, the LHRO board voted or resolved . . .  that Ms. Liao would be removed from that

board. . . . I believe that I voted in favor of that resolution."). He then had Foley Hoag send cease-and-desist letters to Liao threatening her with legal action if she disclosed confidential information. *E.g.*, Ex. 25 at 3 (board minutes: "Liao Tienchi cease and desist letter . . . The letter was sent in Spring 2011 and it appears no public comments, negative publicity, or private responses have been made. So far so good.").

By the time Callahan left the LHRO board in July 2012—less than five years into the Trust's existence—about $8 million of the initial $17.3 million corpus had already been spent. Dkt. 215-1 at 11 & n. 3 (admitting that "when Mr. Callahan resigned from the LHRO board," only $9.3 million remained of the Trust corpus, with only $6.3 million then available for the humanitarian purpose). The proportion that had been spent on the humanitarian purpose was miniscule—only about 8% as of July 2010, Ex. 24 at 5, and zero in 2011. Ex. 9 at 3 ("To date, the LHRO has not approved or disbursed *any* funding for dissident individuals[.]"). When he transitioned the Yahoo LHRO board seat to his successor (David Hantman, they engaged in gallows humor that Callahan had just thrown Hantman under "one of those $1 busses between DC and NYC Chinatowns that always crash." Ex. 28 at 1.

### E.     The plaintiffs bring this lawsuit to try and save, replenish, and reform the Trust.

The current plaintiffs are three Chinese dissidents, Wang Jinbo, Xu Wanping, and Ouyang Yi.[4] *See* Dkt. 186, ¶¶ 11, 12, 14. They are all Chinese dissidents who've been imprisoned for online dissent and who are actual or potential beneficiaries of the Trust. *Id.* In 2008, Wang Jinbo applied for $20,000 in assistance, was told he would receive $4,000, and then only received $3,000. Ex. 29 at 2-3 (¶ 7). Owing to the lack of information about the Trust's inner workings,

---

[4] The case is stayed as to the three other plaintiffs, He Depu, Li Dawei, and Xu Yonghai. *See* Minute Order (Oct. 28, 2024).

however, Wang had no reason to believe this was the result of anything other than clerical error. *Id.* Wang only began to suspect misconduct in 2014, when he learned of allegations that Wu had used Trust monies to gain leverage with several women, one of whom Wang knew well, and who'd alleged that Wu had sexually assaulted her. *Id.* at 3 (¶ 8).

Xu Wanping was incarcerated until April 29, 2014. Ex. 30 at 13 (Xu Dep. at 47:21–48:1). When he contacted Harry Wu to apply for humanitarian assistance in 2016, Wu personally told him that the program was terminated. *Id.* at 18 (Xu Dep. at 69:10-18). Wu gave him $500 of Wu's own money instead. *Id.*

Ouyang Yi has never applied for humanitarian assistance funding but hopes to if the Trust ever has its assets replenished (and also hopes that other deserving dissidents will get funding as well). Ex. 31 at 15–16 (Ouyang Dep. at 57:1–59:22) ("Yahoo did not manage the fund responsibly. And a lot of the money went missing. And then did not use the money as intended. . . . I would like to get my deserved compensation. And also I hope through this lawsuit other deserv[ing] people . . . receive their deserved compensation."). Today, the Trust has no liquid assets remaining. As of April 2024, its only remaining assets were a building and "very limited" "operating capital." Ex. 32 at 30 (Hrg. Tr. at 30:7–10) ("THE COURT: So is this [building] the last trust assets at this point? MR. KOSTEL: Yes. There is some operating capital, but very limited.").

All of the plaintiffs remained under heavy scrutiny by the Chinese government after they were released. *E.g.*, Ex. 30 at 14 (Xu Dep. at 51:5-6) ("when I went out, I understood that I'm being watched or surveillanced, severely"); Ex. 31 at 19 (Ouyang Dep. at 71:19–21) ("Q. Did you ever speak to any of the other plaintiffs by phone? A. Definitely not on the phone because we know that our phones are under surveillance."); Ex. 29 at 2 (¶ 6). None could travel freely.

*See generally, id.* None were proficient in English. *E.g.*, Ex. 30 at 5 (Xu Dep. at 16:3–10) ("Q. Can you read or write in English? A. Just very simple English, just good morning and so forth. . . . Q. Do you agree that a translator is necessary to conduct this deposition? A. Without a translator/interpreter today, I would be dumb and deaf."); Ex. 31 at 3 (Ouyang Dep. at 9:5–15) ("Q. You do not speak English; correct? A. Yes; correct. I don't speak English. Q. You do not write English; correct? A Yes. . . . Q. And are you able to read English? A. No. I cannot. Q. Mr. Yi, you agree with me that a translator is necessary to conduct this deposition? A. Correct."); Ex. 29 at 2 (¶ 6). And until an extraordinary investigation led them to obtain a copy in November 2016, none had access to the key document showing the existence of an enforceable trust, namely the 2007 settlement agreement. Ex. 33 at 2-3 (¶¶ 8–12); *see also, e.g.*, Ex. 35 at 6 (Settlement Agreement, § IV.E.) ("The terms and conditions of this Agreement (collectively, 'Confidential Information') shall remain confidential. The Parties and their authorized representatives, and anyone acting on their behalf, shall not disclose Confidential Information to any other person[.]").

This lawsuit was first brought in April 2017. *Depu*, 715 F. Supp. 3d at 4 (D.D.C. 2022). Typically, the Attorney General has jurisdiction to bring suits to enforce charitable trusts. *Id.* at 26–27. But the plaintiffs allege that, under D.C. law, they have "special interest" standing to pursue their claims. *Id.* at 27. Special-interest standing empowers certain beneficiaries of a charitable trust to step into the shoes of the Attorney General and bring litigation to enforce charitable trusts. *See infra* at 18–19.

### F.    The claims against Callahan.

There are three different claims involving Callahan, premised on different theories of liability. First, the complaint's primary contention is that Yahoo was a trustee of the Trust and that it acted through its representatives, Callahan and then Bell, who were senior executives at

Yahoo at the time. *See* Dkt. 186, ¶¶ 17, 50. Under this theory, Yahoo (the entity) was a trustee until January 2016, when Bell on Yahoo's behalf resigned from the LHRO, terminating Yahoo's involvement in the LHRO and the Trust more generally. Ex. 34 at 1 (R. Bell: "Yahoo's unique role on the LHRO Board is no longer needed," written in an email to the then-CEO of Yahoo, Marissa Mayer). This first theory of liability is not at issue in Callahan's present motion because Yahoo has not moved for summary judgment.

Second, the complaint alleges in the alternative that Callahan and Bell were personally liable as trustees. *See* Dkt. 186, ¶¶ 161-69. Callahan moves for summary judgment on this theory, arguing that the claim that he is personally liable as a trustee is time-barred. Bell has not moved for summary judgment.

