# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

HE DEPU, *et al.*,

                    Plaintiffs,

        v.

OATH HOLDINGS, INC., *et al.*,

                    Defendants.

Case No. 17-0635 (RDM)

Judge Randolph D. Moss

# PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
# IN SUPPORT OF THEIR MOTION FOR ATTORNEYS' FEES, EXPENSE
# REIMBURSEMENT, AND SERVICE AWARDS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 2

ARGUMENT ..................................................................................................................... 6

    I.    THE COURT SHOULD AWARD ATTORNEYS' FEES TO THE PLAINTIFFS ............ 7

        A.   Under the D.C. Code and the common fund doctrine, the plaintiffs' counsel are entitled to their fees and expenses. ....................................................................................... 7

        B.   The requested attorneys' fees are reasonable. ............................................................ 10

        C.   The requested expense reimbursement is appropriate. ................................................ 19

    II.   THE COURT SHOULD AWARD EACH PLAINTIFF A SERVICE AWARD. .............. 20

CONCLUSION ................................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Oversight v. U.S. Dep't of Just.*,
  375 F. Supp. 3d 50 (D.D.C. 2019) ........................................................................ 18

*Blankenship v. Boyle*,
  337 F. Supp. 296 (D.D.C. 1972) .......................................................................... 15

*Cobell v. Salazar*,
  679 F.3d 909 ...................................................................................................... 21

*Cohen v. Minneapolis Jewish Fed'n*,
  346 F. Supp. 3d 1274 (W.D. Wis. 2018) ................................................................ 7

*Depu v. Oath Holdings, Inc.*,
  715 F. Supp. 3d 1 (D.D.C. 2022) ............................................................... 4, 8, 9, 11

*Depu v. Oath Holdings, Inc.*,
  2021 WL 4399528 (D.D.C. Sept. 27, 2021) ............................................................ 4

*Hawes v. Colorado Div. of Ins.*,
  65 P.3d 1008 (Colo. 2003) .................................................................................... 8

*He Depu v. Oath Holdings, Inc.*,
  531 F. Supp. 3d 219 (D.D.C. 2021) ........................................................................ 3

*He Depu v. Oath Holdings, Inc.*,
  2020 WL 12115482 (D.D.C. Dec. 16, 2020) ........................................................... 3

*He Depu v. Yahoo! Inc.*,
  306 F. Supp. 3d 181 (D.D.C. 2018) .................................................................... 3, 15

*He Depu v. Yahoo! Inc.*,
  334 F. Supp. 3d 315 (D.D.C. 2018) ........................................................................ 3

*He Depu v. Yahoo! Inc.*,
  950 F.3d 897 (D.C. Cir. 2020) ...................................................................... 3, 9, 12

*In re Black Farmers Discrimination Litig.*,
  953 F. Supp. 2d 82 (D.D.C. 2013) ........................................................................ 11

*In re Excess Value Ins. Coverage Litig.*,
  598 F. Supp. 2d 380 (S.D.N.Y. 2005) ................................................................... 19

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*,
    4 F. Supp. 3d 94 (D.D.C. 2013) ................................................................. 17

*In re First Databank Antitrust Litig.*,
    209 F. Supp. 2d 96 (D.D.C. 2002) ............................................................. 17

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    205 F.R.D. 369 (D.D.C. 2002) .................................................................... 11

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    2003 WL 22037741 (D.D.C. June 16, 2003) ................................... 14, 17, 20

*In re Nifedipine Antitrust Litig.*,
    2011 WL 13392312 (D.D.C. Jan. 31, 2011) ............................................... 19

*In re Unfunded Ins. Tr. Agreement of Capaldi*,
    870 A.2d 493 (Del. 2005) ........................................................................... 10

*Jones v. Chopra*,
    2023 WL 6037295 (D.D.C. Sept. 15, 2023) .............................................. 22

*Keepseagle v. Perdue*,
    856 F.3d 1039 (D.C. Cir. 2017) ................................................................. 21

*Kifafi v. Hilton Hotels Ret. Plan*,
    999 F. Supp. 2d 88 (D.D.C. 2013) ................................................. 11, 21, 22

*Meijer, Inc. v. Barr Pharms., Inc.*,
    2009 WL 10744520 (D.D.C. Apr. 20, 2009) ............................................. 22

*Missouri v. Jenkins by Agyei*,
    491 U.S. 274 (1989) .................................................................................... 17

*Nat'l Veterans Legal Servs. Program v. United States*,
    724 F. Supp. 3d 1 (D.D.C. 2024) ...................................................... 15, 16, 20

*Schneider v. Chipotle Mexican Grill, Inc.*,
    336 F.R.D. 588 (N.D. Cal. 2020) ............................................................... 19

*Sprague v. Ticonic Nat. Bank*,
    307 U.S. 161 (1939) ...................................................................................... 8

*Swedish Hosp. Corp. v. Shalala*,
    1 F.3d 1261 (D.C. Cir. 1993) ............................................................. 8, 10, 16

*Usery v. Loc. Union No. 639 Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*,
    543 F.2d 369 (D.C. Cir. 1976) ..................................................................... 9

**Statutes**

D.C. Code § 19-1310.04 ........................................................................................ 7, 10

**Other Authorities**

*Newberg and Rubenstein on Class Actions* (6th ed.) ..................................... 7, 9, 17, 18

*Bogert's The Law of Trusts and Trustees* ...................................................... 7

*Restatement (Third) of Trusts* ....................................................................... 7

## INTRODUCTION

After eight years of hard-fought litigation, the plaintiffs have secured substantial relief for the humanitarian purpose of the Yahoo Human Rights Fund ("Trust"): a $5,425,000 contribution made by the defendants that will be used to carry on the humanitarian purpose of the Trust for years. This sum represents 31% of the original $17.3 million used to originally fund the Trust, and it will enable the new manager of these funds—Humanitarian China, a nonprofit with years of experience providing millions of dollars in direct financial assistance to Chinese dissidents—to make hundreds of grants to dissidents that will materially enhance those dissidents' lives.