Third, the complaint also alleges in the alternative that Callahan, even if not a trustee, aided and abetted the LRF, Harry Wu, and the LHRO in their breaches of trust or conspired with them and others to engage in those breaches. *See id.* ¶¶ 175-78; *id.* ¶¶ 181-85. Callahan moves for summary judgment on this theory as well. Bell and Yahoo have not.

Additional facts are discussed below.

## ARGUMENT

Callahan's burden is to show, with the record viewed in the light most favorable to the plaintiffs, "that there is no genuine dispute as to any material fact" and that he "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

I.    **CALLAHAN'S MISCONDUCT INJURED THE CHARITABLE TRUST *RES*
AND PLAINTIFFS CAN SUE HIM AS A RESULT.[5]**

Callahan contends (*see* Dkt. 215-1 at 5) that the timing of his tenure on the LHRO board

means that he could not have caused the plaintiffs' injuries or damages. This is so, he says,

because for the plaintiffs who were denied funding, those denials occurred either before or after

his tenure. And it is so because, at the end of his tenure, there was still $6.3 million available to

be spent on the Trust's humanitarian purpose, such that none of the plaintiffs suffered a

meaningful loss in opportunity to obtain humanitarian assistance. These arguments fail because

under the law of trusts, and especially the law of charitable trusts, the relevant injury is not

personal damages or losses suffered by the plaintiffs, but rather the injury to the trust *res* caused

by Callahan's misconduct.

"A trust is a fiduciary relationship with respect to *property*," *Cabaniss v. Cabaniss*, 464

A.2d 87, 91 (D.C. 1983), and so long as a plaintiff has some cognizable interest in that property,

she can sue for injuries to it.[6] *E.g.*, *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295–96 (3d Cir.

2007) ("When a common-law trustee commits a breach of trust that results in a loss, any

---

[5] Callahan's notice of request for a pre-motion conference requested authorization to file a
motion for summary judgment on the statute of limitations. *See* Dkt. 209. He made no mention
of moving for summary judgment on causation as a merits issue, yet that is now his lead
argument—and it is not a statute of limitations argument. The plaintiffs object to this gaming of
the Court's pre-motion process.

[6] In fact, trustees can be sued for breaches of trust even if there is *no* injury, damage, or loss to
the trust estate or the beneficiary. *E.g.*, BOGERT'S THE LAW OF TRUSTS AND TRUSTEES § 862
("BOGERT") (trustee may be liable for disloyalty even "though the beneficiary has not suffered
any damage" and even though "the trustee has not made any profit[,]" because trust law is
concerned not just with "compensating the beneficiary for the loss," but also with "deter[ring] all
trustees from engaging in disloyal conduct."); *see also, e.g.*, *Hosey v. Burgess*, 319 Ark. 183, 191
(1995) (trustee may be liable for negligent and disloyal conduct "even though no injury was
intended and none was in fact done to the trust estate"); *Coster v. Crookham*, 468 N.W.2d 802,
807 (Iowa 1991) (same). This reality further highlights just how wrong Callahan's conception of
trust law is.

beneficiary whose beneficial interests were *affected* may sue to compel the trustee to make good on the loss."); D.C. Code § 19–1310.02(a)(1) ("A trustee who commits a breach of trust is liable to the beneficiaries *affected* for . . . [t]he amount required to *restore the value of trust property . . . to what [it] would have been* had the breach not occurred"). *See also, e.g.*, *Washington v. Reno*, 35 F.3d 1093, 1102 (6th Cir. 1994) (plaintiffs could sue for breaches of trust which "improperly deplete the balance of [trust] funds ultimately available" to them despite "plaintiffs readily conced[ing] that they are not entitled to demand that distributions from the trust fund be made at any particular time for any particular purpose").

This is true even if one's interest in the trust depends on the trustee's discretion. *E.g.*, *Price v. Akaka*, 928 F.2d 824, 827 (9th Cir. 1990) ("one whose status as a beneficiary depends upon the discretion of the trustee nevertheless may sue to compel the trustee to abide by the terms of the trust"). It is true even if a plaintiff's interest in the trust is such that the breach of trust is unlikely to ever actually result in the plaintiff getting less than they otherwise would. *E.g.*, *Tr. Under Will of Augustus T. Ashton, Deceased Dated Jan. 20, 1950*, 260 A.3d 81, 86–87 (Pa. 2021) (permitting a plaintiff to sue for breach of trust even though the plaintiff would have received all that the plaintiff was entitled to under the trust regardless). And it is true even if a plaintiff is not a beneficiary and can never even theoretically suffer personal damages, as with co-trustees, and, as particularly relevant in this charitable trust case, public officials. RESTATEMENT (THIRD) OF TRUSTS § 39 (2003) ("RESTATEMENT (THIRD)") ("Obviously, a co-trustee can sue another trustee for breach of trust[.]"); D.C. Code § 19–1301.10(c) ("The Corporation Counsel[7] of the District of Columbia has the rights of a qualified beneficiary with

---

[7] Now known as the Office of the Attorney General. *See* https://mayor.dc.gov/page/mayor-executive-branch (noting that the Office of the Attorney General was "[f]ormerly known as the Office of the Corporation Counsel").

respect to a charitable trust having its principal place of administration in the District of Columbia.").[8]

The core flaw in Callahan's argument, then, is that it conflates his liability under trust law with a tort law theory of causation hinged on the plaintiffs' Article III injuries. But neither tort law nor Article III's case or controversy requirement are relevant to the question of whether Callahan is liable under the law of trusts. To be sure, in an abundance of caution to ensure Article III was met, the plaintiffs did allege personal damages and injuries, in addition to alleging injury to the Trust *res*. *See* Dkt. 186 at 7-12 (¶¶ 9–14). But the plaintiffs' personal injuries or whether Callahan caused them is irrelevant to whether he is liable for a breach of trust.

The fact that this is a charitable trust case is even more fatal to Callahan's argument. If the D.C. Attorney General were the plaintiff here (the party who Callahan says should be the plaintiff, *see* Dkt. 189 at 12), Callahan's argument would make zero sense. That is because the D.C. Attorney General has not suffered *any* personal injuries, much less injuries caused by Callahan. Given that the plaintiffs here are effectively stepping into the D.C. Attorney General's shoes via the special-interest rule, the analysis should be the same. *E.g.*, BOGERT §§ 412, 414 (noting that doctrines like special-interest standing emerged as the "lack of enforcement by state Attorneys General became increasingly evident" and that "[i]f Attorney General enforcement

---

[8] As for why trust law provides so many paths for enforcing a trustee's duties, one reason is that those duties "are more intensive than the duties of some other fiduciaries," RESTATEMENT (SECOND), § 2, comment b, and in fact are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982) (citing RESTATEMENT (SECOND), § 2, comment b; *see also ForUsAll, Inc. v. United States Dep't of Lab.*, 691 F. Supp. 3d 14, 20 (D.D.C. 2023) (noting that courts have often called fiduciary duties based on the common law of trusts "the highest known to the law") (cleaned up). *See also, e.g., Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928) (Cardozo, C.J.) ("A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior."). Indeed, as noted in BOGERT § 862, trust law cares as much about deterring breaches of trust as it does about compensation for those breaches.