This outcome was far from pre-ordained. The plaintiffs and their counsel persisted through early dismissal (by Judge Bates), through an appeal to the D.C. Circuit, through multiple additional rounds of dispositive motions briefing (including three fully briefed pending motions, two to dismiss and one for summary judgment), through a bench trial, through fact and expert discovery, through two in-person mediation sessions, through the COVID pandemic, and through dozens of meet-and-confers, discovery disputes, and meetings with defense counsel over every aspect of this litigation. This outcome is solely and exclusively the product of hard work by the plaintiffs and their counsel.

Having taken this case on contingency, the plaintiffs' counsel now move for: (1) payment of attorneys' fees in the amount of 30% of the settlement fund; (2) reimbursement of expenses in the amount of $182,950.77; and (3) awards to each plaintiff in the amount of $50,000 each, with $55,000 for the lead plaintiff He Depu, in recognition of each individual plaintiff's substantial contribution to this litigation over the last eight years. As detailed below, these requests are reasonable and appropriately reflect the amount of work and various risks undertaken by the plaintiffs and their counsel in litigating this case.

## BACKGROUND

The initiative that led to this litigation began in 2014, when He Depu heard rumors concerning the Yahoo Human Rights Fund and began reaching out to other dissidents to organize them into a group that could share information and reach out to people in the United States to gather more information. *See* H. Depu Decl. at 2 (¶¶ 6–8).[1] This involved writing and delivering two letters to Yahoo's former CEO, Jerry Yang, *id.* ¶ 6, contacting media to raise awareness about the issue, *id.* ¶ 8, and finding contacts in the United States to connect them to legal counsel, *id.* ¶ 8. Conducting this work from China was not easy—particularly given that the group was comprised of Chinese dissidents under constant surveillance—and the initial law firm interested in litigating the case asked the plaintiffs to pay the costs of litigation expenses (which they couldn't realistically do). *Id.* at 3 (¶ 12). The plaintiffs ultimately found counsel in Times Wang who, at the time, was at Cohen Milstein Sellers & Toll PLLC. *Id.* The suit was filed in April 2017, alleging breaches of trust and several other claims against the Yahoo defendants, the Laogai defendants, and the Estate of Harry Wu (Wu had died suddenly in 2016). *See* Dkt. 1.[2]

The Yahoo defendants (Yahoo/Oath Holdings, Inc., Michael Callahan, and Ronald Bell) were initially represented by O'Melveny & Myers LLP, and later by McGuireWoods. *See* Dkt. 18 at 2. Impresa Legal Group represented the Laogai defendants (Laogai Research Foundation, Laogai Research Foundation-CA, and the Laogai Human Rights Organization). *See* Dkt. 20-1 at 36. Perry Charnoff PLLC (now Charnoff Simpson) represented the Estate of Harry Wu. *See* Dkt. 22 at 1.

---

[1] This brief is accompanied by the declarations of Times Wang and He Depu.

[2] *See* Andrew Jacobs, "Yahoo Is Sued Over $17 Million Fund for Chinese Dissidents," *The New York Times* (April 11, 2017), https://www.nytimes.com/2017/04/11/business/yahoo-lawsuit-china-dissidents-fund.html.

Following the filing of motions to dismiss, the plaintiffs amended the complaint as of right. *See* Dkt. 26. After significant motion to dismiss briefing, Judge Bates granted the motions in March 2018 and dismissed the litigation with prejudice. *See He Depu v. Yahoo! Inc.*, 306 F. Supp. 3d 181, 185 (D.D.C. 2018). The plaintiffs sought leave to amend the complaint—drafting and attaching a proposed Second Amended Complaint, *see* Dkt. 42-1—and filed motions to alter or amend the judgment, but Judge Bates denied those motions. *See He Depu v. Yahoo! Inc.*, 334 F. Supp. 3d 315, 324 (D.D.C. 2018).

The plaintiffs appealed. Cohen Milstein withdrew from the litigation; Mr. Wang started a firm and continued the litigation on the plaintiffs' behalf. *See* Dkt. 52; T. Wang Decl. at 2 (¶ 9). Mr. Wang successfully briefed and argued the appeal,[3] and the D.C. Circuit unanimously reversed Judge Bates, holding (1) that the plaintiffs plausibly alleged that the settlement agreement forming the Yahoo Human Rights Fund created a charitable trust, and (2) that the plaintiffs plausibly alleged "special interest" (or "charitable trust") standing under D.C. law. *See He Depu v. Yahoo! Inc.*, 950 F.3d 897, 908 (D.C. Cir. 2020) (Garland, C.J.).

On remand, the defendants filed new motions to dismiss, *see* Dkts. 66, 68, 70, and sought to stay discovery pending resolution of those motions, *see* Dkt. 74. The case was reassigned from Judge Bates to this Court. *See* Dkt. 79. The Court granted the stay pending its resolution of the new motions to dismiss. *He Depu v. Oath Holdings, Inc.*, No. CV 17-635 (RDM), 2020 WL 12115482, at *2 (D.D.C. Dec. 16, 2020). After the motion to dismiss briefing was completed, the Court largely denied the motions to dismiss. *He Depu v. Oath Holdings, Inc.*, 531 F. Supp. 3d 219, 247 (D.D.C. 2021) (dismissing as moot the request for removal of Callahan, Bell, and Wu

---

[3] *See* Khorri Atkinson, "DC Circ. Seems Likely To Revive Fight Over $17M Yahoo Fund," *Law360* (Oct. 7, 2019), https://www.law360.com/articles/1207174?scroll=1&related=1.

as trustees and the civil conspiracy claim against the Laogai defendants and Wu). The defendants answered and the parties negotiated a protective order. *See* Dkt. 102.