remains lax, the number of specially interested beneficiaries granted standing to sue can be expected to rise"). After all, unlike a private trust, where trustees are "held to equitable duties to deal with the property for the benefit of another person," *Cabaniss*, 464 A.2d at 91 (D.C. 1983), the trustee of a charitable trust "is held to equitable duties to deal with the property for a *charitable purpose*." *He Depu v. Yahoo! Inc.*, 950 F.3d 897, 903 (D.C. Cir. 2020). And if a plaintiff who hasn't personally suffered an injury can sue the trustee of a private trust to enforce the trustee's private duties, even in the absence of damage to the trust *res*, the same should be even more true of plaintiffs who sue a charitable trustee to enforce the trustee's charitable, quasi-public duties—especially where, as here, there has been considerable damage to the trust *res*. *E.g.*, BOGERT § 363 ("the public or the community . . . is the real beneficiary of every charitable trust and the particular human beings . . . are mere conduits of its social benefits to the public"); *see also, e.g.*, *id.* § 411 ("Most courts are interested in carrying out the settlor's intent and in finding a suitable representative to enforce the duties of the charitable trustee."); *see also, e.g.*, *id.* (noting that traditionally, the suit could even by initiated by "an interested citizen who has brought the alleged breach to the attention of the Attorney General and demanded action" despite the citizen not "having the least beneficial interest in the administration of the charity"); *see also, e.g.*, *id.*, § 414 ("In a number of cases, where a charitable trust was to be carried out, members of a community who were sentimentally interested in seeing the charity promoted and also expected to receive some benefits themselves have been allowed to sue for the protection of the charity or its enforcement.").

This is especially true because Callahan does *not* seek summary judgment that he did not breach his duties to the humanitarian purpose, or that he did not aid and abet the breaches of others, or that he did not conspire with others to commit those breaches—nor does he dispute

that, as a result this misconduct, the Trust's *res* was depleted to the detriment of the humanitarian purpose. Nor could he, given the facts and evidence set forth above.

As for Callahan's cases, they do not help him. For his argument (at 9) that he cannot be sued because his tenure on the LHRO board did not coincide with the denials of funding to the plaintiffs, he cites no cases, much less a case sounding in trust law. For his argument (at 10) that there was no lost opportunity, he cites no trust law cases, and instead cites two inapposite legal malpractice cases that had nothing to do with the availability of trust assets and in which the question was when the statute of limitations began to run. In *Wagner v. Sellinger*, 847 A.2d 1151, 1157 (D.C. 2004), for example, the defendant argued that it began to run when the plaintiff fired the defendant during the litigation for inadequate discovery efforts. In rejecting that argument, the D.C. Court of Appeals entertained the notion—which it noted was dubious under the case law—that it might've began to run when successor counsel's efforts to reopen discovery were rejected, such that the opportunity to conduct discovery was "definitively lost." *Id.* at 1157. This reasoning makes no sense in the context of trust law; a trustee who mismanages a $100,000,000 trust is not subject to suit only when the very last dollar is spent.

So too with *Moshier v. Fisher*, 449 P.3d 145 (Utah 2019). There, the plaintiffs "lost their opportunity to collect" the full amount of the debt owed to them "when their attorney . . . failed to file their nondischargeability claim" by the required deadline. *Id.* at 146. The attorney argued that the statute of limitations on the malpractice claim against him began to run when he missed the deadline, but the Supreme Court of Utah held that it only began to run when the bankruptcy court later confirmed the final bankruptcy plan, because only then was the harm "sufficiently final." *Id.* at 149. How this case helps Callahan is also unclear. It certainly does not say that a

trustee can only be sued for causing a depletion of trust assets that is so extensive that the inability to benefit those assets is "sufficiently final."

For these reasons, Callahan's argument that he did not cause any personal injury that the plaintiffs can sue him for should be rejected.

## II.    THE PLAINTIFFS' CLAIMS AGAINST CALLAHAN ARE TIMELY.

As described above, there are two theories of liability relevant to the present motion. First, the LRF, LHRO, and Harry Wu engaged in breaches of trust, and Callahan aided and abetted those breaches or conspired to engage in them. Second, Callahan is liable himself as a trustee for breach of trust. These claims are pled in the alternative. Callahan contends that the claims against him are time-barred under both theories. But his arguments with respect to the aiding and abetting and conspiracy claims are premised on improperly rewriting the plaintiffs' claims, the text of the statute of limitations, or both. His arguments with respect to the breach of trust claim rely on a novel argument that the breach of trust statute of limitations is a statute of repose, but that argument flies in the face of the relevant legislative history and the structure of the statute. And if the discovery rule or lulling doctrine apply to any of these claims (they apply to all of them), then Callahan cannot prevail—because the record viewed in the light most favorable to the plaintiffs shows that they were not on notice of their claims until November 2016, and that they were more than reasonably diligent prior to that in investigating the underlying events.

### A.    The aiding and abetting and civil conspiracy claims against Callahan are timely.

#### 1.    If the breach of trust statute supplies the relevant statute of limitations, the plaintiffs' claims are timely.

Aiding and abetting and civil conspiracy do not have their own statutes of limitation in D.C., so courts apply the statute of limitations that governs the underlying wrongful act to

determine when the aiding and abetting or civil conspiracy claim should have been brought. *See Nader v. Democratic Nat. Comm.*, 567 F.3d 692, 697 (D.C. Cir. 2009) (civil conspiracy); *Hancock v. Homeq Servicing Corp.*, 2007 WL 1238746, at *9 (D.D.C. Apr. 27, 2007), *aff'd*, 526 F.3d 785 (D.C. Cir. 2008) (aiding and abetting). Here, the relevant underlying wrongful act is a breach of trust, and so the statute of limitations for breaches of trust applies to the plaintiffs' claims that Callahan conspired with others to commit, or aided and abetted, the LRF, the LHRO, and Harry Wu's breaches of trust.

Under the D.C. Code, a beneficiary "may not commence a proceeding against a trustee for breach of trust more than one year after the date the beneficiary . . . was sent a report that adequately disclosed the existence of a potential claim for breach of trust and informed the beneficiary of the time allowed for commencing a proceeding." D.C. Code § 19-1310.05(a). When there is no such a report, the limitations period expands to three years: "a judicial proceeding by a beneficiary against a trustee for breach of trust must be commenced within 3 years after the first to occur of: (1) [t]he removal, resignation, or death of the trustee; (2) [t]he termination of the beneficiary's interest in the trust; or (3) [t]he termination of the trust." D.C. Code § 19-1310.05(c); *He Depu v. Oath Holdings, Inc.*, 531 F. Supp. 3d 219, 239 (D.D.C. 2021).