Concerned about the exhaustion of Trust funds, the plaintiffs moved for a preliminary injunction in July 2021. *See* Dkt. 108; T. Wang Decl. at 3 (¶ 12). After a hearing and attempts at a negotiated resolution, the Court denied the motion, concluding that the plaintiffs had not satisfied the requirement of showing an imminent and irreparable injury. *See Depu v. Oath Holdings, Inc.*, No. CV 17-635 (RDM), 2021 WL 4399528, at *4 (D.D.C. Sept. 27, 2021).

Given the centrality of the issue, the parties agreed to hold an early bench trial "on the threshold question [of] whether the settlement in *Wang v. Yahoo! Inc.*"—the lawsuit whose settlement gave rise to the formation of the Yahoo Human Rights Fund—"created an irrevocable charitable trust." *Id.* at *1. The parties completed document and deposition discovery on that issue in advance of trial, submitted trial briefs, and conducted trial on that issue on October 29, 2021. *See* Dkt. 135 (trial transcript). Two witnesses testified live, in addition to deposition testimony submitted to the Court and roughly four dozen exhibits. *See* Dkt. 135 at 3 (Michael Callahan and Jeffrey Fiedler). The Court agreed with the plaintiffs, finding "by clear and convincing evidence that the 2007 settlement agreement established a charitable trust under D.C. law." *Depu v. Oath Holdings, Inc.*, 715 F. Supp. 3d 1, 31 (D.D.C. 2022). Full merits discovery then began. *See* May 26, 2022 Minute Order.

In 2023, the parties began discussing a potential resolution and selected a mediator. In advance of the mediation, the parties agreed to a stay of discovery. *See* Dkt. 159; April 4, 2023 Minute Order. In May 2023, the parties attended an in-person mediation session in Washington, D.C., before retired U.S. District Judge Walter Kelley (E.D. Va.). *See* Dkt. 165. The parties

exchanged substantial mediation statements. *See* T. Wang Decl. at 2 (¶ 6). The session was productive but unsuccessful.

Discovery resumed. In May 2023, the plaintiffs sought leave to file a Third Amended Complaint, asserting a claim against Impresa Legal Group for restitution, additional theories of recovery against the existing defendants, and conforming the pleading to the evidence. *See* Dkt. 164. The defendants opposed the motion, and the Court ultimately granted the motion. *See* March 21, 2024 Minute Order. In response, the defendants filed new motions to dismiss. *See* Dkts. 188, 192. Those motions were fully briefed as of June 2024. *See* Dkt. 200. (The case settled before the Court issued its opinion on the motions.)

The parties continued discovery, including expert discovery. Fact discovery closed on November 8, 2024 and expert discovery closed on February 7, 2025. *See* August 20, 2024 Minute Order. In total, approximately 11,000 documents comprising more than 120,000 pages were produced in the litigation, including from multiple non-parties. *See* T. Wang Decl. at 4 (¶ 15). There were 13 fact depositions. *Id.* at 4 (¶ 15). There were eight non-party subpoenas. *Id.* There were seven testifying experts retained in this litigation (four by the plaintiffs; three by the defendants). *Id.* at 4 (¶ 16). The defendants deposed all four of the plaintiffs' experts. *Id.* The plaintiffs elected not to depose any of the defendants' experts. *Id.* There was extensive written discovery, requiring the plaintiffs to (among other things) submit substantial responses to the defendants' contention interrogatories. *Id.* at 4 (¶ 15). And there were several discovery disputes. *See* Dkts. 150 and 157 (concerning the plaintiffs' assertion of certain privilege claims and the parties' compromises about them); Dkt. 157 at 3 (concerning the defendants' assertion of certain privilege claims); Dkt. 218 (transcript of hearing concerning the applicability of Chinese law on

the taking of remote depositions, and the assertion of privilege claims concerning certain Foley Hoag documents).

There was also a dispute over the plaintiffs' filing of a *lis* pendens over 1901 18th Street, N.W., the property in Washington, D.C. that the Laogai defendants operated out of and purchased with Trust assets. In March 2024, the Laogai defendants moved to cancel the *lis pendens*. *See* Dkts. 179, 183. After briefing and oral argument, the Court denied the motion without prejudice. *See* April 3, 2024 Minute Order.

In December 2024, Callahan filed a motion for summary judgment as to two issues: causation and statute of limitations. *See* Dkt. 215. That motion was fully briefed as of January 2025. (The case settled before the Court issued its opinion or held argument on the motion.)

In late 2024, the parties agreed to conduct another in-person mediation with Judge Kelley. The session occurred on February 20, 2025. *See* T. Wang Decl. at 4 (¶ 18). After an all-day session, the parties reached an agreement in principle, two months shy of this litigation's eighth birthday. As outlined in the motion for approval of the settlement (filed concurrently), the settlement will result in payment of $5,425,000 towards the Trust's humanitarian purpose.

## ARGUMENT

The plaintiffs request: (1) payment of attorneys' fees in the amount of 30% of the settlement fund; (2) reimbursement of expenses in the amount of $182,950.77; and (3) awards to each plaintiff in the amount of $50,000 each, with $55,000 for the lead plaintiff He Depu, in recognition of each individual plaintiff's substantial contribution to this litigation over the last eight years.

## I.    THE COURT SHOULD AWARD ATTORNEYS' FEES TO THE PLAINTIFFS.

### A.    Under the D.C. Code and the common fund doctrine, the plaintiffs' counsel are entitled to their fees and expenses.