A straightforward application of the plain text of the statute shows that the aiding and abetting and conspiracy claims are timely. For purposes of these claims, the LRF, the LHRO, and Harry Wu are the alleged trustees. *See* Dkt. 186, ¶¶ 177, 182. Callahan has submitted no evidence that *these* trustees provided any relevant report disclosing the existence of any potential claim, so the one-year statute of limitations in § 19-1310.05(a) has not been triggered. He has submitted no evidence that the LRF or LHRO removed themselves as trustees, resigned, or died, so the three-year statute of limitations in § 19-1310.05(c)(1) has not been triggered. Harry Wu

died on April 26, 2016,[9] and this suit was filed in April 2017, well within the three-year period. Callahan has submitted no evidence that the beneficiaries' interest in the Trust has been terminated (indeed, he disputes (at 13, n.6) that it has), so § 19-1310.05(c)(2) has not been triggered. Nor has Callahan submitted any evidence that the Trust was terminated (he disputes this, too), so § 19-1310.05(c)(3) has not been triggered either. So the only event that could have triggered the statute of limitations was Harry Wu's death, but the claim was timely filed shortly after he died. The breach of trust statute of limitations has thus not been triggered, and the clock for the aiding and abetting and civil conspiracy claims either never started (as to the LRF and LHRO) or was met (as to Wu).

Callahan's argument to the contrary is premised on two misreadings layered on top of each other: one of the statute and the other of the plaintiffs' claims. He agrees (at 15) that the breach of trust statute's three-year limitations period applies to the aiding and abetting and civil conspiracy claims against him. He then leaps to the conclusion that his resignation from the LHRO board started the limitations clock. But the three-year clock under the breach of trust statute of limitations starts when "the trustee" is removed, resigns, or dies, *see* D.C. Code § 19-1310.05(c)(1), and Callahan is not a trustee for purposes of the aiding and abetting and conspiracy claims. The entire basis of the aiding and abetting and conspiracy claims as to Callahan is that, if Callahan was *not* a trustee, he is nonetheless liable because he aided and abetted or conspired with the trustees (the LRF, the LHRO, and Wu) to engage in *their* breaches of trust. *See* Dkt. 186 at 59 (¶ 177) ("To the extent Wu, Yahoo, Bell, or Callahan are deemed not to be trustees of the Trust, they are liable to Plaintiffs for aiding and abetting, and knowingly

---

[9] *See* Sam Roberts, "Harry Wu, Who Told World of Abuses in China, Dies at 79," *The New York Times* (April 27, 2016), https://www.nytimes.com/2016/04/28/world/asia/harry-wu-who-told-world-of-abuses-in-china-dies-at-79.html.

assisting and participating in, the LRF's and the LHRO's breaches of trust."); *id.* at 60 ( ¶ 182) (pleading, in the alternative, that "[t]he Yahoo Defendants, Wu, the LRF, and the LHRO, entered into a tacit agreement that . . . Wu and the LRF would be effectively permitted to (wrongfully) all but ignore the Trust's Humanitarian Purpose"). Because Callahan was not a trustee for purposes of the aiding and abetting and conspiracy claims, his resignation from the LHRO for purposes of those counts did not start the clock under the relevant breach of trust statute of limitations.

### 2. If the catchall statute of limitations applies, the plaintiffs' claims are timely.

Callahan alternately argues (at 15) that the catchall statute of limitations in D.C. Code § 12-301(8) applies to the aiding and abetting and conspiracy claims. That is probably wrong for the reasons discussed above, but it does not really matter because the claims are timely under the catchall statute, too. The catchall statute begins to run when the claim "accrues," and the accrual analysis under D.C. law incorporates the discovery rule—and under that rule, the plaintiffs' claims accrued on November 2016, less than one year before this suit was timely filed.

### a. The discovery rule under D.C. law.

The catchall statute of limitations provides that actions "for which a limitation is not otherwise specially prescribed" "may not be brought" three years after "the right to maintain the action accrues[.]" D.C. Code § 12-301(8). "Accrues" is not defined in the statute, so under D.C. law "[t]he task is left to the courts of determining when 'the right to maintain the action accrues' within the meaning of the statute." *Brin v. S.E.W. Investors*, 902 A.2d 784, 792 (D.C. 2006); *Marzorati v. MedStar-Georgetown Med. Ctr., Inc.*, 265 F. Supp. 3d 24, 26 (D.D.C. 2017) (Moss, J.). What constitutes accrual for a cause of action is a question of law, but when accrual actually happened in a particular case is a question of fact. *Diamond v. Davis*, 680 A.2d 364, 370 (D.C. App. 1996).

Some causes of action accrue at the time of injury. This happens in cases when the injury can be "readily determined," such that the relationship between the injury and the wrongful or tortious conduct is reasonably clear. *See Farris v. Compton*, 652 A.2d 49, 54 (D.C. 1994). A plaintiff who, for example, was abruptly fired the same month her employer learned she was pregnant—and was provided no reason for it other than "it wasn't working out"—is faced with both an obvious injury (her firing) and some evidence of the employer's wrongdoing (the proximity to the employer's learning of her pregnancy plus the lack of a justification for the firing), and so her discrimination claims accrued when she was fired, without resort to the discovery rule. *East v. Graphic Arts Industry Trust*, 718 A.2d 152, 155, 157 (D.C. 1998).[10]

But in cases like this one "where the relationship between the fact of injury and the alleged tortious conduct [is] obscure," courts apply the discovery rule. *See Brin*, 902 A.2d at 792; *Farris*, 652 A.2d at 54. It is an equitable doctrine whose purposes are "to preserve claims in circumstances where the fact of injury or breach may not be readily discernible at the time when actually incurred," *Commonwealth Land Title Ins. Co. v. KCI Techs., Inc.*, 922 F.3d 459, 464 (D.C. Cir. 2019), and to discourage filing unfounded claims—because "an accrual rule that d[oes] not require knowledge of wrongdoing would encourage the filing of unfounded claims by plaintiffs seeking to protect their unknown rights." *Diamond*, 680 A.2d at 379.

The discovery rule operates so that "the claim does not accrue until the plaintiff, exercising due diligence, has 'discovered or reasonably should have discovered all of the essential elements of her possible cause of action, *i.e.,* duty, breach, causation and damages.'"

---

[10] *See also Harris v. Ladner*, 828 A.2d 203, 205-06 (D.C. 2003) (plaintiff's breach of contract claim accrued without consideration of the discovery rule when the apparently qualified plaintiff was denied tenure for no identifiable reason, then denied an opportunity for reconsideration of that decision, and then threatened to sue the university).

*Farris*, 652 A.2d at 54. The plaintiff can either have actual notice of these essential elements or be deemed to be on "inquiry notice" of these elements, meaning that "if she had met her duty to act reasonably under the circumstances in investigating matters affecting her affairs, such an investigation, if conducted, would have led to actual notice." *See Diamond*, 680 A.2d at 372. Whether a plaintiff has acted reasonably in exercising due diligence under the circumstances is "a highly factual analysis" that includes "an evaluation of all of the plaintiff's circumstances," including (but not limited to) consideration of the defendant's conduct, the plaintiff's reliance on the defendant's conduct and representations, and whether there is a "confidential or fiducial relationship" between the plaintiff and defendant. *Id.* at 372, 376.