There are two individual bases for the plaintiffs' entitlement to their attorneys' fees and expenses. First, the D.C. Code provides that "[i]n a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy." D.C. Code § 19-1310.04. This reflects a principle of the common law of trusts that "[a]ttorney's fees incurred on behalf of the trust or to benefit the trust and its beneficiaries are properly paid from the trust." *Bogert's The Law of Trusts and Trustees* § 525. Courts make awards of fees and expenses in trust cases when "the beneficiary's participation in the proceeding [was] beneficial to the trust, usually either because of a recovery that benefits the trust's beneficiaries generally (rather than merely the beneficiary in question) or by clarifying a significant uncertainty in the terms of the trust." *Restatement (Third) of Trusts* § 88 cmt. d (2007).[4] *See, e.g.*, *Cohen v. Minneapolis Jewish Fed'n*, 346 F. Supp. 3d 1274, 1288 (W.D. Wis. 2018), *aff'd*, 776 F. App'x 912 (7th Cir. 2019) (awarding attorneys' fees under identical provision of Wisconsin Code in a case alleging breach of a charitable trust).

Second, the common fund doctrine, an equitable principle holding "that an attorney responsible for recovering a common fund is generally entitled to a fee from that fund," provides an additional basis for the Court's award of attorneys' fees and expenses. 5 *Newberg and Rubenstein on Class Actions* § 15:54 (6th ed.). "The underlying justification for attorney reimbursement from a common fund, as explained by the Supreme Court in three early cases, is

---

[4] Unless otherwise specified, all internal citations, quotation marks, and alterations are omitted from quotations throughout this brief, and all emphases are added.

that unless the costs of litigation are spread to the beneficiaries of the fund they will be unjustly enriched by the attorney's efforts." *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993). While the common fund doctrine is often applied in the context of a class action—where an attorney prosecuting a claim secures creation of a fund for payment of claims to class members—"the absence of an avowed class suit" does not preclude application of the doctrine, *Sprague v. Ticonic Nat. Bank*, 307 U.S. 161, 167 (1939), and courts have found application of the common fund doctrine "especially appropriate" in the context of charitable trust litigation. *See Hawes v. Colorado Div. of Ins.*, 65 P.3d 1008, 1021 (Colo. 2003).

Whether under the D.C. Code's fee-shifting provision or the common fund doctrine, the plaintiffs and their attorneys are entitled to a fee award and expenses. After eight years of hard-fought litigation, the plaintiffs obtained a significant benefit for the Trust: a meaningful replenishment of the Trust's assets by the defendants so that additional funds will be available for the provision of humanitarian and legal assistance to the beneficiary class of Chinese dissidents. The settlement sum of $5,425,000 constitutes a healthy 31% of the $17.3 million amount that originally funded the Trust. *See Depu*, 715 F. Supp. 3d at 24. Given that the Trust had three purposes, *id.* at 12–13, and that the Trust assets were at material risk of complete depletion, *see* Dkt. 197 at 7–8, a replenishment representing nearly one-third of the Trust's original funding amount is a material benefit to the Trust, will provide substantial additional funding for the Trust's humanitarian purpose, and represents nearly ten times more than what the plaintiffs' forensic accounting expert determined had been spent on the humanitarian purpose. *See* T. Wang Decl. at 4 (¶ 18). As outlined in the parties' joint motion for approval of the settlement (filed concurrently), the parties have agreed on a plan to ensure that millions of dollars ultimately make their way into the hands of Chinese dissidents upon termination of the Trust.

These same facts also satisfy the elements of the common fund doctrine: the $5,425,000 million is a common fund under the supervision of the Court that will be used further the Trust's humanitarian purpose; and the plaintiffs' attorneys' work generated that common fund. *See* 5 *Newberg and Rubenstein on Class Actions* § 15:55 (6th ed.). None of the factors that might otherwise preclude an award from a common fund are applicable in this case. *See id.* § 15:61. The fund has specific beneficiaries (the dissidents who will ultimately receive grants), the plaintiffs do not have conflicting interests with the beneficiaries (the plaintiffs themselves are beneficiaries), no other beneficiary has obtained independent representation, the class of beneficiaries is distinct, and there is no statutory preemption of the common fund doctrine—the D.C. Code and the common fund doctrine are consonant with each other. *See id.* § 15:61 (listing the factors); *Usery v. Loc. Union No. 639 Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 543 F.2d 369, 386 (D.C. Cir. 1976) (recognizing "a presumption against" statutory preemption of the common fund doctrine and "permitting 'common benefit' awards in the context of statutory causes of action notwithstanding provision for attorney's fees in other sections of the same statute").

In addition to the monetary recovery, the plaintiffs also obtained a key legal victory that clarified significant uncertainty about the terms of the Trust: the plaintiffs prevailed at trial and obtained a ruling in which the Court found that the Yahoo Human Rights Fund was, in fact, a charitable trust. *See Depu*, 715 F. Supp. 3d at 31. This ruling was obtained after the plaintiffs secured the D.C. Circuit's decision reversing Judge Bates' early dismissal of the suit and instead holding (1) that the plaintiffs' allegations that the Yahoo Human Rights Fund was a charitable trust were plausible, and (2) that the plaintiffs' allegations that they had special interest under District of Columbia law were plausible. *See Depu*, 950 F.3d at 908. These rulings helped clarify

which legal standards governed the defendants, subjecting certain of them to the duties imposed on the trustees of a charitable trust. *See In re Unfunded Ins. Tr. Agreement of Capaldi*, 870 A.2d 493, 498 (Del. 2005) (reversing denial of fees and costs when "the litigation [the beneficiaries] initiated conferred a benefit on the Trust, both by reducing its administrative costs and by reconfiguring its governance structure"). Indeed, they confirmed that at least some of the defendants were trustees with attendant fiduciary duties to the humanitarian purpose, which was a critical finding given that the defendants' position was that no trust even existed, much less that there were any fiduciary duties that the plaintiffs could enforce.

Taken together, and only after nearly eight years of litigation, the plaintiffs (1) secured a ruling holding that the Yahoo Human Rights Fund was a charitable trust, and (2) negotiated a settlement that gives new life to that charitable trust's humanitarian purpose before its assets were entirely depleted. It is not an overstatement to conclude that the humanitarian purpose will continue to be served for years only because of the plaintiffs' work in this litigation. This work merits an award of attorneys' fees.