### b.      The Court should apply the discovery rule.

Given that the discovery rule in part turns on whether there is a "confidential or fiducial relationship" between the plaintiff and the defendant, *Diamond*, 680 A.2d at 376, courts often have applied the discovery rule in cases involving claims for breach of trust or fiduciary duty under D.C. law. *See Interdonato v. Interdonato*, 521 A.2d 1124, 1130, 1135 (D.C. 1987) (claim that defendant "breached his fiduciary duty as a trustee of the testamentary trust"); *In re Estate of Delaney*, 819 A.2d 968, 981 (D.C. 2003) ("claims of fraud under a probate statute"); *Diamond*, 680 A.2d at 366, 384 ("breach of professional and fiduciary duties"); *Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939, 942 (D.C. 2003) ("breach of confidential relationship"). Courts applying the law of other jurisdictions in trust and fiduciary disputes also apply the discovery rule.[11] A background trust law principle is that a claim by a beneficiary against a third party who

---

[11] *See Wilbur v. KeyBank Nat. Ass'n*, 962 F. Supp. 1122, 1129 (N.D. Ind. 1997) (applying discovery rule in breach of trust case under Indiana law); *Henderson v. Bank of New York Mellon, N.A.*, 332 F. Supp. 3d 419, 434 (D. Mass. 2018) (applying discovery rule in breach of trust case under Pennsylvania and Massachusetts law); *Pelt v. Utah*, 611 F. Supp. 2d 1267, 1282–

has joined in committing a breach of trust is time-barred only "if the period has elapsed since he [the beneficiary] knew or should have known of the breach," mirroring the discovery rule's "reasonably should have known" standard. *See* BOGERT § 955.[12] Given the equitable nature of the discovery rule, applying it in this case—a case that sounds in equity—is thus appropriate under D.C. law and consistent with the common law of trusts.

Indeed, this case is exactly the type of case to which the discovery rule should apply. The relationship between the fact of the plaintiffs' injuries and Callahan's misconduct with respect to the Trust was more than "obscure." *See Brin*, 902 A.2d at 792. It was indecipherable. That the Yahoo Human Rights Fund was a trust was a secret, tucked away in the confidential settlement agreement. *See* Ex. 35 at 1. The Trust's operations—what the Trust's actual purposes even were and whether those purposes were enforceable by anyone—were complex and also not public. *See id.* Decisions about the Trust, such as whether its humanitarian purpose should be continued, were intentionally concealed from the public; Callahan personally emphasized that "there must be confidentiality relating to the issues of the Trust, the Supporting Organization [the LHRO] and LRF," and he "remind[ed] the board that they should not discuss issues with third parties." *See* Ex. 26 at 2; Ex. 27 at 1 ("A public statement should NOT be announced declaring the new direction of funds," referring to "Suspension of dissident funds"). That the defendants repeatedly touted the Yahoo Human Rights Fund publicly and boasted about how it provided humanitarian

_____

83 (D. Utah 2009) ("Utah applies a version of the 'discovery rule' to statute of limitations concerning a trust beneficiary's breach of trust claims against a trustee[.]").

[12] Judge Lamberth's analysis in *Cobell v. Norton*, 260 F. Supp. 2d 98, 107 (D.D.C. 2003), a trust dispute involving Native Americans and the federal government, provides helpful context about a key related background trust law principle, *i.e.*, "that the statute of limitations does not commence running for a beneficiary's equitable claim to enforce the obligations of the trustee until the trustee has repudiated the beneficiary's right to the benefits of the trust," which is a rule that favors the beneficiary given the protective nature of the fiduciary relationship between the trustee and the beneficiary.

assistance to Chinese dissidents—when the private reality was different, *supra* at 9–12—raises a genuine dispute about whether the defendants' public relations spin concealed the reality that the Trust's humanitarian purpose was so marginalized as to barely exist. *See Ray v. Queen*, 747 A.2d 1137, 1144–45 (D.C. 2000) (representations or conduct, whether explicit or implicit, factor into the discovery rule in the plaintiff's favor, particularly in cases involving fiduciaries).[13]

Callahan asserts (at 17) that the discovery rule does not apply and instead that the clock on the plaintiffs' breach of trust and accompanying claims started running when they received less money than they requested. But without at least some information about what the Yahoo Human Rights Fund actually was (a trust), a reasonably objective conclusion is that the plaintiffs' injuries were not injuries at all—just smaller-than-desired payments out of some ostensibly well-meaning pot of charitable corporate money. There was no way for the plaintiffs to know that the Yahoo Human Rights Fund was a trust as opposed to, say, a lottery, a foundation, a charity, a corporate social responsibility program, or an entirely discretionary slush fund that owed no duties to anyone (which is not far from the defendants' primary merits defense).[14] And without uncovering the secret of what the Yahoo Human Rights Fund was, what would have been the

---

[13] These same facts also show that the defendants and their agents were fiduciaries who "lulled" the plaintiffs into a "failure to protect [their] interests within the statutory limitations period." *Ray*, 747 A.2d at 1142. Lulling and the discovery rule are "[c]losely related" doctrines, and courts apply the two at the same time when the relevant facts involve conduct by the defendant that caused the plaintiff to delay in filing. *See id.* (applying both doctrines at the same time). Whether viewed through the lens of the discovery rule or the lulling doctrine, the fact of the Trust's secrecy combined with the vivid picture Yahoo painted for the public about the Yahoo Human Rights Fund's provision of humanitarian assistance to dissidents operate to delay the running of the statute of limitations.

[14] That the defendants continue to dispute that the Trust is in fact a trust is itself an admission about how opaque the relationship is between the plaintiffs' injury and the defendants' misconduct, because it means that whether there is a trust at all—and thus whether the plaintiffs even have a cognizable claim—is at least unclear enough that the defendants think they have a good faith basis to dispute it.

plaintiffs' claim? The plaintiffs had no suit to file or standing to file it without knowing that the fund was a trust that owed them duties, and courts have "reject[ed] the possibility that a limitations period commences at a time when the [plaintiff] could not yet file suit as inconsistent with basic limitations principles." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 811 (2024); *Wagner*, 847 A.2d at 1155 ("[A] statute of limitations cannot begin to run until the first day on which . . . the plaintiff had a bona fide lawsuit . . . that would survive a motion to dismiss[.]").

### c. Applying the discovery rule, the plaintiffs' claims accrued no earlier than November 2016.

Applying the discovery rule, the plaintiffs' claims accrued at the earliest on the date they obtained the confidential settlement agreement, which was in November 2016. That was the point at which the plaintiffs had the information bearing on the "essential elements" of their possible cause of action, *i.e.,* "duty, breach, causation and damages." *Farris*, 652 A.2d at 54; *Medlantic*, 814 A.2d at 939 ("When the discovery rule applies, a cause of action accrues when the claimant knows or by the exercise of reasonable diligence should know of (1) the injury, (2) its cause in fact, and (3) some evidence of wrongdoing."). Prior to that moment, all the plaintiffs knew was that there was a "human rights fund" that bore Yahoo's name and this fund paid them less than they requested. *See supra* Section II(A)(2)(b). That information is not enough to trigger the duty to investigate, *see supra* Section II(A)(2)(b), but in any event the investigation plaintiffs did conduct showed they were (more than) reasonably diligent and thus cannot be charged with inquiry notice.