### B. The requested attorneys' fees are reasonable.

The D.C. Code authorizes an award of "reasonable" attorneys' fees, D.C. Code § 19-1310.04, and federal courts have a parallel "duty to ensure that claims for attorneys' fees are reasonable" when awarding them, *Swedish Hosp.*, 1 F.3d at 1265. In cases (like this one) involving the creation of a common fund, the D.C. Circuit has held that "a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award." *Swedish Hosp.*, 1 F.3d at 1271.

District courts enjoy "substantial discretion" in deciding what percentage of a fund is reasonable for an award. *Id.* at 1271. There is no required methodology or framework in the D.C. Circuit for arriving at a percentage. Some courts in this district have used the "the *Lorazepam*

factors," which are: "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by class members to the fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by class counsel; and (7) the award in similar cases." *Kifafi v. Hilton Hotels Ret. Plan*, 999 F. Supp. 2d 88, 100–01 (D.D.C. 2013); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 383 (D.D.C. 2002). Other courts have conducted a "lodestar cross-check" to assess the reasonableness of the fee percentage, comparing the dollar value of the attorney time spent in service of the litigation (the "lodestar") with the requested fee percentage. *See In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 101 (D.D.C. 2013).

Regardless of what methodology the Court uses to assess the reasonability of the requested percentage, the plaintiffs' request for an award of 30% of the settlement amount is reasonable.

### 1.    The *Lorazepam* factors

Each *Lorazepam* factor weighs in favor of the conclusion that a fee award of 30% is reasonable.

***The size of the fund created and the number of persons benefitted.*** Whether measuring the size of the settlement fund relative to the original size of the Trust fund or the settlement fund's likely impact on the number of dissidents, the size of the fund and the number of persons benefitted weigh in favor of approving the fee award request.

The settlement fund of $5,425,000 constitutes 31% of the $17.3 million used to originally fund the Trust. *See Depu*, 715 F. Supp. 3d at 24. For a Trust with three original purposes and no express provision quantifying how much of the original fund should be allocated to the Trust's humanitarian purpose, $5,425,000 million represents a meaningful sum that is exclusively

allocated to serving that purpose now. The plaintiffs' damages expert calculated that the range of damages—constituting restitution to the Trust's humanitarian purpose—was between $4.98 million and $14.73 million, before application of prejudgment interest. *See* T. Wang Decl. at 4–5 (¶ 18). $5,425,000 million thus represents between 109% and 36.8% of the damages the plaintiffs calculated that the Trust's humanitarian purpose suffered. *Id.* ¶ 18.

The sum of $5,425,000 million is a good deal of money in the scheme of civil litigation, but it is a particularly significant amount given the purpose it will serve: the provision of direct financial support to Chinese dissidents imprisoned for exercising their speech rights.[5] One reasonable estimate (based on U.S. government data) is that the number of such dissidents imprisoned for online speech is between 800 and 1,200 individuals. *See Depu*, 950 F.3d at 907. A scholar on the topic has more recently estimated that the number of people imprisoned in China since the late 1990s for exercising their freedom of speech online is "likely in the thousands." *See* Dkt. 186 at 52 (¶ 154); William Farris, "How Many People Have Been Punished for Political and Religious Speech in China?" (April 17, 2023),

https://blog.feichangdao.com/2023/04/202304-how-many-in-china-punished-speech.html. A lower-income household in China generates 55,000 CNY or less annually (a reasonable

---

[5] *See* Eileen Guo, "Inside the decades-long fight over Yahoo's misdeeds in China," *MIT Technology Review* (Dec. 12, 2023), https://www.technologyreview.com/2023/12/12/1084990/yahoo-china-dissident-yahoo-human-rights-fund/ ("The need for such assistance couldn't be more urgent; the country has had the 'worst conditions for internet freedom' for nine years in a row, according to the nonprofit Freedom House. And the publicly known violations grossly underrepresent the true situation, according to Yaqiu Wang, Freedom House's research director for China, Hong Kong, and Taiwan, given the increasing opacity of the country's court system and the high levels of self-censorship there.").

assumption is that formerly imprisoned dissidents are generally in this category of households).[6]
If grants of (for example) $2,500 USD are made (approximately 18,000 CNY),[7] each grant
would represent nearly 33% of a lower-income household's annual income—and the fund could
make grants of that size to more than one thousand dissidents. These numbers bolster the
conclusion that the size of the fund and the number of likely beneficiaries weigh in favor of the
fee award.

　　　　*The presence or absence of substantial objections to the fees requested by counsel.* The
plaintiffs are not aware of any objections to the fees requested. The plaintiffs themselves have
directed that the plaintiffs' counsel request 30% of the settlement amount as a fee award. *See* T.
Wang Decl. at 5 (¶ 20). As discussed in the motion for approval of the settlement, the parties will
provide the relevant settlement documentation to the Office of the Attorney General for the
District of Columbia. The plaintiffs' counsel have already been in contact with that office about
the settlement.

　　　　*The skill and efficiency of the attorneys involved.* For much of this eight-plus year
litigation, one attorney has prosecuted it: Mr. Wang. Although he has received meaningful
assistance from other lawyers at various points in the lifecycle of this litigation, the lodestar
numbers bear out what the Court has itself observed over the last several years: that Mr. Wang
was the main lawyer drafting pleadings, managing document discovery and handling discovery
disputes, completing written discovery, taking and defending depositions, litigating multiple

---

[6] *See* McKinsey & Company, "Five consumer trends shaping the next decade of growth in China," at 3 (Nov. 2021),
https://www.mckinsey.com/cn/~/media/mckinsey/locations/asia/greater%20china/our%20insights/five%20consumer%20trends%20shaping%20the%20next%20decade%20of%20growth%20in%20china/china%20article%20on%20redrawing%20consumer%20map%20article_11.pdf.