1.    The details of the plaintiffs' extraordinary diligence are outlined in the declarations of Wang Jinbo and Yaxue Cao-Ritter. The plaintiffs are dissidents based in China. *See* Ex. 29 at 1 (¶ 3); *supra* at 12–14. They were previously imprisoned by the Chinese

government for expressing their views online. *See id.* (¶ 4). Even after release from their respective prisons, their freedom of movement has been heavily restricted, with none of them being able to travel outside of their hometowns, even to other parts of China. *See id.* (¶ 6). They are not proficient in English. *Supra* at 12–14. They are under surveillance by the Chinese government. *Supra* at 13–14. For the two plaintiffs who applied for humanitarian assistance (Wang Jinbo and Xu Wanping), all Wang Jinbo knew was that he received less than he requested, and all Xu Wanping knew was that the humanitarian assistance program was being canceled. *Supra* at 12–14. They did not know and could not have known that they were owed a duty, who owed them that duty, whether that duty was breached, or whether the breaches caused their injury. *See Farris*, 652 A.2d at 54. Indeed, they did not know what the fund was or whether any enforceable rights as to it existed.

With what little information they had, the plaintiffs were much more than reasonably diligent in acting on it. Wang Jinbo first applied for $20,000 of funding in 2008, was told that he would receive $4,000, but then oddly received only $3,000. Ex. 29 at 2 (¶ 7). The first inclination he had that this might be more than a clerical error was in 2014, when he heard of allegations that Harry Wu had used access to Trust funds to gain leverage over young women whom he then sexually assaulted. *Id.* at 3 (¶ 8). That prompted him to discuss the topic with another plaintiff, He Depu, a casual acquaintance of his. *Id.* at 3 (¶ 9). Together, they spoke with other Chinese dissidents and agreed to write a letter to Yahoo and its co-founder, Jerry Yang, to inquire about the Trust. *Id.* at 4 (¶ 11).

At first, they contacted Yahoo in summer 2015, asking for information about the Yahoo Human Rights Fund via letter. Ex. 29 at 4 (¶ 10). Yahoo never responded. *Id.* at 5 (¶ 12). That by itself is more diligence than any comparable case applying the discovery rule in the District of

Columbia, where the plaintiffs fail to ask the defendants for information about the facts relating to the potential claim. *E.g.*, *Cevenini v. Archbishop of Washington*, 707 A.2d 768, 774 (D.C. 1998) ("Had appellants requested information about Father Schaefer's background from the Archdiocese and been refused access to it, our decision might be different."). But the plaintiffs did not stop there. In September 2015, they wrote another letter to Yahoo. *See* Ex. 29 at 4 (¶ 10). Yahoo did not respond to this letter either. *Id.* at 5 (¶ 12). In late 2015, they contacted via Twitter a U.S.-based Chinese democracy activist, Yaxue Cao-Ritter, who began working with them to try and uncover information about the Yahoo Human Rights Fund. *Id.* at 5 (¶ 12). In February 2016, Cao-Ritter sent another letter to Yahoo. Ex. 33 at 2 (¶ 6). Weeks went by without a response. *Id.*

Cao-Ritter also reviewed the Form 990s for the LRF and the LHRO, Ex. 33 at 2 (¶¶ 4–6), and subsequently contacted a *New York Times* journalist, Andrew Jacobs. *Id.* at 2 (¶ 7). It was only after *The New York Times* began asking questions in March 2016, *see* Ex. 37 at 3, that Yahoo finally responded to any of the plaintiffs' written inquiries—which they did with a lawyer-drafted non-answer that (yet again) reiterated the confidentiality of the settlement agreement. *See* Ex. 38 at 3 (R. Bell: "The terms of the settlement Yahoo reached and announced in November 2007 are also confidential, which necessarily limits our ability to respond."). Jacobs' August 13, 2016 article confirmed that Wu had made the decision "to largely discontinue giving grants to Chinese dissidents and their families," making "little effort to hide his disdain for Chinese human rights activists who sought grants, describing them as greedy, deceitful and ungrateful." *See supra* Jacobs, "Champion of Human Rights in China Leaves a Tarnished Legacy." But even Jacobs was apparently unable to get a copy of the settlement agreement, as his article does not quote from it.

For its part, "Yahoo . . . declined to respond to questions about its role overseeing the grant to Mr. Wu's organization," but stuck to its talking point crafted after the disastrous 2007 hearing: "We remain an industry leader in our commitment to protect and promote freedom of expression and privacy online." *Id.*

After the article was published, Cao-Ritter began speaking with lawyers. Ex. 33 at 2 (¶ 9). In October 2016, Cao-Ritter's research and the increasing public scrutiny of the Yahoo Human Rights Fund also led her to Tienchi Liao, a former board member of the LRF living in Germany. *Id.* at 2–3 (¶¶ 10–11). Liao told Cao-Ritter that she had tried to blow the whistle internally about the mismanagement of the Yahoo Human Rights Fund to Yahoo and Callahan specifically, but that rather than take any of her concerns seriously, Callahan worked with Wu, the LRF, the LHRO, and Callahan's lawyers at Foley Hoag to eject Liao from the board and threaten her with litigation if she disclosed information about the Yahoo Human Rights Fund. *Id.* at 3 (¶ 10). When Cao-Ritter explained that she was trying to help the plaintiffs, Liao— concerned with the confidentiality of the settlement agreement—agreed to share a copy of the document, but only if she could hand it off in person, not over email or mail. *Id.* at 3 (¶ 11). Cao-Ritter and the plaintiffs then flew Liao from Germany to the United States in November 2016, where she shared a copy of the settlement agreement with Cao-Ritter. *Id.* at 3 (¶ 11). Cao-Ritter was subsequently introduced to the plaintiffs' current counsel (Mr. Times Wang), and the lawsuit was filed a few months later, in April 2017. *Id.* at 3 (¶ 12).

Viewed in the light most favorable to the plaintiffs, these facts show that they were more than reasonably diligent under the circumstances in acting on what little information was available to them. *See Ray*, 747 A.2d at 1142.

2.    Callahan contends (at 19, n.8) that the plaintiffs should have investigated sooner. He presses that the settlement's existence was public knowledge, Yahoo's name was on the fund, the plaintiffs knew they received less than they asked for, and the fund itself was a tangential defendant in some ancillary litigation in the Eastern District of Virginia. If the plaintiffs filed suit with only that information, they would have been thrown out of court and their lawyers likely subject to Rule 11 sanctions. *See Wagner*, 847 A.2d at 1155 ("a statute of limitations cannot begin to run until the first day on which . . . the plaintiff had a bona fide lawsuit . . . that would survive a motion to dismiss"); *cf.* Dkts. 40, 41, 48, and 49 (opinions and orders dismissing the plaintiffs' amended complaint, filed July 3, 2017).