[7] *See Bloomberg*, https://www.bloomberg.com/quote/USDCNY:CUR?sref=ozUx8R8E (date accessed: March 25, 2025) (USD-CNY rate: 7.2648).

rounds of dispositive motions, briefing, arguing, and winning an appeal in the D.C. Circuit,

trying a major portion of the case, shouldering the expenses of the litigation, representing the

plaintiffs at mediations, attending hearings and court conferences, and managing the expert work.

*See* T. Wang Decl. at 6 (¶ 25) (chart). Throughout all this, Mr. Wang has juggled the rest of his

practice while litigating against opposing counsel from much larger corporate defense firms like

O'Melveny and McGuireWoods. *See* T. Wang Decl. at 1 (¶ 6); *In re Lorazepam & Clorazepate

Antitrust Litig.*, No. 99MS276(TFH), 2003 WL 22037741, at *9 (D.D.C. June 16, 2003)

(recognizing for purposes of a fee award that the "caliber of opposing counsel" required "that

counsel for plaintiffs . . . be capable of providing comparable services"). For this case to have

resulted in this outcome—particularly when the Trust's existing liquid assets were depleted and

the remaining asset (the building) was at risk—is an atypical success.

  ***The complexity and duration of the litigation.*** First initiated in April 2017, *see* Dkt. 1,

the considerable duration of this litigation supports a 30% award. The case's reasonable

complexity was a result of a few factors working together: (1) several legal issues on which the

case turned—the existence of a charitable trust, the plaintiffs' "special interest" standing, the

application of Article III's case or controversy requirement to charitable trust litigation—are not

commonly litigated, and this fact pattern was somewhat unusual; (2) a portion of the evidence in

this case was in Chinese, and the plaintiffs do not speak English; and (3) the litigation's factual

context was set in the Chinese human rights movement, and so the litigation was substantially

aided by having counsel that understood the social, legal, and political landscape inside China

and inside the Chinese human rights community. *See* T. Wang Decl. at 5 (¶ 21). These factors

created issues that percolated throughout the litigation. Some examples include whether

deposition testimony could be taken in China and whether deposition testimony taken in China

could be used in a U.S. court, *see, e.g.*, Dkt. 219-1 at 22, whether an expert could with reasonable precision enumerate the class of beneficiaries given the Chinese government's disinterest in publishing information about Chinese dissidents imprisoned for exercising speech rights, *see* Dkt. 184 at 8, and whether the explanations given by Harry Wu and his agents about why he provided such a relatively small amount of Trust funds to Chinese dissidents were legitimate or pretextual. Given the nature of the issues and the duration of the litigation, the attorneys' fee requested is appropriate. *See See Nat'l Veterans Legal Servs. Program v. United States*, 724 F. Supp. 3d 1, 31 (D.D.C. 2024) ("Before reaching a settlement in this unique case, Class Counsel impressively litigated for nearly eight years."); *Blankenship v. Boyle*, 337 F. Supp. 296, 302 (D.D.C. 1972) (awarding fees in a breach of trust case in excess of the lodestar "because of the monetary and equitable benefits obtained and the complex and somewhat novel issues of this case").

     ***The risk of nonpayment.*** The plaintiffs' counsel agreed to represent the plaintiffs on a contingency fee basis. *See* H. Depu Decl. at 3 (¶ 12). The risk of nonpayment in this litigation was high. The risk emanated from several factors. Judge Bates dismissed the litigation early on, a marker of how high the risk of nonpayment was given some of the legal issues involved. *See Depu*, 306 F. Supp. 3d at 185. The plaintiffs are in far-flung places and under constant surveillance by a foreign government, and so their continued participation in the litigation was a growing risk the longer the case went on. *See* T. Wang Decl. at 9 (¶ 36). A central witness in this case (Harry Wu) died the year before the litigation began. *See* T. Wang Decl. at 5 (¶ 19). The LRF and LHRO began pleading poverty during the litigation, and their use of Trust assets to cover their attorneys' fees created a dynamic in which continued litigation was necessary to generate pressure for settlement but simultaneously drained the Trust's resources. *See* T. Wang

Decl. at 5 (¶ 19). No prior cases or government enforcement actions mapped a path for success in this one. All of these factors and more contributed to the high likelihood that the case would result in nonpayment. Importantly, the risk of nonpayment in this case also meant the risk of losing approximately $180,000 in out-of-pocket expenses advanced by the plaintiffs' counsel. *See* T. Wang Decl. at 8 (¶ 32) (chart).

**_The amount of time devoted to the case by the plaintiffs' counsel._** The plaintiffs' attorneys spent 3,302.71 hours litigating this matter over the last eight years.[8] *See* T. Wang Decl. at 6 (¶ 25). The dollar value of the time spent by the plaintiffs' attorneys in litigating this matter (the lodestar) is $2,333,361.52. *Id.* The amount of time was a significant investment, but not disproportionately so given the case's duration, that it had multiple defendants represented by separate counsel (including counsel from major defense firms), that it went up on appeal and was remanded, that there was a trial, two mediation sessions, and that the case made its way all the way through fact discovery, expert discovery, and had a pending fully briefed summary judgment motion as to one defendant and another two pending fully briefed motions to dismiss as to all defendants. *See* T. Wang Decl. at 1–2 (¶ 6).