Even if Callahan is correct that the plaintiffs should have started investigating at the very moment they received less money than they requested, the question then becomes whether the investigation was adequately diligent under all of the circumstances—and viewed in the light most favorable to the plaintiffs, this record shows the answer is "yes." The discovery rule analysis is so fact-intensive that it is supposed to be a jury question, *Brin*, 902 A.2d at 795, and trial courts are thus often reversed for misapplying the discovery rule at summary judgment— including in cases where the plaintiffs were far less diligent than this one. The plaintiff in *Medlantic*, 814 A.2d at 947, for example, was reasonably diligent in trying to uncover which of his coworkers told the others that he was HIV positive by questioning them about who exactly did it. The plaintiff in *Brin*, 902 A.2d at 791 and 801, was reasonably diligent when she saw doctors for seven years and only filed suit against her employer after the last doctor provided an opinion linking her ailments to the condition of her employer's building. The plaintiff in *Radbod v. Moghim*, 269 A.3d 1035, 1045 (D.C. 2022), was reasonably diligent in trying to figure out whether his interest in certain real property was being denied by his partners in his family real

33

estate investment business when he asked them to recognize his interest (only to learn that they had written his interest out of the deeds). And the plaintiff in *Ray*, 747 A.2d at 1142, was reasonably diligent in trying to understand whether certain settlement proceeds were improperly paid to his mother in violation of the intestacy laws, even though he did not do anything to follow up after obtaining some hint that his mother received more than she should have.

Compare those cases to this one: a rag-tag group of formerly incarcerated Chinese dissidents heard rumors about Wu and so started to work for years to uncover what was going on with a multimillion-dollar human rights fund a world away, requiring them to pierce the shield of confidentiality and public relations spin erected around it by a major company's lawyers, lobbyists, and corporate communications professionals. *Supra* Section II(A)(2)(c). That these facts are set in a context in which the plaintiffs were in a (unknown to them) fiduciary relationship with the people and entities who were managing this fund weighs decisively in the plaintiffs' favor; they should not even have had to investigate their own fiduciaries. *See Ray*, 747 A.2d at 1144 ("The existence . . . of a fiduciary relationship between the plaintiff and the defendant is a significant element in the 'inquiry notice' calculus."); *Malachowski v. Bank One, Indianapolis*, 590 N.E.2d 559, 564 (Ind. 1992) (rejecting the argument that the beneficiary should have investigated its fiduciary sooner because "the notion that the Beneficiaries were not entitled to rely upon the good faith of [the trustee], but were instead under some duty to be suspicious of [the trustee's] activities and to investigate whether [the trustee's] representations were true, 'would seem to undercut the very essence of a trust relationship'").

### B. The breach of trust claim against Callahan is timely.

Count 1 of the plaintiffs' complaint alleges that Callahan himself was a trustee and that he breached his trust duties. *See* Dkt. 186, ¶ 162. For this claim, the breach of trust statute of limitations, D.C. Code § 19-1310.05, discussed above applies. *Supra* Section II(A)(1).

1.      When the District of Columbia enacted the Uniform Trust Code in 2003 (the law

became effective in 2004),[15] it adopted the statute of limitations provision that was drafted and

recommended by the National Conference of Commissioners on Uniform State Laws, with one

modification: it shortened the second limitations period—the one that applies when there is no

report provided to the beneficiary about a potential cause of action—from five years to three

years. *Compare* NCCUSL, Uniform Trust Code, Section 1005(c) (Aug. 14, 2024) ("a judicial

proceeding . . . must be commenced within five years"), *with* D.C. Code § 19-1310.05(c) ("a

judicial proceeding . . . must be commenced within 3 years"). The provision is otherwise

identical to the NCCUSL draft law.

The prefatory note and the comments to the NCCUSL draft law explicitly and repeatedly

call and describe the provision as a "statute of limitations" with a "limitations period."[16] The

provision is titled "Limitation of action against trustee." The NCCUSL drafters left open the

possibility that the limitations period could be "tolled for fraud or other misdeeds," opting to

leave that question to the laws of the respective jurisdictions that enacted the Uniform Trust

Code. NCCUSL, Uniform Trust Code (2023), § 1005, Comment, at 164 (Aug. 14, 2024). Some

jurisdictions, like New Hampshire, have modified the draft NCCUSL law to make it operate

more like a statute of repose. *E.g.*, N.H. Rev. Stat. § 564-B:10-1005(d) (adding the following

---

[15] *See* Council of the District of Columbia, B15-0234, "Uniform Trust Act of 2003," https://lims.dccouncil.gov/Legislation/B15-0234.

[16] *See* NCCUSL, Uniform Trust Code (2023), Prefatory Note, at 6 (Aug. 14, 2024) (the provisions "provide a statute of limitations on claims against a trustee"); *id.*, General Comment, at 157 ("Section 1005 provides a statute of limitations on actions against a trustee."); *id.* § 1005, Comment, at 163 ("[t]he one-year and five-year limitations periods under this section," "when the clock will start to run for purposes of the statute of limitations," "the five-year limitations period," "the limitations period for actions against that particular trustee"). All of these documents are available for download at: https://www.uniformlaws.org/viewdocument/final-act-132?CommunityKey=193ff839-7955-4846-8f3c-ce74ac23938d&tab=librarydocuments.

provision to the NCCUSL draft: "The periods of limitation under this section shall not be tolled for any reason, except by a written agreement of the trustees and qualified beneficiaries or a court order."). The District of Columbia has not.

The breach of trust limitations provision is thus a statute of limitations, and D.C. courts already apply the discovery rule to causes of action for breach of trust, breach of fiduciary duty, and other analogous claims, *supra* at Section II(A)(2)(b), so the Court should apply the discovery rule to the plaintiffs' breach of trust claim against Callahan as well. The discovery rule is, as discussed above, an equitable doctrine, and the D.C. Code expressly incorporates "[t]he common law of trusts and principles of equity" in its enactment of the Uniform Trust Code, "except to the extent modified by this chapter or another statute of the District of Columbia." D.C. Code § 19-1301.06.

In application, the discovery rule analysis for the breach of trust claim is similar to the discovery rule analysis for the aiding and abetting and civil conspiracy claims, *supra* at Section II(A)(2)(c), but with a tweak: the breach of trust claim alleges that Callahan was a trustee, and while Callahan contends that the three-year clock started running when he resigned from the LHRO in 2012, *see* D.C. Code § 19-1310.05(c)(3), under the discovery rule the plaintiffs did not have notice of that fact until November 2016, which was when they had information that there was a trust for which there could even be trustees and cognizable claims against them. For the same reasons discussed in Section II(A)(2)(c), the clock on the breach of trust claim as to Callahan thus did not start running until November 2016.[17] The suit was filed in April 2017, well within the three-year limitations period.