**_The award in similar cases._** A typical contingency fee is 33%. *See Nat'l Veterans*, 724 F. Supp. 3d at 25–26. This case resembles class action litigation, and courts often award between 20% and 30% in common fund class action fee awards. *Swedish Hosp.*, 1 F.3d at 1271. This is

---

[8] The amount of time incorporated here does not include (1) the amount of time contributed to the litigation by Cohen Milstein Sellers & Toll PLLC, or (2) the amount of time contributed to the litigation after the parties reached a settlement agreement on February 20, 2025. *See* T. Wang Decl. at 6–7 (¶ 29). With respect to the second category, the amount of time plaintiffs' counsel has contributed to the litigation since February 20, 2025—negotiating the settlement agreement, drafting various settlement-related documents, drafting this motion, and communicating with the defendants' counsel, the plaintiffs, and Humanitarian China about settlement mechanics—is at least $73,229.20 (as of April 14), and that does not include the forthcoming hearing and additional work. *See* T. Wang Decl. at 6–7 (¶ 29).

consistent with empirical data collected on class action fee awards. 5 *Newberg and Rubenstein on Class Actions* § 15:83 (6th ed.) ("[G]enerally speaking, the circuits are fairly consistent in that the mean award in each is typically close to 25%."). As discussed above, given the amount of time invested in the litigation and its advanced stage, the risk of nonpayment, the quality of opposing counsel, the duration and complexity of the litigation, and the result achieved, an award of 30% is appropriate and broadly consistent with similar cases. *See In re First Databank Antitrust Litig.*, 209 F. Supp. 2d 96, 101 (D.D.C. 2002) (awarding 30% of $8 million fund attributable to counsel's efforts in antitrust class action); *Lorazepam*, 2003 WL 22037741, at *9 ("Accordingly, because this class action was vigorously litigated for a protracted period of time, raised novel and complex issues, involved a substantial risk of absolute non-payment, and demonstrated the quality of Class Counsel's reputation, an award of 30% of the common fund in attorneys' fees is appropriate.").

### 2.      The lodestar cross-check

Courts sometimes conduct a lodestar cross-check as an added quantitative step for assessing the reasonableness of the percentage of the common fund awarded as attorneys' fees. *See In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 113 (D.D.C. 2013). Conducting the cross-check here confirms that the fee request is reasonable.

The lodestar in this case, calculated using current hourly rates, is $2,333,361.52.[9] The rates used to calculate the lodestar are what the two firms that litigated this case (Farra & Wang

---

[9] Application of current hourly rates is appropriate in this case because of the significant delay in payment of fees and reimbursement of expenses. *See Missouri v. Jenkins by Agyei*, 491 U.S. 274, 283–84 (1989) ("Clearly, compensation received several years after the services were rendered . . . is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings. We agree, therefore, that an appropriate adjustment for delay in payment—whether by the application of current

PLLC and Slarskey LLC) typically charge their fee-paying clients, *see* T. Wang Decl. at 6 (¶ 27),

and they are reasonable: the rates are all in line with (and below) the rates listed for lawyers of

the same experience in one of the fee matrices courts in this district commonly use when

assessing fee-shifting petitions. *See id.* ¶ 28; LSI Laffey Matrix,

http://www.laffeymatrix.com/see.html (date accessed: March 31, 2025) (providing that the rate

for lawyers with 11-19 years of experience is $948 per hour); *Am. Oversight v. U.S. Dep't of

Just.*, 375 F. Supp. 3d 50, 70 (D.D.C. 2019) (Moss, J.) (applying LSI Laffey Matrix in FOIA fee-

shifting context).

The requested fee percentage results in a fee of $1,627,500. When compared to the

lodestar of $2,333,361.52, the requested fee thus results in a "negative multiplier" of 0.7.

Positive multipliers—where the fee award exceeds the lodestar value of counsel's time—from 1

to 3 "are the norm[.]" 5 *Newberg and Rubenstein on Class Actions* § 15:86 (6th ed.). This reflects

the economics and risk associated with contingent litigation: "[a] contingent fee must be higher

than a fee for the same legal services paid as or after they are performed" because "[t]he

contingent fee compensates the lawyer not only for the legal services he renders but for the loan

of those services," and "[t]he implicit interest rate on such a loan is high because the risk of

default (the loss of the case, which cancels the client's debt to the lawyer) is much higher than in

the case of conventional loans, and the total amount of interest is large not only because the

interest rate is high but because the loan may be outstanding for years[.]" *See* 5 *Newberg and

Rubenstein on Class Actions* § 15:87 (6th ed.) (quoting Richard A. Posner, *Economic Analysis of

Law* 783 (8th ed. 2011)).

---

rather than historic hourly rates or otherwise—is within the contemplation of the [civil rights]
statute.").

The presence of a negative multiplier here shows the reasonableness of the requested fee, because it means that the plaintiffs' counsel are taking a considerable discount on the value of their time—they worked many hours for which they will not be compensated, they will receive no compensation for incurring the risk of default or the longevity of nonpayment, and they will ultimately be compensated less than if they had spent the same time litigating on behalf of clients who can afford to pay by the hour. *See In re Nifedipine Antitrust Litig.*, No. 1:02:CV01931, 2011 WL 13392312, at *2 (D.D.C. Jan. 31, 2011) ("[T]he requested 33-1/3% fee award is well within the applicable range of reasonable percentage fund awards, and results in a negative multiplier[.]"); *Schneider v. Chipotle Mexican Grill, Inc.*, 336 F.R.D. 588, 601 (N.D. Cal. 2020) ("[T]his negative multiplier suggests that the fee request is reasonable."); *In re Excess Value Ins. Coverage Litig.*, 598 F. Supp. 2d 380, 388 n. 14 (S.D.N.Y. 2005) ("[T]he fact that any reasonable fee would necessarily represent a negative multiplier of the lodestar supports an award at the higher end of the spectrum.").

### C.    The requested expense reimbursement is appropriate.

The plaintiffs' counsel expended $182,950.77 in out-of-pocket costs in service of the litigation. The bulk of these expenses was experts ($102,560.50) and litigation support vendors (discovery) ($45,028.12). *See* T. Wang Decl. at 8 (¶ 32). With respect to experts, the litigation advanced all the way through expert discovery and expert reports, and the plaintiffs' experts included a forensic accounting expert, a damages expert, a Chinese law and Chinese legal system expert (for issues related to special interest standing), and a rebuttal expert to one of the defendants' liability experts. *See* T. Wang Decl. at 4 (¶ 16). These expenses were necessitated by the defendants' mounting of a comprehensive defense in this litigation, which included (1) retaining a trust liability expert who issued a 59-page report, (2) retaining a forensic accounting and damages expert who issued a 30-page report (plus 220 pages of exhibits), and (3) retaining a

19

Chinese law and Chinese legal system expert who issued a 35-page report (plus 70 pages of exhibits). *See id.* With respect to discovery, the litigation involved approximately 11,000 documents, comprising more than 120,000 pages. *See* T. Wang Decl. at 4 (¶ 15).