---

[17] The analysis is the same if the "lulling" tolling doctrine applies. *See supra* n.14.

2.      Callahan argues (at 12) that the breach of trust statute of limitations is a statute of repose. But no D.C. court has ever held that, and the drafting history, text, and context all point against that conclusion.

The relevant NCCUSL commentary shows that the drafters wrote the provision as a statute of limitations. The drafters' committee was a small group of law professors including John Langbein, a Delaware Supreme Court justice, and specialist lawyers. *See supra* n.17. Their decision to call the provision they drafted a statute of limitations rather than a statute of repose was deliberate, careful, and of particular meaning, and not just an oversight or sloppy shorthand during a rushed legislative process. *See A1 Team USA Holdings, LLC v. Bingham McCutchen LLP*, 998 A.2d 320, 326 (D.C. 2010) (considering the NCCUSL drafting history in interpreting the uniform arbitration law enacted by the District of Columbia). The NCCUSL drafting commentary thus distinguishes this provision from others that were clearly intended as statutes of repose.[18]

The text of this statute does not look like a statute of repose. Statutes of repose typically run from "the date of the last culpable act or omission of the defendant." *California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 505 (2017). The federal securities laws, for example, contain a statute of repose that runs "5 years after such violation." 28 U.S.C. § 1658(b). But the triggering events here—the removal, resignation, or death of a trustee, the termination of a trust or a beneficiary's interest in it—are not acts of culpability. Statutes of repose are often drafted with sweeping language affirmatively precluding claims. For example, a certain

---

[18] *Cf. J.H. Westerman Co. v. Fireman's Fund Ins. Co.*, 499 A.2d 116, 120 (D.C. 1985) (D.C. Code § 12-310's provision that actions were "barred" unless injury occurred within 10 years from date defective or unsafe improvement to real property "was substantially completed" was a statute of repose when "Congress referred to statutes of repose that had been enacted in 40 states").

provision of the Uniform Commercial Code provides that untimely claims on an unauthorized signature are affirmatively "precluded" "[w]ithout regard to care or lack of care of either the customer or the bank" after a certain time period. *Peters v. Riggs Nat. Bank, N.A.*, 942 A.2d 1163, 1167 (D.C. 2008). But here the provision simply reads that a judicial proceeding "must be commenced within 3 years after the first to occur of" certain events. *See* D.C. Code § 19-1310.05(c). There is no affirmative claim preclusion or indication that fraud or lack of diligence ("care or lack of care") cannot apply in a tolling or discovery rule analysis.

Callahan's reading of the statute invites bizarre results that are inconsistent with the purpose of the statute. The first part of the statute provides that the clock does not start running on a beneficiary's breach of trust claim against a trustee until the trustee sends "a report" to the beneficiary "adequately disclos[ing] the existence of a potential claim for breach of trust and inform[ing] the beneficiary of the time allowed for commencing a proceeding." D.C. Code § 19-1310.05(a). This is claimant protective. It shifts the burden to the prospective defendant to affirmatively alert the prospective plaintiff to both the existence of a potential cause of action and the time in which the plaintiff must bring that cause of action. Once the trustee resigns or dies or is removed, or the trust or the beneficiary's interest in it is terminated, then the beneficiary—who presumably has knowledge of these triggering events given the extensive reporting obligations of the trustee, *see* D.C. Code § 19-1308.13—is on notice that she has three years to file suit.

Callahan's interpretation takes this claimant-protective approach and erects a shield for the worst trustees with it. His interpretation would mean that a trustee who steals all the trust money, forges account statements, and then quietly resigns without telling the beneficiary is effectively free of a civil suit unless the beneficiary is lucky enough to figure it all out and file a lawsuit within three years. This sort of result—particularly given the claimant-protective policy

expressed in a statute governing fiduciary relationships—strongly weighs against the conclusion that the statute is one of repose. *See Cardozo v. United States*, 315 A.3d 658, 672 (D.C. 2024) ("We shun 'interpretations that lead to unreasonable results,' . . . 'avoid interpretations of statutes which lead to implausible results,' . . . . That is true even when abiding by this principle deviates from the most natural reading of a statute.").

    **C.    Xu Wanping's claims in particular are timely.**

    Regardless of how the Court resolves the other plaintiffs' claims against Callahan, Callahan's motion for summary judgment should be denied as to Xu Wanping, because he was incarcerated from 2005 through April 29, 2014. Ex. 30 at 13 (Xu Dep. at 47:13–48:1) ("Q. . . . [Y]ou have served a total of 20 years in prions for political dissent. Most recently, from 2005 to 2014. That's correct; right? A. Yes. . . . Q. And your last release from prison on April 29, 2014; is that correct? A. Correct."). Under D.C. Code § 12-302, "the District tolls the statute of limitations for causes of action that accrue while a plaintiff is imprisoned, beginning at the time of his or her arrest. . . . Tolling stops when the plaintiff is released[.]" *Jones v. Kirchner*, 835 F.3d 74, 81 (D.C. Cir. 2016). Applying either the catchall or breach of trust statute of limitations, Xu Wanping had three years from the date of his release—or until April 29, 2017—to file his claims. He filed on April 11, 2017. All of his claims against Callahan are thus timely.

    Callahan states (at 14, n.7) that he "does not make a statute of limitations argument" as to Xu Wanping but argues that if the breach of trust statute of limitations is a statute of repose, it bars Xu Wanping's claims, too. The premise in Callahan's argument that D.C. Code § 12-302 does not apply to statutes of repose is wrong. D.C. Code § 12-302 is a statute, not a tolling doctrine or an accrual rule, and so the existence of even a statute of repose does not override § 12-302 or erase it out of the D.C. Code. There is no irreconcilable conflict between the breach of trust provision and § 12-301, and so the result is that the Xu Wanping had three years after he

was released from prison to file his suit, given that Callahan resigned from the LHRO while he was incarcerated. *See Harman v. United States*, 718 A.2d 114, 117 (D.C. 1998) ("If statutes conflict, our task is to reconcile them if possible.")

## CONCLUSION

The motion should be denied.

Date:   January 10, 2025

Respectfully submitted,

**FARRA & WANG PLLC**
/ s / Times Wang
Times Wang (D.C. Bar 1025389)
1543 Champa St., Ste. 400
Denver, CO 80202
Telephone: (202) 505-6227
twang@farrawang.com

Adam H. Farra (D.C. Bar 1028649)
1300 I Street, N.W., Ste. 400E
Washington, D.C. 20005
Telephone: (202) 505-5990
afarra@farrawang.com

**SLARSKEY LLC**
David Slarskey (admitted pro hac vice)
Evan Fried (admitted pro hac vice)
420 Lexington Ave., Suite 2525
New York, NY 10170
Telephone: (212) 658-0661
dslarskey@slarskey.com
efried@slarskey.com

*Counsel for Plaintiffs*