The amount of expenses sought for reimbursement equals about 3.3% of the total recovery obtained for the humanitarian purpose. The plaintiffs' counsel often obtained multiple bids from vendors, negotiated discounts with vendors and experts, and carefully monitored the bills to avoid unexpected costs. *See* T. Wang Decl. at 8 (¶ 33). For this litigation, this amount is reasonable. That the plaintiffs' counsel "were willing to expend their own money, as an investment whose reimbursement was entirely contingent on the success of this litigation, is perhaps the best indicator that the expenditures were reasonable and necessary." *Lorazepam*, 2003 WL 22037741, at *10 (awarding $1 million in expenses in an antitrust case that lasted four years); *Nat'l Veterans*, 724 F. Supp. 3d at 30–31 (awarding expense reimbursement of approximately $1.1 million in expenses and settlement administration costs).

## II.    THE COURT SHOULD AWARD EACH PLAINTIFF A SERVICE AWARD.

The six plaintiffs in this case have contributed significant time and effort to this litigation. They have undertaken considerable personal risk in prosecuting it given their status as dissidents in China. And their persistence and work has generated a benefit for all other similarly situated Chinese dissident beneficiaries. They should thus be appropriately compensated for their service to the litigation. The plaintiffs request the following payments, corresponding to each plaintiff's amount of work in prosecuting this litigation:

| Name | Amount Requested |
|---|---|
| He Depu | $55,000 |
| Li Dawei | $50,000 |
| Wang Jinbo | $50,000 |
| Ouyang Yi | $50,000 |
| Xu Yonghai | $50,000 |

| | |
|---|---|
| Xu Wanping | $50,000 |
| **Total** | **$305,000** |

Service or "incentive awards have often been used to compensate a class representative," *Keepseagle v. Perdue*, 856 F.3d 1039, 1056 (D.C. Cir. 2017), and in setting the amount of such an award, courts consider what the plaintiff did to advance the litigation, the degree to which the litigation benefitted from the plaintiffs' actions, and the amount of time and effort the plaintiff expended. *Kifafi*, 999 F. Supp. 2d at 105.

These factors weigh in favor of the requested awards. The initiative that became this litigation began in 2014, when He Depu took the initiative to investigate, collaborate with others, and ultimately retain counsel (which he and the others did from China) to pursue this litigation. *See* H. Depu Decl. at 1–2 (¶¶ 5–9). After the suit was filed, the plaintiffs were in frequent contact with counsel, providing feedback and consultation. *See* T. Wang Decl. at 8–9 (¶ 36). The plaintiffs complied with their not-insignificant discovery obligations, with each preparing heavily for their depositions (three of them were deposed). *Id.* He Depu alone estimates that he spent several hundred hours on the lawsuit. *See* H. Depu Decl. at 3 (¶ 10).

These efforts were critical to successfully maintaining this litigation. Having engaged plaintiffs who could establish special interest standing and Article III standing, who had claims that were not at risk of being deemed stale, who were bona fide dissidents who fell within the Trust's humanitarian purpose beneficiary class, and who were willing to take the personal risk of being targeted by the Chinese government for their involvement in this litigation has been critical to the litigation's success. *See* T. Wang Decl. at 8–9 (¶ 36). These contributions—made over the last ten years, from the pre-complaint investigation to now—are substantial, enduring, and have resulted in success of the litigation for the Trust and its beneficiaries. Under these circumstances, the requested awards are appropriate. *See Cobell v. Salazar*, 679 F.3d 909, 916 and n. 5 (D.C.

Cir. 2012) (affirming class action settlement involving Native American trust litigation, including incentive payments to the four named representatives of between $150,000 and $2 million each); *Kifafi*, 999 F. Supp. 2d at 105 (awarding $50,000 to named plaintiff in ERISA class action when he regularly consulted with counsel, procured documents, was deposed, and persisted in the litigation for more than 13 years of litigation); *Meijer, Inc. v. Barr Pharms., Inc.*, No. CV 05-2195 (CKK), 2009 WL 10744520, at *5 (D.D.C. Apr. 20, 2009) (awarding $50,000 to each of the five class representatives in an antitrust class action); *Jones v. Chopra*, No. CV 18-2132 (BAH), 2023 WL 6037295, at *7 (D.D.C. Sept. 15, 2023) (preliminarily approving class settlement awarding $50,000 service award to each plaintiff in employment class action). Moreover, given that the Trust's humanitarian purpose is to provide direct financial assistance to Chinese dissidents, the service awards made to these Chinese dissident plaintiffs effectuate that purpose.

## CONCLUSION

The plaintiffs' motion should be granted.

Date:  April 15, 2025                                  Respectfully submitted,

                                                               **FARRA & WANG PLLC**

                                                               / s / Times Wang
                                                               Times Wang (D.C. Bar 1025389)
                                                               1543 Champa St., Ste. 400
                                                               Denver, CO 80202
                                                               Telephone: (202) 505-6227
                                                               twang@farrawang.com

                                                               Adam H. Farra (D.C. Bar 1028649)
                                                               1300 I Street, N.W., Ste. 400E
                                                               Washington, D.C. 20005
                                                               Telephone: (202) 505-5990
                                                               afarra@farrawang.com

                                                               **SLARSKEY LLC**

                                                               David Slarskey (admitted pro hac vice)

Evan Fried (admitted pro hac vice)
420 Lexington Ave., Suite 2525
New York, NY 10170
Telephone: (212) 658-0661
dslarskey@slarskey.com
efried@slarskey.com

*Counsel for Plaintiffs*